## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SELF-HELP CREDIT UNION, as
successor in interest to WINSTON-SALEM
FEDERAL CREDIT UNION,

        Plaintiffs,

v.

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC. and
FISERV, INC.,

        Defendants.

Case No. 1:25-cv-01112-TDS-LPA

### DEFENDANTS' PRELIMINARY RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ALTERNATIVE REQUEST FOR A BRIEFING SCHEDULE

Defendants Fiserv Solutions, LLC and Fiserv, Inc. (collectively "Fiserv"[1] or "defendants"), by their undersigned counsel, oppose Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery ("TRO Motion") and respectfully request that it be summarily denied without further filings, or, in the alternative, that the Court consider the matter in due course in accordance with the submission requirements of the Local Rules or such other briefing schedule as the Court deems proper.

---

[1] Fiserv, Inc., the parent company of Fiserv Solutions, LLC, has no contractual relationship with the plaintiff. Fiserv, Inc. is not a proper defendant in this action and reserves all rights to seek appropriate relief dismissing it from this case.

1

## NATURE OF THE MATTER BEFORE THE COURT

Plaintiff invokes a manufactured "crisis" to seek a TRO that would change the parties' contract following three years of performance during which there were no assertions of security concerns and when, in fact, there is no legitimate emergency. The TRO Motion should be denied because **(a)** a temporary restraining order may not compel the affirmative and mandatory relief that plaintiff seeks as a matter of well-established law; and **(b)** there are no "emergency" or exigent circumstances here requiring a temporary restraining order. As the chronology below demonstrates, plaintiff initially threatened the TRO Motion on November 24, 2025, demanding a response one business day later (which was two days before the Thanksgiving holiday). Despite the threat to file that holiday weekend, plaintiff did not do so. Instead, plaintiff filed this action a week later (on December 4) and did not serve Fiserv until December 9, 2025.

Other than service (which occurred by overnight delivery), two weeks passed after plaintiff filed this action without a word from plaintiff or its counsel about a TRO or anything else relating to this action. Then, last night, defendants' counsel received an email "notice" that plaintiff intended to seek a TRO (though nothing was attached to that email). Without any meaningful attempt at resolution, plaintiff filed the TRO Motion very late in the evening. Defendants' counsel received copies by email at 1:08 a.m. Eastern time on December 19, 2025. As the magnitude (six declarations, some signed a week or more ago) and chronology of the filing make clear, plaintiff has been planning this for some time and chose to file it after hours just a few business days before Christmas Eve and the ensuing holidays (so plaintiff has now disrupted two successive holidays for defendants,

2

Case 1:25-cv-01112-TDS-LPA    Document 23    Filed 12/19/25    Page 2 of 21

defendants' counsel and their families). The obvious and unfortunate objective is to deprive Fiserv of a meaningful opportunity to respond and to leverage financial concessions from Fiserv about contractual issues unrelated to "security" issues, the putative subject of the TRO Motion.

As a result of this orchestrated timing, Fiserv's initial response is necessarily brief. Given plaintiff's tactics and lack of exigency, if the Court declines to summarily deny the TRO Motion, Fiserv alternatively requests that the Court allow Fiserv until **January 16, 2026,** to file its response in opposition to the TRO Motion.

## CONCISE STATEMENT OF THE FACTS AND CIRCUMSTANCES UNDERMINING EMERGENCY RELIEF

1.     Fiserv is one of the nation's leading financial technology companies and provides various account processing services and products to clients across the financial services sector, including banks, credit unions, and other financial institutions. (Declaration of Doug Donofrio ("Donofrio Decl."), ECF Doc. No. 24, ¶ 2.) Fiserv Solutions and Winston-Salem Federal Credit Union ("Winston-Salem") have been parties to a Master Agreement since 2014, and, pursuant to that agreement, Fiserv Solutions has, since May 2022, provided the products at issue in this action to Winston-Salem. (*Id.* ¶ 4.) With minor variation, Fiserv has provided the same account processing and related products and services to Winston-Salem for *more than three years* without significant incident or complaint. (*Id.* ¶¶ 6-7.) The Master Agreement expires in 2030. (*Id.* ¶ 5.)

