**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

SELF-HELP CREDIT UNION, as successor in interest
to WINSTON-SALEM FEDERAL CREDIT UNION,

<em>Plaintiff,</em>

-against-

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC., and
FISERV, INC.,

<em>Defendants.</em>

Case No.: 1:25-cv-01112-TDS-LPA

## AMENDED COMPLAINT AND JURY TRIAL DEMAND

Represented by NERKO PLLC and GARDNER SKELTON PLLC, plaintiff Self-Help Credit Union, as successor in interest to Winston-Salem Federal Credit Union ("**Self-Help**"), alleges as follows against defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively, "**Fiserv**"):

### Preliminary Statement

1.      Self-Help is a not-for-profit credit union. Fiserv, one of the world's largest providers of outsourced technology to financial institutions, sold itself to Self-Help as a trusted custodian of the most sensitive data a financial institution can hold: consumers' transaction histories, account numbers, and personal information. Under its Master Agreement, Fiserv pledged to protect that data with the same high-tech safeguards it uses for its own information and in full compliance with federal standards.

2.      But the reality was starkly different. Fiserv sold and operated systems that were so insecure that no regulated financial institution should have been asked to run its confidential data through them. Fiserv's systems lack basic security controls. They easily expose consumer data.

And Fiserv kept selling them—while falsely assuring Self-Help and its other financial institution customers that everything was secure.

3.      For its own corporate data, Fiserv uses layered, possession-based multi-factor authentication (MFA), token generators, and biometric controls. For Self-Help's data, however, Fiserv withheld those protections. On at least one system housing Self-Help's data, Fiserv had no MFA at all. On others, Fiserv substituted MFA with an "email passcode challenge"—a method of security that is so weak and susceptible to hacking that federal standards ban its use.

4.      Self-Help cannot fix these security problems on its own because Fiserv controls the systems housing Self-Help's data. While Fiserv's systems remain inadequately secured, Self-Help's members remain exposed to harms such as identity theft, account takeover fraud, and other forms of abuse.

5.      Then comes the squeeze. When Self-Help seeks to leave and transfer its data to a safer provider, Fiserv demands a seven-figure "early termination" and deconversion payment as the price of release. Fiserv's ultimatum is simple: pay the ransom, or keep your data exposed on systems Fiserv refuses to adequately secure.

6.      This is Fiserv's business model. According to *The Wall Street Journal,* Fiserv's misconduct is part of a pattern of victimizing financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate and silence its customers from disclosing to other affected customers when there are security problems, and holding customers' data hostage when those customers

2

seek to go to competitors. This gambit has fattened Fiserv's profits but exploited financial institutions and the customers they serve. *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal,* April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000. **Exhibit 1** is a true and correct copy of *The Wall Street Journal* article.

7.     Self-Help brings this action to recover payments for deficient services and to obtain declaratory and equitable relief that blocks Fiserv's improper exit charges and protects Self-Help's members.

## Parties

8.     Plaintiff Self-Help Credit Union is a not-for-profit credit union chartered under North Carolina law and is a citizen of North Carolina. Self-Help merged with Winston-Salem Federal Credit Union in 2025. Self-Help has a principal place of business at 301 West Main Street, Durham, NC 27701.

9.     Upon information and belief, defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc.

10.     Upon information and belief, defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

## Jurisdiction & Venue

11.     This Court has original subject-matter jurisdiction over Self-Help's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over Self-Help's state-law

3

claims 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court also has subject-matter jurisdiction over Self-Help's claims under 28 U.S.C. § 1332 (diversity) because there is complete diversity of citizenship among the parties because Self-Help is a citizen of a different state than either defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

14.     This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction.

**Factual Background**

15.     Self-Help is a not-for-profit cooperative owned by individual consumers, who pool their resources to provide credit to one another. Self-Help offers a range of financial services including savings accounts, checking accounts, loans, and online banking. Self-Help was chartered in 1983 to build a network of branches that partner with working families and communities often underserved by the financial marketplace. With over $2.09 billion in assets and serving more than 105,000 members in 36 branches, Self-Help is one of the fastest-growing community development financial institutions in the country.

16.     Self-Help is part of the Self-Help family of nonprofit organizations whose collective mission is to create and protect ownership and economic opportunity for all. For over 40 years, the Center for Community Self-Help and its affiliates have provided more than $12

4

billion in financing to help more than 174,000 borrowers buy homes, start and grow businesses, and strengthen community resources.

17.     Fiserv is among the largest technology vendors to credit unions and banks. It claims approximately 10,000 financial institution clients and provides technology to more than one in three U.S. financial institutions.

18.     Winston-Salem Federal Credit Union, a credit union acquired through a merger with Self-Help in 2025, contracted with Fiserv to provide technology services under a Master Agreement dated June 5, 2014. **Exhibit 2** is a true and correct copy of the Master Agreement, as amended.

19.     In 2014, the Master Agreement covered only discrete services. After its execution, Fiserv sought to expand its relationship with Winston-Salem Federal Credit Union by urging the credit union to adopt Fiserv as its "core" technology provider—responsible for operating mission-critical systems, including the credit union's account processing system and online banking platform.  An account processing system is the "brains" behind a financial institution, processing and recording all transactions for the financial institution.

20.     Before agreeing to expand Fiserv's role in this manner, John Jameson, then Chief Executive Officer of Winston-Salem Federal Credit Union, specifically requested information concerning the security measures Fiserv deployed to safeguard its financial systems.

21.     In response to Mr. Jameson's inquiries, on November 12, 2020, Natalie Krueger of Fiserv transmitted to Mr. Jameson an email attaching documents entitled "Portico Regulatory and BCP Documents."