2.     In January 2025, Self-Help Credit Union ("Self-Help") acquired Winston Salem. (Donofrio Decl. ¶ 9.) After the acquisition, in October 2025, Self-Help's

3

CEO contacted Fiserv to request early termination of the Master Agreement so that Winston-Salem could transition to another provider of account processing services and products. (*Id*. ¶ 10). In that conversation, Self-Help's CEO requested that Fiserv reduce or waive Winston-Salem's obligation to pay early termination fees and repay certain credits. (*Id*.) Fiserv did not agree to do so. (*Id*.)

3.      On November 24, 2025, out of the blue, Self-Help (as successor to Winston-Salem) sent a demand letter asserting that various Fiserv products have fundamental security deficiencies that put plaintiff's member data at risk. The demand letter did not assert that any data breach, security incident or other precipitating event creating an "emergency" has occurred. (The TRO Motion does not either.) None did. Nonetheless, plaintiff demanded that Fiserv consent to a nebulous "injunction" (the terms of which are not described in the demand letter) by November 25, 2025, one business day later (and two days before Thanksgiving), or plaintiff would sue and seek emergency injunctive relief.

4.      Fiserv responded by letter to plaintiff's counsel on November 25, 2025, explaining, among other things, that: (a) there has been no change in the parties' status quo, (b) plaintiff's request for mandatory relief – that would itself alter the status quo – cannot be obtained through a TRO as a matter of law, making the promised motion frivolous, and (c) the presented facts were (and remain) wholly lacking in any "emergency" or exigent circumstances that would necessitate burdening this Court or the opposing party with expedited TRO proceedings over the Thanksgiving holiday. (Declaration of Andrew J. Wronski ("Wronski Decl."), ECF Doc. No. 24, ¶ 2, Ex. A.)

4

5.     On November 26, 2025, plaintiff's counsel sent a perfunctory letter rife with inaccuracies that remarkably asserted that Fiserv had "conceded" the alleged security deficiencies and refused to "resolve" this matter via an undefined "consent injunction." Fiserv responded by letter that same day, correcting the record and reiterating its willingness to discuss the plaintiff's alleged security concerns in lieu of unnecessary motion practice over the Thanksgiving holiday. (Wronski Decl. ¶ 3, Ex. B.)

6.     Plaintiff did not respond to this letter or accept Fiserv's invitation to discuss the alleged security issues. Plaintiff did not file the TRO Motion over the Thanksgiving holiday (though it never communicated that it would not, creating unnecessary uncertainty and inconvenience for Fiserv, its counsel, and their families over the holiday).

7.     Without further communication on the matter, plaintiff filed suit, but did not seek a TRO, on December 4, 2025. Defendants learned of the complaint through a docketing service; neither plaintiff nor its counsel said anything about the filing. Defendants were served (by overnight delivery) on December 9, 2025, making their response deadline December 30, 2025. Defendants maintain that plaintiff's claims fail as a matter of law and intend to file a motion to dismiss the action pursuant to Federal Rule of Civil Procedure on or before that date.

8.     Since December 4 (other than service), defendants heard nothing from the plaintiff about this action or a "TRO." Yesterday evening, two full weeks after filing the complaint, plaintiff's counsel sent defendants' counsel an email "notice" that plaintiff intended to seek a TRO and a preliminary injunction. (Wronski Decl. ¶ 4, Ex. C.) The

email did not attach a copy of the motion or anything else and did not indicate the basis for that relief or invite any discussion about the matter. Late in the evening, plaintiff filed its TRO Motion; defendants' counsel received courtesy copies by email at 1:08 a.m. this morning (December 19).