22.     Among the documents Ms. Krueger provided to Mr. Jameson on November 12, 2020 was Fiserv's *Enterprise Risk Management, Security and Privacy Program Overview* (the "*Security Overview*").

23.     The *Security Overview* contains representations of present fact concerning Fiserv's then-existing "enterprise approach to information and physical security, risk management, incident response, business continuity management, and the privacy and protection of confidential data."

24.     The *Security Overview* represents, among other things, that Fiserv has "enterprise standards and policies … designed to meet the objectives of applicable security and privacy laws, regulations, industry standards and contractual requirements. All Fiserv business units are required to comply with the Program."

25.     The *Security Overview* further represents that Fiserv aligned its cybersecurity program with the National Institute of Standards and Technology's ("NIST") Cybersecurity Framework, and that Fiserv performed ongoing analysis of its cybersecurity standards and practices to maintain alignment with the NIST Cybersecurity Framework, including associated updates applicable to critical-infrastructure service providers in the financial-services sector:

> **NIST Cybersecurity Framework**
>
> The National Institute of Standards and Technology (NIST) issues and maintains the "Framework for Improving Critical Infrastructure Cybersecurity." This framework provides guidance regarding cybersecurity program elements and their associated effectiveness. Fiserv is a service provider to the Financial Services Sector, which is considered by the Department of Homeland Security to be a critical infrastructure sector. Fiserv performs ongoing rigorous analysis of its existing cybersecurity standards and practices to maintain alignment with the NIST framework, including all associated updates.

6

26.     These statements in the *Security Overview* described Fiserv's then-existing cybersecurity posture and compliance practices. They were false and misleading when made. At the time Fiserv furnished the *Security Overview* to Winston-Salem Federal Credit Union, Fiserv had not aligned its cybersecurity standards and practices with the representations in the *Security Overview*, including the NIST Framework. Moreover, and as further explained below, Fiserv does not comply with the NIST framework, including all associated updates.

27.     Fiserv made these representations knowingly, or with reckless disregard for their truth, to induce Winston-Salem Federal Credit Union to sign an amendment to the Master Agreement, to pay for additional services from Fiserv, and to furnish the credit union's extraordinarily sensitive confidential information to Fiserv. Had Fiserv supplied truthful information to Winston Salem Federal Credit Union, it would have not allowed Fiserv to become the credit union's vendor having core responsibility over mission-critical banking systems.

28.     Winston-Salem Federal Credit Union reasonably relied on Fiserv's representations concerning its existing cybersecurity program in agreeing to expand Fiserv's role to that of core technology provider, to sign an amendment to the Master Agreement, to provide and continue to provide the credit union's confidential information to Fiserv, and to make payments to Fiserv.

29.     Self-Help discovered Fiserv's fraud on or about January 20, 2026, when Fiserv, through counsel, asserted in open court that NIST is not mandatory or binding on Fiserv, and that there is nothing in Fiserv's contract that requires Fiserv to adopt NIST standards.

30.     Fiserv's recent admissions revealed that Fiserv's prior representations concerning its alignment with the NIST standards did not reflect Fiserv's actual cybersecurity practices.

31.    Moreover, given Fiserv's claim that the Master Agreement imposes no contractual obligation for Fiserv to incorporate or maintain alignment with the NIST standards, Fiserv prior representations concerning its compliance with NIST standards were extra-contractual statements of fact that are actionable as fraud.

32.    Fiserv stores and processes Self-Help's most sensitive information, including member names, account numbers, balances, transaction histories, and other personally identifying information, across various Fiserv systems.

33.    **Contractual Standard of Care.** Under the Master Agreement, Fiserv was required to follow the following standards of care:

a.  Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (Exhibit 2 at § 3(b).)

b.  Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

    i.   "protect the security and confidentiality of customer information";

    ii.  "protect against any anticipated threats or hazards to the security or integrity of such information";

    iii. "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer"; and

8

iv. "ensure the proper disposal of 'consumer information'." (Exhibit 2 at § 4(a).)

34. Fiserv protects its own confidential data with robust, high-assurance measures, including token-generated codes, biometric identifiers, and other layered authentication controls, in addition to phishing-resistant multi-factor authentication.

35. **What Self-Help Received.** Despite these contractual obligations, Fiserv failed to implement equivalent protections for Self-Help's confidential information. Instead, Fiserv deployed materially weaker controls.

36. **Why MFA Matters.** MFA is an additional security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (password), has (a device or token), or is (biometric).

37. Not all MFA is created equal. Some forms, such as codes sent by email or text, are susceptible to hacking by interception, SIM-swap, or account takeover.

38. Federal standards and supervisory guidance reinforce these differences. The Federal Financial Institutions Examination Council's *Authentication and Access to Financial Institution Services and Systems*[1] adopts the *Digital Identity Guidelines* of the National Institute of Standards and Technology ("**NIST**"), which mandates: "Methods that do not prove possession of a specific device, such as … email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1.[2] This further requires that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

---

[1] https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf

[2] https://pages.nist.gov/800-63-3/sp800-63b.html

39.     A July 2025 update to NIST's *Digital Identity Guidelines* reinforces that codes sent by email are insufficient to provide proper MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

> • Access using only a password
>
> • Interception in transit or at intermediate mail servers
>
> • Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."[3]

40.     Codes sent by text message are insecure. The United States Cybersecurity and Infrastructure Security Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation."[4] This is because it is fairly simple to intercept or redirect text messages, so a text message code is insufficient to satisfy the "what you have" factor.

41.     On at least one system housing Self-Help's confidential information, Fiserv has not required any MFA or email passcode challenge at all.