9.  In support of the TRO Motion, plaintiff filed a 23-page brief and *six* declarations, including an 8-page declaration from John Jameson, plaintiff's manager, a 17-page, single-spaced declaration from Brendan Mulvey, who is offered as an "expert," a declaration of plaintiff's counsel with voluminous exhibits, and three declarations from representatives of other credit unions (two signed a week or more ago) that have nothing to do with Self-Help or Winston-Salem.

10.  Plaintiff seeks a mandatory injunction compelling Fiserv to "take other appropriate steps to strengthen security" and expedited discovery of an undefined nature. Plaintiff did not submit a proposed form of order for a TRO, so it remains unclear exactly what plaintiff wants, but it is clear that plaintiff wants to alter the status quo and change the parties' contractual obligations.

11.  Despite the significant time between plaintiff's TRO request and both plaintiff's original November 24 threat to move for a TRO and the December 4 filing of the Complaint, plaintiff neither sought to confer about the TRO motion before filing, nor took the time to prepare a thoughtful proposed order regarding the relief it seeks. Federal Rule of Civil Procedure 65(b)(1) limits the circumstances under which a TRO should be issued without notice, and subsection 65(b)(1)(B) anticipates meaningful efforts to provide notice to an opposing party. The local practice is to meaningfully confer about a motion

for TRO before its filing to avoid burdening the Court with unnecessary motion practice. If the Court must be burdened with TRO proceedings, Local Civil Rules 5.3(d)(3) and (f)(3) contemplate a helpful proposed order to guide the Court and the opposition. Plaintiff's failure to comply with local practice is telling: The motion, which presents no true urgency, is an effort to create pressure near the holidays, not a real emergency in need of quick action.

12.     Pursuant to Local Rule 7.3(e), Fiserv has not had sufficient time to prepare and submit materials needed for a complete and fulsome response.  As plaintiff appears to have timed the TRO Motion to prejudice defendants' opportunity to respond meaningfully, particularly given the impending holidays and the known and anticipated holiday and vacation schedules of defendants and their counsel, defendants request that the Court deny the TRO summarily and set an appropriate schedule to address the remaining issues raised in the TRO Motion.

## STATEMENT OF THE QUESTIONS PRESENTED

1.     Whether the motion for a TRO should be summarily denied without further submissions or proceedings, because the TRO Motion, on its face, seeks mandatory relief that would alter the parties' years-long status quo, rather than preserve the status quo?

2.     Whether, in the alternative, the motion for a TRO should be denied, or Fiserv permitted to submit a fully-developed opposition in accordance with the schedule set by the Court, because the facts presented by plaintiff, including its years-long delay in seeking relief for any alleged "security deficiencies," fail to establish an emergency or

7

exigent circumstances or show that immediate injury, loss or damage will result to plaintiff before Fiserv can be heard, as required by Federal Rule of Civil Procedure 65(b)(1)?

## PRELIMINARY ARGUMENTS WHY THE COURT SHOULD SUMMARILY DENY THE TRO MOTION

1. The TRO Motion must be denied unless plaintiff meets the heavy burden of "clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant" before Fiserv can be heard fully in opposition. Fed. R. Civ. P. 65(b)(1). Application of this standard should lead ineluctably to the denial of the TRO Motion without further proceedings.

2. Fiserv denies plaintiff's allegations of so-called "security deficiencies" or that Fiserv has breached the Master Agreement in any way. Given the substance and volume of plaintiff's submission (including the declaration of a proffered technical expert) and the fact that the data security and other technical issues raised by the TRO Motion require the attention, input, and likely declarations of Fiserv's subject matter experts, which cannot fairly be accomplished today or over the holidays, Fiserv will not address the technical merits here. If the Court requires more information with respect to the technical issues before rendering a decision, Fiserv requests that it be permitted to file a full-fledged opposition on January 16, 2025.