42.     For other systems housing Self-Help's confidential information, Fiserv relied on an email passcode challenge instead of MFA. Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. It therefore fails to meet the standard of care Fiserv owes under the Master Agreement.

43.     On other access paths, Fiserv uses codes sent over text message. As the above federal regulatory guidance explains, text message codes are a temporary bridge to stronger,

---

[3]   https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63B-4.pdf

[4]   https://www.cisa.gov/sites/default/files/2023-01/fact-sheet-implementing-phishing-resistant-mfa-508c.pdf

phishing-resistant MFA. Fiserv deploys stronger token- or app-based authenticators for its own systems, but failed to provide equivalent protections to Self-Help, in breach of the Master Agreement.

44.     Fiserv's failure to deploy promised safeguards has resulted in Self-Help paying for services that were not properly performed. Meanwhile, Fiserv has materially increased the risk of hacking and unauthorized access to Self-Help's extraordinarily sensitive confidential information.

### *Fiserv's Pattern: Known Security Gaps, False Assurances, and Active Concealment*

45.     Fiserv has long known that the authentication controls on its systems sold to financial institutions suffer from serious security defects. Yet Fiserv continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remained secure. Fiserv's knowing and willful misconduct—a combination of knowledge of security problems, false assurances its systems had certain security controls, and concealing the absence of security controls—amounts to fraud.

46.     Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed Self-Help's member information to compromise by hackers and forced Self-Help—and other institutions—to operate under hidden, avoidable risk.

47.     In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.[5]

---

[5]     "Fiserv Flaw Exposed Customer Data at Hundreds of Banks,"
https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

11

48.     Customers attempted to alert Fiserv. Yet Fiserv did not treat the defect as urgent. Fiserv acted only after media scrutiny made inaction reputationally costly.

49.     Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to implement a fix.

50.     Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until *after* receiving an inquiry from a ***reporter***—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

51.     Fiserv's lackadaisical approach to cybersecurity persists to this day.

52.     Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, even one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to the *Krebs on Security* article, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his

12

personal social media account[6] so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns." That public admission tracks what Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

53.     For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

54.     In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York, sued Fiserv over online-banking security failures and to challenge Fiserv's asserted early-termination fee when that credit union was seeking to exit Fiserv while undergoing a merger with another credit union. *U.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, No. 1:22-cv-09329 (S.D.N.Y. 2022). Fiserv resolved the case shortly after it was filed.

55.     Other litigation raising security concerns includes *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), and

---

[6]    Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives-and the lines have blurred." *See* https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

*Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025).

56.     Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv worked to keep defects from becoming known to its clients. When another credit union reported security problems, Fiserv responded with threats and litigation pressure designed to silence disclosure. That conduct did not protect Fiserv's customers; it protected Fiserv's reputation and revenue.

### Fiserv's "Sunset" Play: Remove Security Features Mid-Contract, Then Sell Those Features Back as "SecureNow" with Additional Pricing

57.     Fiserv puts revenue first. On December 18, 2025, it sent its credit union customers an "Enhanced Authentication Product Sunset Notice." The notice stated that Fiserv would discontinue the existing "Enhanced Authentication" feature for Virtual Branch Next effective May 31, 2026. A copy of the notice is annexed hereto as **Exhibit 3**.

58.     "Enhanced Authentication" is a lie: as shown above, Fiserv has not even provided baseline authentication for Self-Help, much less any "advanced" authentication.

59.     Fiserv paired the withdrawal of Enhanced Authentication with a sales deadline. Fiserv's notice said that credit unions must sign a new agreement by March 2, 2026 to receive a replacement service Fiserv markets as "SecureNow," which Fiserv touts as "additional security" for Virtual Branch Next.

60.     SecureNow is not an "upgrade." It is a mid-contract shake-down. Fiserv already owes Self-Help and its other customers a contractual duty to safeguard their confidential information. Fiserv cannot pull back security features mid-contract and then sell them back under new terms and higher pricing.

14

61.     SecureNow does not solve the problem it claims to address. The name sounds reassuring; its functionality is not. SecureNow does not provide possession-based MFA and therefore fails to address the root cause of online banking account takeovers. In short, even a credit union that pays for SecureNow remains exposed to hackers and still cannot meet evolving regulatory expectations for protecting member information.

62.     In a February 12, 2026 webinar for its clients, Fiserv's representatives disclosed that SecureNow's authentication process was weaker than advertised. Those representatives confirmed that rather than requiring the use of a one-time password for each and every login attempt, SecureNow would only require the use of OTPs for every log in initially, a term they did not define. Once the system "learned the behavior" of the users, it would only require an OTP if there was something out of the ordinary, such as a login from a new device or a new location.

63.     Fiserv continues to pressure its credit union customers to sign up for SecureNow, sending a follow-up notices concerning the requirement to enroll in SecureNow as recently as February 9, 2026. A copy of the February 9, 2026 notice is attached hereto as **Exhibit 4**.

64.     Fiserv's intent is to compel enrollment in SecureNow. In the February 12, 2026 webinar, Fiserv's representatives stated that implementation of SecureNow was mandatory. One of Fiserv's executives confirmed during the webinar that access to online banking would be "paused" after the May 31, 2026 deadline imposed by Fiserv until the credit union put SecureNow in place.

### *Fiserv Defrauds Its Financial Institution Customers, Including Self-Help*

### 1.     *Fiserv Provides a Fraudulent "Compliance Package" to Financial Institutions Misrepresenting the Security Controls Fiserv Has on Its Systems*

65.     As a regulated financial institution, Self-Help must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Fiserv provides its financial-institution customers a "Compliance Package" that represents Fiserv has implemented security measures to meet financial-institution regulatory requirements.