3. The Court need not, however, reach these issues to deny the TRO Motion. That motion leaves no doubt that plaintiff seeks mandatory relief that would change the parties' years-long status quo. Plaintiff wants this Court to compel Fiserv to provide services that are different from those it has provided to plaintiff for more than three

8

years (without any claimed data breach or other security incident). Plaintiff wants the Court to force Fiserv to "enable compliant MFA and take other appropriate steps to strengthen . . . security." Putting aside that such vague requests could not form the basis of an enforceable TRO, plaintiff wants Fiserv to implement different MFA and security features than those it has provided to plaintiff for more than three years. (And Fiserv denies that these products do not fully comply with the Master Agreement.)

4. Such requests to alter the status quo through a mandatory injunction run contrary to well-established precedent. "The Supreme Court has long held that, 'under federal law [TROs] should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm[.]'" *Shepheard v. Huttonsville Corr. Ctr.*, No. 3:22-CV-55 (GROH), 2022 WL 22877305, at *6 (N.D.W. Va. Dec. 19, 2022) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974)); *see also Hoescht Diafoil Co v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (stating that the purpose of a temporary restraining order is to "preserve the status quo only until a preliminary injunction hearing can be held"); *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 466 (D.S.C. 2020) ("It is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedial process not favored by the courts.").

5. Even at the preliminary injunction stage, relief that changes the status quo, as plaintiff demands here, is disfavored and appropriate only in "the most extraordinary circumstances." *See, e.g., 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto*

9

*Racing, LLC,* 139 F.4th 404, 408 (4th Cir. 2025) (internal quotations and citation omitted); *see also Brown v. Levels*, No. 5:19-CV-01539-RMG, 2019 WL 5304201, at *2 (D.S.C. Oct. 21, 2019) (denying TRO where plaintiff failed to "demonstrate exigent circumstances" that would justify "changing the status quo before the parties ha[d] an opportunity to litigate th[e] case"). Such mandatory injunctive relief is permissible only "when the exigencies of the situation demand such relief" and the relief is "necessary both to protect against irreparable harm in a deteriorating circumstance *created by the defendant* and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Stephenson v. United States Dep't of Educ./Nelnet*, No. 1:17CV262, 2018 WL 1585671, at *5 (M.D.N.C. Mar. 28, 2018) (emphasis in original) (internal quotations and citations omitted). No such circumstances exist here, and the requested TRO should be denied as a result.

6.     The Court should also deny the motion for a TRO because there has been no change in the status quo. There has been no emergency, and there are no exigent circumstances here. To the contrary, plaintiff has delayed, inordinately and intentionally, in seeking a TRO in a manner that belies any credible claim that plaintiff will suffer irreparable injury absent an immediate TRO. Indeed, plaintiff's approach to this dispute flatly contradicts its claim that any urgent or emergency circumstances exist. Specifically:

7.     Plaintiff has been using the products subject to the Master Agreement since ***May 2022*** and has been well aware of the security protocols that these products have and do not have. (Donofrio Decl. ¶ 4.) (In fact, Fiserv recently proposed providing plaintiff additional security features for Fiserv's online and mobile banking products, but plaintiff rejected that proposal given its anticipated merger with Self-Help and plan to terminate the

10

Master Agreement and find a new account processing vendor.) Nothing in the TRO Motion or plaintiff's declarations points to any precipitating incident or event with any Fiserv product that suddenly made plaintiff aware of alleged security issues. The current versions of these products have been the parties' "status quo" for years. Nothing is "new" here.

8. The only thing "new" is that, in or around January 2025, Self-Help acquired Winston-Salem through a merger. Self-Help has made clear its intent to terminate the Master Agreement and obtain account processing services from a vendor other than Fiserv. The Master Agreement does not expire until 2030, but it permits termination for convenience upon payment of certain early termination fees and repayment of certain credits Fiserv provided to Winston-Salem in consideration of the Master Agreement. (Donofrio Decl. ¶¶ 4-5.) Such fees exceed $1.2 million, and Self-Help does not want to pay them.