66.     Fiserv updates its compliance package from time to time and assures Self-Help that Fiserv continues to comply with evolving regulatory and industry requirements. The representations in Fiserv's compliance package were false and misleading.

67.     Among the materials in Fiserv's compliance package is Fiserv's *Standardized Information Gathering Questionnaire*. Self-Help and other Fiserv customers use this questionnaire to assess Fiserv's security posture and vendor risk.

68.     The questionnaire asks: "Are policies and standards based on accepted control standards, frameworks, and industry practices?"

69.     Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

> Fiserv has established a Global Cybersecurity and Technology Management Policy based on NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard. The Global Cybersecurity and Technology Management Policy and standards have been designed to meet applicable industry and regulatory requirements.

- Interagency Guidelines Establishing Information Security Standards and on Response Programs for Unauthorized Access to Customer Information and Customer Notice

- EU General Data Protection Regulation (GDPR)

- Applicable European Banking Authority (EBA) guidelines

- Fair Credit Reporting Act (FCRA)

- Gramm-Leach-Bliley Act (GLBA)

16

- Health Insurance Portability and Accountability Act (HIPAA)

- Numerous state and /or country specific privacy and security laws including the IT Security Act 2.0 from the German Federal Office for Information Security

- International Organization for Standardization (ISO) 27001, Information Security Management

- National Institute of Standards and Technology (NIST) Cyber Security Framework

- Payment Card Industry Data Security Standard (PCI DSS)

70.     Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

71.     The questionnaire also asks: "Is Multi-Factor Authentication (MFA) utilized?" Fiserv answered: "Yes."

72.     That statement was false and misleading. As described above, Fiserv did not utilize MFA on at least one of its systems, and the authentication process used does not meet recognized standards for MFA.

73.     Fiserv also provided Self-Help with a *Fiserv Cybersecurity Fact Sheet 2025*, which again represented that "Fiserv has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard."

74.     The *Fiserv Cybersecurity Fact Sheet 2025* further represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3."

17

75. Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

### 2. Fiserv Publishes a False and Misleading Privacy Notice

76. Fiserv, Inc. publishes a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions.[7]

77. In Section 6, Fiserv represents: it has "in place appropriate security measures to prevent…personal data from being accidentally lost, used or accessed in an unauthorised way, altered or disclosed."

78. That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent Self-Help's data from being used or accessed in an unauthorized way.

79. Fiserv's misrepresentations and concealments harmed Self-Help in a straightforward way: it deprived Self-Help of material facts that would have altered Self-Help's decisions about risk, vendor oversight, and continued use of Fiserv services. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with contractual and legal requirements.

80. Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets comprise a significant portion of Fiserv's corporate

---

[7]   A copy appears at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

assets, and as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk, Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

81.     Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 70% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

82.     Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

83.     That course of conduct shows willful, wanton, and reckless disregard for the privacy and security of financial-institution customers and their members and supports an award of punitive damages.

84.     As a direct result, Self-Help has incurred and will continue to incur substantial costs to protect members, monitor for fraud, investigate suspicious activity, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

### The Severe Impact on Self-Help and Its Members

85.     The information entrusted to Fiserv includes highly sensitive personal and financial data. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate members across other systems.

86.     The harm does not end with a single incident. Once exposed, member information can circulate indefinitely, including through illicit marketplaces. Members face continuing risk

19

of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

87. Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal personal routines and physical whereabouts.

88. Most importantly, members face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of a members' lives, including, for example, which members paid retainers to a divorce attorney or which members receive care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic.

89. Public reporting has recognized the hidden emotional toll of data breaches, a unique form of irreparable harm. While some victims report direct financial impacts, many more—50%—report emotional harm. Nearly one-third said a breach had affected their physical well-being, and nearly a quarter said their relationships were personally affected. Data breaches can expose diagnoses, medical procedures, and other highly sensitive personal information while leaving victims living with persistent anxiety: when will criminals use my data, and how? *See* "The Hidden Emotional Toll on Victims of Data Breaches," *The Wall Street Journal*, Nov. 25, 2025, https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab?mod=Searchresults&pos=2&page=1. **Exhibit 5** is a true and correct copy of *The Wall Street Journal* article.

90. Criminals can also use Self-Help's member information for embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining

20

government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm to Self-Help:

> Businesses suffer most of the direct losses from ... identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit....
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[8]

91.     To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various internet scams impacting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud,

---

[8]    The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.[9]

92.     Stolen data can also be offered for sale on the "dark web," a heavily encrypted part of the internet that makes it difficult for authorities to detect a website's location or owners. The dark web is not indexed by normal search engines such as Google and is accessible only by using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal information. Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

93.     Once a bad actor buys member information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

94.     In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

95.     The problems associated with identity theft are exacerbated by the fact that many identity thieves will delay exploiting stolen information, extending the threat of identity theft long after the initial breach. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

---

[9]   *See* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

96.     Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected for extended periods, amplifying long-term harm. During this time, cybercriminals can continue exploiting across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the theft going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

97.     Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of the breach may not be immediately apparent. Indeed, in order to protect its member information, Self-Help will need to remain vigilant against compromise and unauthorized use of its member information for years and decades to come.

### *Self-Help Delivers a Notice of Breach and Requests Information Pursuant to the Master Agreement; Fiserv Ignores Its Obligations*

98.     Following a November 2025 merger involving Self-Help's affiliate with Cencap Federal Credit Union and learning of Cencap Federal Credit Union's allegations concerning Fiserv's security deficiencies, Self-Help conducted a review of the security controls Fiserv provides to Self-Help.

99.     Self-Help's review identified that compliant MFA was not implemented on Self-Help's online banking website and mobile application used by members to conduct online banking activities.