9. That is not supposition. Plaintiff has informed Fiserv of its decision to transition to a new vendor (a process known as deconversion) in or around May 2026. (Donofrio Decl. ¶ 13.) And in October, Self-Help contacted Fiserv and demanded that Fiserv reduce or waive the termination fees and other deconversion charges required by the Master Agreement. (*Id.* ¶¶ 10-11.) At no point during these communications did Self-Help mention any alleged security issues or deficiencies. (*Id.* ¶ 12.) When Fiserv declined to reduce the contractually required fees, Self-Help's representative responded that it needed to transition to another vendor as soon as possible and so would sign a deconversion agreement, pay the requisite fees, and then sue Fiserv later to recoup them (though there is no legal basis for that either). (*Id.* ¶ 11.) This is that lawsuit and what plaintiff really means

11

when the TRO Motion requests that defendants be enjoined "from possessing Self-Help's data after cooperating with Self-Help in removing its data off of Fiserv's systems." Stated more transparently, plaintiff wants the Court to force Fiserv to permit plaintiff to deconvert and move its data to a new vendor without paying the fees and charges plaintiff agreed to pay in the parties' Master Agreement – it wants the Court to change the parties' contract.

10. In addition, plaintiff's counsel at least twice inquired (on November 12 and November 14) whether Fiserv would agree to a tolling agreement with respect to "Self Help's claims." Plaintiff's counsel never identified what those claims might be or the credit union(s) to which they might relate. It is now apparent, however, that plaintiff's counsel had in mind the very claims asserted in this action. Apparently, plaintiff was content to wait more than a month to assert claims that now, for unexplained reasons, it contends demand emergency expedited relief.

11. Notably, the Master Agreement imposes a mandatory dispute resolution process that the parties must exhaust before either may file suit. Despite this mandatory provision, no representative of either Self-Help or Winston-Salem ever expressed concerns about the security of the Fiserv products provided under the Master Agreement. (Donofrio Decl. ¶¶ 6-8.) The November 24, 2025, demand letter was the first time plaintiff raised a "security" issue. The demand letter did not invite a business or technical discussion about these purported issues or how to resolve them. Instead, it announced that Fiserv was in material breach, that the breach could not be cured, that plaintiff intended to terminate the Master Agreement, and that plaintiff would seek emergency injunctive relief if Fiserv did not agree to an undefined "consent injunction"

12

complying with all of plaintiff's "demands" by the very next day. That threat (and the TRO Motion) is how plaintiff's counsel avoids the parties' dispute resolution process, which has a narrow exception allowing a party to seek injunctive relief. Plaintiff has not complied with, or even attempted to comply with, its mandatory dispute resolution obligations.

12. Fiserv responded to the demand letter on November 25, explaining that there were no legal or factual bases for a TRO or other injunctive relief and offering to work cooperatively with Self-Help on deconversion. (Wronski Decl. ¶ 2, Ex. A.) Plaintiff's counsel rejected that overture and continued to threaten and insinuate that a motion for a TRO was imminent. (Wronski Decl. ¶ 3, Ex. B.)

13. Thanksgiving came and went, however. Plaintiff made no effort to discuss or resolve the issues in its demand letter and went radio silent. What is now obvious is that plaintiff spent the last three weeks (or more) preparing its "emergency" TRO Motion.

14. Plaintiff filed this action on December 4, 2025 – two weeks ago. Defendants learned about the action through a docketing service (not from plaintiff) and were later served (by overnight mail) on December 9, 2025. The chronology would certainly suggest that plaintiff timed filing and service so that defendants' response to the claim would have to be prepared over the holidays and due right before New Year's Eve. After all, plaintiff said on November 24 that it was ready to file imminently if Fiserv did not accede to its demands by November 25.