100.    The Client360 system, which is used by credit union and Fiserv employees for service tickets, change orders, and communications that can include confidential information and requests affecting system security, did not have proper MFA implemented. This system has an email-delivered passcode.

23

101.     The security review also identified that other systems used by credit union employees to host confidential information were not protected by proper MFA, including: Portico, Nautilus, Portico Reporting Analytics, Wisdom Accounting Suite, File Exchange, Sterling File Gateway, Loancierge, Originate (Deposit Essentials), and VirtualBranch InterACT Web.

102.     Given the ongoing security risks, and Fiserv's refusal to deal with them in a timely manner, Self-Help sent Fiserv a Notice of Breach on or about November 24, 2025. A copy of the Notice of Breach is annexed hereto as **Exhibit 6**. Self-Help delivered a supplemental notice of breach the following day, a copy of which is annexed hereto as **Exhibit 7**.

103.     In addition to notifying Fiserv of its breaches of the Master Agreement and demanding that those breaches be remedied, Self-Help also exercised its right under the Master Agreement for information concerning Fiserv's performance (or lack thereof). Specifically, Self-Help's requests included:

    a.    Copies of audits, summaries of test results, and other equivalent evaluations of Fiserv's security, as required by § 4(a) of the Master Agreement and 12 C.F.R. Part 748, Appendix A;

    b.    A summary of Fiserv's written information security plan for the services provided to Self-Help within 30 days, as required by § 4(b) of the Master Agreement;

    c.    Documentation supporting the amounts invoiced by Fiserv for the 12-month period prior to the date of the Notice of Breach, as required § 10(b) of the Master Agreement;

24

d.  Copies of Fiserv's most recent security certifications for the service centers providing services to Self-Help, as required by § 4(d) of the ASP Services Exhibit to the Master Agreement;

e.  Copies of the independent audit reports of the Fiserv service centers providing service to Self-Help, as required by § 4(h) of the ASP Services Exhibit to the Master Agreement; and

f.  Results of Fiserv's tests of its Disaster Recovery Plan, as required by § 6(c) of the ASP Services Exhibit to the Master Agreement.

104.  By letters dated November 25 and November 26, 2025, Fiserv responded to Self-Help's request for audit documentation by denying that the Master Agreement imposed any sort of deadline for producing such documentation and that it would not produce such documentation on two days' notice. A copy of Fiserv's responses are annexed hereto as **Exhibit 8**.

105.  To date, more than 60 days since Self-Help's request, no such documents have been produced by Fiserv, in breach of its audit obligations.

### *Self-Help's Claims Are Timely, as Both the Statute of Limitations and Contractual Limitations Period Have Been Tolled*

106.  Self-Help exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.[10]

107.  Self-Help became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

---

[10] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005)) (denying Fiserv's motion to dismiss the plaintiff credit union's claim as time-barred, relying on the discovery rule).

108.   Self-Help previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

109.   The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

110.   Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading Self-Help.

111.   In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

112.   Fiserv was actually aware of the material defects in its systems, and its failure to comply with regulatory and contractual requirements. Fiserv also knowingly, affirmatively, and actively concealed from Self-Help the risks associated with the defects of its products and services, and that these defects caused damages and harm to Self-Help.

113.   Fiserv's purpose in concealing these facts was to induce Self-Help to continue relying on its services and to delay Self-Help's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent Self-Help from initiating legal action within the applicable limitations period.

114.   Fiserv committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while simultaneously omitting the disclosure of known and foreseeable harms.

26

115.     Self-Help was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

116.     Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing Self-Help to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

117.     For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule, the continuing duty doctrine, and by Fiserv's active concealment with respect to all claims against it.

## First Claim for Relief
### Breach of Contract: Monetary Damages
### (Against Fiserv Solutions Only)

118.     Self-Help repeats the allegations in the preceding paragraphs.

119.     The Master Agreement is a valid contract binding Fiserv Solutions.

120.     In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. To vindicate the parties' apparent intentions and reasonable expectations, Fiserv Solutions was obligated to invoice only for services actually and properly performed and to provide security appropriate for a federally regulated credit union that stores extraordinarily sensitive consumer financial information.

27

121. Self-Help has duly performed all obligations and satisfied all conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

122. Fiserv Solutions materially breached the Master Agreement, including by:

   a. violating Section 3(b) of the Master Agreement by failing to use the same care and discretion to prevent unauthorized disclosure of Self-Help's confidential information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law;

   b. violating Section 4(a) of the Master Agreement by failing to implement and maintain an information security program that appropriately protects the security and confidentiality of Self-Help's information;

   c. violating Section 4(a) and 4(b) of the Master Agreement, and Sections 4(d), 4(h) and 6(c) of the ASP Services Exhibit to the Master Agreement, by failing to provide the documentation required to be produced to Self-Help;

   d. violating Section 10(b) of the Master Agreement by refusing to provide Self-Help with documentation supporting the amounts invoiced by Fiserv;

   e. violating N.Y. General Obligations Law § 5-903 by purporting to effectuate an automatic renewal of the Master Agreement without providing the required personal or certified mail notice to Self-Help beforehand;

   f. repudiating its obligations, including by discontinuing Enhanced Authentication services mid-contract and insisting that Self-Help agree to additional and different contract terms and pay additional charges for "SecureNow" or other ostensible

28

security upgrades that Fiserv is under a preexisting contractual duty to provide; and

     g.    violating the implied covenant of good faith and fair dealing by issuing invoices for services not properly performed and exposing Self-Help to hacking and fraud risks vastly greater than it had bargained for and well outside of commercially reasonable norms.