15. Defendants had no further outreach from plaintiff or its counsel about this action until yesterday evening when defendants' counsel received an email "notice" that plaintiff intended to seek a TRO and other injunctive relief. (Wronski Decl. ¶ 4, Ex.

13

C.)  That email did not contain a copy of the motion or any other papers.  Plaintiff filed its motion late in the evening and first provided a courtesy copy to defendants' counsel at 1:08 a.m. (Eastern time) on December 19, 2025.  That filing occurred more than three weeks after plaintiff's demand letter threatened an imminent motion for a TRO.

16.     The TRO Motion and supporting materials are voluminous.  The brief is 23 pages long.  Plaintiff submitted six declarations, including a 17-page, single-spaced declaration from a purported "expert" whose report does not disclose when he was retained but whose work on this matter, based on the length and content of his declaration and the tasks described therein, must have begun some time ago.  One of the declarations (from Ms. Miller) was signed on December 10.  Another (from Mr. Stone) was signed on December 12.  Plaintiff obviously has been planning this for some time.

17.     There are no exigent or emergency circumstances here.  This is not a real "TRO" case in which a sudden and unexpected event occurs that imminently threatens serious and irreparable injury to a party, leaving it with no option but to seek an emergency TRO and limit the opponent's time to respond.  Rather, it appears that plaintiff has been preparing for some time to ambush Fiserv with a full-blown submission, akin to a motion for a preliminary injunction, not an emergency TRO, with the goal of depriving Fiserv of a fair and meaningful opportunity to respond.  Plaintiff's ultimate goal is to pressure Fiserv into cutting a deal on early termination and other deconversion fees.  This case has nothing to do with "data security" – plaintiff has already decided to change vendors and transition

14

from Fiserv's products in just months. The "TRO" is not about an emergency or irreparable harm – it is a blunt instrument of "negotiation."[2]

18. The Court should summarily deny any request for a TRO and, if plaintiff desires to move forward with a preliminary injunction motion, set an appropriate schedule. That is precisely what Judge Oliver in the District of Connecticut did earlier this year when plaintiff's counsel used this same playbook to sue Fiserv and seek a TRO despite a long and uneventful relationship between Fiserv and the credit union, Cencap (which was also acquired by a Self-Help entity.) As here, plaintiff's counsel sent a strikingly similar demand letter[3] that complained of "security deficiencies" for the very first time, followed by a complaint and a full-blown motion for a TRO supported by multiple declarations. *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, 3:25-cv-00913-VDO.[4]

---

[2] This is not speculation. Plaintiff's counsel (though no longer with the Barclay Damon firm) makes no secret about his approach and lauded this strategy in an article he wrote for the Credit Union Times, describing another credit union client who "[f]aced with steep early termination fees from [Fiserv], . . . didn't simply write a check. Instead, [counsel] rolled up his sleeves and delved into the cybersecurity record of [Fiserv]. After uncovering cybersecurity problems, his credit union negotiated an exit from the [Fiserv] contract without any early termination fees." (https://www.barclaydamon.com/webfiles/Credit%20Union%20Times%20-%20Charles%20Nerko%20and%20Brian%20Rich%20-%2010%2020%2023%20-%20WITH%20REPRINT%20PERMISSION.pdf (accessed December 19, 2025 at 2:33 p.m. CST).)

[3] Since May, Fiserv has received 22 such demand letters from the same counsel who represents plaintiff here. Notably, defendants received a demand letter from FiCare Federal Credit Union (where Ms. Miller is employed) on July 3, 2025, and a demand letter from University of Louisiana Credit Union (where Ms. Kidder is employed) on September 19, 2025. Obviously, many months have passed, but neither FiCare nor University of Louisiana has followed through on the threat to sue and seek an injunction (a threat repeated for emphasis and presumably media consumption in the declarations of Ms. Miller and Ms. Kidder.) While the time in which counsel demands a response varies (although always short) and the Fiserv products differ, these letters are otherwise substantively identical and always threaten expedited injunctive relief. Plaintiff's counsel has filed such a motion only in Cencap (where he lost) and this case.