123. Fiserv Solutions' contract breaches were, at a minimum, grossly negligent. Fiserv had actual knowledge, through reports from financial institutions and others, that Fiserv's security controls were absent or woefully insecure and have led to significant fraud losses and hacking at other financial institutions. Fiserv Solutions, however, failed to properly investigate or secure its systems. Nor did Fiserv Solutions alert Self-Help of the security problems. Fiserv Solutions' contract breaches smack of intentional wrongdoing and evince a reckless indifference to Self-Help's rights.[11]

124. Fiserv Solutions' misconduct was not an isolated incident; it is part of a dangerous pattern that put life savings and extraordinarily sensitive financial information of scores of consumers into the reach of hackers. By withholding basic safeguards from Self-Help's systems despite known hacking risks, Fiserv exposed thousands of consumers to hacking, fraud, and identity theft. And Self-Help is not alone: Fiserv's deficient approach to cybersecurity for its clients has also endangered countless other financial institutions and their customers. Fiserv's

---

[11] New York law governs the Master Agreement. New York public policy bars parties from contracting away liability for gross negligence, even in business-to-business contracts signed by sophisticated parties. The limitation-of-liability clause in the Master Agreement therefore offers Fiserv no protection because its failure to fulfill its obligation to secure Self-Help was, at a minimum, grossly negligent. In *Abacus Federal Savings Bank v. ADT Security Services, Inc.*, 967 N.E.2d 666, 670 (N.Y. 2012), New York's highest court held that a financial institution could recover full, uncapped damages from a security vendor whose gross negligence left the institution insecure. Fiserv's misconduct here is no less grave. The same principle applies, and the damages here are not subject to any contractual cap.

misconduct is actionable as an independent tort as well as egregious, repeated, and directed at Self-Help as part of a broader course of conduct that endangers the public. Fiserv's misconduct reflects a high degree of moral turpitude and such wanton dishonesty as to imply a criminal indifference to Fiserv's civil obligations. Punitive damages are appropriate to deter Fiserv from endangering others in the same way again.

125. As a direct and proximate result of Fiserv Solutions' contract breaches, Self-Help has suffered and will continue to suffer damages and harm.

**<u>Second Claim for Relief</u>**
**Breach of Contract: Rescission[12]**
**(Against Fiserv Solutions Only)**

126. Self-Help repeats the allegations in the preceding paragraphs.

127. Self-Help may have the Master Agreement rescinded due to Fiserv's breaches. The breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left Self-Help in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

128. Self-Help may have the Master Agreement rescinded because Fiserv misrepresented to Self-Help the existence and nature of Fiserv's security controls. These representations were material to Self-Help, and it reasonably relied on them in deciding whether to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations, and the falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by Self-Help.

---

[12] As permitted by Fed. R. Civ. P. 8(a)(3), Self-Help is demanding different types of relief, including in the alternative, on its breach of contract claim.

129. Self-Help may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by Self-Help have altered the essential nature of the Master Agreement, and Self-Help has been unable to obtain its expected bargain from Fiserv.

130. Self-Help has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

**Third Claim for Relief**
**Breach of Contract: Specific Performance**
**(Against Fiserv Solutions Only)**

131. Self-Help repeats the allegations in the preceding paragraphs.

132. The Master Agreement is a valid contract binding Fiserv Solutions.

133. Self-Help has performed or substantially performed its obligations under the Master Agreement.

134. Self-Help is ready, willing, and able to perform its remaining obligations until the contract terminates or is rescinded by an order of this Court.

135. Fiserv Solutions is presently breaching, and absent relief will continue to breach, its contractual obligations to safeguard Self-Help's confidential information.

136. Fiserv Solutions has repudiated the Master Agreement, and absent relief will continue to breach the Master Agreement, by withdrawing security offerings provided under the Master Agreement and compelling Self-Help to accept new service offerings (such as "SecureNow"), at increased prices, in order for Fiserv to continue performing its preexisting duty to safeguard Self-Help's confidential information.

137. Fiserv is capable of performing the Master Agreement, including by deploying phishing-resistant, possession-based MFA and other enhanced security controls that it uses to safeguard its own sensitive data.

31

138.    The loss of confidentiality and risk of unauthorized access constitute irreparable harms not adequately compensable by money damages alone.

139.    Accordingly, the Court should issue an order of specific performance compelling Fiserv Solutions to specifically perform its obligations to Self-Help, including securing Self-Help's confidential information as required by the Master Agreement.

**Fourth Claim for Relief**
**Declaratory Relief**
**(Against Fiserv Solutions Only)**

140.    Self-Help repeats the allegations in the preceding paragraphs.

141.    Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

142.    **No Obligation to Pay for or Contract for "SecureNow" (Preexisting Contractual Duty; Inadequate Security).** Self-Help seeks a declaration that it has no obligation to enter into any agreement for Fiserv's "SecureNow" service. Under the Master Agreement, Fiserv bears a preexisting duty to safeguard Self-Help's information in accordance with governing contractual and regulatory standards. Fiserv may not condition its performance of that duty on Self-Help's agreement to new or different contractual terms or on the payment of additional fees. Self-Help further seeks a declaration that Fiserv's "SecureNow" product does not satisfy Fiserv's existing contractual and regulatory obligations to appropriately protect Self-Help's information.

143.    **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy).** Self-Help is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly

32

negligent, intentional, fraudulent, tortious, or other conduct for which an exculpatory provision or a limitation-of-liability provision is against public policy.

144. **Fiserv's Defective Purported Automatic Renewal of the Master Agreement (N.Y. General Obligations Law § 5-903).** Self-Help is entitled to a declaration that, pursuant to N.Y. General Obligations Law § 5-903, the Master Agreement is unenforceable by Fiserv because it failed to give the statutorily required notice to Self-Help before purporting to effectuate an automatic renewal of the Master Agreement.