[4] Plaintiff's counsel was eager to disseminate news of this suit, posting publicly on LinkedIn the same day the TRO motion was filed, announcing that he filed this lawsuit, proclaiming that this action is "a groundbreaking data security lawsuit," and claiming that his representation of Cencap in this matter is "shap[ing] the legal landscape in this evolving area." (https://www.linkedin.com/posts/charlesnerko_payment-co-faces-claims-for-shockingly-activity-7336801342310535170-bVj8 (accessed December 19, 2025 at 2:37 p.m. CST).) Something similar appears to have occurred here, as the Credit Union Times ran a story about this lawsuit (with a quote from plaintiff's counsel) at 8:44 a.m. on December 5, 2025, the day after this case was filed. https://www.cutoday.info/Fresh-Today/Self-Help-Credit-

19.    Judge Oliver first denied Cencap's request for *ex parte* relief and granted Fiserv's request for a full and fair opportunity to respond to Cencap's TRO motion, noting the obvious absence of any irreparable harm given the parties' long relationship and Cencap's inordinate delay in seeking relief:

> A court may issue a temporary restraining order without notifying "the adverse party or its attorney only if (A) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certified in writing any efforts to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). These requirements are stringent and must be scrupulously honored. *Fed. Trade Comm'n v. Grand Teton Pros., LLC*, No. 3:19-CV-933 (VAB), 2019 WL 4439501, at *2 (D. Conn. June 18, 2019). Here Plaintiff has failed to comply with the stringent requirements of Rule 65. The record does not contain specific facts clearly showing that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition. ***Considering that Plaintiff has been using Defendants' product since 2016, there has not been unexpected event that imminently threatens irreparable injury before Defendants can be heard in opposition.***

*Id.* at Dkt. 19 (emphasis added).

20.    After providing Fiserv with time to respond, considering the parties' written submissions, and conducting a lengthy hearing, Judge Oliver definitively denied Cencap's motion for a TRO, concluding that Cencap had not made the necessary strong showing of irreparable harm given its delay in filing suit and seeking relief: "Here, the record is insufficiently developed as to irreparable harm. . . . Even if there was a

---

Union-Sues-Fiserv-Alleging-Misrepresentations-About-Data-Security (accessed December 19, 2025 at 2:53 p.m. CST).

presumption of irreparable harm here with respect to the purported confidential information of Cencap's customers, that presumption is rebutted by Plaintiff's delay in bringing suit. . . . Therefore, because the presumption of irreparable harm associated with the alleged breach of the master agreement is rebutted by the years-long unexplained delay in bringing suit, the Court denies the request for a temporary restraining order."[5] *Id.* at Dkt. 56.

21.     There is no legal or factual basis for a temporary restraining order here either.  A TRO is an extraordinary remedy that should be granted sparingly. *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir.1991)) (TROs are "extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances"); *see also Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc.*, No. 1:06CV191, 2006 WL 2443521, at *1 (W.D.N.C. Aug. 21, 2006) ("A temporary restraining order is an extraordinary remedy which is to be used sparingly."). It is not a negotiating tool.  As in *Cencap*, the Court should deny that relief.

22.     Should the Court decide to consider the motion further, Fiserv should be given a fair and reasonable opportunity to respond.  In that event, Fiserv requests that the Court enter a briefing schedule permitting Fiserv to file its opposition papers not later than January 16, 2026, and thereafter schedule argument should the Court consider it helpful.

---

[5] Judge Oliver denied the motion without prejudice to Cencap's ability to file a motion for a preliminary injunction after a period of limited discovery.  Cencap has not filed such a motion, and the case is currently stayed.