145. **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy).** Self-Help is entitled to declarations that it has no obligation to pay Fiserv early termination fees, liquidated damages, "deconversion," or other post-termination fees because of the following:

    a. Fiserv has no right to enforce the Master Agreement due to its material breaches, fraudulent inducement, fraudulent performance, failure of consideration, commercial impracticability, frustration of purpose, and violation of N.Y. General Obligations Law § 5-903.

    b. The fees at issue, other than liquidated damages, are not quantified in the Master Agreement and therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

    c. The early termination fees or liquidated damages provisions are unenforceable in a renewal term of the Master Agreement. The Master Agreement contemplated an initial term, during which Self-Help paid and Fiserv received the complete economic benefit of the parties' bargain, including recurring fee revenue. Fiserv's attempt to impose early termination fees or liquidated

33

damages during a renewal term is improper because the purpose of the liquidated damages clause (if valid during the initial term) was to compensate Fiserv for unrecovered upfront investments. In the renewal term, those investments have already been recouped in full or substantially recouped, and the clause serves no compensatory function. The liquidated damages provision is not calibrated to reflect any actual damages arising from an early termination during a renewal term. The same amount is demanded regardless of whether the Master Agreement is terminated in an initial term or renewal term. The formula—80% of all fees remaining in an initial or renewal term—creates a perverse and unreasonable result. Had the parties chosen not to renew at the conclusion of the initial term, no liquidated damages would have applied. Yet if the relationship ended just one day after, Fiserv would claim entitlement to liquidated damages in the millions. This arbitrariness renders the clause punitive in nature, unrelated to any reasonable forecast of actual damages, and unenforceable as a matter of law. The provision fails to be enforceable because it imposes a penalty rather than approximating actual damages, does not decrease or scale based on the elapsed term, bears no reasonable relationship to Fiserv's actual damages, and seeks to unjustly enrich Fiserv by awarding a windfall for services not rendered.

d. The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent reasons why Self-Help may seek to terminate the Master

34

Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce Self-Help into maintaining its relationship with Fiserv. Moreover, even if these provisions are not unenforceable penalties, to the extent Fiserv relies on them for indemnification or recovery of amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

**Fifth Claim for Relief**
**Unjust Enrichment**
**(Against Fiserv Solutions Only)**

146. Self-Help repeats the allegations in the preceding paragraphs.

147. Fiserv Solutions induced Self-Help to pay it by issuing invoices. These invoices, delivered on a recurring basis, conveyed expressly and by implication that the invoiced services had been properly performed and that the invoiced amounts were owed to Fiserv Solutions.

148. In reality, Fiserv Solutions had not performed as promised. Fiserv Solutions' invoices overstated the amounts Self-Help owed, and Fiserv Solutions withheld material facts about the security deficiencies in its systems. Fiserv Solutions' systems were so insecure that they were not even minimally suitable for storing a regulated credit union's confidential information.

149. As a result of this misconduct, Self-Help mistakenly conferred a benefit on Fiserv Solutions in the form of payments for deficient or non-performed services.

150.     Fiserv Solutions was unjustly enriched by those payments. Equity and good conscience require Fiserv Solutions disgorge and make restitution of the amounts Self-Help paid, with interest.

**Sixth Claim for Relief**
**Defend Trade Secrets Act**
**(18 U.S.C. § 1836, *et seq.*)**

151.     Self-Help repeats the allegations in the preceding paragraphs.

152.     Self-Help is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. Self-Help's trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

153.     Self-Help's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

154.     Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

155.     Self-Help has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement and Fiserv's Privacy Notice.

156.     Self-Help has invested substantial resources in developing and protecting its trade secrets. Self-Help's trade secrets provide it with economic advantages over its competitors.

157.     Fiserv knew or should have known that Self-Help's information at issue comprised Self-Help's trade secrets.

36

158. Fiserv misappropriated and continued to misappropriate Self-Help's trade secrets by acquiring and continuing to acquire them through improper means, including by misrepresenting to Self-Help the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to Self-Help, it would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure systems.

159. At the time of Fiserv's use and disclosure of Self-Help's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to Self-Help to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

160. Fiserv's misappropriation of Self-Help's trade secrets was done for its own commercial advantage, allowing Fiserv to obtain and retain excessive payments from Self-Help.

161. Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

162. Fiserv's misappropriation was willful and malicious, entitling Self-Help to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

163. As a direct and proximate result of Fiserv's misappropriation of Self-Help's trade secrets, Self-Help has suffered and will continue to suffer damages and harm.

### Seventh Claim for Relief
### Fraud / Fraudulent Inducement

164. Self-Help repeats the allegations in the preceding paragraphs.

165.     Fiserv fraudulently misrepresented its data security practices and knowingly concealed their profound deficiencies. Relying on these deceptive assurances, Self-Help entrusted Fiserv with sensitive information, a trust Fiserv intentionally violated.

166.     As set forth above, Fiserv fraudulently misrepresented the existence and nature of the security controls that were in place to protect Self-Help's confidential information.

167.     As set forth above, Fiserv also fraudulently represented its performance and intention to perform under the Master Agreement, including by withdrawing security features mid-contract and forcing upgrades to "SecureNow."

168.     Fiserv also fraudulently represented its "Enhanced Authentication" service to Self-Help. As set forth above, "Enhanced Authentication" fails to provide MFA that meets baseline standards for authentication. It is therefore not sufficient authentication at all. And it is certainly not "advanced."

169.     Fiserv's failure to implement two-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived Self-Help about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded Self-Help while placing thousands of members at risk.