23.     Fiserv requests this response date in good faith to address the chronology of this action and the practical reality of the holiday season.  Defendants' Associate General Counsel and Global Head of Litigation, David Frank, is currently on vacation and out of the country until December 26.  Mr. Donofrio, Senior Vice President and Head of Credit Union Solutions at Fiserv Solutions, LLC, will be out on vacation all of next week.  Key members of defendants' outside litigation team also have vacations scheduled.  Mr. Wronski and Mr. House are scheduled to be traveling and on vacation from December 26 through January 2. Mr. Patterson will be traveling to see family from December 24 through December 26, and Mr.  Byam-Katzman will be traveling to see family from December 25 through December 27.  Mr. Dowdy and the remainder of Foley & Lardner's team, of course, have planned time off to spend with family and friends around the Christmas and New Year's holidays as well.  In addition, the issues raised by the TRO Motion will require review, analysis, and perhaps declarations from various, technical subject matter experts at Fiserv.  As a practical matter, it will be very challenging to identify, reach, and secure meaningful time from those experts until after the holidays.

24.     For these reasons, defendants respectfully request that they have a two-week period (from January 2, 2026) to prepare and submit their comprehensive response.  It was, after all, plaintiff's choice to wait to file the TRO Motion, and there is obviously no emergency here.  Fiserv seeks only a full and fair opportunity – reasonably comparable to that plaintiff has had – to present its position before the Court considers whether to grant the extraordinary injunctive relief that plaintiff requests.  In light of the

time plaintiff itself took to plan, prepare and advance its TRO Motion, plaintiff cannot now contend that Fiserv's request will cause prejudice.

## **CONCLUSION**

Plaintiff fails to present a legitimate request for a TRO. Fiserv therefore respectfully requests that the Court summarily deny the TRO Motion, without further filings or proceedings, or, in the alternative, that the Court consider the matter in due course in accordance with the submission requirements of the Local Rules or such other briefing schedule as the Court deems proper. Further, Fiserv requests such other and further relief as the Court deems just and appropriate.

Respectfully submitted on December 19, 2025

**FOLEY & LARDNER LLP**

*/s/ Joseph S. Dowdy*
Joseph S. Dowdy
N.C. State Bar No. 31941
5000 Centregreen Way, Suite 500
Cary, NC 27513
Phone: (984) 375-3033
Email: joe.dowdy@foley.com

*Counsel for Defendants Fiserv*
*Solutions, LLC and Fiserv, Inc.*

**OF COUNSEL**
Andrew J. Wronski
Bryan B. House
Timothy J. Patterson
Jesse Byam-Katzman
FOLEY & LARDNER LLP
777 E. Wisconsin Avenue
Milwaukee, WI 53202
Phone: (414) 271-2400

19

## <u>CERTIFICATE OF WORD COUNT</u>

   The undersigned hereby certifies that the word count of the body, headings and footnotes for the foregoing document complies with in accordance with Local Civil Rule 7.3(d)(1) and does not exceed 6,250 words.  The undersigned attorney prepared the brief using Microsoft Word which reports the word count as 5,244.

*/s/ Joseph S. Dowdy*
Joseph S. Dowdy
N.C. State Bar 31941
Foley & Lardner LLP

## CERTIFICATE OF SERVICE

I hereby certify that I filed a copy of the foregoing document with the Clerk of Court using the CM/ECF System, which will automatically serve notice of such filing to all registered PACER users in the case; I also served a copy of the foregoing document by email sent to the following recipients:

Charles Nerko (cnerko@nerko.com)
Nerko PLLC
1178 Broadway, 3rd Floor
New York, NY 10001

Mark S Pincus (mark@gardnerskelton.com)
Gardner Skelton PLLC
3746 N. Davidson Street
Charlotte, NC 28205*

Respectfully submitted on December 19, 2025

/s/ Joseph S. Dowdy
Joseph S. Dowdy
N.C. State Bar 31941
Foley & Lardner LLP