170.     Even after being directly confronted about this fraud, Fiserv continues the deception. On November 24, 2025, counsel for Self-Help sent a demand letter to Fiserv explicitly identifying the failure to implement two-factor authentication despite receiving payment for such services. *See* Exhibit 6. Rather than implementing the promised security measures, Fiserv responded by disputing its breach. *See* Exhibit 7. Fiserv then pivoted, insisting

38

on "sunsetting" its existing authentication protocol and demanding that Self-Help implement another deficient product, "SecureNow," and pay more for the privilege. *See* Exhibit 3.

171.    Fiserv's continued failure to provide two-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold its end of the bargain was intentional.

172.    Further, independent of any specific misrepresentations made by Fiserv, Self-Help reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of Self-Help's information and Self-Help is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep its information safe. Fiserv did not disclose at any time to Self-Help that its information was vulnerable to hackers because Fiserv's security was inadequate. Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, their ability to authenticate authorized users, and their ability to safely store and process Self-Help's information, and the security measures and services that have been provided to Self-Help.. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures, (b) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's security problems (including by threatening another Fiserv customer who uncovered a security problem with litigation); (d) Fiserv's failure to comply with its own policies, notices, and agreements. Self-Help justifiably relied on Fiserv, which had a duty to disclose material facts that would

undermine Self-Help's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by Self-Help.

173.     Self-Help reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to its detriment by, among other things, entering into the Master Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

174.     Fiserv knew that Self-Help was undergoing a merger with Winston-Salem Federal Credit Union, which was the original party to the Master Agreement. Self-Help knew that Winston-Salem Federal Credit Union was a Fiserv customer and reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions that proper security controls existed to protect Winston-Salem Federal Credit Union's information in deciding whether to pursue a merger with that credit union and how to address the merger. Mergers between financial institutions are common and a foreseeable occurrence to a company such as Fiserv that claims to specialize in serving financial institutions. Fiserv knew or should have known that the statements in its Privacy Notice and other material misrepresentations, concealments, acts, and omissions would be reasonably and justifiably relied on by those evaluating a potential merger with one of its customers to assess the suitability of a merger candidate and the costs expected to consummate a merger.

175.     Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, were material to Self-Help, and were made with the intent of misleading Self-Help into relying upon them, and Self-Help did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments,

40

acts, and omissions was within Fiserv's peculiar knowledge and could not have been reasonably discovered by Self-Help.

176.     By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded Self-Help, including fraudulently inducing Self-Help to contract with, and continue to receive services from, Fiserv.

177.     As a direct and proximate result of Fiserv's fraud, Self-Help has suffered and will continue to suffer damages and harm.

**<u>Eighth Claim for Relief</u>**
**Violation of North Carolina Unfair and Deceptive Trade Practices Act**
**(N.C.G.S. § 75-1.1)**

178.     Self-Help repeats the allegations in the preceding paragraphs.

179.     A defendant is liable under the North Carolina Unfair and Deceptive Trade Practices Act (N.C.G.S. § 75-1.1) if it (1) engages in an unfair and deceptive act or practice; (2)  in or affecting commerce, (3) which proximately caused an actual injury to the plaintiff or to its business.

180.     Fiserv engaged in unfair and deceptive trade acts and practices.  Fiserv misrepresented, both by affirmative conduct and by omission, the existence and nature of Fiserv's security controls, the security of its systems, their ability to authenticate authorized users, and their ability to safely store and process Self-Help's information. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures, (b) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's security problems (including by threatening another Fiserv customer who uncovered a security problem with litigation); (d) Fiserv's failure to comply with its own policies, notices, and agreements.

41

181.     Fiserv's actions affected commerce because they were done in pursuit of business from Self-Help.

182.     Fiserv proximately caused Self-Help actual injury.  Had Fiserv provided Self-Help with truthful information, Self-Help would not have entered into the Master Agreement and other transactions with Fiserv, made payments to Fiserv, furnished confidential information or trade secrets to Fiserv, or allowed trade secrets or confidential information to be stored and accessible on Fiserv's insecure systems.

183.     Under N.C.G.S. § 75-16, Self-Help is entitled to treble damages. Self-Help also is entitled to attorneys' fees under N.C.G.S. § 75-16.1

184.     As a direct and proximate result of Fiserv's unfair and deceptive practices, Self-Help has suffered and will continue to suffer damages and harm.

## Jury Trial Demand

Self-Help requests a trial by jury of all issues so triable.

## Demand for Relief

WHEREFORE, Self-Help respectfully requests that the Court:

(i)     enter judgment for all damages allowed by law—including, without limitation, restitutionary, compensatory, consequential, incidental, reliance, statutory, and punitive—in amounts to be determined at trial;

(ii)    require Fiserv to disgorge and make restitution of Self-Help's payments;

(iii)   declare the parties' rights;

(iv)   order Fiserv to specifically perform its obligations to safeguard Self-Help's confidential information;

(v)    rescind the Master Agreement;

(vi)   award Self-Help its attorneys' fees and costs, and the maximum prejudgment and postjudgment interest allowed by law; and

(vii)  award any further relief that may be necessary to achieve justice.

42

Dated: March 2, 2026

Respectfully submitted,

/s/ Mark S. Pincus
Charles J. Nerko*

Mark S. Pincus
GARDNER SKELTON PLLC
3746 N. Davidson Street
Charlotte, NC 28205
704.335.0350
mark@gardnerskelton.com

John C. Cleary*
Walter E. Swearingen*
NERKO PLLC
1178 Broadway, 3rd Floor
New York, NY 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

* Special Appearance under
Local Civ. R. 83.1(d)

*Attorneys for Plaintiff*
*Self-Help Credit Union, as successor in*
*interest to Winston-Salem Federal Credit*
*Union*

43