# EXHIBIT 2

# MASTER AGREEMENT

MASTER AGREEMENT ("**Agreement**") dated as of ___June 5___, 20[14] ("**Effective Date**") between Fiserv Solutions, Inc., a Wisconsin corporation with offices located at 255 Fiserv Drive, Brookfield, WI 53045 ("**Fiserv**"), and Winston-Salem Federal Credit Union, a credit union with offices located at 711 Salem Avenue, Winston-Salem, North Carolina 27101 ("**Client**").

Fiserv and Client hereby agree as follows:

1. <u>Deliverables</u>.

(a) <u>General</u>. Fiserv, itself and through its Affiliates (as defined herein), agrees to provide to Client, and Client agrees to obtain from Fiserv, the services ("**Services**") and products ("**Products**") (collectively, "**Deliverables**") described in the attached Exhibits, subject to the terms set forth in this Agreement and in the applicable Exhibit. "**Affiliate**" means an entity that controls, is controlled by, or is under common control with a party, where "control" means the direct or indirect ownership of more than 50% of the voting securities of such entity or party. Each Exhibit will be deemed to incorporate all of the terms of this Agreement. Use of the term "Exhibit" throughout this Agreement shall include any Schedules attached to such Exhibit. Exhibits and Schedules attached as of the Effective Date are listed below.

- ASP Services Exhibit to Master Agreement
- EFT Services Schedule to ASP Services Exhibit
- UChoose Rewards Services Schedule to ASP Services Exhibit
- ACCEL Network Membership Exhibit to Master Agreement

(b) <u>Additional Entities and Deliverables</u>. The parties or their Affiliates may add Deliverables to this Agreement by adding an appropriate new Exhibit or Schedule to this Agreement incorporating the added Deliverables and/or Affiliates, as applicable. When Deliverables are received by a Client Affiliate or provided by a Fiserv Affiliate under an Exhibit, then for the purposes of that Exhibit, references to "Client" or "Fiserv" in this Agreement will be deemed to include the applicable Client Affiliate or Fiserv Affiliate. An Affiliate's execution of an amendment to receive or provide Deliverables hereunder shall constitute such Affiliate's agreement to be bound by the terms of this Agreement.

2. <u>Fees for Deliverables</u>.

(a) <u>General</u>. Client agrees to pay Fiserv: (i) fees for Deliverables as specified in the Exhibits, (ii) out-of-pocket and other additional charges pursuant to Section 2(b), and (iii) Taxes as defined in Section 2(c). Fees may be increased as set forth in the Exhibits.

(b) <u>Additional Charges</u>. Client shall pay travel and living expenses and other out-of-pocket expenses reasonably incurred by Fiserv in connection with the Deliverables. As applicable, such out-of-pocket expenses shall be incurred in accordance with Fiserv's then-current corporate travel and expense policy. If an out-of-pocket expense is listed in an Exhibit, such expense may be changed to reflect changes issued by the applicable vendor.

(c) <u>Taxes</u>. Client is responsible for the payment of all sales, use, excise, value added, withholdings and other taxes and duties however designated that are levied by any taxing authority relating to the Deliverables ("**Taxes**"). All Fees and other charges under any Exhibit are exclusive of Taxes. Client shall reimburse Fiserv for those Taxes that Fiserv is required to remit on behalf of Client. In no event shall Taxes include taxes based on Fiserv's income.

(d) <u>Payment Terms</u>. Invoices are due and payable upon Client's receipt of such invoice. Client shall pay Fiserv through the Automated Clearing House unless otherwise set forth in the Exhibits. If any invoiced amounts remain unpaid 30 days after Client's receipt of invoice, Client shall pay a monthly late charge based on the unpaid amounts equal to the lesser of 1.5% or the highest amount allowed by law

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 2 of 138

until such invoice amount is paid in full. Client shall neither make nor assert any right of deduction or set-off from amounts invoiced.

3.   Confidentiality and Ownership.  The provisions of this Section 3 survive any termination or expiration of this Agreement.

(a)   Definitions.

(i)   "**Client Information**" means the following types of information of Client and its Affiliates obtained or accessed by Fiserv from or on behalf of Client or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information; (B) customer lists, business plans, information security plans, business continuity plans, and proprietary software programs; (C) any personally identifiable information, defined as information that can be identified to a particular person without unreasonable effort, such as the names and social security numbers of Client's individual customers ("**Client PII**"); and (D) any other information received from or on behalf of Client or its Affiliates that Fiserv could reasonably be expected to know is confidential.

(ii)   "**Fiserv Information**" means the following types of information of Fiserv and its Affiliates obtained or accessed by Client from or on behalf of Fiserv or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information (including that of any Fiserv client, supplier, or licensor); (B) client lists, information security plans, business continuity plans, all information and documentation regarding the Deliverables, all software Products (including software modifications and documentation, databases, training aids, and all data, code, techniques, algorithms, methods, logic, architecture, and designs embodied or incorporated therein), and the terms and conditions of this Agreement; (C) any personally identifiable information, defined as information that can identified to a particular person without unreasonable effort, such as the names and social security numbers of Fiserv employees; and (D) any other information and data received from or on behalf of Fiserv or its Affiliates that Client could reasonably be expected to know is confidential.

(iii)   "**Information**" means Client Information and/or Fiserv Information, as applicable.  No obligation of confidentiality applies to any Information that: (A) the receiving entity ("**Recipient**") already possesses without obligation of confidentiality, develops independently without reference to Information of the disclosing entity ("**Discloser**"), or rightfully receives without obligation of confidentiality from a third party; or (B) is or becomes publicly available without Recipient's breach of this Agreement.

(b) Obligations.  Recipient agrees to hold as confidential all Information it receives from the Discloser.  All Information shall remain the property of Discloser or its suppliers and licensors.  Recipient will use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law.  Recipient may only use Information for the lawful purposes contemplated by this Agreement, including in the case of Fiserv use of Client Information for fulfilling its obligations under this Agreement, performing, improving and enhancing the Deliverables, and developing data analytics models to produce analytics-based offerings.  Client agrees that prior to providing Fiserv access to any Client PII, Client shall ensure that any necessary consent has been obtained that is required by law or regulation for Fiserv to access the information and to use it pursuant to the terms set forth in this Agreement.  Fiserv specifically agrees not to use or disclose any "non-public personal information" about Client's customers in any manner prohibited by Title V of the Gramm-Leach-Bliley Act or the regulations issued thereunder ("**GLB**"), as applicable to Fiserv.  Recipient may disclose Information to: (i) its employees and employees of permitted subcontractors and Affiliates who have a need to know; (ii) its attorneys and accountants as necessary in the ordinary course of its business; and (iii) any other person with Discloser's prior written consent.  Before disclosure to any of the above

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 3 of 138

person, Recipient will have a written agreement with (or in the case of clause (ii) a professional obligation of confidentiality from) such person sufficient to require that person to treat Information in accordance with the requirements of this Agreement, and Recipient will remain responsible for any breach of this Section 3 by any of the above person. Fiserv as Recipient may also disclose Client Information to third party vendors designated by Client. Recipient may disclose Information to the extent required by law or legal process, provided that: (A) Recipient gives Discloser prompt notice, if legally permissible, so that Discloser may seek a protective order; (B) Recipient reasonably cooperates with Discloser (at Discloser's expense) in seeking such protective order; and (C) all Information shall remain subject to the terms of this Agreement in the event of such disclosure. At Recipient's option, Information will be returned to Discloser or destroyed (except as may be contained in back-up files created in the ordinary course of business that are recycled in the ordinary course of business over an approximate 30- to 90-day period or such longer period as required by applicable law) at the termination or expiration of this Agreement or the applicable Exhibit and, upon Discloser's request, Recipient will certify to Discloser in writing that it has complied with the requirements of this sentence. Recipient acknowledges that any breach of this Section 3 may cause irreparable harm to Discloser for which monetary damages alone may be insufficient, and Recipient therefore acknowledges that Discloser shall have the right to seek injunctive or other equitable relief against such breach or threatened breach, in addition to all other remedies available to it at law or otherwise.

(c) Ownership. With the exception of Client Information, all information, reports, studies, object and source code (including without limitation the Products and all modifications, enhancements, additions, upgrades, or other works based thereon or related thereto), flow charts, diagrams, specifications, and other tangible or intangible material of any nature whatsoever produced by Fiserv or jointly with Client or by any of Fiserv's or Client's employees or agents, through or as a result of or related to any of the Deliverables provided hereunder or development of any data analytics models hereunder, and all patents, copyrights, and other proprietary rights related to each of the foregoing, shall be the sole and exclusive property of Fiserv or its Affiliates. Client hereby irrevocably assigns and transfers to Fiserv all rights, title, and interest in any such works referenced in the foregoing sentence, including without limitation copyrights, patent rights, trade secrets, industrial property rights, and moral rights, and shall execute all documents reasonably requested by Fiserv to perfect such rights. Client shall be entitled to use all such work product in accordance with the applicable terms and conditions of this Agreement.

(d) Restrictions. Without limiting any other obligation set forth in this Section 3, Client shall not use, transfer, distribute, interface, integrate, or dispose of any information or content contained in Deliverables in any manner that competes with the business of Fiserv. Except as expressly authorized in an Exhibit, Client shall not: (i) use the Deliverables to provide services to third parties; or (ii) reproduce, republish or offer any part of the Deliverables (or compilations based on any part of the Deliverables) for sale or distribution in any form over or through any medium.

4. Information Security.

(a) General. Fiserv has implemented and shall maintain an information security program that is designed to meet the following objectives: (i) protect the security and confidentiality of customer information (as defined in GLB); (ii) protect against any anticipated threats or hazards to the security or integrity of such information; (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer; and (iv) ensure the proper disposal of "consumer information" (information obtained from "consumer reports" as defined in the Fair Credit Reporting Act). Fiserv agrees to use security safeguards for all personal information pertaining to Massachusetts residents in accordance with Massachusetts Regulation 201 CMR 17.00. Upon Client's written request, Fiserv shall allow Client to review any associated audit reports, summaries of test results or equivalent measures taken by Fiserv to assess whether its information security program meets the foregoing objectives, to the extent and on the same terms such information is made generally available to Fiserv's other clients. Fiserv shall also take appropriate actions to address incidents of unauthorized access to Client's "sensitive customer information" (as defined in GLB), including notification to Client as soon as possible of any such incident. As required by an applicable industry security organization (e.g. PCI-SSC) or the applicable regulatory agency having jurisdiction over Client, Fiserv may disclose information regarding any such incident to such organization and such agency.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 4 of 138

(b) _Fiserv Plan_. Within 30 days of Client's written request, Fiserv shall provide to Client a summary of Fiserv's written information security plan for the applicable Services received by Client, and thereafter upon Client's request will provide updates on the status of such information security plan.

(c) _Data Encryption_. As applicable to the Deliverables received by Client, Client agrees to comply with Fiserv's then-current data encryption policies and controls regarding transmission to and from Fiserv of tapes, images, and records maintained and produced by Fiserv for Client in connection with the Deliverables ("**Client Files**"), or other data transmitted to and from Fiserv in connection with the Deliverables (collectively with Client Files, "**Data**"). If Client requests or requires Fiserv to send, transmit, or otherwise deliver Data to Client or any third party in a non-compliant format or manner, or Client (or third party on Client's behalf) sends, transmits or otherwise delivers Data to Fiserv in a non-compliant format or manner, then, notwithstanding any other provision of this Agreement: (i) Client understands and accepts all risk of transmitting Data in an unencrypted or otherwise noncompliant format; and (ii) Client releases, discharges, and shall indemnify and hold harmless Fiserv and its employees, officers, directors, agents, and Affiliates from any and all liability, damage, or other loss under this Agreement or otherwise suffered by or through Client or suffered by any of the indemnified entities arising out of the transmission, destruction, or loss of such Data, including without limitation any information security or privacy breach related to such Data.

(d) _Examination of Client Files_. Client Files may be subject to examination by such federal, state, or other governmental regulatory agencies as may have jurisdiction over Client's business to the same extent as such records would be subject if maintained by Client on its own premises. Client agrees that Fiserv may give all reports, summaries, or information contained in or derived from the data or information in Fiserv's possession relating to Client when formally requested to do so by a regulatory or government agency. Fiserv reserves the right to charge Client at Fiserv's then-current rates for any assistance provided in response to regulatory requests, government agency requests, and legal process requests such as subpoena or search warrant, in each case to the extent related to Client, Client Files and/or Client Information, whether issued during or after the term of this Agreement.

5. _Hiring and Employment_.

(a) _Background Checks_. Neither party shall knowingly permit any of its employees to have access to the premises, records or data of the other party when such employee: (i) uses drugs illegally; or (ii) has been convicted of a crime in connection with a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a) (a "Conviction"). Consistent with Fiserv's employment practices, newly hired Fiserv employees are required to pass both a pre-employment criminal background check and are required to pass a pre-employment drug screening, as permitted by law, and Fiserv periodically confirms that employees have not acquired any Convictions subsequent to hiring. Upon Client's reasonable request and at Client's expense, Fiserv may perform more frequent confirmation checks or utilize additional reasonable background checking criteria for those of Fiserv's employees who will have access to Client facilities or Client's networks and computer systems located at Client facilities. The results of all such background checks shall be retained solely by Fiserv or the third party performing such screening on behalf of Fiserv.

(b) _Equal Employment_. Each party agrees that it shall not discriminate against any employee or applicant for employment because of race, creed, color, age, sex, national origin, marital status, liability for service in the armed forces, disability due to veteran status, status as veteran of the Vietnam era or handicap, and each party shall comply with all applicable requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, as well as the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974.

6. _Warranties_.

Case 1:25-cv-01112-TDS-LPA   Document 58-2   Filed 03/02/26   Page 5 of 138

(a) By Fiserv.  Fiserv warrants that: (i) no contractual obligations exist that would prevent Fiserv from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to Fiserv's operations used in the performance of its obligations under this Agreement.

(b) By Client.  Client represents and warrants that: (i) no contractual obligations exist that would prevent Client from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to its receipt and use of Deliverables under this Agreement.

(c) THE WARRANTIES STATED ABOVE AND IN THE EXHIBITS, IF ANY, ARE LIMITED WARRANTIES AND ARE THE ONLY WARRANTIES MADE BY THE PARTIES.  FISERV DOES NOT REPRESENT THAT THE DELIVERABLES MEET CLIENT'S REQUIREMENTS OR THAT THE OPERATION OF THE DELIVERABLES WILL BE UNINTERRUPTED OR ERROR-FREE.  CLIENT ACKNOWLEDGES THAT IT HAS INDEPENDENTLY EVALUATED THE DELIVERABLES AND THEIR APPLICATION TO CLIENT'S NEEDS.  FISERV DISCLAIMS, AND CLIENT HEREBY EXPRESSLY WAIVES, ALL OTHER REPRESENTATIONS, CONDITIONS, OR WARRANTIES, EXPRESS AND IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE.  CLIENT MAY NOT MAKE ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, ON BEHALF OF FISERV, ITS AFFILIATES OR THEIR RESPECTIVE THIRD PARTY PROVIDERS OR LICENSORS TO ANY AUTHORIZED USER OR ANY OTHER PARTY IN CONNECTION WITH THE DELIVERABLES WITHOUT FISERV'S EXPRESS PRIOR WRITTEN CONSENT.

7.  Limitation of Liability.  IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF GOODWILL, OR FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, OR TORT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIM ARISES IN TORT, CONTRACT, OR OTHERWISE.  EXCEPT FOR CLAIMS RELATED TO PROPRIETARY RIGHTS OR PAYMENT OBLIGATIONS, NEITHER PARTY MAY ASSERT ANY CLAIM AGAINST THE OTHER RELATED TO THIS AGREEMENT MORE THAN 2 YEARS AFTER SUCH CLAIM ACCRUED.  FISERV'S AGGREGATE LIABILITY TO CLIENT AND ANY THIRD PARTY FOR ANY AND ALL CLAIMS OR OBLIGATIONS RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL FEES PAID BY CLIENT TO FISERV UNDER THE SCHEDULE RESULTING IN SUCH LIABILITY IN THE 2 MONTH PERIOD PRECEDING THE DATE THE CLAIM ACCRUED.

8.  Term and Termination.

(a) Term.  This Agreement shall be effective on the Effective Date and shall remain in effect until the term of all outstanding Exhibits has expired or such Exhibits have terminated, unless otherwise terminated as provided herein.  The term for Deliverables may be set forth in the applicable Exhibit.  An Exhibit that does not state a term will be effective from its last date of execution until terminated in accordance with this Agreement or the Exhibit.

(b) Termination.  In addition to termination rights set forth in any Exhibit:

(i) Either party may, upon written notice to the other, terminate:  (A) any Schedule if the other party materially breaches its obligations under that Schedule or under this Agreement with respect to that Schedule; or (B) this Agreement if the other party materially breaches its obligations with respect to the non-breaching party's Information or other intellectual property; and the breaching party fails to cure such material breach within 90 days following its receipt of written notice stating, with particularity and in reasonable detail, the nature of the claimed breach.

(ii) If any invoice remains unpaid by Client 30 days after due, Fiserv may, upon 30 days' written notice to Client, terminate:  (A) the Schedule and/or Client's access to and use of Deliverables to which the payment failure relates; or (B) this Agreement if the unpaid amounts constitute a material portion of annual charges due under this Agreement.

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 6 of 138

(c) Remedies. Remedies contained in this Section 8 are cumulative and are in addition to the other rights and remedies available to Fiserv under this Agreement, by law or otherwise.

9.   Dispute Resolution. Before initiating legal action against the other party relating to a dispute herein, the parties agree to work in good faith to resolve disputes and claims arising out of this Agreement. To this end, either party may request that each party designate an officer or other management employee with authority to bind such party to meet to resolve the dispute or claim. If the dispute is not resolved within 30 days of the commencement of informal efforts under this paragraph, either party may pursue formal legal action. This paragraph will not apply if expiration of the applicable time for bringing an action is imminent and will not prohibit a party from pursuing injunctive or other equitable relief to which it may be entitled.

10.  Audit.

(a) Fiserv Operations and Security. Client acknowledges and agrees that Fiserv is subject to certain examinations by the Federal Financial Institutions Examination Council ("**FFIEC**") regulators and agencies. Client acknowledges and agrees that reports of such examination of Fiserv business units are available to Client directly from the relevant FFIEC agencies. Fiserv employs an internal auditor responsible for reviewing the integrity of its processing environments and internal controls.

(b) Billing Records. Upon Client's reasonable request in writing no more frequently than once every 12 months, Fiserv shall provide Client with documentation supporting the amounts invoiced by Fiserv hereunder for the 12-month period preceding such Client request. If such documentation reveals the amounts paid to Fiserv exceed the amounts to which Fiserv is entitled and such amounts are independently verified, Fiserv shall promptly remit or otherwise credit to Client the amount of such overpayment. Conversely, if such documentation reveals the amounts paid to Fiserv are less than the amounts owed, Client shall promptly remit the amount of such underpayment to Fiserv. Invoices dated prior to the 12-month review period hereunder shall be deemed correct. Fiserv reserves the right to charge Client for any assistance required in connection with an audit at Fiserv's then-current rates.

11.  General.

(a) Binding Agreement; Assignment. This Agreement is binding upon the parties, their participating Affiliates, and their respective successors and permitted assigns. Neither this Agreement nor any part thereof or interest therein may be sold, assigned, transferred, pledged, or otherwise disposed of by Client, whether pursuant to change of control, by operation of law or otherwise, without Fiserv's prior written consent. Client agrees that Fiserv may assign all or part of this Agreement and may subcontract any obligations to be performed hereunder; provided that any such subcontractors shall be required to comply with all applicable terms and conditions of this Agreement, and Fiserv shall remain primarily liable for the performance of any such subcontractors.

(b) Entire Agreement; Amendments. This Agreement, including its Exhibits and Schedules, which are expressly incorporated herein by reference, constitutes the complete and exclusive statement of the agreement between the parties as to the subject matter hereof and supersedes all previous agreements with respect thereto and the terms of all existing or future purchase orders and acknowledgments. Each party hereby acknowledges that it has not been induced to enter into this Agreement by virtue of, and is not relying on, any representation made by the other party not embodied herein, any term sheets or other correspondence preceding the execution of this Agreement, or any prior course of dealing between the parties, including without limitation any statements concerning product or service usage or the financial condition of the parties. The protections of this Agreement shall apply to actions of the parties performed in preparation for and anticipation of the execution of this Agreement. Modifications of this Agreement must be in writing and signed by duly authorized representatives of the parties. If the terms of any Exhibit or Schedule conflict with the terms of this Agreement, this Agreement shall control unless the applicable Exhibit or Schedule expressly states that its terms control. If the terms of any Schedule conflict with the terms of the Exhibit to which such Schedule is attached, the terms of the Schedule shall control.

(c) Severability. If any provision of this Agreement is held to be unenforceable or invalid, the other provisions shall continue in full force and effect.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 7 of 138

(d) <u>Governing Law; Jury Trial Waiver</u>. This Agreement will be governed by the substantive laws of the State of New York, without reference to provisions relating to conflict of laws. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. Both parties agree to waive any right to have a jury participate in the resolution of any dispute or claim between the parties or any of their respective Affiliates arising under this Agreement.

(e) <u>Force Majeure</u>. With the exception of Client's payment obligations, neither party shall be responsible for delays or failures in performance resulting from acts of God, acts of civil or military authority, fire, flood, strikes, war, epidemics, pandemics, shortage of power, telecommunications or Internet service interruptions or other acts or causes reasonably beyond the control of that party. The party experiencing the force majeure event agrees to give the other party notice promptly following the occurrence of a force majeure event, and to use diligent efforts to re-commence performance as promptly as commercially practicable.

(f) <u>Notices</u>. Any written notice required or permitted to be given hereunder shall be given by: (i) Registered or Certified Mail, Return Receipt Requested, postage prepaid; (ii) confirmed facsimile; or (iii) nationally recognized overnight courier service to the other party at the addresses listed on page 1 or to such other address or person as a party may designate in writing. All such notices shall be effective upon receipt.

(g) <u>No Waiver</u>. The failure of either party to insist on strict performance of any of the provisions hereunder shall not be construed as the waiver of any subsequent default of a similar nature.

(h) <u>Prevailing Party</u>. The prevailing party in any arbitration, suit, or action brought by one party against the other party to enforce the terms of this Agreement or any rights or obligations hereunder, shall be entitled to receive, in addition to such other relief as the arbitrators or court may award, its reasonable costs and expenses, including without limitation all attorneys' fees, expert witness fees, litigation-related expenses and arbitrator and court or other costs incurred in such proceeding or otherwise in connection with bringing such arbitration, suit, or action. For purposes of this Agreement, a party is "prevailing" if that party prevails on the central issue raised in the action or claim, regardless of the amount of damages awarded or otherwise owed, if any. A party may prevail by judgment or decision in that party's favor, consent decree, settlement agreement or voluntary dismissal with or without prejudice.

(i) <u>Survival</u>. All rights and obligations of the parties under this Agreement that, by their nature, do not terminate with the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement.

(j) <u>Recruitment of Employees</u>. Client shall not, without Fiserv's prior written consent, directly or indirectly, solicit for employment or hire any Restricted Employee (as defined herein) while such person is employed by Fiserv and for the 12-month period starting on the earlier of: (i) termination of such Restricted Employee's employment with Fiserv; or (ii) termination or expiration of this Agreement. "**Restricted Employee**" means any former or current employee of Fiserv or its Affiliates that Client became aware of or came into contact with during Fiserv's performance of its obligations under this Agreement.

(k) <u>Publicity</u>. Client and Fiserv shall have the right to make general references about each other and the type of Deliverables being provided hereunder to third parties, such as auditors, regulators, financial analysts, and prospective customers and clients, provided that in so doing Client or Fiserv does not breach Section 3 of this Agreement. Fiserv may issue a press release regarding this Agreement, including its renewal and the addition of Deliverables, subject to Client's review and approval, which shall not be unreasonably withheld or unduly delayed. Except as authorized herein, Client will not use the name, trademark, service mark, logo or other identifying marks of Fiserv or any of its Affiliates in any sales, marketing, or publicity activities, materials, or website display without the prior written consent of Fiserv. Any such authorized or approved use shall at all times comply with Fiserv's Trademark Usage Guidelines (or such other requirements and/or guidelines) set forth on Fiserv's corporate website and other requirements issued or otherwise made available by Fiserv.

Case 1:25-cv-01112-TDS-LPA   Document 58-2   Filed 03/02/26   Page 8 of 138

(l)   Independent Contractors.   Client and Fiserv expressly agree they are acting as independent contractors and under no circumstances shall any of the employees of one party be deemed the employees of the other for any purpose.   Except as expressly authorized herein or in the Exhibits, this Agreement shall not be construed as authority for either party to act for the other party in any agency or other capacity, or to make commitments of any kind for the account of or on behalf of the other.

(m)   No Third Party Beneficiaries.   Except as expressly set forth in any Exhibit hereto, no third party shall be deemed to be an intended or unintended third party beneficiary of this Agreement.

(n)   Counterparts; Signatures.   This Agreement and any Exhibits hereto may be executed in counterparts, each of which shall be deemed an original and which shall together constitute one instrument. Signatures transmitted by facsimile or electronically via PDF or similar file delivery method shall have the same effect as an original signature, provided that in no event shall the Agreement or any amendment or other document hereunder be executed by placing or inserting a digital signature file into such document.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

For Client:
**Winston-Salem Federal Credit Union**

By: _Tony B. Ebron_

Name: _TONY B. EBRON_

Title: _PRESIDENT_

For Fiserv:
**Fiserv Solutions, Inc.**

By:_____

Name:_____

Title:____Authorized Signatory_____

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 9 of 138

## ASP Services Exhibit to Master Agreement

1.    ASP / Processing Services.  The parties shall add individual Schedules to this ASP Services Exhibit for Fiserv's provision of ASP, processing, or other service bureau Services to Client.  The terms of this ASP Services Exhibit shall apply to the Services set forth in Schedules attached to this Exhibit.

2.    Additional Services.

(a)    Implementation Services.  Services: (i) to convert Client's existing applicable data and/or information to the Services, and/or (ii) to implement the Services (collectively, "**Implementation Services**") will be provided by Fiserv to the extent applicable to the Services, for the fees, if any, set forth in the Schedules to this Exhibit.  Client agrees to provide all necessary cooperation, information and assistance in connection with Implementation Services to facilitate conversion and/or implementation.

(b)    Training Services.  To the extent applicable to the Services, Fiserv shall provide training, training aids, user manuals, and other documentation for Client's use as Fiserv finds necessary to enable Client personnel to become familiar with Services, for the fees, if any, set forth in the Schedules to this Exhibit.  If requested by Client, classroom training in the use and operation of Services will be provided at a training facility designated by Fiserv.

(c)    Optional Services.  If optional services are listed on a Schedule to this Exhibit, such optional services shall become part of the Agreement upon Client's use of such optional services.

3.    Fiserv System and Client Systems.  Fiserv systems used in the delivery of Services (the "**Fiserv System**") and Client's networks and computer systems ("**Client Systems**") contain information and computer software that are proprietary and confidential information of the respective parties, their suppliers, and licensors.  Each party agrees not to attempt to circumvent the devices employed by the other party to prevent unauthorized access thereto, including without limitation modifications, decompiling, disassembling, and reverse engineering thereof.

4.    Fiserv Obligations.

(a)    Client Policies. While assigned to provide Services at a Client location or otherwise visiting Client's facilities, Fiserv employees will: (i) comply with Client's reasonable safety and security procedures and other reasonable Client rules applicable to Client personnel at those facilities to the extent such procedures and rules are provided to Fiserv in writing and in advance, (ii) comply with all reasonable requests of Client personnel, as applicable, pertaining to personal and professional conduct, and (iii) otherwise conduct themselves in a professional and businesslike manner.

(b)    Changes.  Fiserv may make changes in its methods of delivering the Services, including but not limited to operating procedures, type of equipment or software resident at, and the location of Fiserv's service center(s).  Fiserv will notify Client prior to implementing any material change that affects Client's normal operating procedures, reporting, or internal service costs.

(c)    Client Systems Access.  If Fiserv accesses Client Systems, Fiserv will: (i) use this access only to provide Services to Client; and (ii) ensure that the Fiserv System includes up-to-date anti-viral software designed to prevent viruses from reaching Client Systems through the Fiserv System.

(d)    Security Testing.  Fiserv may use a third party to provide monitoring, penetration and intrusion testing with respect to certain Services.  Upon Client's written request, Fiserv agrees to provide Client with a copy of its most recent security certification, if any, for the applicable Fiserv service center providing such Services.

(e)    Services Warranties.  Fiserv represents and warrants that: (i) Services will conform to the specifications set forth in the Schedules to this Exhibit; (ii) Fiserv will perform Services accurately provided that Client supplies accurate data and information, and follows the procedures described in all Fiserv documentation and notices; (iii) Fiserv personnel will exercise due care in provision of Services;

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 10 of 138

and (iv) functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry in which the functionality is intended to be used.

(f)     Error Correction.  In the event of an error or other default caused by Fiserv personnel, systems, or equipment, Fiserv shall correct such error or default at no additional charge to Client, provided that Client supplies Fiserv with a written request for correction of the error within 7 days after Client's receipt of the work containing the error.  Work reprocessed due to errors in data supplied by or through Client or by Client's failure to follow procedures set forth by Fiserv shall be billed to Client at Fiserv's then current time and material rates.

(g)     Infringement Claims.  Fiserv shall, at its expense, defend Client against any third party claim or action alleging that the Fiserv System infringes a United States patent, copyright, or other proprietary right of such third party ("**Infringement Claim**"), and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any Infringement Claim, provided that Client: (i) notifies Fiserv promptly of such Infringement Claim, (ii) grants Fiserv the sole right to control the defense and disposition of such Infringement Claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such Infringement Claim.   The obligations set forth in this paragraph are Fiserv's entire liability and Client's sole and exclusive remedy for any Infringement Claim.

(h)     Audit.  In addition to the audit provisions set forth in Section 10 of the Agreement, Fiserv provides for periodic independent audits of its operations, which shall include an annual SSAE 16 Type II audit to the extent required by law or regulation.   Fiserv shall provide Client with a copy of such independent audit report of the Fiserv service center providing Services within a reasonable time after its completion, and may charge Client a fee based on the pro rata cost of such audit apportioned among Fiserv's clients.  If material deficiencies affecting the Services are noted in such audit report, Fiserv will develop and implement an action plan to address and resolve any such deficiencies within a commercially reasonable time at Fiserv's expense.

5.     Client Obligations.

(a)     Procedures; Processing Priority.   Client agrees to comply with Fiserv's procedures and operating instructions for use of Services and the Fiserv System.  Client acknowledges that Fiserv does not subscribe to any processing priority; all users receive equal processing consideration.

(b)     Communication Lines, Terminals, Equipment, Software.  All communication lines, terminals, equipment, computer software, and interface devices required to access the Fiserv System and to transmit and receive data and information between Client's location(s), Fiserv's service center(s), and/or other necessary location(s) (collectively, "**Client Equipment**") are subject to approval by Fiserv and shall be compatible with the Fiserv System.  Client is responsible for the expense of either procuring Client Equipment from Fiserv or providing Client Equipment itself, provided that all communication lines shall be procured from Fiserv.  If Client has elected to provide Client Equipment itself, Fiserv shall provide Client with a list of compatible equipment and software.  Client agrees to pay Fiserv's standard fee for recertification of the Fiserv System resulting from Client's use of non-compatible Client Equipment.  If Fiserv provides such items, Client agrees to pay charges relating to the installation and use of Client Equipment as set forth in the Schedules to this Exhibit.

(c)     Input.  Client shall be solely responsible for the input, transmission, or delivery to and from Fiserv (whether delivered to or from Client site(s) or any applicable clearinghouse, regulatory agency, or Federal Reserve Bank) of all information and data required by Fiserv to perform Services unless Client has retained Fiserv to handle such responsibilities, as specifically set forth in Schedules to this Exhibit.  The information and data shall be provided in a format and manner approved by Fiserv.  Client is responsible for providing all instructions requested by Fiserv as necessary to perform the Services.  Client shall determine and be responsible for the authenticity, accuracy, and completeness of all information, data, and instructions submitted to Fiserv.  Fiserv is not obligated to check for errors or omissions in any such information, data, or instructions and/or to correct, cancel or amend any action in connection with any

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 11 of 138

Services once Fiserv has received instructions to complete such action.

(d) <u>Client Personnel</u>. Client shall designate appropriate Client personnel for training in the use of the Services, shall supply Fiserv with reasonable access to Client's site during normal business hours for Implementation Services, and shall cooperate with Fiserv personnel in their performance of Services.

(e) <u>Client Review; Responsibility for Accounts</u>. Client shall review all reports furnished by Fiserv for accuracy, and shall work with Fiserv to reconcile any out of balance conditions or discrepancies. As applicable, Client shall be responsible for balancing its accounts each business day and notifying Fiserv promptly of any errors or discrepancies. If Client so notifies Fiserv, Fiserv shall, at its expense, promptly recompute accounts affected by discrepancies solely caused by the Fiserv System or provide for another mutually agreeable resolution. Fiserv will use commercially reasonable efforts to correct errors attributable to Client or Client's other third party servicers. Reconstruction of error conditions attributable to Client or to third parties acting on Client's behalf will be done at Fiserv's then-current professional services rates.

(f) <u>Client Systems</u>. Client shall ensure that Client Systems: (i) are capable of passing and/or accepting data from and/or to the Fiserv System, and (ii) include up-to-date anti-viral software designed to prevent viruses from reaching the Fiserv System through Client Systems.

(g) <u>Client Notification</u>. Client agrees that it shall notify Fiserv as soon as possible upon becoming aware of any incident of unauthorized access to any Information or the Fiserv System.

(h) <u>Indemnity</u>. Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against: (i) any and all claims or actions arising out of (A) the use by Client of the Fiserv System in a manner other than that provided in the Agreement, and (B) access by Client's customers, through a voice response system or through such customers' personal computers or mobile devices, to Client Files or any Fiserv files (including the files of other Fiserv clients) or the Fiserv System or other Fiserv systems; and (ii) any and all claims by third parties through Client arising out of the performance and non-performance of Services by Fiserv, provided that such indemnity shall not preclude Client's recovery of damages from Fiserv pursuant to the terms and subject to the limitations of the Agreement.

(i) <u>Regulatory Requirements</u>. As applicable to Client's receipt of Services and as required by regulatory authorities having jurisdiction over Client, Client agrees to: (i) submit a copy of the Agreement to the appropriate regulatory agencies prior to the date Services commence, (ii) provide adequate notice to the appropriate regulatory agencies of the termination of the Agreement or any material changes in Services, (iii) retain records of its accounts, and (iv) obtain and maintain at its own expense any required Fidelity Bond and casualty and business interruption insurance coverage for loss of records from fire, disaster, or other causes.

6. <u>Business Continuity / Disaster Recovery</u>.

(a) <u>General</u>. Fiserv maintains a business continuity plan ("**<u>Business Continuity Plan</u>**") for each Service that describes measures it will implement to recover from a Disaster. A "**<u>Disaster</u>**" shall mean any unplanned impairment or interruption of those systems, resources or processes that enable standard performance of the applicable Service's functionality. Each Business Continuity Plan shall include a plan for the recovery of critical technology systems (a "**<u>Disaster Recovery Plan</u>**"), as well as procedures for restoring business operations at the primary location or at a designated recovery site, if necessary. Fiserv shall work with Client to establish a plan for alternative communications in the event of a Disaster.

(b) <u>Disaster Occurrence</u>. Fiserv shall notify Client as soon as possible after the occurrence of a Disaster and shall comply with the Business Continuity Plan. Fiserv shall move the processing of Client's standard services to the recovery site as expeditiously as possible if operations cannot be satisfactorily restored (in Fiserv's sole discretion) at the primary location. If a recovery site is used, Fiserv shall coordinate the cut-over to back-up telecommunication facilities with the appropriate carriers. Client shall maintain adequate records of all transactions under the reasonable control of Client during the period of service interruption and shall have personnel available to assist Fiserv in implementing the switchover to the recovery site. During a Disaster, optional or on-request services shall be provided by Fiserv only to

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 12 of 138

the extent adequate capacity exists at the recovery site and only after stabilizing the provision of base services.

(c) Disaster Recovery Test. Fiserv shall test the Disaster Recovery Plan periodically. Client agrees to participate in and assist Fiserv with such test, if requested by Fiserv. Upon Client's request, test results will be made available to Client's management, regulators, auditors, and insurance underwriters.

(d) No Warranty. Client understands and agrees that the Business Continuity Plan is designed to minimize, but not eliminate, risks associated with a Disaster affecting Fiserv's service center(s). No performance standards shall be applicable for the duration of a Disaster. Client maintains responsibility for adopting a disaster recovery plan relating to disasters affecting Client's facilities and for securing business interruption insurance or other insurance necessary for Client's protection. Fiserv agrees to release information necessary to allow Client's development of a disaster recovery plan that operates in concert with the Business Continuity Plan.

7. Lost Records. Notwithstanding Section 7 of the Master Agreement, if Client's records or other data submitted for processing are lost or damaged as a result of any failure by Fiserv, its employees, or agents to exercise reasonable care to prevent such loss or damage, Fiserv's liability on account of such loss or damages shall not exceed the reasonable cost of reproducing such records or data from Fiserv's back-up data or from exact duplicates thereof in Client's possession.

8. Term and Termination; Deconversion.

(a) Term. Unless otherwise set forth in an applicable Schedule to this Exhibit, the initial term of Services provided hereunder shall end August 13, 2019. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of 5 years.

(b) Convenience; Early Termination. If Client terminates the Agreement or reduces (other than as a result of account attrition or volume fluctuation in the ordinary course of business) or terminates Services for any reason other than pursuant to Section 8(b)(i) of the Agreement, Client shall pay a termination fee based on the remaining unused term of the Services. Such fee shall be determined by multiplying the average of the monthly invoices for each Service received by Client during the 6-month period preceding the effective date of termination (or if no monthly invoice has been received, the estimated monthly billing for each Service to be received hereunder) by 80% times the remaining months of the term, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination.

(c) Defaults. If Client: (i) fails to cure its material breach or fails to pay amounts due, each as set forth in Section 8(b) of the Agreement; (ii) deconverts any data or information from the Fiserv System either without Fiserv's prior written consent or in violation of the Agreement; or (iii) commits an act of bankruptcy or becomes the subject of any proceeding under the Bankruptcy Code or becomes insolvent or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application, or sale for or by any creditor or governmental agency; then, in any such event, Fiserv may, upon written notice, terminate the Agreement in whole or in part and be entitled to recover from Client as liquidated damages for such early termination an amount equal to the present value of all payments remaining to be made for the remaining unused term of the Agreement or the applicable Exhibit, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination. For purposes of the preceding sentence, present value shall be computed using the "prime" rate (as published in *The Wall Street Journal*) in effect at the date of termination and "all payments remaining to be made" shall be calculated by multiplying the average monthly invoices for the 6 months immediately preceding the date of termination by the remaining months of the term.

(d) Liquidated Damages. Client understands and agrees that Fiserv losses incurred as a result of early termination of the Agreement, this Exhibit, or any Schedule would be difficult or impossible to calculate as of the effective date of termination since they will vary based on, among other things, the number of clients using the Fiserv System on the date the Agreement (or applicable part thereof)

Case 1:25-cv-01112-TDS-LPA Document 58-2 Filed 03/02/26 Page 13 of 138

terminates. Accordingly, the amounts set forth in Sections 8(b) and 8(c) above and Section 10(e) below represent Client's agreement to pay and Fiserv's agreement to accept as liquidated damages (and not as a penalty) such amount for any such termination.

(e)     Return of Client Files. Upon expiration or termination of the Agreement or any Schedule to this Exhibit, Fiserv shall furnish to Client such copies of Client Files as Client may request in a Fiserv standard format, and shall provide such information and assistance as is reasonable and customary to enable Client to deconvert from the Fiserv System; provided, however, that Client authorizes Fiserv to retain Client Files until: (i) Fiserv is paid in full for all amounts due for all Services provided through the date such Client Files are returned to Client; (ii) Fiserv is paid its then standard rates for the services necessary to return such Client Files; (iii) if the Agreement or applicable Schedule is being terminated, Fiserv is paid any applicable termination fee pursuant to Section 8(b) or (c) above; and (iv) Client has returned or destroyed all Fiserv Information in accordance with Section 3(b) of the Agreement. Fiserv shall be permitted to destroy Client Files any time after 30 days from the final use of Client Files for processing, unless: (A) Fiserv is directed by Client in writing to retain such files for a longer period, provided that Client may not require Fiserv to retain Client Files for longer than 90 days unless Fiserv agrees to such longer retention period, or (B) otherwise specified in a Schedule.

(f)     Miscellaneous. Client is responsible for the deinstallation and return shipping of any Fiserv-owned equipment located on Client's premises.

9.     Exclusivity. Client agrees that Fiserv shall be the sole and exclusive provider of the services that are the subject matter of the Schedules to this Exhibit. Client agrees not to enter into an agreement with any other entity to provide these services (or similar services), and not to perform these services (or similar services) for itself, during the term of this Exhibit without Fiserv's prior written consent. If Client acquires another entity, the exclusivity provided to Fiserv hereunder shall take effect with respect to such acquired entity as soon as practicable after expiration or earlier termination of such acquired entity's previously existing arrangement for these services. If Client is acquired by another entity, the exclusivity provided to Fiserv hereunder shall apply with respect to the level or volume of services provided immediately prior to the signing of the definitive acquisition agreement relating to such acquisition and shall continue with respect to the level or volume of such services until any termination or expiration of this Exhibit.

10.     Additional Fee Provisions.

(a)     Annual Adjustment. Fiserv's fees for Services may be increased annually effective each January 1 upon 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Consumers ("**CPI**") for the most recently available 12-month period preceding such 30-day notice period, or 5%, whichever is greater.

(b)     Holdover. Upon any termination or expiration of the Agreement or an Exhibit, Services provided after the applicable termination date, expiration date, or final processing date specified by Client will be provided subject to Fiserv's capacity and will be invoiced at then current fees under the applicable Schedule plus a holdover premium of 25%, unless such holdover is due to Fiserv's action or inaction.

(c)     Deconversion Charges. Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Fiserv System.

(d)     Regulatory and Compliance Charge. Fiserv reserves the right to charge Client for Client's share of direct Fiserv costs of maintaining regulatory compliance as required by Section 4(e)(iv) of this Exhibit and/or meeting relevant third party standards (such as PCI-SSC's Payment Card Industry Data Security Standard).

(e)     Assumptions. Fees set forth in the Schedules to this Exhibit are based on completion of the initial term of all Services. If Services are reduced or terminated pursuant to Section 8(b) or (c) above, or if Client renegotiates pricing before expiration of the initial term, Client shall reimburse Fiserv for all credits, rebates, discounts, and incentives granted on all Services. Any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Services.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 14 of 138

11.  Residuals.  Nothing contained in the Agreement shall restrict Fiserv from the use in its business of any ideas, concepts, know-how, or techniques contained in Client Information accessed by Fiserv in connection with the Services that are related to Fiserv's business activities and retained in the unaided memory of Fiserv's employees.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 15 of 138

## EFT Services Schedule to ASP Services Exhibit

1. <u>Description of Services</u>.  Fiserv agrees to provide to Client the Services, as may be more fully described in this Section or Schedule below, which are set forth in the fee schedule contained in this Schedule or, for Services selected by Client after the Effective Date, which are set forth in a service request form ("EFT Service Request") provided by Fiserv and signed and returned by Client ("EFT Services"):

   a.  <u>On-Line Host Interface</u>.  The operational environment that allows an electronic transaction to be processed against a cardholder's account.

   b.  <u>ATM Driving/Monitoring</u>.  The process of providing an ATM with the on-line instructions necessary to process transactions and verifying equipment and telephone operability.

   c.  <u>Networks</u>.  Those regional or national ATM associations who provide electronic access to financial transactions for cardholders of member financial institutions.  Networks are as set forth in the fee section below.

   d.  <u>Web Connectivity</u>.  Links Client's IBM compatible PC to the Fiserv System, allowing Client to retrieve reports, retrieve transaction history, and perform network adjustments.

   e.  <u>Card Management</u>.  An automated system for plastic card ordering, pin ordering, card re-issue tracking and "Hot Carding", accessible to Client via On-Line Terminal Dial-Up PC or Batch Processing.

   f.  <u>Transmissions</u>.  Transactions reports and settlement information transmitted to Client's host data processing system.

   g.  <u>Business Continuity</u>.  Fiserv's disaster recovery program.

   h.  <u>Telecommunications and Equipment</u>.  ATM phone line and modems relevant to driving and monitoring Client's ATMs.

   i.  <u>Conversion Date</u>.  On mutually agreed upon date by Client and Fiserv.

2. <u>Fees</u>: As of June 1, 2014, Client agrees to pay Fiserv the fees set forth below for EFT Services, and prior to such date, Client agrees to pay Fiserv the fees at the rates charged to Client as of the Effective Date, included under the previous agreement between Fiserv and Client for such services Client agrees to pay Fiserv the fees set forth below for EFT Services.  Such fees will be invoiced to Client on a monthly basis unless otherwise indicated.  Notwithstanding Section 10(a) of the ASP Services Exhibit, Fiserv shall have the right to bill Client the full amount of any increases in third-party telecommunications costs or network pass-through fees incurred on behalf of Client as of the same effective date such increases are billed to Fiserv.

| Solution | Description | Unit Price |
|---|---|---|
| **Signature Transactions** | | |
| -Tiered- | Visa Check Transaction  Authorizations - VISA0010 | $0.041042 |
| -Tiered- | Visa Check Transactions Posted - VISA0011 | $0.041042 |
| **Pin Transactions** | | |
| -Tiered- | Transaction Fees (Is,Si) - TRX0107 | $0.041042 |

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 16 of 138

**Auth Support**

| | |
|---|---|
| On-Line Interface Maintenance Fee | $274.51 |
| Card Management Monthly Maintenance Fee | $54.90 |
| Remote Card Maint. Monthly (RCM) | $54.90 |
| Per Card Record Storage Fee | $0.03294 |
| Per PC Input Record Maintenance | $0.0549 |
| Card Master Batch Per Entry | $0.03294 |

**File or Report Transmission**

| | |
|---|---|
| Report Transmissions To Host | $0.00 |

**Chargeback Processing**

| | |
|---|---|
| Visa Check Back Office - Per Card Fee | $0.05 |
| Enhanced Visa Chargeback | $10.98 |

**Single Point Corrections**

| | |
|---|---|
| Network Adjustments ( On-Line) | $2.75 |

**Client Central**

| | |
|---|---|
| BASE COMPLIANCE / AUDIT SUPPORT FEE | $85.83 |
| CVi 12 Month Access | $54.90 |
| Web Connect Maint Fee | $54.90 |
| Web Connect Port Access Fee | $54.90 |
| Web Connect  Per Security Token Maint Fee | $5.49 |

**Card Self Service**

| | |
|---|---|
| CARD ACTIVATIONS - IVR | $0.54901 |
| CARD ACTIVATIONS - IVR FIRST PINNED - FAILURE | $0.54901 |
| CARD ACTIVATIONS - IVR MANUAL - SUCCESS | $0.54901 |
| Monthly Support (Standard)-IVR | $54.90 |

**Payment Networks**

| | |
|---|---|
| Plus Pass-through Card Fee | $0.0021 |
| Visa Access Fees | $0.00549 |
| Bankmate/HonorWest/Star Midwest Gateway Access Fee | $50.00 |
| Plus Monthly Membership Fee | $90.00 |
| Visa Sponsorship Fee | $50.00 |

**Financial Risk Management**

| | |
|---|---|
| Risk Subscription - per transaction | $0.0033 |
| CardTracker Monthly Support (Debit Cards) | $54.90 |
| CaseTracker User Fee | $27.45 |
| HOT CARDS | $5.49 |
| Monthly Enhanced Visa Status Fee | $109.80 |
| CVV,  AVS & Enhanced $1.00 Status Fee | $100.00 |
| TranBlocker Monthly Fee - Per Bin | $219.61 |
| Verified By Visa - Per Transactions | $0.03294 |

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 17 of 138

| | |
|---|---|
| Verified By Visa - Monthly Storage Fee | $54.90 |
| Verified By Visa - Per Enrolled Card | $0.0533 |
| Verified By Visa - Card Activation by Cardholder | $0.27451 |
| EnFact Case Mgmt Scoring-per transaction | $0.01131 |
| EnFact Per Case Created | $7.00 |
| EnFact Monthly Fee | $56.55 |
| ENFACT LETTER - U.S. POSTAGE | $0.49 |
| ENFACT STANDARD FRAUD LETTER | $0.00 |
| EnFact Real-Time - per transaction | $0.01417 |

## Loyalty Solutions

| | |
|---|---|
| UCHOOSE ISSUER FISERV ACCTS-DB | $0.23059 |
| UCHOOSE Administrative Tool | $54.90 |

## Additional Services

| | |
|---|---|
| CA5003-IVR - AGENT REFER TO FI | $0.00 |
| VROL2368-Fraud Reports Submitted | $0.00 |

## Debit Pass-throughs

Plus Processing Fee
Images Added or Uploaded
Visa Tran Inquiry Requests within 6 months
Chargeback QNs with Financial Submitted
Exception File Inquiries
Visa Quarterly Pass-through Fee
Visa Check Pass-through Net Fees/Rebates

## Tiered Pricing Tables

**Authorized Transactions**
**VISA0010, VISA0011, TRX0107**

| | Tiered | Blended rate | |
|---|---|---|---|
| | | | $0.041042 |
| From Volume | To Volume | Rate | |
| 0 | 50,000 | | $0.05 |
| 50,001 | 100,000 | | $0.045 |
| 100,001 | 150,000 | | $0.04 |
| 150,001 | 200,000 | | $0.035 |
| 200,001 | and above | | $0.03 |

*Notice and Disclaimers:*

*Client is subject to Network Operating Rules, Fees and Settlement Funding Requirements.*

*Client shall be responsible for payment to Fiserv of network pass-through fees and expenses. If client's volume qualifies for volume discounts from network, Fiserv will pass such adjusted fees to Client.*

*Client may be subject to additional charges, including one-time costs associated with network related expenses and the production and inventory of plastic cards.*

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 18 of 138

3. <u>Performance Standards</u>. Performance standards applicable to EFT Services are as follows:

The Fiserv System used to provide EFT Services shall be available 99% of the time during any full calendar month (exclusive of planned downtime).

4. <u>Hours of Operation</u>. Hours of operation for EFT Services are as follows:

a. Fiserv will provide access to its EFT Services 24 hours a day, 365 days per year, except for planned downtime that shall be reserved for scheduled maintenance. Client will be notified in advance of such downtime.

b. Client support assistance will be available during normal business hours, Monday through Friday, with the exception of the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. When a holiday falls on Saturday, Fiserv will observe the preceding Friday, when a holiday falls on Sunday, Fiserv will observe the following Monday.

5. <u>Additional Terms</u>. The following additional terms apply to EFT Services:

a. <u>Network Support Services</u>. Fiserv will provide network support services (monitoring, service, and maintenance for equipment) in accordance with instructions supplied by Client. If any or all of the communication network should fail, Fiserv or its designated agents will locate the problem and correct any malfunction not associated with equipment or circuits provided by common carriers. If the problem is located in the equipment or circuits of the common carriers, Fiserv will contact the common carriers and request that the problem be corrected. Maintenance fees incurred by Fiserv for repairs caused by faulty electrical power, inadequate physical facilities, physical abuse, or other Client-supplied or controlled factors will be reimbursed by Client.

b. <u>Reports</u>. Fiserv will provide output reports to Client for daily, weekly, monthly, and annual transactions.

c. <u>Backup Records</u>. Fiserv currently retains historical files at a location separate from the data center sufficient to recreate files for the most recent week and month-end. A daily transaction log of all Client transactions for the most recent ten business days will also be maintained at this location.

d. <u>Software Modifications</u>.

   (i) <u>Custom Programming</u>. Fiserv will develop a preliminary estimate of the anticipated hours and costs plus or minus fifty (50) percent associated with the implementation of said change. This estimate will be returned to Client within four weeks. Written acceptance by Client to proceed with the project will be required prior to beginning final specifications. Fiserv will assign a projected completion date to the project, provided no additional changes or modifications to the original specifications occur once the project is in development.

   (ii) <u>Regulatory Software Changes</u>. Software changes required by government bodies will be quoted in accordance with subsection (i) above and such costs will be distributed to all clients on an equitable basis.

   (iii) <u>Major Software Enhancements</u>. All major software enhancements will be subject to additional charges for processing and development. Fiserv is under no obligation to upgrade its software during the term of this Schedule.

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 19 of 138

e. <u>Hardware</u>.  Client will obtain written approval from Fiserv prior to connecting any equipment to the data communication equipment provided by Fiserv. Equipment, if any connected to the Fiserv System must be configured in a manner acceptable to Fiserv.  Client agrees to pay Fiserv for the testing and acceptance of such equipment by Fiserv at its then current rates.  Client shall at all reasonable times permit the authorized personnel of Fiserv and the equipment manufacturers to have access to any Fiserv owned or leased equipment provided under this Schedule, and shall permit removal of such equipment upon termination of this Schedule.

f. <u>Protection of Data</u>.  Fiserv has developed an operations backup center for which Client has agreed to pay the charges indicated above.  Fiserv tests the procedure periodically to ensure compliance. Copies of transactions files are maintained by Fiserv off premises in secured vaults.

g. <u>On-Line Security</u>.  Fiserv will provide access to Client, after execution of appropriate "on-line" security measures, to allow Client to perform Cardholder maintenance on Client's EFT data files in the Fiserv System.

h. <u>Network Agreement</u>.  Fiserv provides access to electronic fund transfer networks for the purpose of participating in the exchange of transactions on an inter-network basis.  Client may participate in such networks subject to the following terms and conditions:  (i) Client will enter into an agreement with each such network in which Client elects to participate, and will operate within and abide by the operating rules established by each such network, and pay any associated fees imposed by each such network; and (ii) the clearing of transactions and reconciliation of payments will be in accordance with settlement procedures established between Fiserv and each such network.

i. <u>Settlement Accounts</u>.

(i) Client shall establish a demand deposit account at Client's institution, which is accessible by Fiserv (the "Settlement Account"), and shall maintain at all times in the Settlement Account funds in the amount sufficient to enable Fiserv to perform the settlement procedures set forth herein.  Client authorizes Fiserv, at Client's expense, to access the Settlement Account through the Automated Clearing House ("ACH") or by wire transfer in order to maintain Client's required Settlement Deposit (defined below), or for any purpose described in below, and, similarly, for the transfer of funds owing to Client in the Settlement Account.  Client guarantees that the funds in the Settlement Account shall at all times be accessible to Fiserv for the above-referenced purposes and shall ensure that Fiserv shall be able to make withdrawals and transfers required under this Schedule by providing overdraft protection for the Settlement Account in an amount reasonably required by Fiserv.

(ii) Client shall maintain on deposit with Fiserv, in an account controlled by Fiserv, an amount of funds (the "Settlement Deposit") equal to the average daily "Net Settlement Position" of Client multiplied by 2 days.  The average daily Net Settlement Position is equal to the net sum of all Network settlement entries debited or credited to Client's Settlement Account during the month, divided by 30 days.  If the Net Settlement Position is a credit balance, then no Settlement Deposit shall be required.  The initial Settlement Deposit will be estimated by Fiserv prior to live date based on anticipated transaction volumes supplied by Client.  Fiserv may adjust the Settlement Deposit from time to time upon prior written notice to Client, based on actual transaction volume history and seasonal factors.

(iii) Fiserv may use Client's Settlement Account or, if applicable, Client's Settlement Deposit for the following purposes:

(A) daily settlement of all incoming network transactions;
(B) daily settlement of all fees and assessments charged by the network (or network sponsor) to Client as a participating member institution;

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 20 of 138

(C) settlement of all outgoing network transactions not more than 3 business days following receipt by Fiserv of such outgoing transactions from Client;

(D) settlement of any transaction activity post-termination of this Schedule, including transaction adjustments or chargebacks; and

(E) settlement of all fees and assessments billed by Fiserv to Client for use of EFT Services, and recovery of any incentives due to be paid back to Fiserv under this Agreement.

6. WC3. If applicable to the EFT Services provided hereunder, Client shall, during the term of this Schedule, have the non-exclusive right to use and access WC3 (Web Client Control Center, a card order and inventory reporting portal). Client agrees that WC3 access shall be given only to Client's employees on a need to know basis, and only after informing such employees of the terms and conditions of the Agreement relative to use, disclosure and ownership as set forth in Section 3. Client shall cause all parties to whom Client gives WC3 access to adhere to all applicable provisions of the Agreement, the ASP Services Exhibit and this EFT Services Schedule. Client shall be responsible for any breach thereof by any party to whom Client provides access to WC3.

7. Section 4(e)(iv) of the ASP Services Exhibit does not apply to the Services provided hereunder.

8. Risk Management. The following terms and conditions apply to the Fiserv Services offered by Fiserv to assist Client in detecting and mitigating fraudulent transactions processed under this Agreement, including, without limitation, EnFact, RuleManager, CardTracker, CaseTracker, TranBlocker, Risk Office, and similar Services, however named (collectively, the "Risk Management Services"):

a. Fiserv will provide the Risk Management Services in accordance with industry standards and, with respect to the EnFact product, the material product descriptions contained in the then current EnFact Reference Guide (the "Guide"), but Client acknowledges and agrees that no fraud detection tool is 100% accurate. Should Client elect to have Fiserv provide case management as part of the Risk Management Services, Fiserv will maintain a call center as set forth in the Guide, and when potential fraud is detected, Fiserv will use commercially reasonable efforts to contact via phone (by a voice response system or a live representative) either the applicable cardholder or Client, according to Client's chosen Risk Management Services strategy.

b. Fiserv's provision of the Risk Management Services is subject to downtime as necessary to implement system/software enhancements, modifications, and updates, to perform scheduled or preventative maintenance, or as a result of factors beyond Fiserv's reasonable control. Fiserv will use commercially reasonable efforts to minimize the amount of such downtime.

c. Client agrees to review Fiserv reports related to the Risk Management Services within a commercially reasonable time period after receipt to confirm appropriate action has been taken by Fiserv. Client acknowledges that any delay in reviewing Fiserv reports and confirming appropriate Fiserv action, or in taking corrective action recommended by Fiserv, may diminish the effectiveness of the Risk Management Services.

d. Client is expressly prohibited from extending any warranty on behalf of Fiserv or related to the Risk Management Services to any third party.

e. Fiserv shall not be liable for the actual or alleged fraudulent activity of third parties. With respect to the Risk Management Services, Client shall be solely responsible for the consequences of any instructions it may give to Fiserv and for any Client failure to supply accurate information or to fulfill its obligations in the manner prescribed by Fiserv.

f. Upon termination of Risk Management Services in accordance with the applicable provisions of this Agreement, Client will assume sole responsibility for pending Risk Management Services activities, such as case research and actual cardholder verification, based on Fiserv reports.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 21 of 138

9.    EFT Service Request. If an EFT Service Request is accepted by Fiserv in accordance with this Agreement and the applicable terms and conditions set forth in such EFT Service Request, then such EFT Service Request shall be deemed to incorporate the terms and conditions of this Agreement, which shall govern all Services provided in connection with such EFT Service Request.  To the extent an EFT Service Request contains additional terms and conditions applicable to the EFT Services provided by Fiserv in connection therewith, such additional terms and conditions shall apply solely with respect to the EFT Services provided in connection with such Service Request and shall remain subject to the terms of this Agreement.  If the terms of an EFT Service Request conflict with the terms of this Agreement, this Agreement shall control unless the applicable EFT Service Request expressly states that its terms control.  For the purpose of clarity, all products and services provided by Fiserv to Client in connection with an EFT Service Request shall be deemed to be "Services," as such term is used throughout this Agreement.

10.  Deconversion/Termination Notice. Notwithstanding anything to the contrary in the Agreement, Client notice of deconversion or termination of any of the EFT Services must be received by Fiserv at the following address; notices sent by Client to any other address will be ineffective:  4550 SW Macadam Avenue, Portland, OR  97239.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 22 of 138

## UChoose Rewards Services Schedule to ASP Services Exhibit

Client agrees with Fiserv as follows:

1. <u>Services</u>. Fiserv, itself and through its affiliates and third party service providers, will provide Client the UChoose Rewards Services set forth in this Schedule ("UChoose Rewards Services").

2. <u>Fees</u>. Client shall pay Fiserv the fees and other charges for UChoose Rewards Services specified herein.

3. <u>Equipment and Supplies</u>. Client shall obtain and maintain at its own expense such equipment, including without limitation, telecommunication connections, as may be necessary or appropriate to facilitate the proper use and receipt of UChoose Rewards Services. Client shall be responsible for paying for all supplies to be used in connection with UChoose Rewards Services.

4. <u>Service Modifications</u>. In connection with Fiserv's provision of UChoose Rewards Services, either party may terminate UChoose Rewards Services, or any part thereof, immediately upon notice to the other party of any legislative, regulatory, or judicial (i) impairment of the provision thereof; and/or (ii) restrictions or conditions that would materially affect the integrity thereof.

5. <u>Effect of Termination</u>. Notwithstanding anything in the Agreement to the contrary, upon notice to Client Fiserv may terminate this Schedule in the event its agreement with any or all of its service providers terminates; provided, however, Fiserv agrees to use commercially reasonable efforts to enter into an agreement with another service provider before terminating this Schedule; provided, further, that Fiserv agrees to use commercially reasonable efforts to continue to provide the UChoose Rewards Services until the earlier of (i) termination of this Schedule in accordance with its terms, or (ii) expiration or any transition period provided by Fiserv's service providers which period shall be set forth in Fiserv's notice to Client. Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to UChoose Rewards Services until all such UChoose Rewards Services are no longer provided to Client and its customers.

6. <u>Trademark and Content License</u>. Client hereby grants to Fiserv and its affiliates and third party service providers a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "Trademarks"), and Content (as defined below) in connection with Fiserv's provision of UChoose Rewards Services. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of Fiserv's and its third party service provider's use of Trademarks and/or Content.

7. <u>Regulatory Compliance</u>. Client shall use UChoose Rewards Services only in conjunction with lawful purposes. Client agrees not to use UChoose Rewards Services for any activities in violation of any laws or regulations, including, but not limited to, wrongful transmission of copyrighted material, sending of threatening or obscene materials, or misappropriation of exportation of trade or national secrets.

8. <u>Client Warranties</u>. Client represents and warrants that (a) any work, content, or information ("Content") provided to Fiserv is either original or that Client has the legal right to provide such Content; and (b) Content doesn't impair or violate any intellectual property or other rights of Fiserv or any third party. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of UChoose Rewards Services. Client acknowledges that neither Fiserv nor its third party service providers shall monitor, review, or approve any Content. Client acknowledges that access to UChoose Rewards Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

9. <u>UChoose Rewards Services Indemnification Notification and Process</u>. Notwithstanding anything in the Agreement to the contrary, Client agrees to immediately notify Fiserv in the event it receives notice from a third party or otherwise becomes aware of any claim that the use of the UChoose Rewards Services or the Fiserv System or other systems used to provide the UChoose Rewards Services infringes any patent, copyright or other intellectual property right of such third party (a "UChoose Rewards Infringement Claim"). Client agrees that Fiserv or its third party service provider shall unconditionally control the defense and disposition of all UChoose Rewards Infringement Claims. Client will have the opportunity to participate in the defense of any UChoose Rewards Infringement Claims at its own expense. Client further agrees that it will not settle

Fiserv – Confidential

22

Case 1:25-cv-01112-TDS-LPA   Document 58-2   Filed 03/02/26   Page 23 of 138

any such UChoose Rewards Infringement Claims in which they are named as a party without the prior written consent of Fiserv's third party service provider.

10. Term. Notwithstanding anything contained in the Agreement and the ASP Services Exhibit, the initial term of this Schedule shall end on the date that the initial term of the EFT Services Schedule is to expire.

23

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 24 of 138

<h2 style="text-align:center">UChoose Rewards Services Schedule</h2>

**Fiserv Responsibilities:**

1. Fiserv will provide Client access to UChoose Rewards Services via a browser-based solution to communicate with the Fiserv System or the systems of Fiserv's third party service provider. Client's customers may access and conduct certain business transactions to their enabled accounts from these access solution(s).

2. Fiserv shall configure the UChoose Rewards Services to enable customers to accrue Client-funded points, merchant-funded points, and/or relationship enterprise rewards points (all of the foregoing are "Points") as directed by Client and agreed by Fiserv and its third party service provider. The UChoose Rewards Services shall enable end user customers to redeem Points for rewards designated by Client and agreed to by Fiserv and its third party service provider.

3. Fiserv shall provide UChoose Rewards Services that Fiserv controls in a 24 x 7 environment, subject to reasonable downtime for maintenance. Fiserv will attempt to limit its downtime to those hours of operation least impacted by customer usage, when such options are available.

4. Client acknowledges and understands that UChoose Rewards Services may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties.

5. Fiserv agrees that Fiserv or its third party service provider shall provide Client's customers with email first level support in the event a customer is unable to adequately resolve customer support issues related to the normal operation of the UChoose Rewards Services during normal business hours. Fiserv or its third party service provider shall provide Client's customers with call center first level support upon payment of additional fees. Fiserv's and its third party service provider's sole obligation to any customer is to provide a response for requests for support. As used herein, "first level support" shall mean responding to and answering general inquires to Client's customers related to the normal operation of the UChoose Rewards Services, and customer account and Point balances. In no event shall Fiserv's first level support obligations include the performance of Point redemptions.

6. Fiserv shall provide Client with first level support in the event Client is unable to resolve a customer support issue related to the normal operation of the UChoose Rewards Services adequately during normal business hours. Fiserv's and its third party service provider's sole obligation to Client is to provide a response for requests for support. As used herein, "first level support" shall mean responding to and answering general inquires to Client related to the normal operation of the UChoose Rewards Services, and customer account and Point balances. In no event shall Fiserv's first level support obligations include the performance of Point redemptions.

7. Fiserv will provide Client with 1 Fiserv standard training session which shall not exceed 1 business day, which training shall be comprised of a general system overview, administration, and end user training in the use of UChoose Rewards Services. Client acknowledges and agrees to reimburse Fiserv for reasonable travel, boarding, and meal expenses incurred for such on-site training. Client further acknowledges that additional training, project management, and consulting may be obtained from Fiserv at the current rates for such services.

8. Upon request, Fiserv will brand the UChoose Rewards Services web site with the Client's logo and corporate colors.

9. Fiserv shall not be liable for (i) any delays caused by any of Fiserv's third party service providers or (ii) any delay or failure on the part of any merchant, including without limitation, the failure of any merchant to reimburse Client for any merchant funded points.

10. Fiserv shall provide to Client daily redemption and settlement reports and monthly UChoose Rewards Services administration reports.

**Client Responsibilities:**

1. Client acknowledges and agrees that Fiserv may use one or more third party service providers to provide the UChoose Rewards Services. Client hereby consents to the delivery of transaction and account information of Client and its customers to such providers. Client hereby further consents to the processing of transactions and account information, and the creation and retention of transaction and account history by such providers.

2. Client hereby consents to Fiserv collecting and providing to applicable third party service providers approximately 6 months of Client customers' cardholder history for the purpose of merchant recruitment and as otherwise needed by Fiserv or such third party service provider hereunder.

3. Client will designate the transactions that will qualify for Points, the Point valuation for each transaction, and the rebates and/or benefits that can be provided when a customer redeems Points.

4. Client will obtain from each Client customer all information needed to enable the Client customer to enroll in the UChoose Rewards Services and to enable Fiserv or its third party service provider to authenticate each customer when he or she accesses the UChoose Rewards Services.

5. Client will provide Fiserv with all information needed by Fiserv to enable Fiserv to customize the UChoose Rewards Services for Client and its customers.

6. Client is, and shall remain, solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each Client customer accessing UChoose Rewards Services.

7. Client will use, and will instruct its customers to use, UChoose Rewards Services in accordance with such reasonable rules as may be established by Fiserv from time to time as set forth in any materials furnished by Fiserv to Client.

8. Client assumes exclusive responsibility for the consequences (i) of any instructions it may give to Fiserv, (ii) for Client's or its customers' failures to access UChoose Rewards Services properly in a manner prescribed by Fiserv, and (iii) for any information required for registration of a Client customer or related to authentication of such customer.

9. Client will develop and maintain a privacy policy on Client's website describing the UChoose Rewards Services as required by applicable law, rule and regulation and Client will comply with all laws, rules, and regulations applicable to Client's receipt of the UChoose Rewards Services.

10. Client agrees that Fiserv or its third party service provider shall at least once each calendar quarter during the term of this Schedule market and promote the UChoose Rewards Services to its customers, unless such customer has expressly opted out of such marketing. Such marketing distribution shall, at a minimum, consist of one email communication to all customers with a valid email address and for Clients that select a program other than a Client only funded program, a statement insert to all card customers promoting merchants offering products through the UChoose Rewards Services. Any such marketing distribution shall occur in accordance with Client's then current marketing policies. Client further agrees to provide additional marketing distributions to its customers, which may also include (in the Client's discretion) various communications, including, but not limited to, direct mail dedicated to the UChoose Rewards Services, additional monthly statements, promotions on the UChoose Rewards Services website, additional e-mails to customers, communications in Client's branches, and/or in other communications that Client sends to its customers generally. Client further agrees that upon delivery of its written consent, Fiserv or its third party service provider shall be permitted to send direct mail on behalf of merchants offering products through the UChoose Rewards Services at the expense of such merchant or Fiserv's third party service provider.

11. Client will facilitate timely cooperation between any necessary third parties in order for Fiserv to provide UChoose Rewards Services.

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 26 of 138

12. Client is expressly prohibited from extending any warranty or warranties on Fiserv's behalf to any person.

13. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

14. In the event Client creates or uses any marketing materials that reference Fiserv or any third party in connection with the UChoose Rewards Services, Client shall obtain the prior written approval of Fiserv before using such materials and any such use shall only be in the form approved by Fiserv.

15. Client shall obtain from Fiserv a template welcome brochure which shall welcome Client's customers to the UChoose Rewards Services. Client shall add its logo and colors to the brochure and distribute the brochure to all Client customers participating in the UChoose Rewards Services. Fiserv may perform the foregoing obligations for Client upon the request of Client and provided that Client pays Fiserv its then current rates for such services.

16. Client shall provide to Fiserv its logo and corporate colors for customization of the UChoose Rewards Services promptly, following the effective date of this Schedule. Client acknowledges and agrees that any receipt by Fiserv of the logo and corporate colors more than 5 days following execution of this Schedule may result in a delay in implementation of the UChoose Rewards Services.

In the event Client wishes to delay implementation or modify the UChoose Rewards Services at anytime, Client shall notify Fiserv in writing. Client acknowledges that any delays or changes may be subject to payment by Client of additional Fees.

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 27 of 138

## Accel Network Membership Exhibit to Master Agreement

1.  Network Services.  Fiserv, through the Accel® Network (the "Network"), operates an electronic funds transfer ("EFT") system that enables Member Financial Institutions to offer consumers or merchants shared Automated Teller Machine ("ATM") and Point of Sale ("POS") EFT services.  Client wishes to participate in the Network on the terms and conditions set forth herein and in the Agreement to which this Accel Network Membership Exhibit (this "Exhibit") is attached and forms a part.  Capitalized terms used but not defined herein shall have the meanings given to them in the Accel Network Operating Rules and the Appendices thereto (the "Rules") and the Agreement, as applicable.  For purposes of this Exhibit and the Rules, Client shall be hereinafter referred to as "Member".

2.  Compliance with Rules and Law.

(a) Member acknowledges (i) receipt of the Rules and (ii) that it has fully reviewed the Rules and understands the duties and responsibilities of a Member in the Network.

(b) Member hereby agrees to be bound by and perform all obligations and requirements imposed on it by this Exhibit and the Rules as the same may be amended or supplemented from the date hereof and thereafter from time to time.

(c) Member agrees, and will cause any other entity that Member sponsors into or causes to participate in the Network, pursuant to the Rules, to be bound by, comply with, and perform all the requirements of membership as may, from time to time, be set forth in the Rules and all applicable laws, rules, and regulations, as all the foregoing may be amended from time to time. The parties acknowledge that certain provisions of this Exhibit may be subject to Federal Reserve Board Regulation II, Debit Card Interchange Fees and Routing (the "Final Rule"), 12 CFR Part 235, as amended ("Regulation II").  The parties further acknowledge that an essential inducement for each party to enter into this Exhibit is their collective understanding that none of the economic provisions contained in this Exhibit are inconsistent with Regulation II or its implementing regulations.  Accordingly, if Regulation II's restrictions on interchange transaction fees, including the provisions thereof addressing evasion or circumvention of such restrictions, (a) are interpreted by rule, regulation, order, regulatory guidance, judicial decision or other action to apply to any economic provisions contained in this Exhibit or (b) become applicable due to a change in the circumstances of Member, then the party that discovers such interpretation or change of circumstances shall provide written notice thereof to the other party no later than thirty (30) days of the discovery of such interpretation or change in circumstances, and the parties shall meet promptly thereafter to discuss in good faith a mutually agreeable solution to the situation, which may include repayment by Member of amounts paid by Network. In the event that a payment is owed by Member to Network in order to be in compliance with Regulation II, such payment shall be made no later than forty-five (45) days after such request is received by Member.  If no mutually agreeable resolution is reached within thirty (30) days of the first meeting, then Network shall not be required to make any future payments of any amounts, provide any economic concessions or perform any other obligation hereunder that would conflict with or violate any such law or regulation.

(d) The parties understand that this Exhibit and the operation of ATMs and POS devices are governed by and subject to applicable law and to the laws, rules, and regulations now or hereafter in force of any governmental official, commission, board, or agency having supervisory control over the parties.  Neither Fiserv nor the Network shall be responsible for obtaining any necessary regulatory approval for or on behalf of Member, its Merchants, sponsored Service Providers, or Affiliated Groups.

(e) The parties acknowledge and agree that the interchange transaction fees and other amounts that Fiserv pays to Member pursuant to this Exhibit and the Rules for transactions performed at Terminals for the purchase of goods and services, except for those transactions that are exempt under the Final Rule, will be limited to the amounts permissible under the Final Rule.

3.  Fees.  The Membership fees and pricing are set forth in Network Fee Schedule of the Rules and may be changed by the Network in accordance with the procedures set forth in the Rules.

4.  License of Trademark; Advertising and Graphics.  Fiserv hereby licenses to Member a non-transferable, non-exclusive license, with no right of sublicense, to use all trademarks, service marks, and registered

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 28 of 138

symbols of the Network. Such use shall be strictly in accordance with the requirements of the Rules and the Accel Network Graphic Standards contained therein, as they now exist or may hereafter be amended. Notwithstanding the foregoing sentence, any provisions in the Accel Network Graphics Standards that allow the brand, mark, or logo of the Network to be displayed on a particular debit card or that otherwise limit the ability of brands, marks, or logos of other EFT Networks to appear on a debit card shall not apply to Member.

5.  Term and Termination.

    (a) The initial term of this Exhibit shall end August 13, 2019. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, this Exhibit shall automatically renew for additional term(s) of 5 years. This Exhibit may be terminated prior to the expiration of the initial term or any renewal term either (i) pursuant to the applicable provisions of the Rules, or (ii) as expressly provided in Section 5(b) below.

    (b) If Member or Fiserv breaches this Exhibit, the non-breaching party may give notice in writing to the breaching party of the violation. If the breach is material, and the notice so states, the breaching party shall, within three days, initiate action to correct or eliminate the breach, and shall complete such action as soon as is reasonably possible, but no later than thirty (30) days following receipt of notice. Other breaches shall be corrected within thirty (30) days, or otherwise as soon as is reasonably possible and as agreed to by Fiserv and Member. If the breaching party does not comply within such prescribed times, the non-breaching party may terminate this Exhibit upon written notice.

    (c) No termination of this Exhibit shall relieve Member from the responsibility of paying delinquent charges or fees nor shall it relieve Fiserv or Member from such other damages or remedies as may result from a breach (including those provided in the Network Operating Rules). Upon expiration or termination of this Exhibit for any reason, Member shall be responsible for all costs of disconnection from the Network.

6.  Network Participation.

    (a) As of the effective date and for the remainder of its term, Member shall cause all eligible cards previously issued by Member ("Existing Cards") and all eligible cards hereafter issued by Member, including but not limited to those eligible cards hereafter acquired by Member ("New Cards") through merger, acquisition, or otherwise (an "Acquisition") to participate in the Network (Existing Cards and New Cards collectively referred to as "Cards" or "Member's Cards"). Member shall take all necessary actions to ensure, including without limitation by providing notice to other ATM or POS networks ("EFT Networks"), their processors, and other parties as may be applicable, that all transactions performed (i) by Member's Cards, which for purposes of this Exhibit shall include RFID and/or NFC PIN enabled devices and other related card technology, and (ii) by cards other than Member's Cards ("Not-On-Us Cards") at Member owned or operated ATMs, cash dispensers, POS devices, and other terminal equipment ("Terminals") (transactions performed by all Cards and at all Terminals collectively referred to herein as "Network Transactions"), are priority routed through the Accel Network ahead of all other EFT Networks.

    (b) Notwithstanding anything to the contrary, the parties acknowledge and agree that merchant routing instructions will take precedence over any conflicting routing instructions required by this Exhibit with respect to Network Transactions performed at Terminals for the purchase of goods or services.

    (c) Member shall ensure that all Cards contain the brand and logo of the Network. In addition, Member shall ensure that all Terminal signage will display the brand and logo of the Network. With respect to Terminals acquired by Member as part of an Acquisition, Member shall ensure compliance with the immediately preceding sentence within six (6) months of the Acquisition.

7.  Conflict.    If this Exhibit and the Agreement conflict, the terms of this Exhibit shall control. If this Exhibit or the Agreement and the Rules conflict, the terms of the Rules shall control.

8.  Network Name Change.    If the name of the Network changes, whether through re-branding, consolidation with another network, or otherwise, during the term of this Exhibit, then all references to the Network in this Exhibit shall thereafter be deemed to refer to any such subsequent brand of the Network.

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 29 of 138

9.  <u>Survival Beyond Term of Agreement</u>.  This Exhibit's term may survive the earlier expiration or termination of the Agreement, in which case this Exhibit will continue to be governed by the terms and conditions of the Agreement as if still in effect.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 30 of 138

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

# AMENDMENT TO AGREEMENT

AMENDMENT ("**Amendment**") dated as of ___December 14, 2020 | 08:23 MST___ ("**Amendment Effective Date**") between Fiserv Solutions, LLC, a Wisconsin limited liability company with offices located at 255 Fiserv Drive, Brookfield, Wisconsin 53045 ("**Fiserv**"), and Winston-Salem Federal Credit Union with offices located at 711 E Salem Ave, Winston Salem, NC 27101 ("**Client**"), to the Master Agreement dated June 5, 2014 between Fiserv and Client (as amended through the date hereof, the "**Agreement**").

WHEREAS, on March 31, 2015, Fiserv Solutions, Inc., a Wisconsin corporation, was converted to a limited liability company under Wisconsin law to become Fiserv Solutions, LLC, a Wisconsin limited liability company;

WHEREAS, Fiserv and Client entered into the Agreement for Fiserv's provision of various Services and Products to Client; and

WHEREAS, Fiserv and Client wish to amend the Agreement as set forth below;

NOW, THEREFORE, Fiserv and Client hereby agree as follows:

1. <u>Defined Terms</u>. Unless otherwise defined herein, capitalized terms used herein shall have the same meanings assigned them in the Agreement.

2. <u>ASP Services Exhibit to Master Agreement</u>. Section 8(b), Term, of the ASP Services Exhibit is hereby deleted in its entirety and replaced with the following new subsection:

> "(b)    <u>Term</u>. Unless otherwise set forth in an applicable Schedule to this Exhibit, the initial term of Services provided hereunder shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of five (5) years."

3. <u>Additional and Replacement Deliverables</u>. The Exhibits and/or Schedules listed below and attached hereto are hereby added to the Agreement for Fiserv's provision of such Deliverables to Client. To the extent a corresponding Exhibit or Schedule to the Agreement already exists, the attached Exhibit or Schedule shall replace and otherwise supersede the existing Exhibit or Schedule in its entirety. For clarity, all Products and Services provided under the following Exhibits and/or Schedules shall be subject to the terms of the Agreement.

> Portico Account Processing Services Schedule to the ASP Services Exhibit
> CheckFree Bill Payment and Delivery Services Schedule to ASP Services Exhibit
> Deposit Solutions Schedule to ASP Services Exhibit
> Digital Online Banking Services Schedule to ASP Services Exhibit
> ID Verification Services Schedule to ASP Services Exhibit
> Nautilus Essentials Archive Services Schedule to ASP Services Exhibit
> Originate Services Schedule to ASP Services Exhibit
> Statement Processing Services Schedule to the ASP Services Exhibit
> Virtual Branch Services Schedule to the ASP Services Exhibit
> Web Signatures for Credit Unions Services Schedule to the ASP Services Exhibit
> Wisdom Services Schedule to ASP Services Exhibit
> Zelle Payment Services Schedule to ASP Services Exhibit
> Consulting Services Exhibit to Master Agreement
> Custom Development Services Exhibit to Master Agreement
> Equipment Exhibit to Master Agreement
> Portico Equipment Schedule to the Equipment Exhibit
> Software Products Exhibit to Master Agreement
> Laser Checks Software Schedule to the Software Products Exhibit
> Wisdom Software Schedule to Software Products Exhibit

4. <u>Master Agreement</u>. Section 11(n) of the Master Agreement is hereby deleted in its entirety and replaced with the following new subsection:

> "(n)    <u>Counterparts; Signatures</u>. This Agreement  and any Exhibits hereto may be executed in counterparts, each of which shall be deemed an original and which shall together constitute one instrument. The parties and their Affiliates may execute this Agreement and any Exhibit or amendment hereto in the form

of an electronic record utilizing electronic signatures, as such terms are defined in the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 et seq.). Electronic signatures, or signatures transmitted by facsimile or electronically via PDF or similar file delivery method, shall each have the same effect as an original signature."

5.   <u>Amendment</u>.  This Amendment is intended to be a modification of the Agreement.  Except as expressly modified herein, the Agreement shall remain in full force and effect.  In the event of a conflict between the terms of this Amendment and the Agreement, this Amendment shall control.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized representatives as of the Amendment Effective Date.

For Client:
**Winston-Salem Federal Credit Union**

For Fiserv:
**Fiserv Solutions, LLC**

By: _John Jameson_

By: _Theo Curey_

Name: John Jameson

Name: Theo Curey

Title: President/CEO

Title: Authorized Signatory

Date: December 14, 2020 | 08:23 MST

Date: December 14, 2020 | 10:49 CST

**Portico Account Processing Services Schedule**

**to the ASP Services Exhibit**

1.  **SERVICES.**

    (a) Fiserv agrees to provide to Client the following Services set forth in Attachment 1 ("**Account Processing Services**"):

    (b) Base Services:

    > Basic Member Processing
    > Share Account Processing
    > General Ledger Processing
    > Certificate Processing
    > Loan Processing
    > Payroll Processing

    (c) Standard On-Line Reports:

    As defined and periodically updated on the porticousers.com website.

    (d) Standard Off-Line Reports:

    Standard media is a hardcopy or the advanced storage option of Client's choice. Additional report copies are available as an optional service. Additionally, as an optional service, reports may be received at frequencies other than those stated.

    (e) Optional Services:

    Client agrees to pay Fiserv the Fees set forth in Attachment 1 for the Account Processing Services. The boxes marked with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("**Selected Services**"). Only those Optional Services selected by Client, the Selected Services, are included in the Services provided by Fiserv. Such Selected Services will be charged and paid by Client monthly at the rates set forth in Attachment 1, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. For purposes of this Account Processing Services Schedule, "Included" means the fee for a specific service has been factored into the monthly on-line use fee outlined above. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Account Processing Services Schedule. Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

    (f) Optional Reports:

    As defined and periodically updated on the porticousers.com website.

    (g) Interfaces:

    Fiserv agrees to make available to Client access to certain Interfaces or extract files identified in Section 2(c) below, and any additional interfaces or extract files agreed by the parties from time to time, in accordance with the terms set forth in this subsection and subject to subsection (d) of the Additional Terms section below ("Third Party Interfaces"). Fiserv agrees to work with Client to determine whether Fiserv, Client or the applicable third party can develop and support such Third Party Interfaces, whether such Third Party Interfaces are based on extracts Client, Fiserv or the third party will provide, or whether such Third Party Interfaces are web service interfaces to be provided by Fiserv, Client or an applicable third party. Access to any Third Party Interface and any development by Fiserv or the third party with respect thereto is subject to Fiserv entering into a reasonable agreement with such third party and such agreement remaining in full force and effect; provided, that Fiserv will work in good faith to enter into a reasonable agreement as promptly as possible. Any such development by Fiserv is also subject to Fiserv's resource availability. Upon completion

of such agreement and development of such Third Party Interface, Fiserv will certify the Third Party Interface with the third party.  To the extent Fiserv has entered into an agreement with such third party and the development and certification have been completed prior to the date the Account Processing Services are first used in live production, Fiserv shall make such Third Party Interface available to Client.  Any access to Third Party Interfaces which are based on extracts Client or such third party will provide, any development to be provided by Client or a third party, or web service interfaces provided by a third party are subject to Client and the applicable third party fulfilling their obligations with respect thereto and Fiserv shall not be liable for any delay or failure to receive access or use such Third Party Interface. Client agrees that Fiserv may provide any Client Information to any third party with whom Fiserv has a Third Party Interface used or accessed for Client.  Notwithstanding anything in the Agreement to the contrary, Third Party Interfaces and access thereto are provided "as is" and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from use of or access to any Third Party Interfaces.

(h)  Telecommunication Services.

The monthly telecommunication fees and included bandwidth shall be billed to Client as set forth in Attachment 1.  The monthly telecommunication fees include Client's current locations and will be subject to increase or decrease by Fiserv in direct proportion to any increase or decrease in Fiserv's associated costs from the telecommunications vendor.  If Client adds any branch locations during the term of this Schedule, Fiserv will invoice Client at Fiserv's then current standard charges for any telecommunication charges associated with any such Client branch locations.  In addition, any changes or upgrades to the Fiserv-provided telecommunications network connections requested by Client will be provided at Fiserv's then current standard rates.

(i)  Forms and Supplies.  Client assumes and will pay the charges for all customized forms, supplies, and delivery charges.  Custom forms ordered through Fiserv will be subject to a 15% administrative fee for warehousing and inventory control.

## 2.  FEES.

(a)  In exchange for access to the Services, Client agrees to pay Fiserv the fees for Account Processing Services as set forth in Attachment 1.

(b)  All One-Time Fees shall be paid upon execution of this Schedule.  Monthly fees shall be invoiced monthly, in advance.

(c)  Base Services:

The Monthly On-Line Use Fee shall be as set forth in Attachment 1.

## 3.  PERFORMANCE.

(a)  Hours of Operation.  Fiserv will use reasonable efforts to make the Account Processing Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime, and causes beyond the reasonable control of Fiserv.

(b)  Technical Support. Client is responsible for first level technical support to its end users and Fiserv will provide second level technical support to Client's designated support representatives (meaning Fiserv will accept an initial technical support inquiry from Client, but not any end users), and initiate a troubleshooting process in accordance with Fiserv's standard support process. Such support will be available during Fiserv's standard business hours. Fiserv will use commercially reasonable efforts to address issues caused by Client's failure to fulfill its responsibilities in this Schedule at its then current rates and will not be obligated to address or circumvent such issues in any designated time frames.  Fiserv shall have no obligation to address or support: issues caused by Client modifications to the Services; services that are not currently supported; Services problems caused by Client's negligence, abuse, or misapplication; or use of the Services other than as specified in this Schedule or the (Name) Services documentation.

## 4.  ADDITIONAL TERMS AND CONDITIONS.

(a)  Annual Histories.  As applicable, Fiserv maintains annual histories for its clients, which can be used to reconstruct Client Files in an emergency.  However, in order to permit prompt and accurate reconstruction of accounts, Client agrees to retain at all times and make available to Fiserv upon request the most recent data

printout(s) received from Fiserv, together with copies or other accurate and retrievable records of all transactions to be reflected on the next consecutive printout(s).

(b) <u>Communication Lines</u>. Client acknowledges that access to Account Processing Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client or Client's on-site systems and remote employee or affiliate access.

(c) <u>Third Parties</u>. In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

(d) <u>eReceipts and eMail Messaging</u>. Notwithstanding anything in the Agreement or this Schedule to the contrary, the eReceipts and eMail Messaging functionality is provided "as is", and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of or access to the eReceipts and eMail Messaging functionality. Fiserv will not provide maintenance or support for the eReceipts or eMail Messaging functionality. Any support or other services requested by Client with respect to the eReceipts or eMail Messaging functionality may be provided in Fiserv's sole discretion, subject to resource availability and payment by Client of fees at Fiserv's then current rates.

(e) <u>Core to Core Transition</u>. If at any time during the term of this Schedule, Client desires to transition to a different Fiserv or Fiserv Affiliate's core account processing system and executes Fiserv's then-current Schedule(s) for such core account processing system and any other Deliverables Client wishes to license, purchase or receive from Fiserv or its Affiliates ("New Schedules"), Client may terminate this Schedule on a date mutually agreeable to Fiserv and Client. In the event of termination pursuant to this subsection, Client shall not be required to pay early termination fees or deconversion fees under this Schedule if the total amounts due Fiserv and its Affiliates for all Fiserv Deliverables (and not any third party products or services, pass through charges, out-of-pocket expenses, third party costs, or Taxes) set forth in the New Schedules are equal to or greater than the amounts Client would have paid Fiserv during the remaining term of this Schedule. Any conversion services required will be charged at Fiserv's then-current professional services rates.

(f) <u>Third Parties</u>. In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

(g) <u>Flex Credit</u>. Fiserv agrees to provide Client a flex credit in the amount of $145,000.00 ("<u>Flex Credit</u>"). The Flex Credit may be applied by Client beginning on the date the Portico System is first used and continuing thereafter for a period of eight (8) years of the ASP Services Exhibit against Fiserv invoice(s) for one-time implementation fees and/or monthly processing fees for Account Processing Services, subject to the following: (i) Client shall provide Fiserv's indicated designee with at least 30 days prior written notice (which may be via email) of Client's election to use any portion of the Flex Credit, specifying the amount of the Flex Credit to be applied and the invoiced amount(s) to which such amounts should be applied; (ii) elimination and/or failure to implement any Account Processing Services included in the Agreement as of the Effective Date and/or a reduction in actual customer or member accounts converted and/or processed will result in a reduction of the Flex Credit; and (iii) the Flex Credit may not be applied to any third party software or services fees, deconversion or early termination fees, out-of-pocket expenses, equipment costs, third party costs, or Taxes. In the event of termination of the Agreement, the ASP Services Exhibit, or the Account Processing Services Schedule during the initial term of the ASP Services Exhibit for any reason other than Fiserv's uncured material breach pursuant to Section 8(b)(i) of the Agreement, Client will reimburse Fiserv for the Flex Credit applied by Client pursuant to this section, in addition to any applicable termination fees due from Client. Any unused flex credit at the expiration or earlier termination of the initial term of the ASP Services Exhibit

shall be forfeited by Client.  The Flex Credit is provided by Fiserv solely as a credit against the applicable fees that would otherwise be due from Client under the Portico Account Processing Services Schedule.

(h)  Monthly Credit.  Client shall receive a monthly credit in the amount of $1,500.00 per month beginning on the date the Portico System is first used and continuing thereafter for a period of eight (8) years.

(i)  Operational Review. Fiserv agrees to provide Client with 1 operational review every 2 years during the initial term of the Agreement beginning 1 year after the Account Processing Services are first used in live production without payment of the applicable Professional Services Fees for such review provided, however, Client shall be responsible for all out-of-pocket expenses in accordance with Section 2(b) of the Agreement incurred by Fiserv or its Affiliates in providing such operational review. The operational review will be scheduled on a mutually agreeable date and will include a review of Client's Portico product setup, Client's option setting within Portico and evaluation of other processes. Following such discovery session, Fiserv will make recommendations of changes Client may consider implementing to help improve Client's use of the Portico System. Client may purchase additional operational reviews at any time during the initial term or any renewal term at Fiserv's then current fees for such services, subject to Fiserv's resource availability.

(j)  Training Services. During the initial term of this Schedule, Fiserv agrees to provide Client up to 20 hours of training Services following each Operational Review at no additional charge; provided that such training Services will be provided by Fiserv at a mutually agreeable time, subject to Fiserv's resource availability.

(k)  Conference Registrations. During the initial term of this Schedule, Fiserv agrees to provide Client with 1 registration each year to a Fiserv conference at no charge; provided, however, Client shall be responsible for all out of pocket expenses incurred by Client's personnel attending such conferences.

(l)  Term. The initial term of this Schedule shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of three (3) years.

**Attachment 1**

**Fees**

Monthly On-Line Use Fee:

| | |
|---|---|
| 0 – 10,000 members | $1.00 per member per month |
| 10,001 – 20,000 members | $0.95 per member per month |
| Over 20,000 members | $0.90 per member per month |

Telecommunication Services:

The monthly data center connectivity fees shall be billed to Client at a rate of $100.00 per month. Fiserv has designed the Portico System to run across private (Verizon) and public (Internet) connections, which creates a built-in back up circuit strategy. If one of the two is down, Client can switch within minutes to the backup network. Client has elected to only use Internet connectivity and therefore acknowledges that it is responsible for outages caused by a single point of failure. Fiserv will not be responsible for connectivity to any Client office, branch or designated recovery location should a network outage occur. Client acknowledges that it does NOT wish to have redundant host connectivity and assumes responsibility for its connection to the Fiserv host.

Optional Services:

Optional Reports shall be included in Base Services Monthly Online Use Fee.

| | |
|---|---|
| ☒ Basic Share Draft Processing | Included |
| ☒ Expanded General Ledger Processing | Included |
| ☒ Expanded Member Processing | Included |
| ☒ Expanded Share Draft Processing | Included |
| ☒ IRA Processing | Included |
| ☒ Mortgage Loan Processing | Included |
| ☒ ACH | |
| ☒ ACH Notification of Change | Included |
| ☒ ACH NSF Fees and Notices | Included |
| ☒ ACH NSF History | Included |
| ☒ ACH On-line Posting | Included |
| ☒ ACH Origination | $300.00 onetime |
| Monthly Fee | Included |
| ☒ ACH Same-Day Origination | $0.25 per transaction |
| ☒ ACH Pend Feature | Included |
| ☒ ACH POS Transactions | Included |
| ☒ ACH Returns | Included |
| ☒ ACH Stop Payment | Included |
| ☒ ACH Transactions | Included |
| ☒ Account Analysis | $250.00 onetime |
| 1 – 100 Accounts | Included |
| Over 100 Accounts | $2.50 each per month |
| ☒ Aires Download | Included |
| ☒ ATM Services: | |
| ☒ Automated Network Balancing – Cardholder | $2,650.00 onetime |
| Monthly Fee | Included |
| ☒ Automatic ATM Card Re-Issue Program | Included |
| ☒ ATM Cardholder Record | Included |
| ☒ Debit Cardholder | Included |
| ☒ Exception Processing for On-Line Network ATMs (settled networks) Included | |
| ☒ On-Line ATM Card Ordering | Included |
| ☒ ATM/Debit Temporary Withdrawal Limits & ATM/Debit Holds $3,150.00 onetime | |
| Monthly Fee | Included |

| | | |
|---|---|---|
| ☒ | Audio Response | $550.00 onetime |
| ☒ | Audio Sessions | $0.06 per session |
| ☒ | Authorized User Record | Included |
| ☒ | National Audio Response Center* | $0.05 per minute |

*With respect to the 800# provided to Client by Fiserv in its provision of NARC services to Client, such 800# is owned by Fiserv, can only be used by Client during the term of this Schedule, and may not be sold by Client to any third party.*

| | | |
|---|---|---|
| ☒ | 400 Day History | Included |
| ☒ | ACH Courtesy Pay | Included |
| ☒ | Share Draft Courtesy Pay | Included |
| ☒ | Enhanced Courtesy Pay | Included |
| ☒ | Automated CTR Support | $2,550.00 onetime |
| | Monthly Fee | Included |
| ☒ | Automatic Closing and Re-opening of Self-Service Tellers | Included |
| ☒ | Cash Control | Included |
| ☒ | Certificate Automatic Rate Change | Included |
| ☒ | Check Protection Feature | Included |
| ☒ | Collection | Included |
| ☒ | Collection Letter Printing | Included |
| ☒ | Credit Bureau Reporting | Included |
| ☒ | Credit Card Payments Supported On-Line | Included |
| ☒ | Data Match | Included |
| ☒ | Dividend Check Printing | Included |
| ☒ | Electronic Teller Journaling | Included |
| ☒ | eMail Messaging | |
| | (Subject to the terms set forth below in this Schedule) | $3,850.00 onetime |
| | Monthly Fee | Included |
| ☒ | Enhanced CD On-Line History | Included |
| ☒ | Enhanced Loan On-Line History | Included |
| ☒ | Enhanced Skip Payment | $1,800.00 onetime |
| | 1 – 100 Skips | Included |
| | Over 100 Skips | $4.00 each per month |
| ☒ | eReceipts | |
| | (Subject to the terms set forth below in this Schedule) | $700.00 onetime |
| | Monthly Fee | Included |
| ☒ | Escheat Processing | Included |
| ☒ | Expanded Journal Voucher | Included |
| ☒ | Flexible Fees Program | Included |
| ☒ | Forms Management | Included |
| ☒ | Holiday/Vacation Club Checks/Transfers | Included |
| ☒ | IRA Direct Express Interface (Ascensus) | $375.00 onetime |
| | Monthly Fee | Included |
| ☒ | Laser Notices | Included |
| ☒ | Loan Origination Processing | |
| | ☒ Loancierge | $6,325.00 onetime |
| | ☒ Credit Bureau Report Retrieval | Included |
| | ☒ Loan Decision Manager | |
| | ☒ Decision Tool Set-up Fee (includes up to 8 Process ID's) | $3,300.00 onetime |
| | ☒ Decision Fees | $5.50 per decision |
| | ☒ Re-Decision Fees (Loancierge & Virtual Branch Lending) | $2.20 per re-decision |
| | ☒ Monthly Hosting | Included |
| | ☒ Risk Based Pricing | $825.00 onetime |
| ☒ | Member Notepad Capability and Reporting | Included |
| ☒ | Member On-Line History | Included |
| ☒ | Multiple Statement Sort Options | Included |

☒ Non-Financial History – 365 Days — Included
☒ Notices Printed by Fiserv — $0.15 per notice
  ☒ Postage — Standard rates
☒ NOW Network Integration in support of
  real-time Zelle P2P Payments — ~~$2,400.00~~ Waived*
  (*Due upon execution*)

*The onetime Integration Fee as set forth above shall be waived if a Schedule for Zelle Services is executed on or before December 31, 2020. Fee does not include generation of Zelle data contribution files (ZOE/ZXF) due to Client having less than 100,000 DDA accounts. If Client DDA size exceeds 100,000 in the future, additional setup (i.e. enablement of data contribution files, etc.) may be required, based on then current Zelle network participation rules and then current cost.*

☒ Online Delinquency History — Included
☒ Online Payroll Posting — Included
☒ Payroll Transmission
  ☒ Positive Payroll Transmission — Included
  ☒ Payrolls Transaction — Included
  ☒ Payrolls Transmission — Included
☒ Periodic Address Standardization,
  Including ZIP+4 Updates and Bar Coding — Included
☒ Portico Data Download — Included
☒ Portico User Automation Applications
  ☒ Contact Manager — $550.00 onetime
    Monthly Fee — Included
  ☒ Cross Sell and Sales Tracking — $550.00 onetime
    Monthly Fee — Included
  ☒ DocumentIT (CUNA documents plus 12 additional) — $1,100.00 onetime
  ☒ ID Capture (eFichency Imaging Interface) — $165.00 onetime
    Monthly Fee — Included
  ☒ Member Activity Tracking Setup Fee — Included
  ☒ Member Warnings & Alerts Setup Fee — Included
  ☒ Safe Deposit Box — $825.00 onetime
    Monthly Fee — Included
  ☒ Teller Automation Platform/New Member Origination — $264.00 onetime
    Monthly Fee — Included
☒ Portico User Experience — Included
☒ Portico XChange Learning Management System
  (5 Licenses per year) — $200.00 per year
☒ Relationship Pricing — $600.00 onetime
  Monthly Fee — Included
☒ Reporting Analytics (2 Admin, 8 Consumer User, 10 Report Author) $250.00 onetime
  ☒ Loancierge Data — Included
  ☒ Non-Financial Data — Included
  ☒ Wisdom Data — Included
  ☒ Virtual Branch Data — Included
  ☒ Contact Manager Data — Included
  ☒ Cross Sell Data — Included
  ☒ Automated Delivery Tool — $750.00 onetime
    Monthly Fee — Included
  ☒ Executive Dashboard — $4,400.00 onetime
    Monthly Fee — Included
☒ Share Draft & Regular Statements Combined — Included
☒ Single Interest Insurance — Included
☒ Statement Message for JV Transactions — Included
☒ Teller Administration — Included
☒ Teller Security System — Included

| | |
|---|---|
| ☒ Transfer File | Included |
| ☒ Vehicle Valuator for Credit Unions | |
|    ☒ NADA – Subject to the terms of Appendix 1 | |
|    ☒ Vehicle Valuator Set-up Fee – NADA | $550.00 onetime |
|    ☒ Vehicle Valuator Set-up Fee - NADA Specialty | $550.00 onetime |
|    ☒ Vehicle Valuator Per Request Fee – NADA<br>     *(Monthly Minimum $55.00)* | $0.38 per valuation |
|    ☒ Vehicle Valuator Per Request Fee - NADA Specialty<br>     *(Monthly Minimum $55.00)* | $1.38 per valuation |
| ☒ GAP & MBP Interface (CUNA) | $880.00 onetime |
|    Monthly Fee | $83.00 per month |
| ☒ Workflow Automation Print | Included |
| ☒ Workflow Processing | Included |
| ☒ Share Draft Services: | |
|    ☒ Deluxe One | $175.00 onetime |
|    Monthly Fee | Included |
| ☒ Portico Professional Services* | |
|    ☒ Mobile Source Capture Setup (4 hours at $180.00 per hour) | $720.00 onetime** |
|    ☒ Nautilus Essentials Integration (2 hours at $180.00 per hour) | $360.00 onetime** |
| ☒ Portico History Conversion (up to 12 months) | $10,000.00 onetime |
| ☒ Implementation/Conversion Services* | $35,000.00 onetime |

- Includes 2,000 hours**
- Create and monitor Project Plan
- Provide internal status reporting
- Provide external status reporting
- Review and create Data Mapping
- Provide system Training
- Review Processing Options
- Coordinate activities of Fiserv participants
- Provide files and instructions for Data Validation
- Provide instructions for User Acceptance Testing
- Provide system Training

*Travel-Related Expenses. Additional charges may include reasonable out of-pocket travel-related expenses incurred in connection with the services provided herein. All travel-related expenses shall be billed on a monthly basis as incurred, and are due and payable upon receipt of invoice.

**Estimated Hours and Fees. The hours and fees set forth above are estimates based upon the scope of the services. All services-related hours worked in excess of the hours quoted in this Schedule shall be billed at Fiserv's then-current professional services rate, and are due and payable in accordance with the payment terms set forth herein.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Appendix 1**

1.  With respect to the Vehicle Valuator for Credit Unions Services made available to Client under the Account Processing Services Schedule, Fiserv will provide access to the NADA Car Valuation Guide and certain data including Vehicle Identification Number information and vehicle valuation information (collectively, "**NADASC LICENSED DATA**") provided to Fiserv by NADA Services Corporation d/b/a the NADA Used Car Guide ("**NADASC**"). In connection with its receipt of access to the Vehicle Valuator for Credit Unions Services, Client agrees as follows:

2.  Client acknowledges that the license to use the NADASC LICENSED DATA granted hereunder shall not permit Client to market, sublicense or utilize the NADASC LICENSED DATA separate from or independent of the Account Processing Services.

    (a)  Client agrees to not disassemble, decompile, reverse engineer or otherwise modify or alter the NADASC LICENSED DATA.

    (b)  Client agrees that the NADASC LICENSED DATA shall not be used as a data source from which a new Database or valuation system may be created, and that vehicles will be valued individually as needed in the Account Processing Services.

    (c)  Except as otherwise provided in the terms of this Appendix or the Account Processing Services Schedule, Client agrees not to reproduce, store in a retrieval system or transmit, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, any vehicle valuation information contained in the NADA Official Used Car Guide® (hereinafter, the "NADASC Values"), without the prior written consent of NADASC.

    (d)  Client acknowledges and agrees that the NADASC LICENSED DATA, the NADASC Values, all enhancements and derivative works, are the sole property of NADA Services Corporation, and are subject to a valid copyright.  Client acknowledges that NADASC has created the NADASC Values and the NADASC LICENSED DATA at great time and expense and that the NADASC Values and the NADASC LICENSED DATA contain confidential and proprietary information protected by copyright and trade secret laws.  Client further acknowledges that certain of its employees will become familiar with the NADASC LICENSED DATA and that NADASC may suffer great harm if Client or its employees disclose the NADASC LICENSED DATA to a third party.  Client, therefore, agrees to:  (a) hold the NADASC LICENSED DATA in strict confidence; (b) disclose the NADASC LICENSED DATA only to Client's employees to whom knowledge is required for its proper use hereunder; (c) cause such employees to hold the NADASC LICENSED DATA in strict confidence; and (d) take steps to prevent the accidental or otherwise unauthorized disclosure of the NADASC LICENSED DATA.  The confidentiality obligations of Client contained in this paragraph shall survive termination of this Appendix 1 and the Account Processing Services Schedule.

3.  In the event Fiserv's agreement with NADASC terminates for any reason, Fiserv may terminate Client's access to the NADASC LICENSED DATA, the Vehicle Valuator for Credit Unions Services, and all portions of the Account Processing Services Schedule related thereto.  During the term of this Schedule, Fiserv may provide written notice to Client that it is offering a product and/or service of substantially similar functionality and use as all or any portion of the functionality provided herein.  Following such notice, either party may elect to transition Client to such product or service, subject to (i) providing the other party with written notice at least 90 days prior to such transition and (ii) Fiserv and Client entering into a separate Schedule to the Agreement or an amendment to the Account Processing Services Schedule for such product and/or service.

4.  Notwithstanding anything in the Agreement to the contrary, including without limitation Section 7 of the Agreement, access to the Vehicle Valuator for Credit Unions is provided "as is", and neither Fiserv nor NADASC shall be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of or access to the Vehicle Valuator for Credit Unions Services.  Without limiting the foregoing, neither Fiserv nor NADASC shall have any liability for use or display of NADASC LICENSED DATA or access or use by Client of the NADASC LICENSED DATA.

5.  Notwithstanding Sections 2(a) of the Agreement or anything in the Account Processing Services Schedule to the contrary, Fiserv may increase fees in the event of any fee increase imposed by NADASC.  Fiserv agrees to provide Client with as much advance notice of any such change as is reasonably possible under the circumstances.

The terms of Sections 4, (d), (e), (g), (h), and 6 of the ASP Services Exhibit, and Sections 3, 4(a), (b), (c) and (d) of the Account Processing Services Schedule shall not apply to the Vehicle Valuator Services.

5.   In the event of a conflict between the terms of this Appendix and the terms of the Agreement, the terms of this Appendix shall control, provided, however, to the extent comparable provisions in the Agreement are more restrictive than those set forth in this Appendix, the provisions in the Agreement shall control.

**CheckFree Bill Payment and Delivery Services Schedule**

**to ASP Services Exhibit**

On the terms and subject to the conditions set forth below, Fiserv and Client hereby enter into this CheckFree Bill Payment and Delivery Services Schedule (this "**Schedule**"), and agree that this Schedule shall be incorporated into and made subject to the provisions of the Agreement.  The initial term of this Schedule shall end eight (8) years following the date the Service is in production, i.e., available to accept enrollments and process payments.  Unless written notice of non-renewal is provided by either party at least one hundred eighty (180) days prior to the expiration of the initial term or any renewal term, this Schedule shall automatically renew for additional term(s) of three (3) years.  In the event of any conflict, ambiguity or inconsistency between this Schedule and the Agreement, or any other document which may be annexed hereto, the terms of this Schedule shall govern.

1.   Services.  Fiserv will provide to Client the services described in this Schedule and Client will pay the fees set forth in this Schedule.  Fiserv and/or its Affiliates provide the services described below ("**Services**") which permit Client's customers ("**Customers**") to initiate and authorize payments from their accounts ("**Accounts**") to payees ("**Payees**") that Customers have selected in advance to receive payments by means of the Services unless otherwise described below.

   (a)  General Bill Delivery and Payment Services Terms.  This Section .1.(a) applies to all of the Services described below, except for Section .1.(d) below(Electronic Remittance Services), Section .1.(f) below (Customer Care), Section .1.(g) (Implementation and Related Services) and as otherwise set forth below.

   (i)   Payment Execution.  Fiserv will provide the Services to Customers who have been approved for enrollment pursuant to procedures and criteria mutually agreed upon by Fiserv and Client.  Fiserv will execute the delivery of all payments as instructed by a Customer unless one or more of the following conditions occurs: (a) erroneous or incomplete information is provided by the Customer; (b) insufficient funds are available in the Account (including without limitation due to a closed or frozen Account); (c) a Payee cannot or will not accept a payment delivered by Fiserv; or (d) the Customer does not follow Fiserv's operating instructions.  For each remittance processing day, Fiserv debits Customers via an ACH debit for applicable transactions.

   (ii)  Method of Payment.  Fiserv will determine the method of payment for Customer payments via the Services.  These methods include, but are not limited to, the following: the Automated Clearing House Network; other electronic payment processing networks; direct Payee transfer; paper checks drawn on a corporate account of the Services; or paper drafts drawn on the Accounts.

   (iii) Late Payment Commitment.  Fiserv will bear the responsibility for any late payment related charges up to fifty dollars ($50.00) should a payment arrive after the due date displayed within the Services as long as the Customer scheduled the payment in accordance with the applicable Service's Terms of Service (defined below in Section .2.(b)(i)).

   (iv)  Risk of Loss.  Fiserv shall be responsible for Transaction Losses (defined below) solely to the extent that (a) Fiserv's debit of a Customer's account for the transaction was returned for an insufficient available balance from the Customer regardless of funding method (e.g., NACHA Reason Codes R01 (Insufficient Funds) or R09 (Uncollected Funds)), but not if due to a closed or frozen Customer Account with Client or due to any actual or alleged fraudulent or criminal conduct, as reasonably determined by Fiserv, Fiserv permitted a transaction that exceeds the Limits (defined below in Section 1.(e)(iii)).  Fiserv will have the right to collect funds against such Transaction Losses for which Fiserv is responsible.  Client shall be responsible for all other Transaction Losses regardless of the amount or circumstance of the Transaction Loss.  Without limiting the preceding sentence, Client will research reports that it receives from any Customer that an unauthorized transaction has occurred through the Services, and for funding any Transaction Losses or other amounts due Customers or another party resulting from such unauthorized transaction.   As part of the Services under this Schedule, Fiserv is in no way responsible for authenticating Customer credentials for access to the Services.  Client acknowledges that with respect to the Service transactions, Client or its Customer is the Originator under the ACH Operating Rules.  Client and Fiserv agree to notify the other in the event of fraud being investigated by either party as it relates to the Services; such notification should be made within two (2) business days of the party learning of the issue.  "**Transaction Loss**" is a loss that occurs because the associated Services transaction was rescinded as unauthorized or has been returned and is un-collectable.

(v) <u>Credit Screen</u>.  Fiserv will conduct standard credit screening.  Generally, the credit screen will be a review of the Customer's credit history (a soft inquiry), which does not affect the Customer's credit rating, nor does the fact a soft inquiry has been made appear on the Customer's credit report that may be obtained by another institution for credit decision purposes.  Fiserv will use the results of such soft inquiry only to set risk parameters in determining the method of payment for the Customer's payments via the Services and as otherwise described in Section .1.(e) (A2A Transfer Service) below.

(vi) <u>Threatening Conditions</u>.  If Fiserv reasonably believes that a Service, or Client's or any Customer's conduct in using a Service (including, without limitation, a Customer intentionally initiating fraudulent or unauthorized transfers, account access or violating any agreement under which it has been provided access to the Services) violates any applicable laws, rules, regulations or industry standards, or otherwise poses a threat to Fiserv's or any Fiserv client's system (including without limitation any Fiserv System), security, equipment, processes, intellectual property or reputation ("**Threatening Condition**") and if, in the reasonable and good faith determination of Fiserv, the Threatening Condition poses an imminent or actual threat (including without limitation regulatory investigation, inquiry or penalty), Client agrees that Fiserv may suspend any and all use of the applicable Service until such Threatening Condition is cured.  Fiserv will promptly notify Client of such suspension, including the identity of the affected Customer(s) as needed, and both parties will use reasonable efforts to cure or cause the correction of the Threatening Condition following such notice.  Fiserv may terminate Client's and/or Customer's use of the applicable Service without further requirement of notice if the Threatening Condition remains uncured more than thirty (30) calendar days after Client is notified of the Threatening Condition.

(vii) <u>Bill Delivery Service</u>.  On behalf of Client, Fiserv will operate a bill delivery service ("**Bill Delivery**") to allow Customers to electronically receive, via the Services described below in Section .1.(b)(i), summary and graphically detailed billing information, billing terms and conditions, and merchant customer care contact information.  Customers can select from a pre-defined list of Payees to receive electronic bills.  Once the Customer has activated the Bill Delivery Service for a Payee, the Customer will begin to receive future bills electronically within the Service.  Publishing of Client's own internal bills for distribution is not covered under this Schedule.

(viii) <u>Overnight Check Service</u>.  The overnight check service ("**Overnight Check**") provides the capability for Customers to schedule certain paper payments to be delivered within one (1) business day after the deemed business date such payment was scheduled rather than the standard multi-business day window.  If available for a Payee, the Service's user-interface will display the earliest business day the payment can arrive.  Additionally, the Service's user-interface will display a configurable fee to be charged to the Customer on behalf of Client.

(ix) <u>Same-Day Bill Payment Service</u>.  The same-day bill payment service ("**Same-Day Bill Payment**") provides the capability for Customers to schedule certain electronic payments to be delivered on the same business day as scheduled, rather than the standard next-business day window.  If available for a Payee, the Service's user-interface will display the earliest business day the payment can arrive.  Additionally, the Service's user-interface will display a configurable fee to be charged to the Customer on behalf of Client.

(x) <u>Bill Discovery Service</u>. The bill discovery service ("**Bill Discovery Service**") enables the automatic searching, identification, and retrieval of information about Customer's Payees and bills based on matching information about the Customer's identity. As part of the Bill Discovery Service, a Fiserv-approved consent is required for each Customer to authorize the access and use of information from the Customer's consumer report from a credit bureau, and Fiserv's biller network to perform the Bill Discovery Service.

(xi) <u>PFM/Banking Service</u>. If enabled by Client and Fiserv pursuant to a mutually agreed upon statement of work, Fiserv will provide bill payment and, as mutually agreed in writing, certain other electronic banking services which can be accessed through the Quicken and QuickBooks, third party personal finance management (PFM) software made available by Intuit to its customers who are also Customers ("**PFM/Banking Service**").  For the avoidance of doubt, other than the processing of bill payment transactions received from Customers through Quicken and/or QuickBooks (via the OFX 1.0.2 standard only), Fiserv does not provide any support whatsoever associated with Quicken or QuickBooks. CheckFree Small Business, as well as Sections .1.(a)(vii) (Bill Delivery Service), .1.(a)(viii) (Overnight Check Service), .1.(a)(ix) (Same-Day Bill Payment Service), 1(a)(x) (Bill Discovery Service) and 1(e)

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 44 of 138

(A2A Transfer Service) do not apply to the PFM/Banking Service. Fiserv will have the right to discontinue the PFM/Banking Service upon twelve (12) months notice to Client.

(b) <u>CheckFree RXP and/or CheckFree Small Business</u>.

(i) <u>Service Description</u>. The CheckFree RXP ("**CheckFree RXP**") and/or CheckFree Small Business ("**CheckFree Small Business**") Service(s) is an Internet/World Wide Web server application that offers payment and bill delivery features and functionality. Fiserv will host a CheckFree RXP site and/or CheckFree Small Business site ("**Subsite**") for access by Customers through Client's Web site. Fiserv will be responsible for the Subsite development, appropriate system operations, system redundancy and maintenance of the operating system. Sections .1.(a)(viii) (Overnight Check Service), .1.(a)(ix) (Same-Day Bill Payment Service), 1(a)(x) (Bill Discovery Service) and .1.(b)(ii) (Online Education Center) do not apply to, and the Services described in such Sections are not available for, CheckFree Small Business.

(ii) <u>Online Education Center</u>. Fiserv will make available video tutorials and "click-through" Web-based demonstrations for CheckFree RXP and, as made available in Fiserv's sole discretion, limited video tutorials and Web-based demonstrations for certain other Services provided under this Schedule. "**Online Education Center**" means such tutorials or such demonstrations or both, as designated by Client for purchase below. The Online Education Center tutorials and demonstrations are hosted by Fiserv or a Fiserv service provider and are not available for download or storage by Clients. Client shall have the right to display the Online Education Center in Client's own Web site or other Web sites, in accordance with then-current Fiserv's written specifications, which are available upon request. Fiserv shall have the right to replace the Online Education Center with substantially similar content. Fiserv shall have the right to terminate the Online Education Center upon one hundred eighty (180) days prior written notice to Client for any or no reason; if Fiserv exercises such right, then Fiserv will issue a pro rata refund to Client for any fees paid by Client for the Online Education Center after the date of such termination. Client grants Fiserv and Fiserv's service providers a nonexclusive license to display Client's trademark or similar brand features in the Online Education Center. Fiserv will comply with any written branding guidelines provided by Client together with such brand features; if Fiserv does not do so, then Client's sole and exclusive remedy shall be to notify Fiserv in writing of such breach of guidelines, and terminate Fiserv's right to use such brand features if Fiserv does not cure such breach thirty (30) days after receiving such notice.

(c) <u>FraudNet</u>. FraudNet ("**FraudNet**") is a service that provides an automated and scalable system to aid in fraud detection. Fiserv will provide to Client the FraudNet Service described in this Schedule, solely in connection with CheckFree RXP and/or CheckFree Small Business bill payment Services provided hereunder, and Client will pay the fees set forth in this Schedule. FraudNet uses various layers of fraud detection and alert levels when identifying and storing fraud data. FraudNet monitors and profiles consumer behaviors and merchant transaction activities that are suspicious or unusual. Fiserv and/or its Affiliates have developed a dynamic negative file database ("**Negative File Database**") that is integrated into FraudNet to identify repeat offenders. Fiserv may also use other third party databases in connection with providing FraudNet.

(i) <u>Fiserv Responsibilities</u>.
   A. Fiserv will from time-to-time develop and implement new detection schemes and rules in FraudNet.
   B. Fiserv will generate cases for all alerts originating from FraudNet, and will perform necessary research (including contacting Client, and, when applicable, Customers).

(ii) <u>Client Responsibilities</u>.
   A. Client will designate personnel with the skills to review and assist in research when necessary, and Client will notify Fiserv of such personnel's contact information (and any changes thereto) for the purpose of Fiserv contacting Client with regard to alerts, cases and other matters related to FraudNet.
   B. Client acknowledges that data gathered from confirmed cases will be utilized to detect fraud for other Fiserv clients. Client grants Fiserv permission to use such data to further the detection and prevention of fraud; however, no proprietary consumer information is shared or viewable by other Fiserv clients, other than reasonably necessary information, such as Customer name.
   C. Client shall use FraudNet only for transactions originating from the respective Fiserv bill payment Service and not other types (e.g. Client debit card). Continued use of FraudNet is contingent on Client fulfilling its payment obligations pursuant to the Agreement.

D. Client will notify Fiserv within twenty-four (24) hours of becoming aware of any fraud cases originating from the Fiserv bill payment Service that were not detected by FraudNet.

(d) Electronic Remittance Services.

Fiserv has developed payment and service systems to maximize the electronic delivery of payments, and to minimize or eliminate the use of paper drafts and checks. In cases where Client is the Payee, Fiserv will collect and electronically deliver payments ("**Payments**") submitted by Customers, debited from Customer's designated Accounts (the "**Debit Entries**") to Client as the Payee.

Where Fiserv has received the funds prior to remitting the Payment to Client (known as "**Good Funds**"), there will be no limit (unless indicated otherwise in "Internal Lines of Business – Electronic Remittance" section (hereinafter the "**Internal Lines of Business Activation Process**") of the Fiserv "Data Gathering Form" (hereinafter the "**DGF**") completed separately by Client) on the amount of a single Payment, and the eligible Payment will be transmitted through the electronic interface. If Client elects to limit the daily amount of any single Payment through the electronic interface, such amount shall be indicated in Internal Lines of Business Activation Process section of the DGF, and individual Payments in excess of such amount will be made by paper draft or check.

The Payments' data will be 100% in balance with the expected amount of funds every day. The associated Payments' funds for each Internal Line of Business will be deposited electronically in the designated account per Client's instructions in the Internal Lines of Business Activation Process section of the DGF, and be available for use no later than the business day following the date of transmission of the data records.

No Payment transmitted hereunder may be rejected by Client unless the account data for such Payment is incorrect or incomplete or the account is blocked or closed. It is Client's responsibility to (i) retrieve remittance data each day; (ii) promptly post the Payments; (iii) maintain current contact and notification information with Fiserv; and, (v) maintain security of any user ID and password information.

Fiserv and Client mutually agree that if a Payment from a Customer of Client, which is transmitted by Fiserv to Client, or to an agent of Client, does not post, it may be necessary for Fiserv to contact Client in an attempt to resolve the problem (a "**Contact**"). Client acknowledges that when Fiserv makes a Contact, it is doing so as agent for the Customer, and Client agrees to provide the Customer information requested by Fiserv.

Client accepts full financial responsibility for the dollar amount of Debit Entries originally credited to Client and returned unpaid to Fiserv that were originated by Fiserv for Payments, irrespective of the reason for the return. Client agrees that Fiserv is authorized to initiate a debit of Client's designated bank account (see Internal Lines of Business Activation Process of the DGF) in the amount of the returned Debit Entries on the day Fiserv notifies Client of the return.

Client acknowledges that Payments will not be transmitted electronically in the following circumstances:

(i) Where the Customer banks at a financial institution that is not accessible through the Automated Clearing House;

(ii) Where the Customer's Client account number is incomplete, incorrect or otherwise fails the account number edit procedures established by Fiserv and Client; or

(iii) For a Payment in excess of the amount indicated in Internal Lines of Business Activation Process portion of the DGF, if applicable.

Upon termination or expiration of this Schedule, if Fiserv and Client desire to maintain an electronic remittance relationship, the parties must enter into a separate mutually agreed upon remittance agreement (with a mutually agreed upon remittance method, which may be different than that under this Schedule, and with mutually agreed upon pricing, which may be higher than that under this Schedule) prior to termination or expiration of this Schedule.

(e) A2A Transfer Service.

(i) Service Description. The Fiserv Account-to-Account transfer service ("**A2A**") via CheckFree RXP enables Customers to transfer money electronically, in some cases as soon as the next business day, between their Accounts with a Client financial institution and external third-party financial institutions where Customer holds a U.S.-based checking, savings, or money market demand deposit Account. Sections .1.(a)(vii) (Bill Delivery Service), .1.(a)(viii) (Overnight Check Service), and .1.(a)(ix) (Same-Day

Bill Payment Service) do not apply to A2A. Customers may be asked to provide and/or validate certain Account information as requested by Fiserv in order to utilize A2A. Client will provide all cooperation and assistance required or requested by Fiserv to complete the implementation of A2A. Fiserv will process the A2A transaction in accordance with the transfer instructions as provided by the Customer, within the limitations of A2A; Fiserv does not validate that the transfer instructions received by Fiserv from the Customer are in any way the correct or intended instructions from the Customer. Fiserv does not guarantee that A2A supports all Account to Account transfers; unsupported transfers include, but are not limited to, transfers to financial institutions that do not participate in the Automated Clearinghouse (ACH) system. Fiserv shall have the right to establish transaction limitations on A2A funds transfers. Fiserv shall use the credit screen results described earlier in this Schedule to establish such limits per Customer.

(ii) <u>Modifications</u>. If any modification to A2A is required by law or governmental regulation, or is necessary based on any transfer processing requirements, each party shall use its commercially reasonable efforts to comply in a timely manner. Fiserv may make any modifications, changes, adjustments or enhancements to A2A that Fiserv deems to be suitable. Notwithstanding anything in this Schedule or the Agreement, Fiserv has the right to discontinue the A2A service upon one hundred eighty (180) days' notice.

(f) <u>Customer Care (Care Assist)</u>.

(i) <u>Definitions</u>. Client has the option of having Fiserv provide Full Service Customer Care or having Fiserv provide only Back Office Operations Customer Care. "**Full Service Customer Care**" is defined as Fiserv's Customer support responsibilities which include, but are not limited to: (a) answering incoming calls and e-mails from Customers; and, (b) opening Services payment research cases on the Customer Care System, as further described below. "**Back Office Operations Customer Care**" is defined as Fiserv's direct support to Client for Customers, and includes, but is not limited to, researching and processing Services payment cases received by Client and contacting Payees regarding payment research cases received; Back Office Operations Customer Care does not include direct communications between Fiserv and Customers.

(ii) <u>Full Service Customer Care</u>. If selected in the <u>Fee Exhibit</u> to this Schedule, Fiserv will provide Full Service Customer Care, with the exception of Client's responsibilities for marketing/selling any products and handling banking transaction inquiries and any inquiries not related to the Service. Fiserv will receive and respond to all incoming calls and e-mails from Customers regarding the Service. Fiserv will research all Service payment inquiries received from Customers, which includes, but may not be limited to, contacting the Payee by telephone on behalf of the Customer, and forwarding proof of payment to Payee on behalf of Customer. Client will verify accuracy, completeness, and readability of all account information provided by the Customer. Client will refer Customers to Fiserv customer service if Customer is inquiring about bill payment transactions. Client will notify Fiserv of Customer account changes, including, but not limited to, Account number changes, Customer name, address or telephone changes, and changes to status of Account, such as closed Account.

(iii) <u>Back Office Operations Customer Care</u>. If selected in the <u>Fee Exhibit</u> to this Schedule, Client will provide customer care directly to Customers, and Fiserv will provide Back Office Operations Customer Care to Client for all Service payment research cases received from Client. Client will use the Customer Care System (defined below) to provide customer care. Client will log in the Customer Care System all incoming calls and e-mails from Customers pertaining to the Service. Client will receive and respond to all incoming calls and emails from Customers, and Client will forward to Fiserv via the Customer Care System all bill payment inquiries received from Customers which require Payee contact or research to resolve. Fiserv will research all bill payment research cases received from Client through the Customer Care System, which includes, but may not be limited to, contacting the Payee by telephone on behalf of the Customer, and forwarding proof of payment to Payee on behalf of Customer. Fiserv will send all research results to Client via the Customer Care System.

(iv) <u>Customer Care Systems</u>. Fiserv's customer care system ("**Customer Care System**") is an account tracking system that contains Customer bill payment data, and aids Fiserv and/or Client in performing support for a Customer of the Services. If applicable to the customer care servicing model utilized, and for payment of any applicable fees, Fiserv provides the Customer Care System security access form to Client on-line, and Fiserv processes all requests and provides Client with user IDs. Each of Client's employed personnel who access the Customer Care System ("**Client Representative**") will choose

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 47 of 138

individual passwords when signing on to the Customer Care System. Client will provide the Client Representatives with necessary equipment. Client will establish and monitor internal procedures which limit one user ID to one Client Representative. Client and Client Representatives will not share Customer Care System user IDs and passwords. Fiserv reserves the right to change security procedures established for the Customer Care System and will make information about such changes available to Client. Client will comply with Fiserv's standard operating procedures for the Customer Care System. Client will: (a) take reasonable steps to safeguard the confidentiality and security of the user IDs and passwords; (b) limit access to the user IDs to persons who have a need to know such information; (c) notify Fiserv promptly if Client has any reason to believe the security or confidentiality required by this provision has been or may be breached; (d) promptly inform Fiserv if Client knows or suspects that the confidentiality of the user IDs have been compromised in any way; and, (e) access the Customer Care System only to administer transactions that result from the Services. Client shall closely and regularly monitor Client Representatives' use of the Customer Care System to ensure compliance with this provision. Client shall protect the Customer Care System from security breaches at Client by establishing, maintaining and updating policies, procedures, equipment and software that are designed to safeguard the security and integrity of the Client computer systems used to access the Customer Care System.

(v) <u>Limitations</u>. If Fiserv determines, in its reasonable discretion, that any support issues are caused by any action of Client or its Customers, including without limitation abuse or misuse of the Services, any modification or addition to the Services not authorized or performed by Fiserv or any failure of Client to maintain its technology or the Services, or any other circumstance outside of Fiserv's control, then Fiserv reserves the right to charge for any work performed by Fiserv in investigating such problem at Fiserv's then-current rates. Any troubleshooting or assistance requested by Client in connection with any such problems shall be provided at Fiserv's sole discretion and at Fiserv's then-current rates.

(g) <u>Implementation and Related Services</u>.

(i) <u>Generally</u>. Each party will make available management and technical personnel and will work with the other party in accordance with a mutually agreed upon written implementation plan to implement the Services. Any other services are subject to the mutual, written agreement of the parties.

(ii) <u>Training</u>. Fiserv will provide training resources on the Services to Client's trainers (in a 'train the trainers' environment) during the first year of the initial term of this Schedule. Client's trainers will be responsible for training Client's associates. Fiserv and Client may mutually agree to additional training requirements to meet the ongoing needs of Client, at Fiserv's then-current training fees. If any training hereunder is not performed at Fiserv's location, Client will also pay for travel and other appropriate expenses for Fiserv personnel involved in such training.

2. <u>Client Obligations and Responsibilities</u>.

(a) <u>Compliance</u>.

(i) <u>Warranties</u>. Client represents and warrants to Fiserv that it has taken and will continue to take whatever action may be necessary to comply with all applicable laws, rules, statutes and regulations (and any interpretations thereof and rules promulgated thereunder), including, but not limited to, the USA Patriot Act, the federal Bank Secrecy Act, federal and state laws and regulations relating to money transmission, currency reporting and the prevention of money laundering, any rule or regulation issued by a regulatory body, including the U.S. Office of Foreign Assets Control, the Electronic Fund Transfer Act and its implementing Regulation E, and the bylaws and operating regulations of any payment network or organization through which transactions are being processed, to enable it to offer and provide the Services to its Customers, and to otherwise register and activate Customers to make use of the Services and other Fiserv services that may be provided under this Schedule, including, but not limited to, any necessary pre-registrations, consents and authorizations from and notices to its Customers. The parties acknowledge and agree that Fiserv is relying on Client's performance as described in this Section in Fiserv's performance of the Services.

(ii) <u>Indemnification</u>. Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) arising from or related to any breach of the preceding

representation and warranty or this Section .2.(a) (Compliance). The foregoing indemnification obligation shall not be subject to any limitations on Client's liability otherwise set forth in the Agreement. Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim, and grant Client control over the defense or settlement of such claim.

(iii) Records. Client shall maintain all records and prepare and file any necessary forms, reports or other documentation, including without limitation, suspicious activity reports or currency transaction reports required to be filed in accordance with laws applicable to Client. Client shall immediately notify Fiserv of instances of suspected fraud, money laundering, terrorist financing, or other illegal activities determined within Client's reasonable discretion and involving the Services. Client will not use Customer Social Security numbers or Federal Employer Identification Numbers in the account numbers that Client designates within the Service; Fiserv will not be responsible for any resulting liability if Client violates this sentence.

(b) Operating Procedures and Terms of Service.

(i) Terms of Service. Client will require Customers to follow Fiserv's standard operating procedures with respect to use of the Services as described by Fiserv from time to time. Client will also enter into a written agreement regarding the Services with Customers ("**Terms of Service**") and require the Customers to follow the Terms of Service. Client acknowledges that the Terms of Service are between Client and its Customers, not Fiserv.

(ii) Sample Terms. As part of Fiserv's standard Services documentation it generally provides to its financial institution clients, Fiserv may make available to Client sample general terms and conditions that Client may consider in establishing the Terms of Service. Any terms that are required by Fiserv to be present in such terms and conditions without substantial modification will be marked as such; Client will not substantially modify such marked terms and conditions without the prior, written approval of Fiserv. Furthermore, if Fiserv provides sample terms and conditions and Client elects to modify such terms and conditions, then Fiserv will not be (i) obligated to host or support such modified terms and conditions, unless the parties agree otherwise in writing, or (ii) responsible for any Customer complaints or legal claims that result from such modifications.

(iii) In its Terms of Service or other governing agreement between Client and the Customers for the Services, Client will include (i) disclaimers of incidental, indirect, consequential, special, punitive, and exemplary damages; and (ii) quantified limitations on direct damages that, with respect to both (i) and (ii), may be claimed or alleged by such Customers arising out of or relating to the Services. Such disclaimers and limitations must extend to Client's third party suppliers or providers (but do not need to specifically reference Fiserv). Client will enforce such disclaimers and limitations in claims, lawsuits and proceedings brought by Client's Customers.

(c) No Payee Contact; Client Employees. Client understands that all Payee contact is Fiserv's responsibility, and Client will not contact Payees at any time on behalf of Customers. If Client employees or associates access the Services on behalf of Customers, then Client shall be responsible for authentication and authorization of such employees and associates, as well as all resulting access and use of the Services and the Customer Data.

(d) Payee Data. At the time the Agreement or this Schedule is terminated, if Client is not then in uncured default of any payment obligations under the Agreement or this Schedule, Client shall be entitled to receive from Fiserv records or lists equivalent in content to Fiserv's standard Authorized Vendor/Payee List (which contains the Customer-inputted Payee name, Payee address and Payee account number) for each of Client's Customers on Fiserv's file in Fiserv's standard format and at Fiserv's standard fees. Client shall bear the cost of all programming and processing that may be necessary to render the information usable to Client.

(e) Client Site. Client is responsible for registering and maintaining the registration of Client's Internet address. Client will maintain editorial control over and be solely responsible for maintaining Client's Web site and providing access through it to the Services. Client will connect to the Services using Single Sign-On (SSO) technology, unless otherwise agreed in writing. Client is solely responsible for regulatory compliance of its Web site and its functionalities with all relevant federal, state and local laws, rules and regulations.

(f) Client Content. If applicable, Client will provide any content for incorporation in any manner into the Subsite to Fiserv in HTML format, or will pay for conversion of such content to HTML at Fiserv's then-current hourly rate or at an otherwise agreed upon project-specific price. Client is responsible for providing all such content in accordance

with Fiserv's guidelines for the Subsite. Client will obtain all necessary permissions and licenses (including trademark licenses), if any, required for Client and Fiserv's use of Client content incorporated into the Subsite and of linkages provided by Client from the Subsite to third-party Web sites (other than linkages provided by Fiserv).

(g) Releases. Client will use commercially reasonable efforts to make corresponding changes to its systems to use the then-current release of the applicable Service, but in any case will not be on any release of the applicable Service after such release is discontinued by Fiserv. Fiserv will provide each release of the Services for at least twenty-four (24) months after making such release generally available to its clients of the applicable Service. Fiserv will inform Client at least six (6) months prior to discontinuing a release of the Services, unless required to discontinue earlier for security or legal reasons. If Client is in violation of the first sentence of this Section, then Fiserv reserves the right to upgrade Client to a release of the Services that complies with such sentence. All Feature Packs for the Services are mandatory and will be placed into production when made generally available to all Fiserv clients for the applicable Services, with the sole exception of any specific functions within a Feature Pack that require a separate written agreement between Client and Fiserv for any fees for such function.

3. Fees.

(a) Fee Exhibit. Client will pay Fiserv the fees set forth in the Fee Exhibit attached hereto.

(b) Postage. Notwithstanding any provision to the contrary in this Schedule or the Agreement, in the event that the United States Postal Service raises its postage rates, Fiserv may, without prior notice to Client, increase its fees commensurately. Such increase in postal charges shall become effective coincident with the effective date of the United States Postal Service increase in such charges.

---

**Fee Exhibit**

**to CheckFree Bill Payment and Delivery Services Schedule**

| |
|---|
| **Winton-Salem Federal Credit Union** |
| **711 Salem Ave.** |
| **Winston Salem, NC  27101** |

☒ **CHECKFREE RXP**

**CheckFree RXP Implementation Fee:**                    ~~$5550~~  Waived

*All Implementation Fees are payable on the date this Schedule is incorporated into the Agreement.*

**CheckFree RXP Recurring Fees**:

**Monthly Maintenance Fee**

| Total number of DDA or Share Draft accounts of Client: | | Monthly Maintenance Fee: |
|---|---|---|
| ☐ | ≤500 | $225 |
| ☐ | 501 to 1,000 | $280 |
| ☐ | 1,001 to 2,500 | $350 |
| ☐ | 2,501 to 5,000 | $400 |
| ☒ | **5,001 to 10,000** | **~~$525~~ $200** |
| ☐ | 10,001 to 15,000 | $650 |
| ☐ | 15,001 to 25,000 | $900 |
| ☐ | 25,001 to 40,000 | $1,150 |
| ☐ | 40,001 to 75,000 | $1,400 |

*(If a box is not checked above, then Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client.  Fiserv reserves the right to change such Fee based on changes to the total number of such accounts, in accordance with the preceding table.)*

☒   The first 2 months of bill pay service the $0.70 per bill pay transaction will be waived.

☒ **Per transaction fee:**                    $0.70

*Failure of Client to indicate "bundled" or "unbundled" in selecting the preferred "Enrolled Customer Fees" above will result in a default to the "bundled" rate.*

☐ FraudNet for CheckFree RXP

| Total number of DDA or Share Draft Accounts of Client: | | Setup Fee | Monthly Fee |
|---|---|---|---|
| ☐ | ≤500 | $500 | $100 |
| ☐ | 501 to 1,000 | $525 | $100 |
| ☐ | 1,001 to 2,500 | $550 | $150 |
| ☐ | 2,501 to 5,000 | $575 | $150 |
| ☐ | 5,001 to 10,000 | $600 | $150 |
| ☐ | 10,001 to 15,000 | $625 | $300 |
| ☐ | 15,001 to 25,000 | $650 | $500 |
| ☐ | 25,001 to 40,000 | $675 | $500 |
| ☐ | 40,001 to 75,000 | $700 | $500 |
| ☐ | >75,000 | $725 | $700 |

*(If a box is not checked above, then Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client.  Fiserv reserves the right to change such Fee based on changes to the total number of such accounts, in accordance with the preceding table.)*

☒ **Overnight Check**
**Implementation Fee:**                    ~~$500~~ Waived
**Wholesale Client Transaction Fee:**                    $12.45 per transaction

Fiserv will directly debit the Customer account for the Customer Transaction Fee of $14.95 and then Fiserv will issue a revenue-share credit on Client's invoice for $2.50, which represents the difference between the Customer Transaction Fee and the Wholesale Client Transaction Fee.

☒ **Same-Day Bill Payment**

| | |
|---|---|
| **Implementation Fee:** | **$500** **Waived** |
| **Wholesale Client Transaction Fee:** | $7.95 per transaction |

Fiserv will directly debit the Customer account for the Customer Transaction Fee of $9.95 and then Fiserv will issue a revenue-share credit on Client's invoice for $2.00, which represents the difference between the Customer Transaction Fee and the Wholesale Client Transaction Fee.

☒ **A2A Transfer Service**

| | |
|---|---|
| **Implementation Fee:** | **$500** |
| **Wholesale Client Transaction Fee**: | $0.35 each |

Fiserv will directly debit the Customer account for the configurable fee that Client elects to charge the Customer and will include a line item on the invoice for the credit(s) to Client associated with any amount in excess of the Wholesale Client Transaction Fee listed above. A2A customers will only be considered as enrolled bill payment customers if and when they set up a payee on CheckFree RXP, at which time the applicable bill payment fees will be assessed according to their activity.

**Bill Discovery Services**

| Total number of DDA or Share Draft Accounts of Client | Implementation Fee | Monthly Fee |
|---|---|---|
| ☐ 1 – 500 | $1,000 | $100 |
| ☐ 501 – 1,000 | $1,125 | $150 |
| ☐ 1,001 – 2,500 | $1,250 | $175 |
| ☐ 2,501 – 5,000 | $1,375 | $200 |
| ☐ 5,001 – 10,000 | $1,500 | $250 |
| ☐ 10,001 – 15,000 | $1,875 | $300 |
| ☐ 15,001 – 25,000 | $2,250 | $450 |
| ☐ 25,001 – 40,000 | $2,625 | $500 |
| ☐ 40,001 – 75,000 | $3,000 | $750 |
| ☐ 75,001+ | Per quote | Per quote |

*(If a box is not checked above, then Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client. Fiserv reserves the right to change the Monthly Fee based on changes to the total number of such accounts, in accordance with the preceding table.)*

☐ **CHECKFREE SMALL BUSINESS**

| | |
|---|---|
| **CheckFree Small Business Set-Up Fee:** | $2,000 |

**CheckFree Small Business Recurring Fees:**

| | |
|---|---|
| Monthly Maintenance Fee: | $175 |
| Enrolled Business Customer (Primary Level 1 Customer): | $5.75 / Customer / month |
| Enrolled Business Customer (Secondary Level 2 or Level 3 Customers): | No charge |
| Per transaction fee (first 10 transactions per month): | No charge |
| Per transaction fee (additional transactions): | $0.48 |

| ☐ **FraudNet for CheckFree Small Business** | Setup Fee | Monthly Fee |
|---|---|---|
| | $500 | $110 |

| ☒ **Electronic Remittance Service** | $0.00 |
|---|---|

**Transaction Fees**

| Request Money Fees | |
|---|---|
| Wholesale Transaction Fee:3-day | $0.60 per transaction |
| e-Greetings | Included |
| New User Risk Assessment Fee | $1.00 each |
| Additional Fees: | |
| ACH Return, Chargeback or NOC Fee | $25.00 each |
| Payment Investigation/Claims Fee | $35.00 each |
| Stop Payment – In Process Transaction Cancellation Fee | $10.00 each stop payment or cancellation |

| ☒ **Dedicated Customer Service 800#:** | No Charge |
|---|---|

**Customer Care (Care Assist)**
*(If a box is not checked below as to the customer care servicing model, then Fiserv will provide Full Service Customer Care for the fees set forth below.)*

☒ **Full Service Customer Care**

| | |
|---|---|
| Customer Care System Access (up to five (5) user IDs): | $10.00 per ID per month |
| Customer Care System Access (sixth (6th) user ID and above): | $20.00 per ID per month |
| Partner Assist Line (PAL): | Included |
| Claims/Payment Investigation: | Included |
| Care Assist – Fiserv Standard Hours | Included |

☐ **Back Office Operations Customer Care**

| | |
|---|---|
| Customer Care System Access: | $50.00 per ID per month |
| Partner Assist Line (PAL): | Included |
| Claims/Payment Investigation: | $35.00 each |

☐ **Overnight Hours Support**

*[NOTE: This add-on service is only available if Fiserv is providing Full Service Customer Care under this Schedule.]*
If selected, Fiserv will provide overnight hours support (1:00am-7:00am ET, daily) in conjunction with Fiserv's provision of Full Service Customer Care to Client under this Schedule for the applicable fees set forth below.

| Total number of DDA or Share Draft Accounts of Client | Implementation Fee | Monthly Fee |
|---|---|---|
| ☐ 1 – 500 | $250 | $125 |
| ☐ 501 – 1,000 | $250 | $175 |
| ☐ 1,001 – 2,500 | $250 | $200 |
| ☐ 2,501 – 5,000 | $250 | $300 |
| ☐ 5,001 – 10,000 | $250 | $400 |
| ☐ 10,001 – 15,000 | $250 | $500 |
| ☐ 15,001 – 25,000 | $250 | $600 |
| ☐ 25,001 – 40,000 | $250 | $650 |
| ☐ 40,001 – 75,000 | $250 | $700 |
| ☐ 75,001+ | $250 | Per quote |

*(If a box is not checked above, then Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client. Fiserv reserves the right to change the Monthly Fee based on changes to the total number of such accounts, in accordance with the preceding table.)*

☐ **Extended Hours Support**

*[NOTE: This add-on service is only available if Fiserv is providing Back Office Operations Customer Care under this Schedule.]*
If selected, Fiserv will provide extended hours support (from Client's close of business until 7:00am ET, daily) in conjunction with Fiserv's provision of Back Office Operations Customer Care to Client under this Schedule for the applicable fees set forth below.

| Total number of DDA or Share Draft Accounts of Client | Implementation Fee | Monthly Fee |
|---|---|---|
| ☐ 1 – 500 | $1,500 | $250 |
| ☐ 501 – 1,000 | $1,500 | $350 |
| ☐ 1,001 – 2,500 | $1,500 | $400 |
| ☐ 2,501 – 5,000 | $1,500 | $600 |
| ☐ 5,001 – 10,000 | $1,500 | $800 |
| ☐ 10,001 – 15,000 | $1,500 | $1,000 |
| ☐ 15,001 – 25,000 | $1,500 | $1,200 |
| ☐ 25,001 – 40,000 | $1,500 | $1,300 |
| ☐ 40,001 – 75,000 | $1,500 | $1,400 |
| ☐ 75,001+ | $1,500 | Per quote |

*(If a box is not checked above, then Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client. Fiserv reserves the right to change the Monthly Fee based on changes to the total number of such accounts, in accordance with the preceding table.)*

**Insights Assist**

| | |
|---|---|
| Monthly Fee per Sponsor ID: | $80 per Subject Area |

*Insights Assist is a self-service reporting option that offers the ability for Client to access and run reports without engaging Fiserv. A Subject Area is a group of reporting content with similar data (such as, but not limited to, Subscriber Activity), presented in one dashboard containing key metrics about the Subject Area, including reports that are pre-developed by Fiserv as well as a business objects universe in the dashboard which can be used by Client to create custom reports. To gain access to a Subject Area, Client must contact its Fiserv account representative; Client will then be billed for a minimum of twelve (12) months after enabling*

*each specific Subject Area, and will continue to be billed monthly for each Subject Area until providing notice to Fiserv to discontinue access.*

☐ **Online Education Center**: Please select one of the following:

  ☐ "Click-through" Web-based demonstrations-only package
  ☐ Video tutorials-only package
  ☐ Combination package (both Web-based demonstrations and video tutorials)
Client branding in Online Education Center:                              $1,500 (one-time fee)
Online Education Center annual fees:

| Client Total Asset Size (M for million dollars, B for billion dollars) (assessed annually) | Click-Through Web Demonstration Package | Video Tutorial Package | Combination Package |
|---|---|---|---|
| $0-100M | $1,500/year | $2,000/year | $2,750/year |
| $100M+ through 250M | $2,000/year | $2,500/year | $3,500/year |
| $250M+ through $500M | $3,000/year | $3,500/year | $5,000/year |
| $500M+ through $1B | $4,000/year | $4,500/year | $6,500/year |
| $1B+ through $2B | $5,000/year | $5,500/year | $8,000/year |
| $2B+ through $5B | $6,000/year | $6,500/year | $9,500/year |
| $5B+ through $10B | $7,000/year | $7,500/year | $11,000/year |

Notes:

Branding Fee. If Client upgrades to the Online Education Center Combination Package and has previously paid Fiserv the one-time fee set forth above for Client branding, then Fiserv will not require such fee in connection with Client branding in such Combination Package.

Holding Companies. If Client is a holding company that controls more than one financial institution that receives Services under this Agreement (where "control" means the direct or indirect ownership of more than fifty percent (50%) of the voting securities of such financial institution), then Fiserv will discount the Online Education Center fees set forth above by a total of fifteen percent (15%) for the second of Client's financial institutions that purchases the Online Education Center, and discount such fees by a total of thirty percent (30%) for the third and each additional of Client's financial institutions that purchases the Online Education Center under this Schedule.

**Miscellaneous Fees:**

  ACH Return/Chargeback/NOC Fee:                                   $25.00 each
  NACHA – Unauthorized Entry Fee                                $4.50 per return
*If NACHA increases its fee or otherwise requires the payment of additional fees for the use of the Automated Clearing House, then Fiserv will have the right to pass through such fee increases or additional fees to Client for payment, without any mark-up.*
  SSAE18 Audit Report:                                          ~~$490 annually~~ Waived

**Optional Services**:

☐ Conversion – Customer Data, Merchant Data <2000 Customers:           $5,000
☐ Conversion – Future Dated Payments:          $2.50 / payment (700 transactions minimum)

    (a) Monthly Maintenance Fees go into effect when the Service is in production, i.e. available to accept enrollments and process payments or one hundred eighty (180) days from the date that this Schedule is incorporated into the Agreement (either by amendment or through inclusion when the Agreement is signed), whichever occurs first.

    (b) Monthly Maintenance Fees set forth in this Schedule, unless otherwise provided for, are based upon Client's current number of demand deposit or share draft accounts. In the event, during the term of this Schedule, Client exceeds the account limitation set forth herein, Client shall inform Fiserv and the Monthly Maintenance Fee(s) will automatically increase to the applicable fee for the then-current account level based upon Client's then-current number of accounts, and Client shall be obligated to pay Fiserv said amount. Upon Fiserv's request, Client will provide a system generated report to validate the number of demand deposit or share draft accounts.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

(c)  Upon thirty (30) days' notice to Client, Fiserv's fees for Services may be increased annually effective each January 1st beginning the first year following the effective date of this Schedule.  Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Households ("**CPI**") for the most recently available twelve (12) month period preceding such thirty (30) day notice period, or five percent (5%), whichever is greater.

(d)  Fiserv does not charge for a single sign-on interface to Fiserv proprietary Internet-banking products that Fiserv has developed prior to the effective date of this Schedule; however, a charge may be assessed by the core provider.  Please contact core provider for single sign-on contract requirements.  If Client requests a single sign-on interface to a non-Fiserv Internet-banking product, Fiserv reserves the right to charge for such interface at Fiserv's then-current rates.

(e)  Fees set forth in this Schedule are based on completion of the initial term of all Services under this Schedule. If Services are reduced or, to the extent allowed under the Agreement, terminated early for convenience, or if Client renegotiates pricing before the expiration of the initial term, Client shall reimburse Fiserv for all credits, rebates, discounts and incentives granted on all Services.  Any such credits, rebates, discounts and incentives will no longer be granted through the remainder of the term for any continuing Services.

(f)   If early termination is permissible under the Agreement, should Client elect to terminate this Schedule, and such early termination date is during a period of time where Client has been receiving invoices that are in a reduced form due to a promotional "free" or "reduced" discount period, the amount of the early termination fees will be determined by multiplying the sum of the estimated monthly billing for each Service received hereunder (but calculated without including any promotional discounts) by eighty percent (80%) times the remaining months of the term, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination plus one hundred percent (100%) of other non-processing related credits, if any, provided by Fiserv to Client. Notwithstanding anything to the contrary in the Agreement, (i) in the event Fiserv collects fees from Customers on behalf of Client ("**Client Customer Fees**"), and remits these fees to Client in the form of a credit to Client's monthly invoices, such Client Customer Fees shall not be included in the calculation of any applicable early termination fees; and (ii) any non-monthly recurring fees (e.g., annual maintenance fees) shall be prorated to monthly amounts and included in the calculations of early termination fees.

**Deposit Solutions Schedule to ASP Services Exhibit**

1. SERVICES.

    (a) Description of Services. Client agrees to purchase the deposit solutions services identified on Attachment 1 to this Schedule (the "**Deposit Solutions Services**") and Fiserv agrees to provide Client, in accordance with the Agreement, the ASP Services Exhibit to Master Agreement and this Schedule.

    (b) Defined Terms. As used in this Schedule, the following terms shall have the meaning set forth below:

    (i) "**Implementation Date**" means the first date on which the applicable Deposit Solutions Services is made available to Client in live production.

    (ii) "**Item**" means any check, teller cash ticket, general ledger entry, loan entry, control document, batch ticket or other document, whether paper, electronic or system created, presented to Fiserv for processing under this Schedule.

    (iii) "**Schedule Effective Date**" means the Effective Date of the Agreement.

    (c) Implementation Services. Fiserv will provide Client with the implementation services described in Attachment 1 (the "**Professional Services**"). Client is responsible for the accuracy and completeness of all Client Files provided to Fiserv during the implementation. Fiserv is not responsible for any damages incurred as a result of any data provided by Client or Client's third party vendors. Additional professional services, including implementation, customizations, or modifications to the standard services, shall be provided upon Client's request at Fiserv's then current fees for such services, subject to the availability of Fiserv resources.

2. FEES. Client shall pay the fees for Services as identified on Attachment 1. Fiserv reserves the right to change fees in Attachment 1 to cover any increases in Federal Reserve System costs and charges with 90 days' notice unless such change by the Federal Reserve System prevent time to provide such notice. Asset based fees, where applicable, are calculated based on Client's current asset size, as published at www.ncua.gov or www.fdic.gov.

3. ADDITIONAL TERMS.

    (a) No Fiduciary Relationship. Fiserv shall perform such Deposit Solutions Services in the capacity of Client's agent. Client acknowledges and agrees that Fiserv shall not by reason of entering into this Schedule or providing the Deposit Solutions Services hereunder have a fiduciary relationship with respect to Client.

    (b) Client Responsibilities. Client shall submit all Items to Fiserv, provide all requested instructions and guidance necessary to perform the Deposit Solutions Services and otherwise comply with all Client obligations in accordance with the requirements set forth in this Schedule. Client shall maintain adequate supporting materials (i.e. actual items or exact copies of items, records, and other data supplied to Fiserv) in connection with the provision of Deposit Solutions Services, and Client shall provide written notice of confirmation and/or verification of any instructions given by Client, its agents, employees, officers, or directors to Fiserv in connection with Fiserv's provision of the Deposit Solutions Services. Fiserv may rely upon and act in accordance with all instructions as provided, and Client assumes all risk for the consequences of any such instructions Client gives (or fails to give) and Fiserv's reliance thereon. If Fiserv discovers an error or defect in Client's accounts (provided Fiserv is under no duty to discover any such error or defect), Fiserv is authorized, to correct any such error or defect and to make any adjustments in order to correct such error or defect. Client agrees to execute and deliver any agreements, documents, or other forms as may be necessary to comply with the provisions of all applicable laws, regulations, rules terms and conditions, including, without limitation, agreements to establish Fiserv as Client's agent for purposes of delivery of processed items from or to the Federal Reserve Banks or such other correspondent banks as Client may use from time to time.

    (c) Additional Terms for Mitek Components.

    (i) Certain applications and programs used to provide the Services for mobile capture, including, without limitation, MiSnap™ ("**Mitek Components**") are third party software provided by Mitek Systems, Inc. ("**Mitek**"). Use of Mitek Components provided under this Schedule is solely for use of submitting items through the Fiserv Mobile Capture Services. Mitek Components are provided solely for use with Fiserv's approved ASP mobile banking services. Client may offer the Mitek Components to its customers only. In the event Fiserv's agreement with Mitek for use of Mitek Components is terminated, then the Mitek Components related Services provided under this Schedule shall terminate.

(ii) Client acknowledges and agrees that any copyright notices or branding related to Mitek Components, including "Powered by Mitek" or "© 2008-2020 by Mitek Systems, Inc. All rights reserved." without alteration.   Client shall not remove or alter any such notices (or similar notices) from the notices section of the Service application.

(iii) MITEK COMPONENTS ARE PROVIDED "AS IS", WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT, IN NO EVENT SHALL FISERV, AUTHORS OR COPYRIGHT HOLDERS BE LIABLE FOR ANY CLAIM, DAMAGES, OR OTHER LIABILITY, WHETHER IN AN ACTION OF CONTRACT, TORT OR OTHERWISE, ARISING FROM OUT OF OUR IN CONNECTION WITH THE MITEK COMPONENTS OR THE USE OR OTHER DEALINGS IN THE MITEK COMPONENTS.   IN NO EVENT WILL FISERV BE DEEMED TO MAKE ANY WARRANTY ON BEHALF OF MITEK.   CLIENT SHALL NOT MAKE ANY REPRESENTATION, WARRANTY OR OTHER SUCH OBLIGATION TO ANY END USER OR OTHER THIRD PARTY REGARDING MITEK COMPONENTS OR THE SERVICES PROVIDED USING MITEK COMPONENTS.

(iv) Notwithstanding anything to the contrary in the Agreement, Fiserv's aggregate liability to Client for any loss, liability, or damage arising out of or related to Mitek Components shall not exceed the fees paid for the Mitek Components related services provided under this Schedule in the 2 months preceding the claim.

(d) <u>DS Flex Credit</u>.  Fiserv agrees to provide Client with a flex credit in the amount of $21,478.00 ("**DS Flex Credit**") that that may be applied by Client against invoices for Services provided under the Deposit Solutions Schedule, subject to the following: (i) Client shall provide Fiserv's indicated designee with notice (which may be via email) of Client's election to use any portion of the DS Flex Credit; (ii) elimination of any services included in the Agreement as of the Amendment Effective Date or a reduction in actual customer or member accounts converted and/or processed could result in a reduction of the total DS Flex Credit; and (iii) the DS Flex Credit may not be applied to any third party software or services, out-of-pocket expenses, equipment costs, third party costs, or Taxes. In the event of termination of the Deposit Solutions Schedule during the initial term; Client will reimburse Fiserv for the DS Flex Credit applied by Client pursuant to this Section.  Such reimbursement shall be in addition to any applicable termination fee due from Client, and any unused DS Flex Credit remaining upon expiration of the initial term shall be forfeited by Client.

(e) <u>Term</u>. The initial term of this Schedule shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of three (3) years.

(f) <u>Conflicts</u>.  In the event of a conflict between the terms of this Schedule and the Agreement, the terms of this Schedule shall govern in relation to the Deposit Solutions Services and any other Products and Services provided under this Schedule.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Attachment 1 to Deposit Solutions Schedule**

**Services; Fees**

Deposit Solutions Services to be provided by Fiserv shall include only those services specifically marked with an "X" as included and for which fees are set forth in the applicable attachment hereto.

| Services Attachments included | Included Services marked "X" |
|---|---|
| **Deposit Services** | |
| Inclearing Deposits Services | X |
| Return Services | X |
| Branch Deposits Services | X |
| ATM Deposits Services | |
| Merchant / Remittance Deposit Services | |
| Mobile Deposits Services | X |
| Virtual Item Capture Services | X |
| Other Services | X |
| Transmission Services | X |
| **Digital Deposit Activation Services** | |
| **Fiserv Clearing Network** | X |
| **Back Office Services** | |
| Research / Adjustment Services | X |
| National Image Archive / Online Retrieval Services | |
| Client Workstation (CWS) Image Applications | |
| Digital Signature Verification Services | |
| **Statement Services** | |

1.  Payment Terms.

    (a)  One-time Fees.  All one-time fees set forth in this Attachment are due and payable in full on the Implementation Date. Notwithstanding the foregoing, the one-time fees for MiSnap portions of the Mitek Components are due and payable on the Mobile Deposits implementation or upgrade date (or if Mobile Deposits is in live production on the Schedule Effective Date then such amounts are due and payable on the Schedule Effective Date.

    (b)  Recurring Services Fees.  Commencing as of the Implementation Date and each month thereafter, Client shall pay the fees set forth in this Attachment for all Deposit Solutions Services provided in the prior month.  Notwithstanding the foregoing, the recurring fees for MiSnap portions of the Mitek Components shall commence on the Mobile Deposits implementation or upgrade date (or if Mobile Deposits is in live production on the Schedule Effective Date then such amounts shall commence on the Schedule Effective Date).  All fees may increase per Section 2(a) of the Agreement and as set forth in the Schedule.

2.  Services Fees.  Client shall pay the fees noted in each of the attachments hereto setting forth the specific Services and fees for such Services, and where applicable additional terms for such Services.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Deposit Services Attachment to Attachment 1 to Deposit Solutions Schedule**

| SERVICE | DESCRIPTION | FEE |
|---|---|---|
| **DEPOSIT SERVICES** | | |
| **Inclearings Deposits** | | |
| Inclearing Deposits Hosting | Electronic capture and balancing of incoming image cash letters. | $0.015 |
| **Return Services** | | |
| Monthly Base Fee | File loading and processing of Client's return item files for both inbound and outbound returns. | $250.00 |
| Outgoing Returns Items | Processing of outgoing return items | $0.80 |
| Late Outgoing Return Items | Return item processing that exceeds the normal 24-hour FRB window for regular returns or is past the established deadline for the return decision. Late Returns are subject to collection rules and procedures. | $5.00 |
| Large Dollar Notification | Fiserv provides Reg CC Notification to the bank of first deposit for the return. (Excluding the cost of the return.) | $5.00 |
| Deposit Return Items | Electronic capture and processing of Deposit Return image cash letters. | $0.80 |
| **Branch Deposits Services** | | |
| Branch Deposits Hosting | Capture of images scanned by Client using a Fiserv provided application host services for branch and teller deposit items. | $0.0244 |
| Branch Deposits Workstation Software Access | Access to software supporting operation of back counter workstations. Fee is per month, per workstation. | $75.00 |
| | Secure web connection - Using Fiserv's MFA program to facilitate connectivity between a Branch Deposits workstation and the Fiserv data center over the internet.  Fee is per month, per workstation. | $10.00 |
| | Item Image Field Entry- Fields not captured by CAR/LAR and/or MICR recognition | $0.023/field |
| | Balancing of transactions done by Fiserv | $0.008 |
| | Deposit Corrections - Fiserv correction of Client deposit/teller errors. | $2.00 |
| **Mobile Deposits Services** | | |
| Mobile Deposits Hosting | - First 1,000 checks deposited | $0.40 |
| | - 1,001 to 6,000 checks deposited | $0.30 |
| | - 6,001 to 16,000 checks deposited | $0.25 |
| | - Over 16,000 checks deposited | $0.22 |
| Monthly Maintenance Fee | $300M and under | $250.00 |
| | Over $300M - $750M | $400.00 |
| | Over $750M - $3B | $550.00 |
| | Over $3B | $750.00 |
| MiSnap™ for use with Mobiliti™ (per mobile banking channel certified by Fiserv for use with MiSnap) | | $38.00/month |
| **Virtual Item Capture** | | |
| Virtual Item Capture | Capture of deposited items presented electronically from other applications received in Fiserv's standard for x9 file formats.  The service includes receipt of file, confirmation of files and processing of transactions. | $0.027 |
| | Handling of virtual item depositors for each depositing file source | $100.00/sender |
| **Other Services** | | |
| Deposit Review | Fiserv will decision exceptions and rejects identified for deposit review unless pricing for specific exceptions is provided in another attachment for such exceptions. | $0.25 |
| Account Validation Reject Repair | Fiserv will correct any exceptions/rejects from captured items that fail to meet the account validation table, rejecting and correction the exceptions at end of day for the account number. | $0.25 |
| | Account validation file processing | $250.00/month |
| Data Extraction Services | Fiserv will extract data as provided in the Data Extraction Services guide and transmit that data to Client once daily following the end of processing. | $500.00/month |

| SERVICE | DESCRIPTION | FEE |
|---|---|---|
| Batch Management | Fiserv will notify Client when any capture batches are left unprocessed due to a batch status which prevents the completion of processing. Fiserv will notify Client for each batch pending daily and disposition the batch deletion as requested. If a batch is pending multiple days, the fee applies to each day it is pending. | $50.00/batch |
| Level One Support Calls | This fee applies only if Client requests Fiserv to provide support or service for issues that Client has been trained to handle through level one support training provided by Fiserv. This fee will not apply to Client calls for level two technical support for platform operations due to a Fiserv delivery issue. Chargeable calls include questions addressed in documentation, password reset, unlocking the system after password failures, and scanner set ups. This fee is waived during the first 90 days of service to support Client use and learning of system. | $35.00/call |
| **Transmission Services** | | |
| File Transmission | Transmitting of MICR data to a Client application processor (non-Fiserv system). | $0.005 |
| | Import/Export of MICR and image data to a Client designated application in an x9 formatted file. (non-Fiserv system). | $0.013 |
| | Image Import/Export - Creation of Multi-tif or other approved format for capture items. Monthly minimum is $250.00 per month. Excludes bulk image exports. | $0.005 |
| | Real Time Deposit Confirmation Service for Mobile and/or other applications that qualify. Real Time Deposit Confirmation makes the deposit visible to the account holder in online banking. | $250.00/month |
| | Intraday Posting - In lieu of Real Time Deposit Confirmation, Fiserv may provide periodic intraday file transmissions to update core account balances for deposit channels that qualify. | $250.00/month |
| Daily Settlement Notification | Notification of Daily Cash Letter received/deposited. | $55.00/month |
| Cash Letters | Charge for preparing every outgoing Cash Letter. This fee does not apply to items serviced by the Fiserv Clearing Network | $10.00 |
| Cash Letter Transmission | - Fiserv Clearing Network Items | $0.01 |
| | - Other Certified Cash Letter Program Items | $0.013 |
| **Other Services** | | |
| Processing Minimum Per Month | Deposit Solutions Services per financial institution installed. Fiserv Clearing Network, pass-through and one-time charges are excluded from minimum. | $750.00/month |
| **Implementation Services**<br>**(Training for the use of all services is included in the initial implementation)** | | |
| Inclearing Deposits | Service includes the installation of an Inclearing sort pattern, certification of incoming presentment files from FRB or FCN with file extractions to any Fiserv AP Service. | $4,000.00 |
| | Same Day Settlement (SDS) or Direct Presentment Implementation - In addition to the Inclearings Implementation Fee, an additional set up fee will be applied to each incoming presentment file source associated with the processing of Inclearing Services. | $3,000.00 |
| Deposit Returns | Service includes the installation of Deposit Return Services to receipt FedReturn files | $3,000.00 |
| Branch Deposits | Services include project management, sort pattern definition, testing and post conversion support for Branch Deposits system supporting a Fiserv AP Client. This includes deployment for the first two branches. | $8,000.00 |
| | Additional branch deployments | $250.00/location |
| | Certification and set up of Client's custom forms or forms not acquired through Fiserv's forms procurement service. This will include establishing necessary steps to identify qualifying coordinates on custom documents to facilitate Courtesy and Legal Amount Recognition as well as recognition of other fields as necessary. | $650.00/form |

| SERVICE | DESCRIPTION | FEE |
|---|---|---|
| Cash Letter Transmission | Service includes the installation of any non-FCN ICL services to any certified endpoint. This service does not include any custom cost associated with network requirements necessary to process the file. Fee is per ICL installation. | $2,250.00 |
| Mobile Deposits | Based on Client Asset Size and number of mobile banking platforms installed (i.e., Retail, Business, etc.) | $4,875.00 for the first platform, $1,875.00 for each additional platform |
| MiSnap™ for use with Mobiliti™ (per mobile banking channel certified by Fiserv for use with MiSnap) | | $2,250.00 |
| Account Validation Tables | Set up to provide for account validation against tables provided by Client which represent their valid accounts to be used to compare capture activity against any capture operations. Files received from Client's account processing system must be in the proscribed Fiserv format. | $3,000.00 |
| Data Extraction Services | Fiserv will set up the service to include delivery of the data file to designated FTP inbox for receipt. Any support beyond the initial set up will be billed at the Professional Services rate. | $1,500.00 |
| Real Time Deposit Confirmation | Fiserv will install Real Time Deposit Confirmation services for the handling of capture activity for supported capture services. | $5,000.00 |
| Intraday Posting | Fiserv will install intraday file transmission to update core account balances to deposit channels that qualify. Fee is charged per hour at Professional Services rate. Minimum setup is 2 hours. | $225.00/hour |
| Incoming X9 File Set Up and Certification | Fiserv will certify receipt of any X9 file requested by Client. Certification may be required for such a project set up. File should be based on Fiserv's standard format. | $3,500.00 |
| Outgoing Returns Services | Service includes the installation of an Exception Item File Processing and set up of Fiserv's Image Returns Application to facilitate returns cash letter creation. ICL Return Services are not included. | $1,350.00 |
| | Service includes the installation of any non-FCN ICLR services to any certified endpoint. This service does not include any custom cost associated with network requirements necessary to process the file. Per Outgoing Return Cash Letter Installed. | $2,250.00 |
| Virtual Item Capture Set Up | Fiserv will certify receipt of any X9 file requested by Client. Certification may be required for such a project set up. File should be based on Fiserv's standard format. Fee is per incoming source set up. | $3,375.00/source |
| Training | Subsequent training can be scheduled on request. | $225.00/hour |
| MICR Manipulation Tables | Fiserv will provide MICR Manipulation Tables and Account Translation Tables as required to support any capture service. Fiserv will provide a bid for services following a discovery of requirements. | $225.00/hour |
| Professional Services and Changes to Service | Fiserv will provide Client with an estimate of services required. Professional Services and related changes to service are available for any services not currently utilized by Client. Bid provided unless the Set-up fee has already been provided in this fee schedule. | $225.00/hour |
| | Business Analyst Request to perform research, investigations and other related activities billed in ½ hour minimum increments. $1.00 Copy fee. | $40.00/hour |

**Fiserv Clearing Network Services Attachment to Attachment 1 to Deposit Solutions Schedule**

1.  Fiserv Clearing Network.  The following terms shall apply to Client's use of the Fiserv Clearing Network ("**FCN**").  FCN Services are provided each business day (excluding Saturdays, Sundays, and locally observed holidays).  Items presented to FCN will be processed in accordance with federal regulatory practices and in adherence with the Electronic Check Clearing House Organization ("**ECCHO**") Image Exchange Rules.

(a)  Fee Adjustments.  Notwithstanding anything to the contrary in the Agreement, the FCN Services fees may be changed at any time upon 30 days prior written notice to Client (except for any increases assessed by collecting institutions, resulting from related clearing costs or materials to affect the clearing function where such prior notice will not be required for such increases).  Upon notification of a fee change, Client may terminate the Fiserv Clearing Network Services provided under this Attachment without payment of the applicable termination fee by ensuring Fiserv receives written notice of such termination within 30 days of Fiserv issuing a notice of such fee increase.

(b)  Settlement.  Client agrees to perform settlement utilizing Viewpointe LLC ("**Viewpointe**") as the agent to pass financial entries to Client's account at the Federal Reserve or designated settlement institution.  As such, Client agrees to execute the authorization agreement documentation (the form of which are set forth below in this Attachment) necessary for Viewpointe to pass financial entries to Client's account at the Federal Reserve.  Such forms are to be provided by Client at the same time this Attachment is made part of the Agreement and shall be a prerequisite for Client's access to FCN.  Client agrees to fund its Federal Reserve account to cover the entries passed from Viewpointe before final settlement occurs.

(c)  FCN Forward Service.  Fiserv will provide check clearing services for items deposited by Client's depositors.  Fiserv will process all outgoing transit items for collection from the paying institutions to include all US fund checks payable to Federal Reserve chartered financial institutions.  Fiserv will fund Client's settlement account based on successful capture and/or presentment of files through Fiserv's Deposit Solutions Services otherwise provided under the Deposit Solutions Schedule.  Fiserv reserves the right to adjust funds availability based on the inability to collect items due to factors beyond Fiserv's direct control.

(d)  FCN Return Services.  Fiserv will provide return check clearing services for outgoing return items from Client's accounts.  Fiserv will process all return transit items for collection from the paying institutions to include all US fund checks payable to Federal Reserve chartered financial institutions.  Fiserv will fund Client's settlement account based on timely processing of Outgoing Return Services through Fiserv's Deposit Solutions Services otherwise provided under the Deposit Solutions Schedule.  Fiserv reserves the right to adjust funds availability based on the inability to collect items due to factors beyond Fiserv's direct control.

(e)  FCN Receipt Services.  Fiserv participates in the collection process by accepting checks payable against Client's routing number (as provided by Client).  Fiserv will provide such Items, in the manner received, to Client in the form of Inclearing Deposits Services and/or Deposit Return Services as supported by Client's operating procedures.

(f)  FCN Adjustment Services.  All adjustment back-up documentation and entries required for Client to process all inbound adjustments received on a daily basis will post through Client designated Viewpointe account and net-settle to Client's Federal Reserve Bank account.  Outbound adjustments will require Client to initiate entries through its designated Viewpointe account and upload back-up documentation to the Viewpointe website; entries will net-settle to Client's settlement account.  Details of this process are defined in Fiserv FCN Users Guide.  Upon request and with written authorization, Fiserv will further support these adjustment services on behalf of Client and process any outgoing collection adjustments that result from Client input error as provided in the Fees.  Fiserv will provide back-up documentation for all inbound adjustments within 24 hours following the Viewpointe debit for an adjustment.  Fiserv will provide Client with Source of Receipt needed to process outbound adjustment within 24 hours of request.  Full adjustment processing requires 3 to 5 business days.

2. FCN Services Fees.

| SERVICE | DESCRIPTION | | | | | | FEE |
|---|---|---|---|---|---|---|---|
| | **FISERV CLEARING NETWORK** | | | | | | |
| **Fiserv Clearing Network (FCN) – Forward Service Fees** | | | | | | | |
| **Outbound Items - ALL TIMES ARE EASTERN TIME** | | | | | | | |
| Type of Item | Fee is per Item processed by noted time | | | | | | |
| **Description** | **6:30PM** | **8:30PM** | **10:30 PM** | **12:30AM** | **2:30 AM** | **5:30 AM** | |
| In-network Image | $0.005 | $0.005 | $0.005 | $0.005 | $0.005 | $0.005 | |
| Exchange Image | $0.010 | $0.010 | $0.010 | $0.010 | $0.010 | $0.010 | |
| Transit Image | $0.021 | $0.022 | $0.033 | $0.044 | $0.060 | $0.150 | |
| Friday 8:30PM through 5:30AM Saturday will receive 8:30PM weekday pricing | | | | | | | |
| **Fiserv Clearing Network (FCN) – Return Service Fees** | | | | | | | |
| **Outbound Items - ALL TIMES ARE EASTERN TIME** | | | | | | | |
| FCN Direct Returns | Outgoing returns that are presented to the network for clearing services and are submitted by the deadline defined for outgoing return services and achieve a 9:30 p.m. EST presentment of returns for 98% availability of funds. | | | | | | $0.6500/item |
| **Settlement Services** | | | | | | | |
| Settlement Account Charge | $0 - $76M  in assets | | | | | | $155.00/month |
| | Over $76 - $350M  in assets | | | | | | $180.00/month |
| | Over $350 - $700M  in assets | | | | | | $205.00/month |
| | Over $700M - $1B  in assets | | | | | | $255.00/month |
| | Over $1B in assets | | | | | | $355.00/month |
| **Adjustment Fees** | | | | | | | |
| Research/Adjustments Requested by Client | Any research requested by Client. | | | | | | $40.00/Hour |
| | NSS Viewpointe adjustment entries performed by Fiserv | | | | | | $10.00/adjustment |
| **Implementation Services** | | | | | | | |
| FCN Implementation Fee | This fee is a one-time set up fee for Client's data to be loaded in the Fiserv Electronic Clearing Services Application.  Other implementation fees may apply to support the conversion of Deposit Solutions Services to this program. | | | | | | $500.00 plus estimated IP change fees |
| **Funds Availability (Explicit Float) Charges** | | | | | | | |
| Explicit Float Charges | In consideration of Fiserv providing a float to Client and making 100% of all completed ICL transmissions received and acknowledged by 5:30 Eastern Time as immediately available funds the next business day, Client shall pay Fiserv a monthly float charge calculated as follows:<br><br>(Value of total funds deposited) multiplied by (the Float Percentage) multiplied by (the then current effective federal funds rate (EFFR)) divided by (360 days). | | | | | | Float Percentage = 2% |

3. Forms of FCN Authorizations (on following pages):

**[Depository Financial Institution's Official Letterhead]**

*[Date]*

Through:                    Fiserv Deposit Solutions

                           255 Fiserv Drive

                           Brookfield, WI 53045


For further delivery to:    Electronic Check Clearing House Organization

                           3710 Rawlins Street, Suite 1075

                           Dallas, TX 75219

ATTN: Mr. David Walker

By signing below, the Depository Financial Institution named below as a Sponsored Member sponsored by Fiserv pursuant to its Sponsorship Agreement with the Electronic Check Clearing House Organization ("**ECCHO**"), agrees to the terms of the ECCHO Bylaws and ECCHO Operating Rules, as they may be amended from time to time.

_____

Full Legal Name of Depository Financial Institution

_____

Authorized Signature

_____

Printed Name

_____

Title

_____

Primary R/T Number

ECCHO fees associated with clearing items through FCN will be paid by Fiserv as part of the FCN clearing services agreement.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**SETTLER AGREEMENT**

[To be typed on letterhead stationery of Settler]

DATE: _____

TO:

| Check for Distribution (To be completed by Fiserv) | |
|---|---|
| | Fiserv |
| | Viewpointe |
| | Federal Reserve Bank of New York |

We are a Settler in the **MBR NATIONAL EXCHANGE**, a Settlement Arrangement, and **#021050644**
**NAME OF EXCHANGE**
Request that you settle our Balances. We agree to settle the balances on a Settlement File for the following Institution(s):

| PARTICIPANT NAME | PARTICIPANT ABA# | SETTLER NAME | SETTLER ABA# |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

We agree to the terms of your Operating Circular No. 12 as revised from time to time, and we authorize the Reserve Bank that holds our Master Account to debit or credit our Master Account as provided by that Operating Circular. We designate Viewpointe LLC, as Settlement Agent, or a successor Settlement Agent designated to you by Viewpointe, LLC, or by a successor Settlement Agent that is the Settlement Agent at the time of such designation. The Settlement Agent will provide you a list of names of all the current Settlers in this Settlement Arrangement. The Settlement Agent may from time to time inform you of additional Settlers in the Settlement Arrangement or a successor Settlement Agent, and is authorized to otherwise carry out the responsibilities of a Settlement Agent as specified in the Operating Circular.

_____
**NAME OF SETTLER**

_____
**SIGNATURE OF AN OFFICER OF THE INSTITUTION AND AN AUTHORIZED SIGNER AT THE FRB**

_____
**PRINT NAME OF OFFICER**

_____
**TITLE, TO INCLUDE THE OFFICER'S TITLE (i.e. Officer, AVP, VP, etc.)**

_____
**PHONE NUMBER OF OFFICER**

**Back Office Services Attachment to Attachment 1 to Deposit Solutions Schedule**

| SERVICE | DESCRIPTION | FEE |
|---|---|---|
| | **BACK OFFICE SERVICES** | |
| **Research/Adjustments** | | |
| Research/Subpoena Work | Research other than a Fiserv created error, and/or research requested by subpoena, search warrant, or other legal request. Billed in ½ hour increments plus $1.00 Copy fee. Bid provided. | $40.00/hour |
| | Copies, fax, email of any work request per item provided Client utilizes Fiserv's National Image Archive Service. | $5.00 |
| | Fed or Correspondent Adjustments - Research of outages. (Plus Research Fee if over ½ hour). | $10.00 |

**Digital Online Banking Services Schedule**

**to ASP Services Exhibit**

On the terms and subject to the conditions set forth below, Fiserv and Client hereby enter into this Digital Online Banking Services Schedule (this "**Schedule**"). The parties agree that this Schedule incorporates as if fully set forth herein all of the terms and conditions of, and shall be made subject to the provisions of, the Agreement.

1.  Term. The initial term of this Schedule shall begin on the first day that the Digital Online Banking Services are made available by Fiserv to Client (the "**Digital Online Banking Service Date**") and continue thereafter coterminous with the Portico Account Processing Services Schedule. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, this Schedule shall automatically renew for additional term(s) of three (3) years.

2.  General Terms. The following terms and conditions apply to all Services provided under this Schedule ("**Services**") except as noted below.

(a)  Hours. Fiserv will use reasonable efforts to make the Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime, and causes beyond the reasonable control of Fiserv. Fiserv shall have no obligation to address or support: issues caused by Client modifications to the Services; services that are not currently supported; Services problems caused by Client's negligence, abuse, or misapplication; or use of the Services other than as specified in this Schedule or the Services documentation.

(b)  Support. Client is responsible for first level technical support to its Users, unless otherwise set forth herein, and Fiserv will provide second level technical support to Client's designated support representatives (meaning Fiserv will accept an initial technical support inquiry from Client, but not the Users (defined below in Section 3(a)), and initiate a troubleshooting process) in accordance with Fiserv's standard support services process. Such support will be available during Fiserv's standard business hours. Fiserv will use commercially reasonable efforts to address issues caused by Client's failure to fulfill its responsibilities in this Schedule at its then current rates and will not be obligated to address or circumvent such issues in any designated time frames.

(c)  Releases. Fiserv may, from time-to-time, automatically release new version(s) of the Services that improves existing functions or performance. Release schedules are published by Fiserv and are available to Client. Client will cooperate with Fiserv as to any necessary corresponding Client system changes outside Fiserv's control.

(d)  Service Providers. Fiserv uses third party service providers ("**Service Providers**") for certain Services. Fiserv will identify the then-current Service Providers who have access to Client Confidential Information upon Client's request. Client grants Fiserv permission to pass data to Service Providers in order to deliver the Services and will obtain User consent for Fiserv and the Service Providers to perform under this Schedule. Fiserv shall provide Client with no less than 90 days notice in the event that Fiserv changes Service Providers in a manner that necessitates material changes to Client's implementation. Fiserv may terminate the Services, or applicable portions thereof, upon notice to Client in the event Fiserv's agreements with the applicable Service Provider(s) terminate. Prior to such termination, Fiserv will use commercially reasonable efforts to replace such third party Service Provider(s). Depending on the third party services, Client may be required to enter into separate agreements with such third party Service Providers.

(e)  Client Third Party Service Providers. Fiserv will transmit Client's relevant data via SSO or API to all Client-requested third party providers as designed and agreed upon in a statement of work ("**Client Third Party Service Providers**").  Fiserv is not responsible for any Client Third Party Service Provider's actions or inactions in connection with the processing of Client's relevant data.

(f)  Test Accounts; Telecommunications; VPNs. Client will provide Fiserv with access to test accounts in accordance with Fiserv's specifications. Fiserv may order, on Client's behalf and after receiving Client's written approval, the installation of appropriate telecommunications services and equipment for the Services. Client shall pay for all costs of installation and use of such telecommunication services and equipment.  As may be required, Client is responsible for providing reasonable assistance to support Fiserv's installation of a VPN router at Client's expense for connectivity to the Account Processing Platform and for providing and maintaining VPN connectivity between the Client's network(s) and Fiserv's servers providing the Services. If multiple VPN connections are necessary, additional charges may be incurred by Client per connection.

(g)  Services. This Schedule may refer to Services not purchased by Client. Fiserv is only obligated to provide the Services that have been designated for purchase by Client in the Fee Attachment.

(h)  Fees. Client will pay the fees set forth in the Fee Attachment attached hereto ("**Fee Attachment**"). Monthly fees for the first month will be prorated commencing on the Digital Online Banking Service Date; provided, however, if Fiserv is prevented from making the Services available due to Client's inaction or delayed efforts, the Digital Online Banking Service Date will be the date 15 days after the date that Fiserv notifies Client of such inability and the applicable fees will be assessed based on Client's expected total online User population, determined by the number of online users within any other online banking system, and lacking that, Client's online user projections.

3.   Services and Service-specific Terms.

(a)  Digital Online Banking Services. Fiserv will provide to Client the Digital Online Banking Services ("**Digital Online Services**") as described in the Fee Attachment. "**User(s)**" means the end customer(s) of Client enrolled in the Digital Online Banking Services. "**Account Processing Platform**" means Client's primary financial system of record and transaction processing. Client will only use the Digital Online Banking Services as set forth in the Documentation.

(i)  Digital Online Banking Implementation and Training. Fiserv's implementation of the Digital Online Banking Services shall be considered part of the Digital Online Banking Services, and will be subject to a separate statement of work. As part of the implementation, Client will enter into developer licenses directly with the applicable supported third party mobile application stores. Fiserv will provide Client with standard remote training during the initial implementation of the Digital Online Banking Services.

(ii)  Scheduling.  After the effective date of this Schedule Fiserv will work with Client in good faith to establish a mutually agreeable implementation schedule and Digital Online Banking Service Date, which shall be no later than 9 months following the effective date of this Schedule, unless otherwise agreed in writing by Fiserv.  Once a Digital Online Banking Service Live Date has been set, if within 30 days of the scheduled Digital Online Banking Service Date Client notifies Fiserv of a need to delay its implementation, an additional fee equal to 50% of the implementation one-time charges set forth in this Schedule will apply.  Retraining costs, if applicable, will be $500 per session. The rescheduling fee is not applicable if the implementation delay is the result of any issue exclusively under Fiserv's control.  In the event Client does not implement the Digital Online Banking Services within 9 months following the effective date of this Schedule, and such failure is not due exclusively to the fault of Fiserv, (i) Client agrees to pay Fiserv the applicable implementation and conversion fees set forth in the Fee Attachment upon receipt of an invoice from Fiserv, and (ii) notwithstanding anything in the Agreement to the contrary, with written notice to Client, Fiserv may terminate this Schedule and Client agrees to pay early termination fees due pursuant to Section 8(b) of the ASP Services Exhibit in connection with such termination upon receipt of an invoice from Fiserv.

(iii)  Systems Configuration. Fiserv shall only be obligated to configure the Digital Online Banking Services to Client's Account Processing Platform and supported third party integrations as documented in the Fee Attachment and Implementation Services statement of work.

(iv)  Primary Customer Service.  Client acknowledges that Fiserv will not provide level 1 technical support to Client's Members if Client has not selected and is not paying for t Primary Customer Service as set forth in the Fee Attachment.  Such Primary Customer Service is available only for the online banking portion of the Digital Online Banking Services.

(v)  FedImage Access.  In the event Client elects to use the Federal Reserve as its image provider, Fiserv, Client and the Federal Reserve shall be required to enter into a letter agreement for such use and access ("**Letter Agreement**"). Client acknowledges and agrees that any dispute, claim, liability, legal action, damage, arbitration or court ordered award, fee, or expense of any kind that arises between Client and Fiserv in connection with such Letter Agreement shall be governed by the terms and conditions of the Agreement and this Schedule.  Fiserv and Client each agree that as between Fiserv and Client, in the event of a conflict between the terms of the Letter Agreement and the terms of the Agreement (including this Schedule), the terms of the Agreement shall control.  Client agrees to indemnify, defend, and hold harmless, and hereby releases Fiserv and its Affiliates and each of their directors, officers, agents, and employees, and any successors or assigns of the foregoing (individually an ("**Indemnified Party**") and collectively, ("**Indemnified Parties**")), from and against any and all liability, losses, costs (including but not limited to litigation and settlement costs and reasonable attorneys' fees), charges, or judgments brought or alleged against any Indemnified Parties arising from, relating to or in connection with Client's use of the Federal Reserve as its image provider, or any of Fiserv's acts or omissions taken in accordance with or pursuant to the instructions of Client.  Client shall, at its own cost and expense, not

subject to reimbursement, defend all such actions and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim at Client's expense, and grant Client sole control over the defense and settlement of such claim.

(vi)   With respect to online statements, Client agrees that it will provide statement data to Fiserv in the format and timeline specified by Fiserv, in order for Fiserv to provide Client with the online statement services pursuant to this Schedule.  If Fiserv does not receive the statement data as set forth herein, Fiserv will not be responsible for any failure to provide to the Client or Member the online statement services and Fiserv may terminate this Schedule for cause pursuant to the terms of the Agreement.  Client will be solely responsible for the accuracy and integrity of the information reflected on each of its members' statements and notices.

(vii)  Client is and shall remain solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each member accessing the Digital Online Banking Services.

(b)   SecureNow Services. As elected by Client and for the fees identified in the Fee Attachment, Fiserv will provide Client with the SecureNow Services (collectively, "**SecureNow Services**"):

(i)   Third Party Factors; No Guarantee. Client acknowledges that the SecureNow Services involve the use of non-confidential Internet, telephone and wireless telecommunication networks to potentially transmit and/or receive information from Client's Users. Client acknowledges that Fiserv's performance of the SecureNow Services is dependent on the facilities, networks, security and connectivity of third party telecommunications and network service providers, governmental entities and other third parties (collectively, the "**Third Party Factors**"). Client acknowledges that the performance of the SecureNow Services will be affected by such Third Party Factors and that Third Party Factors are outside Fiserv's control. FISERV WILL HAVE NO LIABILITY FOR ANY REDUCTION, INTERRUPTION, IMPAIRMENT, TERMINATION OR SUSPENSION OF THE SECURENOW SERVICES TO THE EXTENT CAUSED BY FACTORS OUTSIDE FISERV'S CONTROL. Client acknowledges that access to the SecureNow Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall not be held responsible for any delays or missed delivery dates by a third party unless such third party is a subcontractor of Fiserv. Client acknowledges and agrees that (A) Fiserv cannot guarantee that Client's use of SecureNow Services will prevent all cyberattacks or detect all cyber fraud; and (B) use of information technology carries inherent information security risks and information security cannot be guaranteed, generally. SecureNow Services are only a component of, and should not be considered to be a replacement of, or substitute for, Client's own enterprise data protection and fraud prevention strategy.

(ii)   Data Usage. Client acknowledges that data gathered from confirmed cases will be utilized to detect fraud for other Fiserv clients. Client grants Fiserv permission to use such data to further the detection and prevention of cyberattacks and fraud; however, no proprietary consumer information is shared or viewable by other Fiserv clients, other than reasonably necessary information, such as User name. In addition, Client agrees Fiserv may aggregate Client's non-personal user data and information relative to the use of the SecureNow Services by Users and their mobile devices with similar data from other Fiserv customers for the purposes of enhancing Fiserv products and adoption techniques.

(iii)   Service Provider Required Terms. Client or Users must share with Fiserv certain data, including without limitation: (A) the User's, name, e-mail address, zip or postal code; and (B) account information (e.g., financial data, account and routing numbers, user identification, login and password and personal information (including without limitation birth date, IP address and social security number) (collectively, "**User Data**"). Client acknowledges that such SecureNow Services are proprietary and confidential and shall be treated as Fiserv Information under the Agreement. Client grants to Fiserv and Fiserv's applicable Service Providers a non-exclusive, non-transferable, except as provided herein, right to use, copy, store, modify and display the User Data solely to the extent necessary to provide the SecureNow Services pursuant to this Agreement. Client represents that it has obtained all necessary User consent as may be reasonably required to grant such license rights to Fiserv and its Service Providers. The SecureNow Services will be only used for the purpose of verifying the identity of the User and will not be used, in whole or in part, as a basis for determining the eligibility of a User for credit, insurance or employment or to take 'adverse action,' as defined in the Fair Credit Reporting Act or similar laws. Client will not copy or retain any authentication questions or the Users' answers to such questions or use such questions for purposes other than identity verification and User authentication, except (1) as required by

law and (2) that Client shall be permitted to use and retain the pass/fail indication returned by the SecureNow Services along with any related explanatory information/codes for risk management or other internal purposes permitted by law. Client will not reverse engineer or create derivative works based on the identity verification and authentication elements of the SecureNow Services (or the technology used to provide such SecureNow Services). Client is responsible for ensuring each User has consented to share data with Fiserv and its Service Providers for the purposes of detecting and preventing fraud. Client must ensure that the Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with Users), except as Fiserv and Client otherwise agree in writing:

Client may share certain personal information and device-identifying technical data about User and User's devices with third party service providers who will compare and add device data and fraud data from and about User and User's devices to a database of similar device and fraud information in order to provide fraud management and prevention services and identify and block access to the applicable service or Web site by devices associated with fraudulent or abusive activity. Such information may be used by Client and its third party service providers to provide similar fraud management and prevention services for services or Web sites not provided by Client.

(iv) <u>Market Adoption</u>. Client agrees to assist Fiserv with certain marketing efforts associated with the SecureNow Services, as reasonably requested by Fiserv and mutually agreed with Client, which may include a press release, marketing the SecureNow Services to Client's Users, and serving as a reference contact, among other examples.

4. <u>Implementation Services</u>.  Fiserv shall provide implementation services for the Services provided pursuant to this Schedule as set forth in the attached Statement of Work attached hereto as Appendix 1.

5. In the event of a conflict between the terms set forth in the Agreement and the terms set forth in this Schedule, the terms set forth in this Schedule shall prevail.

**Attachment 1 – Fee Attachment**

**Digital Online Banking Services**

| DESCRIPTION | FREQUENCY | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Virtual Branch Next | | | | |
| Virtual Branch Next Implementation | One Time | | | 5,500.00 |
| Online Banking Conversion | One Time | | | 2,750.00 |
| Virtual Branch Next | Monthly | | | 0.00 |
| Monthly User Fee | Flat Monthly | | | $3,500 |
| | | | | |
| Enhanced Authentication | | | | |
| Implementation | One Time | | | 2,200.00 |
| Maintenance Fee | Monthly | TBD | 0.028 | TBD |
| | | | | |
| Account Alerts | | | | |
| Implementation | One Time | | | 825.00 |
| Maintenance Fee | Monthly | | | 0.00 |
| | | | | |
| Demographic update to/from APS | | | | |
| Implementation | One Time | | | 825.00 |
| Maintenance Fee | Monthly | | | 83.00 |
| | | | | |
| Virtual Branch Next Forms - Basic | | | | |
| Maintenance Fee | Monthly | | | Included |
| | | | | |
| Virtual Branch Next Online Electronic Notices | | | | |
| Implementation | One Time | | | 1,650.00 |
| Maintenance Fee | Monthly | | | 165.00 |
| | | | | |
| Electronic Notice Alert Fee – per alert sent | | | | |
| Maintenance Fee | Monthly | | | 0.020 |
| | | | | |
| VB Chat* | | | | |
| Implementation | One Time | | | 1,100 |
| Maintenance Fee (Minimum) | Monthly | | | 275.00 |
| Per Call Fee | Per Call | | | 2.75** |
| **plus $2.75 per minute* | | | | |
| Chat Session Fee | Per Session | | | 11.00 |
| Secure Messaging Fee | Per Email | | | 11.00 |

*VB Chat Services shall begin on the date such Service is first used by Client and continue thereafter for a period of one (1) month.*

| | | | | |
|---|---|---|---|---|
| VB Links and Single Sign On (SSO) | | | | |
| Link to Fiserv System - Electronic Statements, Originate Deposits | | | | |
| Implementation | One Time | 2 | | Included |
| Maintenance Fee | Monthly | 2 | | Included |
| | | | | |
| Link to Fiserv System - Check Images, CheckFree® RXP®, Mobile Source Capture | | | | |
| Implementation | One Time | 3 | 825 | 2,475.00 |
| Maintenance Fee | Monthly | 3 | | Included |

| | | |
|---|---|---|
| Link to Non-Fiserv System - Check Reorder | | |
| Implementation | One Time | 1,650.00 |
| Maintenance Fee | Monthly | 165.00 |
| | | |
| VB Online Statement Services | | |
| Statement Express | | |
| Implementation - Statements direct from APS | One Time | 2,750.00 |
| Maintenance Fee - Monthly Minimum | Monthly | 165.00 |
| | | |
| *Per Loaded Statement Fee (with 12 months retention)* | | |
| Maintenance Fee | Monthly | 0.30 |
| | | |
| *Per Loaded Statement Fee (per each month additional retention)* | | |
| Maintenance Fee | Monthly | 0.022 |

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 72 of 138

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Attachment 1 – Fee Attachment (continued)**

**Mobiliti Services**

| DESCRIPTION | FREQUENCY | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Implementation and Monthly Service Fees | | | | |
| Initial Setup Fee - billed upon siging | One Time | | | 3,000.00 |
| *Includes TouchBankingTM-branded Smartphone App, Mobile Browser and SMS access methods.* | | | | |
| Monthly Service Fee | Monthly | | | Waived |
| Client Branded Smartphone App (CBA) | | | | |
| Two Apps (Apple and Android) in two online stores | | | | |
| Implementation for two Apps (Apple and Android) in two o | One Time | | | 3,400.00 |
| CBA Monthly Service Fee | Monthly | | | 125.00 |

*Online Store Fees: Client will pay for online store license or registration fees directly to the Apple and Google Play online stores. (Apple license fee $99 annually, Google Play $25 one time; subject to online store policy changes.)*

| DESCRIPTION | FREQUENCY | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| User Fees for Phone and Tablet | | | | |
| Per Mobile User Pricing | | | | |
| *Client will be billed for the total number of enrolled mobile users, whether active or inactive.* | | | | |
| Per Enrolled Phone User | Monthly | Per User | 1.20 | TBD |
| Monthly Minimum Fee | Monthly | | | 150.00 |
| SMS Usage Fees | | | | |
| Bundled Fee Option | | | | |
| Pre-purchase of 16 Messages Per Enrolled SMS User | Monthly | Per User | 0.15 | TBD |
| Additional Messages (above aggregate total of SMS users x 16 messages) | | | | |
| User or System Sent | Monthly | Per User | 0.0125 | TBD |
| -OR- | | | | |
| Per Message Fee | | | | |
| User Sent (up to 100,000) | Monthly | Per User | 0.008 | TBD |
| System Sent (up to 100,000) | Monthly | Per User | 0.026 | TBD |
| SSO to Mobiliti for Virtual Branch Next | | | | |
| SSO to Originate | | | | |
| Maintenance Fee | Monthly | | | Included |
| Implementation | One Time | | | Included |
| Miscellaneous Fees | | | | |
| Changes to configured items after initial set-up | One Time | Per Change | | 1,500.00 |

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 73 of 138

**Appendix 1 – Statement of Work**

**Virtual Branch (VB) Online Banking Implementation**

**Statement of Confidentiality.** The content of this Statement of Work ("SOW") and any material or information represents the proprietary, confidential information pertaining to Fiserv and its clients. No copy of this document will be made without the prior consent of Fiserv.

1. **In-Scope Services.**

   This project allows clients to offer Virtual Branch online banking to their membership. Features and functionality include 24/7 access to online banking to view accounts, balances and pending items, transfer funds, update personal information, compose and reply to secure mails, update logon id, security code, and secondary level customer support. This project requires implementing Intelligent Authentication (Multi-Factor Authentication) (separate SOW). If the client has an existing online banking system and desires the current enrolled users of that system be converted then this project can be implemented in combination with an Online Banking Conversion (Separate SOW).

2. **Out of Scope Services.**

   - Any activity not listed in **"In-Scope Services"**
   - Customized reports
   - Customization of client's Virtual Branch online banking site

3. **Responsibilities.**

   Fiserv will:

   - Schedule kick off call to review implementation process and timeline
   - Work with the client and representatives from the clients Account Processing System to coordinate activities.
   - Create a Virtual Branch online banking site using client's logo and colors
   - Create a model office environment for client testing and a production environment for their membership rollout
   - Complete setup of the client and an administrator in Virtual Branch administrative system (InterACT Web)
   - Schedule and provide live Webex training (2 hours) and documentation
   - Update client's production site once client's approval/sign off has been received

   Client will:

   - Attend kick off call
   - Provide contacts for online banking implementation process
   - Return form with list of contacts (names, phone numbers and email addresses) for future Virtual Branch constant contact communications
   - Attend Webex training and review documentation.
   - Enroll and log on successfully to Virtual Branch
   - Set up admin users with respective authorization groups in Virtual Branch Interact Web
   - Review and walk through Virtual Branch online banking site
   - Provide updates/modifications requests to their Virtual Branch online banking site in a timely manner
   - Verify that approved updates have been promoted to client's production site
   - Provide sign-off/approval in a timely manner so client's Virtual Branch site can be released to their membership

*Fiserv will notify Client if Fiserv anticipates exceeding the hours estimated below.*

4. **Estimated Project Hours.**
*70 hours*

<u>Estimated Hours.</u>  *The hours set forth above are estimates based upon the scope of the services described in this SOW.  All services-related hours worked in excess of the hours quoted in this SOW shall be billed at Fiserv's then-current professional services rate, and are due and payable in accordance with the payment terms set forth herein.*

<u>Travel-Related Expenses</u>.  *In addition to the fees associated with this SOW, additional charges may include reasonable out-of-pocket travel-related expenses incurred in connection with the services provided herein.  All travel-related expenses shall be billed on a monthly basis as incurred, and are due and payable upon receipt of invoice.*

<u>Taxes</u>.  *All fees quoted are exclusive of any applicable taxes.*

5. **Change Management.**
Changes are defined as:
- Any scope items not listed in this SOW
- Provision of deliverables not included in this SOW
- Changes to the overall delivery plan/schedule
- Change to assumption or any section which impacts one or more sections of this SOW

Fiserv and Client will use formal change control procedures to identify, assess, approve and communicate changes.  All changes must be set forth and pre-approved in writing by both parties before they will become effective.

6. **Fiserv Contact.**  For questions related to this SOW, please contact your Fiserv Client Partner or Service Manager.

**ID Verification Services Schedule**

**to ASP Services Exhibit**

1. SERVICES

    (a) Fiserv agrees to provide to Client the services set forth in Attachment 1 (**"ID Verification Services"**)

    (b) Interfaces. Fiserv agrees to make available to Client access to certain interfaces or extract files identified in Attachment 1 and any additional interfaces or extract files agreed by the parties from time to time, in accordance with the terms set forth in this subsection and subject to 3(g) of the ASP Services Exhibit ("Third Party Interfaces"). Fiserv agrees to work with Client to determine whether Fiserv, Client or the applicable third party can develop and support such Third Party Interfaces, whether such Third Party Interfaces are based on extracts Client, Fiserv or the third party will provide, or whether such Third Party Interfaces are web service interfaces to be provided by Fiserv, Client or an applicable third party. Access to any Third Party Interface and any development by Fiserv or the third party with respect thereto is subject to Fiserv entering into a reasonable confidentiality or other agreement with such third party, and such agreement remaining in full force and effect. Any such development by Fiserv is also subject to Fiserv's resource availability. Upon completion of such agreement and development of such Third Party Interface, Fiserv will certify the Third Party Interface with the third party. Fiserv shall not be liable for any delay or failure to receive access or use such Third Party Interface. Client agrees that Fiserv may provide any Client Information to any third party with whom Fiserv has a Third Party Interfaces used or accessed for Client. Notwithstanding anything in the Agreement to the contrary, Third Party Interfaces and access thereto are provided "as is" and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from use of or access to any Third Party Interfaces.

    (c) Fiserv Responsibilities

        (i) Client acknowledges and understands that ID Verification Services may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties.

        (ii) Fiserv agrees to provide second level support to Client in the event Client is unable to resolve issues related to the normal operation of ID Verification Services adequately during normal business hours. Fiserv' sole obligation is to provide timely response to Client for requests for support.

        (iii) Fiserv itself or through its vendor or subcontractor (in the sole discretion of Fiserv), will provide reasonable free training via the Internet during the term of this Schedule, provided that such training is provided by Fiserv's vendor or subcontractor during such term.

    (d) Client Responsibilities

        (i) Clients of Fiserv will be responsible for sending new customer data for OFAC and FinCen validation accessing ID Verification Services via the Platform or Desktop Solution to research and resolve any possible matches. A message is returned that provides a "pass" or "fail" answer on the information submitted. If a "fail " message is returned, the message includes a notation of the information that did not match or the name submitted appeared on one more of the government lists. Client also has the option to log on to ID Verification Services via the Internet to research and resolve any possible matches for OFAC.

        (ii) Client will review and approve all applications for use of ID Verification Services, using any validation procedures Client determines.

        (iii) Client is, and shall remain, solely and exclusively responsible for any and all financial risks associated with its employees and/or customers (as applicable) accessing ID Verification Services.

        (iv) Client will use, and will instruct its employees to use, ID Verification Services in accordance with such reasonable rules as may be established by Fiserv from time to time as set forth in any materials furnished by Fiserv to Client.

        (v) Client is expressly prohibited from extending any warranty or warranties on Fiserv' behalf to any person.

(vi) Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

(e) Merger Responsibilities

(i) In the event of any merger or acquisition involving Client, Client agrees to promptly notify Fiserv. Fiserv will inform Client whether Client is responsible for transitioning the data of such merged or acquired institution, whether Fiserv will coordinate with its third party subcontractor on Client's behalf to transition such data into Fiserv's third party subcontractor's database, or if such data cannot be merged and transitioned into Fiserv's third party subcontractor's database and Client will be required to maintain two databases. In the event Client is required to notify Fiserv's third party subcontractor or any other third party, Client agrees to do so promptly and to relieve Fiserv from any and all liability or obligations arising directly or indirectly out of any delay or failure by Client or any failure of such data to transition into Fiserv's third party subcontractor's database. In the event Fiserv will coordinate data transition on Client's behalf, Fiserv shall provide Client with notice (which may be via email) of all amounts due Fiserv and Client agrees to pay such amounts, provide Fiserv with all requested assistance and information that may be needed in connection with such data transition, and to promptly enter into any agreements or amendments required by Fiserv or its third party subcontractor.

2. FEES

(a) In exchange for access to the Services, Client agrees to pay Fiserv the fees for Account Processing Services as set forth in Attachment 1.

(b) All One-Time Fees shall be paid upon execution of this Schedule. Monthly fees shall be invoices monthly in advance.

3. PERFORMANCE

(a) Hours of Operation. Fiserv will make reasonable efforts to provide ID Verification Services that Fiserv controls 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime, and causes beyond the reasonable control of Fiserv.

(b) Technical Support. Client is responsible for first level technical support to its end users and Fiserv will provide second level technical support to Client's designated support representatives (meaning Fiserv will accept an initial technical support inquiry from Client, but not any end users), and initiate a troubleshooting process in accordance with Fiserv's standard support process. Such support will be available during Fiserv's standard business hours. Fiserv will use commercially reasonable efforts to address issues caused by Client's failure to fulfill its responsibilities in this Schedule at its then current rates and will not be obligated to address or circumvent such issues in any designated time frames. Fiserv shall have no obligation to address or support: issues caused by Client modifications to the Services; services that are not currently supported; Services problems caused by Client's negligence, abuse, or misapplication; or use of the Services other than as specified in this Schedule or the (Name) Services documentation.

4. ADDITIONAL TERMS AND CONDITIONS

(a) The following additional terms apply to ID Verification Services:

(i) Access. Client acknowledges that access to ID Verification Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

(ii) Equipment and Supplies. Client shall obtain and maintain at its own expense such equipment as may be necessary or appropriate to facilitate the proper use and receipt of ID Verification Services. Client shall be responsible for paying for all supplies to be used in connection with ID Verification Services.

(iii) Trademark and Content License. Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "**Trademarks**"), and Content (as defined below) in connection with Fiserv' provision of ID Verification Services. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of Fiserv' use of Trademarks and/or Content.

(iv) Client Warranties.  Client represents and warrants that (a) any work, content, or ID Verification ("**Content**") provided to Fiserv is either original or that Client has the legal right to provide such Content; and (b) Content does not impair or violate any intellectual property or other rights of Fiserv or any third party.  Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of ID Verification Services.  Client acknowledges that Fiserv shall not monitor, review, or approve any Content.

(v) Technical Support.  Client agrees to provide all end user technical support.  Fiserv will provide "second level" Technical Support to Client's user support representatives.  "Technical Support" means Fiserv will take an initial technical support inquiry from Client and initiate the troubleshooting process.  Fiserv shall use commercially reasonable efforts to determine the source of technical support issues, and to remedy the issue.  Technical Support is available as described in this Schedule.

(vi) Effect of Termination.  Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to ID Verification Services unless Fiserv receives written notice to delete Client Files from the Fiserv System.  Client shall continue to be responsible for all data communications and modem fees until (i) all circuits are disconnected and the telecommunications company ceases invoicing Fiserv; and (ii) Fiserv receives back all equipment supplied to Client by Fiserv.

(vii) In the event any of Fiserv' obligations under this Schedule are directly or indirectly dependent on entering into or having an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into or maintain an agreement with such third party or obtain such action, Fiserv' obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.  During the term of this Schedule, Fiserv may provide written notice to Client that it is offering a product and/or service of substantially similar functionality and use as the services provided herein.  Following such notice, either party may elect to transition Client to such product or service, subject to (i) providing the other party with written notice at least 120 days prior to such transition and (ii) Fiserv and Client entering into a separate Schedule to the Agreement for such product and/or service.

(viii)  In the event Fiserv elects to use an alternate service provider for ID Verification Services, Client agrees to execute Fiserv's then current Schedule for Such services, which Schedule shall supersede this Schedule.

(ix) Notwithstanding anything set forth in the Agreement, the following additional terms and conditions shall apply to the ID Verification Services provided pursuant to this Schedule.   These Additional Terms and Conditions are required by Fiserv's third party subcontractor and shall not be modified by the Client.  In the event of a conflict between the Additional Terms and Conditions of this schedule and the Agreement, these Additional Terms and Conditions shall control, unless otherwise specified below; provided however, to the extent comparable provisions in the Agreement are more restrictive than those set forth below, the provisions in the Agreement shall control.

(b)  License of Information

(i) General. Fiserv grants a non-exclusive license to Client to use the information provided through the ID Verification Services only as described in this schedule.  Client may reproduce or store the information obtained through the ID Verification Services solely for each of their respective uses in accordance with this Schedule, and will hold all information licensed under this Schedule in strict confidence and will not reproduce, reveal or make it accessible in whole or in part, in any manner whatsoever, to any others unless required by law, or unless Client first obtains Fiserv's written consent; provided, however, that Client may discuss information in a report with the subject of that report when Client has taken adverse action against the subject based on the report.  Client will not provide a copy of the report to the consumer, except as may be required or permitted by law or approved in writing by Fiserv, except in any state where this contractual prohibition would be invalid.  Client will refer the consumer to Fiserv whenever information contained in a report is in dispute.  Client will not interpret the failure of Fiserv to return information regarding the consumer's identity as a statement regarding that consumer's identity,

because that failure may result from one or more factors unrelated to identity validation. Client warrants that it is the end user of the information.

(ii) <u>Restrictions</u>. Client will not use any alert messages generated by the ID Verification Services as a part of the eligibility determination for granting credit, insurance or employment. Client acknowledges that any such alert message is merely an indication that the application information should be further verified prior to a business decision. Client may only use the data from the ID Verification Services for the specific transaction for which the alert message is provided. The ID Verification Services are proprietary and Client may not use the ID Verification Services as a component of any database or file built or maintained by Client. Client understands that the information supplied by the ID Verification Services may or may not apply to the consumer who has made the application to Client.

(iii) <u>International Supplier</u>. Client may from time to time request the ID Verification Services for consumers having identity information accumulated outside of the United States. If that information is available under the terms of this Schedule, Fiserv may facilitate Client's access of that information through a Fiserv affiliated company, affiliate or independent supplier (collectively, "**International Supplier**"). Client's receipt and use of that information will be subject to all the terms of this Schedule and this Schedule will be deemed to be a separate agreement between Client and the applicable International Supplier directly, with Fiserv having entered into that agreement with Client on behalf of the International Supplier. Client further recognizes that Fiserv will merely facilitate access to the information. In addition, Client acknowledges that the receipt and use of that information may be governed by various laws and regulations of the country, state or province in which the subject resides or from which the information originates, and Client will comply with those applicable laws and regulations regarding Client's receipt and use of that information.

(iv) <u>Third Party Beneficiary</u>. Notwithstanding anything set forth in the Agreement to the contrary, Client agrees that Fiserv's third party subcontractor is designated as a third party beneficiary of this Schedule as it relates to the use of subcontractor's system as contemplated by the terms of this Schedule.

(v) <u>Compliance with Laws</u>. Client will comply with the provisions of the Fair Credit Reporting Act (the "**FCRA**"), the Federal Equal Credit Opportunity Act, as amended (the "ECOA"), all state law counterparts of them, and all applicable regulations promulgated under any of them, including, without limitation, any provisions requiring adverse action notification to the consumer. In addition the Client will comply with the following:

(vi) <u>Client Use Limitations</u>. Client acknowledges that Fiserv and/or any third party involved in the provision of the ID Verification Services or information contained therein ("**Third Parties**") retain all right, title and interest under applicable contractual, copyright and related laws in the databases and materials contained therein used to provide the ID Verification Services, and Client shall not use such materials in any manner that is inconsistent with such right, title and interest and notify Fiserv of any threatened or actual infringement thereof. Client shall notify Fiserv immediately of any changes to the information contained in Client's application for the ID Verification Services. Client shall at no time represent that it is the authorized agent or representative of Fiserv or any Third Party providing information or any part of the ID Verification Services.

(vii) <u>Client Use Limitations – Fair Credit Reporting Act</u>. Client agrees not to use the ID Verification Services or any data, which is the subject of this Schedule, for consumer credit purposes, consumer insurance underwriting, employment purposes, tenant screening purposes, or for any other purpose(s) covered by the FCRA or other similar and applicable law.

(viii) <u>Client Use Limitations – Driver's Privacy Protection Act</u>. Client agrees to use the ID Verification Services and any data received there from, in strict conformance with the Federal Drivers Privacy Protection Act (18 U.S.C. Section 2721 et seq.) or other similar and applicable law.

(ix) <u>Client Use Limitations – Gramm-Leach-Bliley Act</u>. Client agrees to use the ID Verification Services and any data received there from, which is the subject of this Agreement, in strict conformance with the Gramm-Leach Bliley Act (U.S.C. Title 15, Chapter 94, Section 6801 et seq.) and similar state statutes, if applicable.

(x) <u>Misuse of Services or Information</u>. Client agrees to take appropriate measures so as to protect against the misuse of the ID Verification Services. Client agrees that Fiserv may, if it is concerned about Client's

use, temporarily suspend Client's access for up to 10 business days pending an investigation of such use. Client agrees to cooperate fully with any and all investigations. If misuse is confirmed through investigation, Fiserv may immediately terminate this Agreement.

(xi) <u>Changes in Use or Access.</u> Fiserv may, at any time, impose restrictions and/or prohibitions on the Client's use of the ID Verification Services or certain data. Client understands that such restrictions or changes in access may be the result of a modification in Fiserv or one of its Third Parties' policies, a modification of Third Party agreements, a modification in industry standards, or a change in law or regulation. Upon written notification by Fiserv of such restrictions, Client agrees to comply with such restrictions.

(c) <u>Data Security</u>

(i) This Section 4(c)(i) applies if Client will access any ID Verification Services via personal computer or direct access terminals (in either case, a "**DAT**"). Client will: (a) restrict access to each DAT to those employees who have completed training offered by Fiserv, (b) inform users of the ID Verification Services of Client's FCRA and other obligations with respect to the access and use of consumer reports, (c) ensure that neither trained operators nor other employees will obtain any reports for personal reasons or provide them to any third party, and (d) take all necessary measures to prevent unauthorized use of the DAT by any persons other than the trained operators for permissible purposes. Those measures will include limiting knowledge of the Client number(s), access codes, and telephone access number(s) Fiserv provides, and any DAT user passwords Client may use, to train DAT operators and other employees with a need to know, changing the user passwords on the DAT at least every 180 days, or sooner if an employee trained to operate the DAT is no longer responsible for accessing reports, or if Client suspects an unauthorized person has learned the password, and using all security features in the software and hardware Client uses to access the ID Verification Services or the Fiserv System. Client will immediately notify Fiserv if Client suspects or knows of unauthorized access to the Fiserv System. Client will not ship hardware or software between Client's locations or to third parties without deleting all Client number(s), access codes, telephone access number(s) and user passwords. Client will inform trained DAT users and other employees with a need to know that unauthorized access to consumer reports may subject them to civil and criminal liability under the FCRA punishable by fines and imprisonment. Fiserv may suspend or terminate DAT service to Client at any time Fiserv reasonably believes that Client has violated this Section.

(ii) <u>Indemnification</u>. Client hereby agrees to protect, indemnify, defend and hold harmless Fiserv and all Third Parties from and against any and all costs, claims, demands, damages, losses and liabilities (including actual attorneys' fees) arising from or in any way related to use of information by Client (or any third party receiving such information from or through Client) furnished by or through the ID Verification Services by Fiserv to the extent such costs, claims, demands, damages, losses or liabilities (including actual attorneys' fees) do not result from the grossly negligent acts or omissions of Fiserv or Third Parties. Provisions hereof related to release of claims, indemnification, use of information and ID Verification Services, payment for ID Verification Service and disclaimer of warranties shall survive any termination of this Agreement.

(iii) <u>Warranty, Indemnification and Limitation of Liability</u>. Neither Fiserv, its affiliates, directors, officers, agents, employees, contractors, licensors, vendors or third parties, nor any persons or entities affiliated with the foregoing (collectively, "**Fiserv affiliates**") shall be liable to client or to any person claiming through client or to whom client may have provided service-related information for any loss, damage or injury arising out of or caused, in whole or in part, by their negligent acts or omissions in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the service or in otherwise performing this agreement. client acknowledges that every business decision involves the assumption of risk, and that the Fiserv affiliates do not underwrite that risk in any manner whatsoever. if, notwithstanding the foregoing, liability can be imposed on a Fiserv affiliate, then client agrees that the aggregate liability for any and all losses, damages or injuries arising out of same, regardless of the cause (including negligence), and regardless of the nature of the legal or equitable right claimed, shall not exceed, in the aggregate, the fees paid for the service to which the claim relates by client during the 6 months immediately preceding the first such claim. client further covenants and promises that it will not sue a Fiserv affiliate for an amount greater than such sum even if the Fiserv affiliate was advised of the possibility of such damage, client shall not seek nor be entitled to recover punitive, consequential, incidental, indirect, exemplary or special damages, including lost profits in any suit against a Fiserv

affiliate. the foregoing waivers, disclaimers and limitations of liability are provided by client in consideration of the receipt of the id verification services at the rates charged under this agreement, which are far lower than would be available to client absent those waivers, disclaimers and limitations of liability. the Fiserv affiliates do not make, and fully disclaim, any warranty, express or implied. the Fiserv affiliates do not guarantee or warrant the correctness, completeness, correctness, merchantability or fitness for a particular purpose of the service or the components thereof. in no event shall a Fiserv affiliate be liable for any direct, incidental or consequential damages, however arising, incurred by client.

(iv) <u>Confidentiality</u>. Client agrees to hold in confidence all information received through the ID Verification Services, except as specifically permitted in this Schedule. Each recipient of confidential information will hold those materials and that information in strict confidence, and will restrict its use of those materials and that information to the purposes anticipated in this Schedule. If the law or legal process requires recipient to disclose confidential and proprietary data, recipient will notify the disclosing party of the request. Thereafter, the disclosing party may seek a protective order or waive the confidentiality requirements of this Schedule or the Agreement, provided that recipient may only disclose the minimum amount of information necessary to comply with the requirement. Recipient will not be obligated to hold confidential any information from the disclosing party which (a) is or becomes publicly known, (b) is received from any person or entity who, to the best of recipient's knowledge, has no duty of confidentiality to the disclosing party, (c) was already known to recipient prior to the disclosure, and that knowledge was evidenced in writing prior to the date of the other party's disclosure, or (d) is developed by the recipient without using any of the disclosing party's information. Each party will indemnify, defend and hold harmless the other from and against any direct and actual loss, cost, liability and expense (including reasonable attorneys' fees) resulting from the indemnifying party's breach of this Section 4(e)(iv).

(v) <u>Assignment</u>. Client may not assign its rights or obligations under this Schedule without the written consent of Fiserv; provided, however, unless prohibited by the terms of the Agreement, Client may assign or transfer this Schedule, by operation of law or otherwise, to any person that becomes the successor entity of Client, in connection with a change of control (which shall include a direct or indirect transfer of all or substantially all of Client's stock or assets to a third party, a merger, reorganization or other such transaction, or any such transaction by a parent corporation of Client) and Fiserv consents to such assignment or transfer in advance. Subject to the foregoing, this Schedule shall be binding upon all successors and assigns. The legal successor(s) resulting from such aforementioned assignment or transfer shall succeed to and be bound by this Schedule. Fiserv may subcontract any of the work, services, or other performance required of Fiserv under this Schedule without the consent of Client.

(d) <u>Termination</u>. If the continued provision of all or any portion of the ID Verification Services becomes impossible, impractical, or undesirable due to a change in applicable federal, state or local laws or regulations, as determined by Fiserv in its reasonable judgment, Fiserv may either (a) cease to provide the affected ID Verification Services within, or pertaining to persons residing within, the affected jurisdiction, or (b) establish new prices which will apply to the affected ID Verification Services when provided or delivered within, or pertaining to persons residing within, the affected jurisdiction, which prices will be reasonably calculated to cover the costs incurred by Fiserv in complying with the applicable laws or regulations and will become effective on the date specified in such notice unless Client objects in writing, in which case Fiserv may exercise its rights under clause (a) above. Fiserv will attempt to provide written notice of its actions as far in advance of the effective date as is reasonably possible under the circumstances.

(e) <u>Third Party Interfaces.</u> In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

(f) <u>Term</u>. The initial term of this Schedule shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of three (3) years.

(g) If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to the ID Verification Services and any other Deliverables provided under this Schedule.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 82 of 138

**Attachment 1**

**Fees**

One-Time Set-up Fee (includes Training): $2,000.00 one-time

Monthly Recurring Fees:

Client's ID Verification Services Monthly Fee is calculated utilizing the chart set forth below:

| Current Tier | Number of Members | Monthly Fee* | Free IDV Transactions per Month | IDV Transaction Fee Charged after Free IDV's |
|---|---|---|---|---|
| ☐ | 0 – 10,000 | $100.00 | 10 | $2.50 each |
| ☒ | 10,001–30,000 | $150.00 | 20 | $2.50 each |
| ☐ | Over 30,000 | $200.00 | 30 | $2.50 each |

*Includes the following:*

- Unlimited OFAC Screenings
- Unlimited 314(a) Screenings
- Maintenance of the Data Repository
- Administrative Functionality
- Annual Maintenance

**Nautilus Essentials Archive Services Schedule**

**to ASP Services Exhibit**

1. **Description of Services.** If purchased by Client, Fiserv will provide the following file management services ("**Nautilus Essentials Archive Services**" formerly known as "**eFichency Services**").

(a) The electronic file management system that delivers the Nautilus Essentials Archive Services (the "**Nautilus Essentials System**") (i) allows Fiserv to store and index Client's electronic files; and (ii) allows Client to store, index and purge the Nautilus Essentials Documents (as defined below). Client may view and perform searches on such information through Client's utilization of the Internet.

(b) The electronic files that may be accessed by Client using the Nautilus Essentials System include:

(i) if applicable, all standard output reports provided as part of the Fiserv System (defined in the Agreement), and

(ii) Fiserv System account-related imaged documents that are either: (A) scanned and loaded by Client, (B) imported into the Nautilus Essentials System by Client, or (C) imported electronically by Fiserv, on Client's behalf, pursuant to any Fiserv service used by Client ("**Nautilus Essentials Documents**").

The files set forth in (i) and (ii) above are hereinafter collectively referred to as the "**Nautilus Essentials Reports**".

2. **Term.** The term of this Schedule and the Deliverables provided hereunder shall begin on Client's first Use of the Software in a live production environment ("**Go-live Date**") and continue thereafter for a period of eight (8) years ("**Nautilus Essentials Archive Services Term**").

3. **Fees.** Client agrees to pay Fiserv the fees set forth below for the Nautilus Essentials Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated. Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Essentials Services Schedule. Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

System One-time Set-Up Fee: **$10,650.00**

Provides Client i) access to the Nautilus Essentials System, ii) the appropriate number of User ID's and passwords, iii) creation of User Security Profiles for each User ID, iv) standard and customary indexes, v) and Remote Training.,

Nautilus Essentials Documents Monthly Fee: **$934.00**

Nautilus Essentials Saas Subscription includes the following:

Functionality:
- Store and search Core reports
- Store and search user uploaded content
- Store and search batch scanning
- Printing capabilities
- Export capabilities
- Static retention
- Customer lookup when indexing

Batch Capture Stations included: One (1) station $20.00

Storage includes: Production 100 GB

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 84 of 138

Disaster Recovery        100 GB

Additional accounts for individuals: Nautilus Essentials Documents Monthly Fee (described above) is either based upon Client's total number of members (Credit Union), or Client's Total Asset size (Bank) as reported to [FDIC or NCUA], for that institution.  Confirmed to be: **14,240**

Fiserv will perform an annual review of Client's member count to determine if incremental Monthly Service Fees will apply.  In the event Client's number of members increases above the confirmed about, Client will pay then current additional fee corresponding to the updated reported number:

Additional Fee: $135.00 for up to 17,500 members

Additional Gigabytes.  If Client exceeds the amount of storage included above in Monthly Fee, Fiserv will increase the number of gigabytes and invoice Client at **$1.18** per GB for the additional increased monthly storage capacity used, unless specified otherwise in this Nautilus Essentials Archive Services Schedule.

4. **Hours of Operation.**

(a)  Subject to scheduled maintenance, scheduled downtime and causes beyond the control of Fiserv, Fiserv will use reasonable efforts to cause the Nautilus Essentials Archive Services to be available to Client, 24 hours a day, 365 days per year.

(b)  Upon receipt of Nautilus Essentials Report information, Fiserv will use commercially reasonable efforts to make the Nautilus Essentials Reports available to Client within 24 hours of the Fiserv System processing such information.  In addition, Fiserv will use commercially reasonable efforts to make month-end and quarterly Nautilus Essentials Report data available to Client within 48 hours of the Fiserv System processing such data.

5. **Additional Terms.**

(a) Fiserv Responsibilities.

(i)   Fiserv will provide to Client the appropriate number of user identifications ("**User IDs**") and passwords in order to access and use the Nautilus Essentials Archive Services. The Client personnel whom Client designates as its system administrator will be one of those individuals issued a User ID and password by Fiserv (the "**System Administrator**").

(ii)  Fiserv will work with the System Administrator to complete installation of the Nautilus Essentials Archive Services according to an implementation schedule agreed upon by both parties. The Nautilus Essentials Archive Services will be deemed installed when Client has received User IDs from Fiserv and the Nautilus Essentials Archive Services are available for use by Client ("**Nautilus Essentials System Go-live**").

(iii) Fiserv will schedule Client to receive Nautilus Essentials Archive Services' "train-the-trainer" training for the System Administrator remotely via the telephone ("**Remote Training**").

(iv)  Pursuant to Client's reasonable direction, Fiserv will set-up Nautilus Essentials System access restriction profiles for each User ID that will designate which of the Nautilus Essentials Reports each User ID has been authorized by Client to access ("**User Security Profiles**").

(v)   Fiserv may implement "add", "change", and/or "delete" actions concerning Client User IDs, including changes to passwords and User Security Profiles.

(b) Client Responsibilities.

(i)   To access the electronic files, Client will be responsible, at Client's expense, to acquire its own personal computers, each of which will be equipped with industry standard browser software and the capability to access the Internet. Client acknowledges that access to Nautilus Essentials Archive Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines. Client acknowledges and understands its responsibility

and liability as related to Client's access to the Internet and Fiserv assumes no liability or control over the Internet access of Client or Client's on-site systems and remote employee or affiliate access.

(ii) Client acknowledges and agrees that the Nautilus Essentials System is the exclusive property of Fiserv. Client will acquire neither title nor ownership rights to the Nautilus Essentials System.

(iii) Fiserv will disclose to Client only such information concerning the Nautilus Essentials System as necessary in order for Client to access the Nautilus Essentials Archive Services.

(iv) The Client's System Administrator will (A) attend the Remote Training conducted by Fiserv, (B) control distribution of User IDs and passwords, and (C) be the sole person to request, on behalf of Client, that Fiserv implement "add", "change", or "delete" actions for each User ID, which will include changes to User Security Profiles and passwords.

(v) Client will be responsible for all communications costs associated with Client accessing the Nautilus Essentials Archive Services.

(vi) Client will be responsible for the supervision, management and control of its use of the Nautilus Essentials Archive Services, including without limitation, implementing sufficient procedures to satisfy its requirements for the security and accuracy of data. Fiserv is entitled to rely upon and act in accordance with any instructions, guidelines or information provided by Client which is given by persons having actual or apparent authority to provide such instructions, guidelines or information.

(vii) If required, Client will provide at its own expense equipment ("**Scanning Hardware**") for the purpose of scanning the Nautilus Essentials Documents into the Nautilus Essentials System. In addition, Client will be responsible for the maintenance of the Scanning Hardware. Fiserv shall provide Client with a list of compatible Scanning Hardware. Client agrees to pay Fiserv's then standard fee for certification of non-compatible Scanning Hardware.

(c) <u>Access to Electronic Files</u>. Fiserv will archive the Nautilus Essentials Reports beginning on the document archive date and continuing for 7 years thereafter or upon expiration or termination of the Nautilus Essentials Archive Services, whichever comes first. Upon the 7 year archive limit date or a different retention schedule date, as requested by Client, Fiserv will deliver all archived Nautilus Essentials Reports to Clients or destroy them, if directed by Client. Upon the expiration or termination of the Nautilus Essentials Archive Services, for any reason, Client may choose one of the following options:

(i) <u>Option One</u>: For the applicable charge, Fiserv will, upon written request from Client, provide Client, in Fiserv's then current electronic media format, with copies of those electronic files received by Client from Fiserv during the term of the Nautilus Essentials Archive Services. The fee for this service will be based upon Fiserv's then current rates; or

(ii) <u>Option Two</u>: Nautilus Essentials Archive Services can be modified to provide Client with the ability to continue to view existing electronic files on the Nautilus Essentials System. The dates of such Nautilus Essentials Reports will be as of the date of the Nautilus Essentials System Go-live Date until the date of expiration or termination of the Nautilus Essentials Archive Services. The fee for these services will be based upon Fiserv's then current rates.

(iii) <u>Option Three</u>: Client may elect to purge all electronic files residing on the Nautilus Essentials System. Should Client fail to provide Fiserv with written notice within 90 days after termination or expiration of the Nautilus Essentials Archive Services of its intent to choose Option One or Option Two, Fiserv will automatically purge all electronic files residing on the Nautilus Essentials System.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Originate Services Schedule**

**to ASP Services Exhibit**

1. SERVICES.

(a) Fiserv agrees to provide the services set forth in Attachment 1 ("**Originate Services**"). Client may engage Fiserv for the following additional services pursuant to the terms of a separate schedule: funding, and validation functionality (e.g., automated clearinghouse origination, credit or debit card, and OFAC checking).

(b) Interfaces. Fiserv agrees to make available to Client access to certain interfaces identified in Attachment 1 and any additional interfaces as agreed by the parties from time to time, in accordance with the terms set forth in this subsection and subject to 3(g) of the ASP Services Exhibit ("**Third Party Interfaces**"). Fiserv agrees to work with Client to determine whether Fiserv, Client or the applicable third party can develop and support such Third Party Interfaces, whether such Third Party Interfaces are based on extracts that Client, Fiserv or the third party will provide, or whether such Third Party Interfaces are web service interfaces to be provided by Fiserv, Client or an applicable third party. Access to any Third-Party Interface and any development by Fiserv or the third party with respect thereto is subject to Fiserv entering into a reasonable confidentiality or other agreement with such third party, and such agreement remaining in full force and effect. Any such development by Fiserv is also subject to Fiserv's resource availability. Upon completion of such agreement and development of such Third-Party Interface, Fiserv will certify the Third-Party Interface with the third party. Fiserv shall not be liable for any delay or failure to receive access or use of such Third-Party Interface. Client agrees that Fiserv may provide any Client Information to any third party with whom Fiserv has a Third-Party Interfaces used by or accessed for Client. Notwithstanding anything in the Agreement to the contrary, Third Party Interfaces and access thereto are provided "as is" and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from use of or access to any Third Party Interfaces.

(c) Implementation and Related Services. The Fees for Implementation Services are set forth in Attachment 1. Fiserv will provide its standard implementation and training services ("**Implementation Services**") as described in a statement of work. As part of such statement of work, the parties will agree upon a mutually acceptable date for commencement of the Implementation Services ("**Project Start Date**"), which shall be no later than nine (9) months from the effective date of this Schedule ("**Conversion Date**").

(i) Implementation Schedule. If Client notifies Fiserv within 30 days of the scheduled Project Start Date of the need to delay its implementation, an additional fee equal to 50% of the implementation one-time charges set forth in Attachment 1 will apply ("**Rescheduling Fee**"). The Rescheduling Fee is not applicable if the implementation delay is the result of any issue solely under Fiserv's control. If Client does not implement Originate Services by the Conversion Date, and such failure is not solely Fiserv's fault, (1) Client agrees to pay Fiserv the applicable implementation fees in Attachment 1 upon receipt of invoice, and (2) notwithstanding anything in the Agreement to the contrary, upon written notice to Client, Fiserv may terminate the Originate Services for which such delay is experienced and Client agrees to pay early termination fees pursuant to Section 8(c) of the ASP Services Exhibit in connection with such termination.

(ii) Client Obligations and Responsibilities.

A. Client will provide to Fiserv any content and branding it intends for Fiserv to use in connection with Originate Services. Client acknowledges that Fiserv will not monitor, review or approve any Client content, including without limitation grammar, spelling, copyrighted information and claims regarding services and products. Client shall review the user interface and promptly inform Fiserv if there are any errors or inaccuracies in the website. Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "**Trademarks**"), and other content provided in connection with Fiserv's provision of Originate Services. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Client provided content.

B. Client shall be solely responsible for, (a) registering and maintaining its Internet site(s) used in connection with Originate Services, including without limitation maintaining all Internet addresses relating thereto, and (b) providing reasonable security for such Internet site(s) and users of such Internet site(s). Client shall have sole editorial control over its Internet sites, and Client shall be

responsible for providing access through its Internet sites to Fiserv for the provision of Originate Services.

C. Client acknowledges that it has certain notice requirements to its customers in connection with its use and provision to such customers of Originate Services. Client acknowledges and agrees that it is responsible for ensuring its customers are provided with any applicable privacy disclosures prior to such customers' enrollment and use of Originate Services.

D. Client is solely responsible for third party data communications costs, and for establishing and maintaining an internal authentication program regarding its accounts, including without limitation the establishment and funding of accounts through Originate Services that meet all obligations required by applicable law, rule or regulation, as well as Client's internal business requirements and standards.

E. Client is, and shall remain, solely and exclusively responsible for any and all financial transaction risks associated with its accounts and customers, including without limitation insufficient funds, fraudulent transactions and transitions resulting from improper input data associated with Originate Services and any other Deliverables provided under this Schedule.

F. Client shall obtain appropriate licensing for use of any fillable PDF loan forms provided to Fiserv for use with Originate Services. Management of all functions and services with the third party vendors are the responsibility of Client. Client is responsible for contacting the third party vendors in the event of technical issues. If Fiserv resources are required for consultation or to resolve issues caused by the third party vendors, and those issues are determined not to have been caused by Fiserv, Client shall pay Fiserv actual hours incurred at Fiserv's then current fees for such services.

2. <u>FEES</u>.

(a) In exchange for access to Originate Services, Client agrees to pay Fiserv the fees set forth in Attachment 1. Fees do not include data communications charges or third party pass-through fees that are incurred by Fiserv in the performance of Originate Services.

3. <u>PERFORMANCE</u>.

(a) <u>Hours</u>. Fiserv will use reasonable efforts to make Originate Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime, and causes beyond Fiserv's reasonable control.

(b) <u>Technical Support</u>. Client is responsible for first level technical support to its end users and Fiserv (or Service Provider, if applicable) will provide second level technical support to Client's designated support representatives (meaning Fiserv will accept an initial technical support inquiry from Client, but not any end users), and initiate a troubleshooting process in accordance with the Fiserv's standard support services. Such support will be available during Fiserv's standard business hours. Fiserv will use commercially reasonable efforts to address issues caused by Client's failure to fulfill its responsibilities in this Schedule at its then current rates and will not be obligated to address or circumvent such issues in any designated time frames. Fiserv shall have no obligation to address or support issues caused by Client modifications to Originate Services; services that are not currently supported; Originate Services problems caused by Client's negligence, abuse, or misapplication; or use of Originate Services other than as specified in this Schedule or the documentation applicable to such Originate Services.

(c) <u>Releases</u>. Fiserv may, from time-to-time, automatically release new version(s) of the Fiserv System used to provide the Originate Services. Release schedules are published by Fiserv and are available to Client. Client will cooperate with Fiserv as to any necessary corresponding Client System changes outside Fiserv's control.

(d) <u>Supported Browsers</u>. Fiserv will use commercially reasonable efforts to support the most commonly used browsers in the United States as determined by Fiserv's research. Notwithstanding the previous sentence, Fiserv will only support the use of those browsers that undergo Fiserv's quality assurance testing services (each, a "**Supported Browser**"). If a new version or release of a Supported Browser is Backward Compatible, Fiserv will remedy issues arising from accessing Originate Services through the new version or release of such Supported Browser. If the new version or release of a Supported Browser is not Backward Compatible, the browser will cease to be a Supported Browser, and Fiserv will need to perform additional quality assurance and development services on a time and materials basis to reestablish such browser as a Supported Browser. "**Backward Compatible**," as used herein, means the software continues to provide all the functionality and application programming interfaces (APIs) provided

by the previous release(s) or version(s) of the software, enabling applications that worked with the previous release or version to continue working, without modification, with the new release or version.

4. ADDITIONAL TERMS AND CONDITIONS.

(a) Term. The initial term of Originate Services shall begin on the date such Services are first used and continue thereafter coterminous with the Portico Account Processing Services Schedule. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, Originate Services shall automatically renew for additional term(s) of three (3) years.

(b) Third Party Delays. If Fiserv's performance of Originate Services relies upon the provision of services or information from third parties, including without limitation credit reporting agencies, credit scoring service providers, consumer reporting agencies, or credit bureaus, Client acknowledges that the delivery of Originate Services may be delayed due to delays or unavailability of such third party inputs.

(c) Threatening Condition. If Fiserv reasonably believes Client's use of Originate Services poses an imminent or actual threat to a Fiserv System ("**Threatening Condition**"), Client agrees that Fiserv may suspend any and all use of the applicable Originate Services until such Threatening Condition is cured, provided that Fiserv notifies Client in writing prior to such suspension or as soon as commercially practicable thereafter.

(d) Third Party Provided Services. Client agrees that it is purchasing certain third party provided services through Fiserv as set forth in Attachment 1 ("**Third Party Services**"), and Client agrees that such Third Party Services are subject to the additional terms as set forth in this Section. Fees for such Third Party Services are set forth in Attachment 1, and remain subject to increase based on this Agreement and/or the agreement Client has with the applicable Third Party Services provider. In connection with the Third Party Services, Fiserv will remit payment of fees paid by Client that are due to the applicable Third Party Services provider. FISERV HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE THIRD PARTY SERVICES. EXCEPT FOR THE IMPLEMENTATION AND SUPPORT OBLIGATIONS EXPRESSLY PROVIDED BY FISERV HEREUNDER AND ITS OBLIGATIONS TO REMIT PAYMENT RECEIVED FROM CLIENT TO THE THIRD PARTY SERVICES PROVIDER, FISERV WILL HAVE NO LIABILITY WHATSOEVER IN CONNECTION WITH THE THIRD PARTY SERVICES. IN NO EVENT WILL FISERV BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL AND/OR OTHER DAMAGES WHATSOEVER, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT FISERV HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

(e) Originating Depository Financial Institution. For Originate Services that may be used to originate ACH transactions, this provision shall apply. Fiserv, acting on behalf of Client (and for purposes of this Schedule, Client is Originating Depository Financial Institution "**ODFI**"), as a Third-party Service Provider (as defined in the NACHA Rules), will process ACH files originated to the Federal Reserve ("**ACH Operator**") and shall comply with the rules, regulations and other requirements as defined by NACHA ("**NACHA Rules**") in connection with Client originating ACH entries. For ACH files originated by Client, Client will be the originator, ODFI and Receiving Depository Financial Institution ("**RDFI**"), and shall comply with the NACHA Rules. The ODFI is solely responsible for entries originated by its employees or members. Client shall designate Fiserv, and Fiserv will act, as authorized sending and receiving point to the ACH Operator for ACH files that Fiserv processes for Client. Client will be responsible for ensuring its procedures are compliant with the NACHA Rules.

(f) Templates/Forms. Any sample notices or disclosure documents generated by Fiserv or its Service Providers and any accompanying guidance therewith ("**Forms**") are provided for demonstration purposes only and were not drafted for any specific organization or customized for Client. Client is responsible for reviewing and bear all risk for use of the Forms and modifying the content of such Forms to meet its needs and regulatory requirements. Forms are provided "AS IS" and Fiserv and Services Providers expressly disclaim all warranties, express or implied, in connection with the Forms. Client shall be responsible for all charges and fees incurred for customized forms, supplies and delivery charges.

(g) Conflicts. If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to Originate Services and any other Deliverables provided under this Schedule.

**Attachment 1 to Originate Services Schedule**

**Services; Fees**

1. Payment Terms.

(a) One-time Fees. All one-time fees set forth below shall be due and payable 50% upon the effective date of this Schedule and the remaining 50% due upon implementation.

(b) Recurring Monthly Services Fees. Recurring monthly fees set forth below shall commence on the Conversion Date.

(c) Recurring Annual Fees. Recurring annual fees set forth below shall commence on the Schedule effective date, with such fees due and payable annually in advance on such date and the anniversary thereof.

2. Services; Fees.

| PRODUCT CODE | DESCRIPTION | FREQUENCY | QUANTITY | UNIT OF MEASURE | CLOUD SERVICES | IDA/IDV OFAC DATA | AMOUNT |
|---|---|---|---|---|---|---|---|
| | **Originate Deposits Monthly Hosting** | | | | | | |
| 117-161 | Monthly Hosting | Monthly | 1 | Per FI | | | $337 |
| | **Originate Deposits Per Application Fees** | | | | | | |
| 117-162 | 0 to 50 Applications | Monthly | TBD | Per Tran | $7 | $6 | TBD |
| 117-162 | 51 to 100 Applications | Monthly | TBD | Per Tran | $5 | $6 | TBD |
| 117-162 | 101 to 250 Applications | Monthly | TBD | Per Tran | $4 | $6 | TBD |
| 117-162 | 251 to 500 Applications | Monthly | TBD | Per Tran | $3 | $6 | TBD |
| 117-162 | 501 to 1,000 Applications | Monthly | TBD | Per Tran | $2 | $6 | TBD |
| | Over 1,000 Applications | Monthly | TBD | Per Tran | $0 | $6 | TBD |
| | Minimum Fee | Monthly | 1 | Per FI | $300 | $500 | $800 |
| | **Implementation** | | | | | | |
| 117-160 | Originate Deposits Implementation | One Time | 1 | Per FI | | | $10,000 |
| | Data Implementation | One Time | 1 | Per FI | | | $2,500 |

| | | | | | |
|---|---|---|---|---|---|
| **Originate: 3rd Party Add-On Services** | | | | | |
| AcuFill - Per Transaction | | | | | |
| From 1 to 500 Total Transactions | Monthly | | Per Trans | 0.67 | TBD |
| From 501 to 1,000 Total Transactions | Monthly | | Per Trans | 0.63 | TBD |
| From 1,001 to 2,500 Total Transactions | Monthly | | Per Trans | 0.56 | TBD |
| From 2,501 to 5,000 Total Transactions | Monthly | | Per Trans | 0.52 | TBD |
| From 5,001 to 10,000 Total Transactions | Monthly | | Per Trans | 0.47 | TBD |
| From 10,001 to 25,000 Total Transactions | Monthly | | Per Trans | 0.43 | TBD |
| From 25,001 to 50,000 Total Transactions | Monthly | | Per Trans | 0.39 | TBD |

Data Capture software that securely processes and auto populates data and images

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

AssureID (includes AcuFill) - Per Transaction

| | | | | |
|---|---|---|---|---|
| From 1 to 500 Total Transactions | Monthly | Per Trans | 2.00 | TBD |
| From 501 to 1,000 Total Transactions | Monthly | Per Trans | 1.87 | TBD |
| From 1,001 to 2,500 Total Transactions | Monthly | Per Trans | 1.73 | TBD |
| From 2,501 to 5,000 Total Transactions | Monthly | Per Trans | 1.60 | TBD |
| From 5,001 to 10,000 Total Transactions | Monthly | Per Trans | 1.47 | TBD |
| From 10,001 to 25,000 Total Transactions | Monthly | Per Trans | 1.33 | TBD |
| From 25,001 to 50,000 Total Transactions | Monthly | Per Trans | 1.20 | TBD |

Document authentication and identify verification to prevent fraud

ID Scanning - Per Transaction

| | | | | |
|---|---|---|---|---|
| From 1 to 10,000 Total Transactions | Monthly | Per Trans | 0.27 | TBD |
| From 10,001 to 25,000 Total Transactions | Monthly | Per Trans | 0.24 | TBD |
| From 25,001 to 50,000 Total Transactions | Monthly | Per Trans | 0.20 | TBD |
| From 50,001 to 100,000 Total Transactions | Monthly | Per Trans | 0.16 | TBD |

Pricing is in addition to AcuFill or AssureID

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Statement of Work**

**Originate Deposit Implementation**

**1.   Project Overview:**

Fiserv will provide the services required to complete the implementation of Originate Deposits in a timeframe jointly established by Fiserv and Client.  As set forth in more detail below, the project scope includes the following:

**1.1.    Project Management**

**1.2.    Planning / Kickoff Meetings**

**1.3.    Configuration Information Gathering Session**

**1.4.    Implementation Services**
  - **1.4.1.**   Environment Setup
  - **1.4.2.**   System Configuration
  - **1.4.3.**   Technical and Business Support
  - **1.4.4.**   Client Testing Support

**1.5.    Production Migration**

**1.6.    Location of Performance**
Fiserv shall perform the Services at Fiserv offices unless otherwise specified herein.  Subject to the reimbursement of travel and other expenses, Fiserv shall perform certain Services at Client's office located in Winston Salem, NC.

**2.   Fiserv Responsibilities**

Fiserv will perform the following Services for Client:

**2.1.    Project Management**
The Fiserv Project Manager is responsible for the following:

  - **2.1.1.**   Communicate with the Client Project Manager
  - **2.1.2.**   Prepare and maintain a project schedule that defines activities, tasks, milestones, resources, and timeframes for Fiserv responsibilities and related Client Milestone dates for the implementation
  - **2.1.3.**   Conduct regularly scheduled conference calls and project status meetings
  - **2.1.4.**   Review deviations from the project schedule and initiate, if necessary, the Change Management Process defined below, with the Client Project Manager
  - **2.1.5.**   Produce project status report and distribute it to project stakeholders on a regular basis
  - **2.1.6.**   Serve as the escalation point of contact for the project team and Client
  - **2.1.7.**   Direct and coordinate Fiserv team activities to ensure completion of the project

**2.2.    Planning /Kickoff Meetings**
  - **2.2.1.**   Fiserv will conduct a pre-planning session as part of the events leading up to the project kickoff.  During this meeting, Fiserv will review the prerequisites for implementation, in order to ensure Client readiness for the project kickoff meeting.
  - **2.2.2.**   Fiserv will conduct a Kickoff meeting at the start of the project. The Fiserv Project Manager will review the project scope, roles and responsibilities, milestone events and Fiserv resources assigned to the project, in the kickoff. Fiserv Project Manager will collaborate with Client Project Manager prior to the kickoff to define Client resources assigned to the project.

**2.3.    Configuration Information Gathering**
Fiserv will facilitate information gathering via spreadsheet templates and will conduct a Requirements review. The requirements templates are reviewed with Client during the planning meeting and subsequent working sessions.  Fiserv provides instructions on completing the templates and once

complete, Fiserv will work with the client to setup the mapping/configurations into the Originate Deposits environment.

**2.4. Vendor/Service Provider Setup**
Fiserv will perform the following activities to assist Client in setting up their vendors/interfaces:

**2.4.1.** Install Originate Deposits environment and work with Client to establish connectivity with the systems/vendors which require interfacing.

**2.5.** Environment and Admin User Setup
Fiserv will assist Client with the following:

**2.5.1.** Create the Client Environment
**2.5.2.** Setup Admin users
**2.5.3.** Upon written approval by Client, Fiserv will deploy to the Production Environment and purge test data.

**2.6. Configuration**
Fiserv will work with the Client to configure the system based on the information gathered in the configuration information gathering sessions.

**2.6.1.** Mapping for Deposit Products:
Client will provide Fiserv with detailed instructions for setup of up to 5 products.

**2.6.2.** Logo:
Client will provide Fiserv with **a .jpg or .png logo file under 500K in size.**

**2.7. User Acceptance Testing Support**
Fiserv will support two cycles of testing conducted by Client during the scheduled Client Testing window of 16 Business Days. Client will execute all planned test cases during the first cycle of testing (5 business days), allowing 5 business days for Fiserv to perform issue remediation activities and the second cycle of testing (3 business days).

**2.8. Training**
**2.8.1.** Fiserv will provide 4 hours of training over the course of the project via Virtual Instructor Led Training (VILT).

**2.9. Technical Support**
Fiserv will provide technical support for the setup of Originate Deposits. Technical, implementation, and application support will only be provided during Fiserv standard business working hours of 8:00 AM to 5:00 PM ET (Eastern Time Zone), Monday through Friday except Holidays.

**2.9.1.** The Fiserv implementation team will provide Implementation Support immediately following Production migration for a period of a month (4 weeks/20 business days), within Fiserv standard business working hours as defined above in 2.1.0.
**2.9.2.** After the first month, support will be provided by Fiserv's Client Services team.

**2.10. Production Migration**
Once Client provides written approval to proceed to Production, Fiserv will migrate Originate Deposits UAT environment to the Client's Production environment.

**2.11. Excluded Services**
The scope of this SOW does not include the following:

**2.11.1.** Fiserv will not be responsible for proprietary or non-Fiserv systems impacted by the implementation of Originate Deposits.
**2.11.2.** Anything not specifically provided for in this SOW is out of scope.

## 3. Client Responsibilities

**3.1. In General**
Section 3 of this SOW describes the activities that will be the responsibility of Client for the successful implementation of Originate Deposits. Fiserv's performance during this implementation and the successful implementation of Originate Deposits is predicated upon the responsibilities set forth in this

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 93 of 138

Section 3 being fulfilled by Client in a timely manner, as defined by the project schedule mutually developed.

**3.2. Client Resources**

Client will provide the resources, personnel, connectivity, technology, hardware, and software necessary to implement Originate Deposits.

**3.2.1.** Client's Project Management

Client will designate one person (the "Client Project Manager") to whom Fiserv communications will be addressed and who has the authority to act and bind Client in all aspects of this SOW. The Client Project Manager's responsibilities include:

**3.2.1.1.** Identify and assign resources to participate in the project and coordinate activities and tasks that are defined for the project. The Client resources should be knowledgeable about the Client's deposit origination operations. Client further agrees to use their best efforts to ensure resources allocated to the project at the beginning of the implementation will continue until Originate Deposits has been deployed in the Client's Production environments.

**3.2.1.2.** Ensure that all assigned client tasks are completed on time and that target dates are not missed. If Client is implementing multiple Fiserv products/systems at the same time, Fiserv recommends that Client has dedicated resources assigned to the Originate Deposits project to ensure that expected timeframes are met.

**3.2.1.3.** Serve as the interface between the Fiserv project team and Client departments participating on this project.

**3.2.1.4.** Oversee the project and assist in the monitoring of tasks for timeliness and accuracy.

**3.2.1.5.** Maintain project communication with the Fiserv Project Manager and Client Stakeholders.

**3.2.1.6.** Participate in regularly scheduled conference calls and project status meetings.
**3.2.1.7.** Ensure the necessary Client users are included in the training provided by Fiserv.
**3.2.1.8.** Arrange the necessary business and technical resources required to complete tasks according to the project schedule.

**3.2.1.9.** Document decisions related to this implementation.
**3.2.1.10.** Participate in completion of the Fiserv satisfaction survey.

**3.3. Planning and Configuration**

Client will participate in the implementation planning, kickoff, and recurring status calls required for the installation and production rollout of Originate Deposits. The responsibilities include:

**3.3.1.** Identify and assign resources to participate in the planning session and coordinate activities and tasks that are defined for the project.
**3.3.2.** Complete the requirements template provided by Fiserv in the agreed upon timelines during the configuration information gathering sessions.
**3.3.3.** Work closely with Fiserv to configure the Originate Deposits application. Complete the configuration tasks for UAT and Production as instructed by Fiserv within the dates and agreed upon timelines.
**3.3.4.** Identify the administrative users who will need to use Originate Deposits and ensure they are setup in the environment for testing purposes and confirm same users prior to moving to Production.

**3.4. Vendor Provider Setup and Communication**

Client will be responsible for completing the activities required to setup their vendor service providers including but not limited to:

**3.4.1.** Any contract requirements between Client and Vendor for interfaces should already be vetted, completed and executed prior to the start of this project. If not, they must be disclosed at the project kick-off or planning meeting, whichever comes first.

**3.4.2.** Client will assist with coordinating the establishment of connectivity between Originate Deposits and client contracted 3rd parties.

**3.4.3.** Delays resulting from Client or Client contracted 3rd parties will be subject to the Change Management Process defined in section 4, to address additional cost and/or schedule impact.

**3.5. Originate Deposits Test Region**

To facilitate this implementation for Fiserv Clients, Fiserv will support deployment of an environment for the purpose of Fiserv System testing and user acceptance testing ("UAT").

Client will be responsible for the planning and setup preparation for the implementation of Originate Deposits within the dates agreed upon in the project schedule. The Client responsibilities include, but are not limited to:

**3.5.1.** Ensure a test region is available for their Core systems.

**3.5.2.** Testing of other applications that may be impacted by the implementation of Originate Deposits. This testing will not be allowed to interfere with the testing of Originate Deposits. Any costs associated with the setup and testing of these surround systems is solely Client's responsibility.

**3.6. User Acceptance Testing**

Client will be responsible for User Acceptance Testing (UAT). The responsibilities include:

**3.6.1.** Performing testing - Client will execute all planned test cases during UAT testing.

**3.6.2.** Logging of reported UAT issues within the Fiserv Issue tracking system.

**3.6.3.** Client will need to ensure that all the UAT components/configurations are in place in the Core test environment prior to the start of testing.

**3.6.4.** Client will provide written approval to move to Production after UAT testing is complete.

**3.6.5.** Client is responsible for testing other applications that may be impacted by the implementation of Originate Deposits. Any costs associated with the setup and testing of systems that interface with Originate Deposits is solely Client's responsibility.

**3.7. Production Migration**

Client will be responsible for:

**3.7.1.** Providing signoff on system/interface environment configurations in Production prior to the agreed upon Go Live date. This signoff constitutes acceptance of the product.

**3.7.2.** Logging of reported production issues within the Fiserv Issue tracking system.

**4. Change Management Process:**

In the event a change is required, the established Fiserv Change Request (also referred to herein as a "CR") Process will be followed.

**4.1 Qualifying Changes:**

A Change Request will be initiated for, but not limited to:

**4.1.1** Changes in scope/requirements, budget, and/or timeline.

**4.2 Change Request Process:**

**4.2.1** A CR can be initiated by either Client or Fiserv.

**4.2.2** The Fiserv project team will use reasonable efforts to evaluate and determine the scope and impact of the change (and if applicable, the associated effort) to address the request.

**4.2.3** Subject to 4.2.2, the change will be documented and the completed CR, including applicable fees, will be provided to Client for review and approval.

**4.2.4** The CR will not be deemed effective unless and until it is signed by both Client and Fiserv.

**5. Payment Schedule:**

The pricing in this SOW is valid until December 31, 2020.

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 95 of 138

**5.1. Payment Schedule:**

Fiserv shall invoice Client according to the schedule set forth below. All invoices shall be paid in accordance with the payment terms set forth in the Agreement.

Project will be invoiced in installments as follows:

- Implementation and other one-time fees invoiced as noted in Attachment 1.
- Monthly fees invoiced once Originate Deposits is live production.

## 6. Additional Terms:

**6.1. Ownership:**

With the exception of Client Information, all information, reports, studies, object and source code (including without limitation the services and all modifications, enhancements, additions, upgrades, or other works based thereon or related thereto), flow charts, diagrams, specifications, and other tangible or intangible material of any nature whatsoever produced by Fiserv or jointly with Client or by any of Fiserv's or Client's employees or agents, through or as a result of or related to any of the services and deliverables provided hereunder or development of any data analytics models hereunder, and all patents, copyrights, and other proprietary rights related to each of the foregoing (collectively, the "Deliverables"), shall be the sole and exclusive property of Fiserv or its Affiliates. Client hereby irrevocably assigns and transfers to Fiserv all rights, title, and interest in any such Deliverables, including without limitation copyrights, patent rights, trade secrets, industrial property rights, and moral rights, and shall execute all documents reasonably requested by Fiserv to perfect such rights. Client shall be entitled to use all such Deliverables in accordance with the applicable terms and conditions of the Master Agreement.

**6.2. Delays:**

Client's failure to timely complete its required tasks and responsibilities may result in delay(s). Client shall be solely responsible for any additional costs resulting from Client's delay(s). Should Client request a project extension of thirty (30) calendar days or greater, Fiserv has the right to assess a restart fee and/or disengage from Client's project until a time that is mutually agreed upon for restart. A restart fee of $10,000 for each 30 (calendar) days of the extension in the project shall be charged to client and shall be due upon receipt of invoice.

Except as expressly modified herein, the Master Agreement shall remain in full force and effect. As of the Effective Date, the Master Agreement, as modified by this SOW, contains the entire understanding of the parties, and supersedes and extinguishes all prior oral and written communications between the parties about its subject matter.

**Statement Processing Services Schedule**

**to the ASP Services Exhibit**

## 1. SERVICES

(a) <u>Description of Services</u>.  Fiserv will provide Client with certain print and creation services, as further described in the Services Description Attachment(s) to this Schedule (the "**Statement Processing Services**"). Client shall also, during the term of this Schedule, have the non-exclusive right to use and access Fiserv's Web Client Control Center ("**WC3**") application.

(b) <u>Client Obligations and Responsibilities</u>.

(i)  Client shall designate appropriate Client personnel to act as the Fiserv contact, shall supply Fiserv with reasonable access to Client's site during normal business hours, and shall cooperate with Fiserv personnel in their performance of Statement Processing Services.

(ii) In the event the Client modifies Client Equipment utilized in production or transmission of statement data, Client shall notify Fiserv 30 days prior to any modification.

(iii) In the event the format of statement data is modified from its original format, Client will notify Fiserv 90 days prior to any such change to provide for testing and verification of statement data.  The Client is responsible for all programming costs as they relate to any change in statement format after initial setup if the change is made by Client.  If Fiserv modifies its format of statement data, it will be responsible for all format costs.

(iv) Client or its customers will provide to Fiserv any trademarks, trade names, service marks, service names, third party links, information, specifications, materials, designs, logos, copy or other such works, marks or other such content Client desires to be used in developing the Statement Processing Services (collectively "**Client Content**").

(v) Client will also provide any specifications and instructions and otherwise comply with any additional responsibilities set forth in the Services Description Attachment to this Schedule.

(vi) Client is the owner of their data and as such is responsible for the accuracy of all data contained in statement extracts.

## 2. FEES

(a) <u>Fees</u>.  Client will pay Fiserv the fees set forth in the Services Description Attachment to this Schedule for the Statement Processing Services.  Such fees will be invoiced to Client on a monthly basis unless otherwise indicated.

(b) <u>Materials Costs</u>.  Notwithstanding anything to the contrary in the Agreement, Client understands that fees and costs in respect of materials purchased through Fiserv ("**Materials**") are not fixed or otherwise guaranteed for the term of this Schedule.

(c) <u>Annual Adjustment</u>. Fiserv's fees for Services may be increased annually effective each January 1 beginning at the start of the following year upon and with 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Households ("CPI") for the most recently available 12-month period proceeding such 30-day notice period or 5% whichever is greater.

## 3. PERFORMANCE

(a) Notwithstanding anything to the contrary in the Agreement, all Statement Processing Services shall be deemed to have been accepted by Client unless Client provides Fiserv with written notice describing (with reasonable particularity) any failure of the Statement Processing Services to comply with the terms of this Schedule within 15 days following Fiserv's performance of the Statement Processing Services ("**Defect Notice**").  Fiserv shall, at no additional cost to Client, reprint and remail, if applicable, any item(s) that fail, due to the fault of Fiserv, to comply with the terms of this Schedule within a reasonable time following receipt of the Defect Notice.   Notwithstanding any other performance obligations or any other terms set forth in the Agreement, Client agrees that, if an item(s): (i) fails, due to the fault of Fiserv, to comply with the terms of this

Schedule or (ii) is lost or damaged while in Fiserv's custody, Client's sole remedy under this Schedule shall be for Fiserv to reproduce and remail, if applicable, such item(s) in accordance with this Section.

## 4. UNITED STATES POSTAL REGULATION

(a)  All provisions of this Agreement shall be subject to governing regulations of the United States Postal Service, and laws of the United States.  Where mandated by such laws or regulations, this Agreement shall be deemed to be modified in whole or in part to comply with any requirements imposed by such laws or regulations.  This Agreement shall be subject to renegotiation in the event of rate increases for qualified first-class presort mailings, as may from time to time be established by the United States Postal Service.  In the event presort discounts are terminated by the United States Postal Service, any portion of this Agreement regarding presort services shall become null and void.

## 5.   ADDITIONAL TERMS AND CONDITIONS

(a)  Client acknowledges and agrees that it is responsible for providing all requested instructions and guidance necessary to perform the Services contemplated by this Schedule and that Fiserv will rely upon and act in accordance with all such instructions as provided, and Client assumes all risk for the consequences of any such instructions Client gives (or fails to give) and Fiserv's reliance thereon.  Fiserv shall have no obligation to check for any errors or omissions in any such instructions and/or to correct, cancel or amend any action pursuant to any Service(s) provided under this Schedule once Fiserv has received instructions to complete such action.

(b)  During the Term of this Schedule, and solely for the purpose of providing the Statement Processing Services, Client hereby grants to Fiserv a non-exclusive, worldwide, royalty-free right and license to copy and use all the elements of the Client Content in accordance with Client's instructions.  Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against any third party claim or action alleging infringement of a copyright, trademark or other proprietary right of such third party to the extent such claim or action arises out of or in connection with any information, specifications, materials, designs, Client Content, copy or other items provided to Fiserv by Client, its customers or any third party on behalf of client or its customers, as the case may be.

(c)  Client agrees that WC3 access shall be given only to Client's employees on a need to know basis, and only after informing such employees of the terms and conditions of the Agreement relative to use, disclosure and ownership, including without limitation those set forth in Section 3 of the Agreement.  Client shall cause all parties to whom Client gives WC3 access to adhere to all applicable provisions of the Agreement, the ASP Services Exhibit and this Schedule.  Client shall be responsible for any breach thereof by any party to whom Client provides access to WC3.

(d)  For purposes of Section 7 of the Agreement, the parties hereby acknowledge and agree that "TOTAL FEES" excludes any fees, costs or expenses paid by Client in connection with products, Materials or supplies, including without limitation, amounts paid for postage or freight.

(e)  Client acknowledges that access to the Statement Processing Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non Fiserv sources.

(f)  Client shall not use the Statement Processing Services for any activities in violation of any laws or regulations, including without limitation, wrongful transmission of copyrighted material, sending of threatening or obscene materials, or misappropriation of exportation of trade or national secrets.

(g)  Fiserv shall provide to Client, at no additional charge, statement compliance changes as required and mandated by Federal regulation and deliver them to the Client by the required compliance date as outlined within the law or regulation.  Such compliance changes will only be implemented and available if the Client's account processing system has made such changes and they are available within the statement data file.

(h)  Term. The initial term of this Schedule shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of three (3) years.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

(i)    If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to the Statement Processing Services and any other Deliverables provided under this Schedule.

Services Description Attachment
to the Statement Processing Services Schedule

1. **Description of Print and Fulfillment Services:** Fiserv will provide Client with certain print, electronic and creation services as further described below (collectively, "**Statement Services**").

1.1. Composition and Statement Print: Fiserv will provide statement services to the Client that includes the composition using a current statement layout for the creation of the statement document. The statement will be created from an initial data file created following each statement cycle by Fiserv's Account Processing Service or from a qualified Account Processing System approved by Fiserv.

1.2. Preprocessing and Data Preparation: Fiserv will receive Client data as transmitted from the Client or from the Client's data processor and initiate the necessary data preparation to achieve the Client's desired output format and document composition elements for statements and notices. Preprocessing includes alteration of the Client's data to achieve an output appearance that varies from the original format. It also includes, but is not limited to; applying of Post Net bar coding, page grouping, and/or account sorting and application of managed content via "onserts" or other such direct-print method.

1.3. Web Client Control Center (WC3) Access: As part of the Statement Services, Client shall, during the term of this Attachment, have the non-exclusive right to use and access Fiserv's WC3 web application. Client will be trained to utilize WC3 which is a technology provided by Fiserv to support the workflow monitoring and statement messaging capabilities of the Service. Client should consult WC3 following the creation of any cycle to insure files are promptly received by the Service and are in process. This system includes structured sections of the Client's statement for onserts and custom messaging which the Client will update/maintain once the training period has been completed.

1.4. Mailing Services: Fiserv will appropriately page sort, group, nest, fold, insert Client statements and notices and deliver to the U.S. Postal Service for delivery. The process includes, but is not limited to, sorting of documents in order to obtain the lowest possible postage rate, weighing said materials and applying appropriate postage necessary for the mail piece to reach the intended recipient.

1.5. Special Handling: Fiserv will ship to the selected destination any diverted statement as defined in the special request system, including bulk to destination, suppress from print, and divert to destination. Foreign mail is determined by state code and split into separate jobs for proper USPS postage and handling. Bulk selected statements can be presented to the client selected destination and can be folded and inserted in an unsealed envelope and without postage.

1.6. Image Archival: As required, Fiserv will provide hosting and/or delivery of electronic statements.

1.7. Fees:
Plus-Duplex:

| | |
|---|---|
| Set-up Fee | $2,000.00 onetime |
| Base Monthly Fee | $75.00 per month |
| Annual Maintenance | $0.00 |
| Per Page Fee | $0.12 each |
| FOS Interface | $5,500.00 onetime |
| Postage | Standard rates |

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Virtual Branch® Services Schedule**

**to the ASP Services Exhibit**

1. SERVICES

(a) Description of Services. Fiserv will provide to Client the following services: (i) online banking, (ii) bill payment, (iii) new member applications, (iv) loan applications, (v) website design and hosting, and (vi) online statements and notices by Internet or Internet-enabled devices (collectively, "**Virtual Branch Services**"). Where Virtual Branch Services require connectivity to an account processing ("AP") system, the services are offered only for an institution utilizing a Fiserv supported account processing system. Functionality and processes will vary between account processing systems.

(b) Fiserv Responsibilities:

(i) Fiserv will provide Virtual Branch Services directly to Client's customers ("Members") on Client's behalf. In the course of providing Virtual Branch Services to a particular Member, Client authorizes Fiserv to choose the most effective method to process a Member payment instruction, including, without limitation, electronic, paper or other draft means.

(ii) Fiserv will be responsible for storage, telecommunications, appropriate operating system maintenance, and security monitoring of Virtual Branch Services at Fiserv's site.

(iii) Fiserv will present all new web site builds to Client for review prior to going live to its Members.

(iv) Fiserv shall retain ownership of all designs and software code prepared by Fiserv for the web site.

(c) Client Responsibilities:

(i) Client will provide and make available to Fiserv appropriate management and technical personnel of Client who will work with Fiserv and will perform, on a timely basis, the activities referenced in this Schedule, the responsibility for which is required therein to be assumed by Client. In addition, Client will cooperate with Fiserv through making available such personnel, management decisions, information, authorizations, approvals and acceptances in order that Fiserv's performance of the Virtual Branch Services may be properly, timely and efficiently accomplished.

(ii) Client will complete and perform any and all validation procedures it determines, in its sole discretion, are necessary to authenticate the identity and ensure the financial integrity of a particular Member or potential Member.

(iii) Client will provide necessary hardware, software and connectivity to access the Virtual Branch systems.

(iv) Client acknowledges that Fiserv will not monitor, review or approve any Client Content (as defined below), including without limitation grammar, spelling, copyrighted information and claims regarding services and products. Client shall review the web site and promptly inform Fiserv if there are any errors or inaccuracies in the web site.

(v) With respect to all Virtual Branch Services, Client is and shall remain solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each Member accessing the Virtual Branch Services. Fiserv shall not be liable in any manner for such risk.

(vi) Client acknowledges that if it does not select Primary Customer Service offered by Virtual Branch ("VB"), Client will provide level 1 technical support to its Members.

(vii) Client agrees that it will use, and will instruct its Members to use, the Virtual Branch Services in accordance with such rules as may be established by Fiserv from time to time. Client will be responsible for the supervision, management and control of its use of Virtual Branch Services, including without limitation, implementing sufficient procedures to satisfy its requirements for the

security and accuracy of data.  Fiserv is entitled to rely upon and act in accordance with any instructions, guidelines or information provided by Client which is given by persons having actual or apparent authority to provide such instructions, guidelines or information.

(viii)    Client shall execute separate agreements with third party vendors as directed by Fiserv when needed for Virtual Branch Services including, but not limited to, check image presentment, estatements, credit bureau information and identity verification services.   Any charges from these third parties are the responsibility of Client.   Client is responsible for contacting the third party vendors in the event of technical issues.   If Fiserv resources are required for consultation or to resolve issues caused by the third party vendor, and those issues are determined to not be caused by Fiserv, Fiserv will bill Client at Fiserv's then current hourly rate.

(ix) Client acknowledges that it and its Members are responsible for obtaining access to the site through an Internet service provider, using current third party supported Internet browser software, including any associated plug-in applications and support software and having email access for system notifications.

(x) Client acknowledges that it has certain notice requirements to its Members in connection with its receipt of Virtual Branch Services.  Client acknowledges and agrees that it is responsible for ensuring its Members are provided with any applicable privacy disclosures prior to such Members' enrollment and use of the Virtual Branch Services.  Client further acknowledges and agrees that it shall comply with all applicable laws, rules and regulations in connection with its receipt of Virtual Branch Services.

(xi) With respect to bill payment services, tax payments and court ordered payments ("Exception Payments") may be scheduled through bill payment services; however, such payments are scheduled at Client's risk and in no event shall Fiserv be liable for any claims or damages resulting from the scheduling of Exception Payments.  Client acknowledges that Fiserv has no obligation to research or resolve any claim resulting from an Exception Payment.  All research and resolution for any misapplied, mis-posted or misdirected payments shall be the sole responsibility of Client.

(xii) With respect to bill payment services, Client shall designate a bank settlement account such as a Federal Reserve account or a separate clearinghouse account ("Settlement Account") which will be used by Fiserv to settle, in the aggregate, all financial transactions requested via the Virtual Branch Services by each Member.  In certain instances, financial transactions requested via the Virtual Branch Services will be settled utilizing a Member's account as opposed to the Settlement Account.  Client shall be solely responsible for the auditing and balancing of Member accounts.

(xiii)    With respect to online statements, Client agrees that it will, or will cause a third party, if applicable, to provide statement data to Fiserv, or Fiserv's designated third party subcontractor, in the format specified by Fiserv, or by such Fiserv third party subcontractor, on a monthly and/or quarterly basis, or such other basis as determined by Fiserv or such Fiserv third party subcontractor, in order for Fiserv to provide Client with the online statement services pursuant to this Agreement.  Notwithstanding anything to the contrary in the Agreement, in the event Fiserv, or Fiserv's third party subcontractor, does not receive the statement data as set forth herein, Fiserv will not be responsible for any failure to provide to the Client or Member the online statement services and Fiserv may terminate this Schedule for cause pursuant to the terms of the Agreement.

(xiv)    With regard to online statements and notices, Client will be solely responsible for the accuracy and integrity of the information reflected on each of its Members' statements and notices.

2.  FEES

(a) Client agrees to pay Fiserv the fees set forth below for Virtual Branch Services.  Such fees will be invoiced to Client on a monthly basis unless otherwise indicated.  The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("**Selected Services**").  Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule.  If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 102 of 138

additional Services.  If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Virtual Branch Services Schedule.  Notwithstanding Section 11(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

☒ **VB Loan Delivery Services**
☒ 5 loan types

| | |
|---|---|
| Implementation Fee | $4,015.00 |
| Monthly Maintenance | $138.00 |
| Per application submitted | $1.00 |
| Loan Application Receiver Onetime Fee | $0.00 |

☒ Each Additional loan type

| | |
|---|---|
| Implementation Fee | $412.50 |

**VB Professional Services**

| | |
|---|---|
| Hourly rate - configuration, research or project management services | then current rate |

(b) Scheduling.  After the effective date of this Schedule Fiserv will work with Client in good faith to establish a mutually agreeable implementation schedule and date the Virtual Branch Services will first be used in live production ("**Virtual Branch Live Date**") subject to Fiserv's availability, which Virtual Branch Live Date shall in any event be no later than 9 months following the effective date of this Schedule, unless otherwise agreed in writing by Fiserv.  In any event, once a Virtual Branch Live Date has been set and agreed to, if within 30 days of the scheduled Virtual Branch Live Date Client notifies Fiserv of a need to delay its implementation, an additional fee equal to 50% of the implementation one-time charges set forth in this Schedule will apply.  In addition, retraining costs, if applicable, will be limited to the lesser of Fiserv's standard hourly rate or $500 per session. The rescheduling fee is not applicable if the implementation delay is the result of any issue exclusively under Fiserv's control.  In the event Client does not implement the Virtual Branch Services within 9 months following the effective date of this Schedule, and such failure is not due exclusively to the fault of Fiserv, (i) Client agrees to pay Fiserv the applicable Set-Up Fee upon receipt of an invoice from Fiserv, and (ii) notwithstanding anything in the Agreement to the contrary, with written notice to Client, Fiserv may terminate this Schedule and Client agrees to pay early termination fees due pursuant to Section 7(c) of the ASP Services Exhibit in connection with such termination upon receipt of an invoice from Fiserv.

3.  PERFORMANCE

(a) Hours of Operation.  Fiserv will use reasonable efforts to make the Virtual Branch Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime and causes beyond the reasonable control of Fiserv.

(b) Customer Support.

(i)  Primary.  Fiserv will provide all end user customer support in connection with Virtual Branch Services.  Fiserv will take an initial technical support inquiry from Client and Client's Members and initiate the troubleshooting process.

(ii) Secondary. Fiserv will take an initial technical support inquiry from Client and initiate the troubleshooting process.  Client will provide all end user customer support and Fiserv will provide "second level" Customer Support to Client's user support representatives.

(iii) Fiserv will use commercially reasonable efforts to determine the source of technical support inquiry and to remedy the issue.

4.  ADDITONAL TERMS

(a) <u>Equipment and Supplies</u>.  Client shall obtain and maintain at its own expense such equipment as may be necessary or appropriate to facilitate the proper use and receipt of Virtual Branch Services.  Client shall be responsible for paying for all supplies to be used in connection with Virtual Branch Services.

(b) <u>Effect of Termination</u>.  Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to the Virtual Branch Services unless Fiserv receives written notice to delete Client Files from the Fiserv System.  Client shall continue to be responsible for all data communications and modem fees until (i) all circuits are disconnected and the telecommunications company ceases invoicing Fiserv; and (ii) Fiserv receives back all equipment supplied to Client by Fiserv.

(c) <u>Client Trademark and Content License</u>.  Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, tradenames, service marks, and service names (collectively, "Client Trademarks"), and Client's work, content or information ("Client Content") in connection with Fiserv's provision of Virtual Branch Services.  Client will indemnify, defend, and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Client Content.  Fiserv acknowledges that all of the goodwill associated with the use of the Client Trademarks shall be owned by Client.

(d) <u>Fiserv Trademark and Content License</u>.  Fiserv hereby grants to Client a non-exclusive, non-assignable right to use the trademark related to Virtual Branch Services owned by Fiserv, (the "Fiserv Trademark"), and Fiserv work, content, or information ("Fiserv Content") in connection with Client's receipt of Virtual Branch Services.  Fiserv will, at its expense, defend Client against any third party claim or action alleging that the Fiserv Trademark and/or Fiserv Content infringes a United States patent, trademark, or other proprietary right of such third party and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any such claim; provided that Client (i) promptly notifies Fiserv of such claim, (ii) grants Fiserv the sole right to control the defense and disposition of such claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such claim. The obligations set forth in this subsection are Fiserv's entire liability and Client's sole and exclusive remedy for any infringement claim with regard to the Fiserv Trademark or Fiserv Content.  Client acknowledges that all of the goodwill associated with the use of the Fiserv Trademark shall be owned by Fiserv.

(e) Client shall use the Fiserv Trademark only in the manner and with appropriate legends prescribed at any time by Fiserv.  Client shall not use any other trademark, tradename, service mark, service name or logo in combination with the Fiserv Trademark without the prior written approval of Fiserv, except if required by law.  Client shall not use any other trademark, trade name, service mark, service name or logo similar to or resembling the Fiserv Trademark that is likely to cause confusion, deception or mistake.

(f) <u>Client Warranties</u>.  Client represents and warrants that (i) any Client Content provided to Fiserv is either original, or that Client has the legal right to provide such Client Content; and (ii) Client Content doesn't impair or violate any intellectual property or other rights of Fiserv or any third party.  Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of Virtual Branch Services.  Client acknowledges that Fiserv shall not monitor, review or approve any Client Content.  Client acknowledges that access to Virtual Branch Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

(g) <u>Marketing</u>.  Client agrees to market, promote and sell the Virtual Branch Services to Client's Members and potential members.  In addition, and as may be reasonably requested, Client will assist Fiserv and its authorized representatives in marketing, promoting and selling the Virtual Branch Services to its Members and potential members.

(h) <u>Service Modifications</u>.  In connection with Fiserv's provision of Virtual Branch Services, either party may terminate Virtual Branch Services, or any part thereof, immediately upon notice to the other party of any legislative, regulatory, or judicial (i) impairment of the provision thereof; and/or (ii) restrictions or conditions that would materially affect the integrity thereof.

(i)  Communication Lines.  Client acknowledges that access to Virtual Branch Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.  Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines and assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.  Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet.

(j)  FedImage Access.  In the event Client elects to use the Federal Reserve as its image provider, Fiserv, Client and the Federal Reserve shall be required to enter into a letter agreement for such use and access ("**Letter Agreement**"). Client acknowledges and agrees that any dispute, claim, liability, legal action, damage, arbitration or court ordered award, fee, or expense of any kind that arises between Client and Fiserv in connection with such Letter Agreement shall be governed by the terms and conditions of the Agreement and this Schedule.  Fiserv and Client each agree that as between Fiserv and Client, in the event of a conflict between the terms of the Letter Agreement and the terms of the Agreement (including this Schedule), the terms of the Agreement shall control.  Client agrees to indemnify, defend, and hold harmless, and hereby releases Fiserv and its Affiliates and each of their directors, officers, agents, and employees, and any successors or assigns of the foregoing (individually an ("**Indemnified Party**") and collectively, ("**Indemnified Parties**")), from and against any and all liability, losses, costs (including but not limited to litigation and settlement costs and reasonable attorneys' fees), charges, or judgments brought or alleged against any Indemnified Parties arising from, relating to or in connection with Client's use of the Federal Reserve as its image provider, or any of Fiserv's acts or omissions taken in accordance with or pursuant to the instructions of Client.  Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim at Client's expense, and grant Client sole control over the defense and settlement of such claim.

(k)  Term. The initial term of this Schedule shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of three (3) years.

(l)  In the event of a conflict between the terms of the Agreement and the terms of this Schedule, the terms set forth in this Schedule shall control.

**Web Signatures for Credit Unions Services Schedule**

**to the ASP Services Exhibit**

**1.  Description of Services:**

(a) Web Signatures for Credit Unions Services are designed to enable Client to deliver documents electronically, enable the recipients of those documents to sign those documents electronically, continue to sign documents in-branch, and store the electronically signed documents.  The Web Signatures for Credit Unions Services are designed to perform the following functions:

- Allow Authorized Users (as defined below) to upload eContracts for review by a Client's End User (as defined below).
- Approve the eContracts for viewing by the End User and notify the End User of eContract availability.
- Enable the End User to view, print, download, and/or electronically sign the eContracts set forth in Envelopes uploaded by Client for such End User.
- Allow End User to access and view all eContracts set forth in the Envelope that have been released for viewing and signature by the Client.
- Allow Client to designate signer types as allowed by Fiserv System functionality.
- Allow Client to have a mix of in-branch and web-based signatures.
- Authorized Users may designate signer authentication methods, the order in which documents are presented for signing through the Web Service, and the order in which signers must sign the documents.
- Confirm the End User has received and opened the documents sent to them.
- Provide a mechanism to capture electronically the End User's confirmation that they wish to receive eContracts electronically from Client and have the ability to electronically sign the documents as permitted by the Client through acknowledgment of the ESIGN consent document as a precondition to accessing eContracts.
- Provide a mechanism to allow Client to present to the End User the Client's specific terms and conditions relative to the End User's request to receive documents electronically, with an electronic signature option, including the End User's right to "opt out" from electronic delivery of documents at any time following the Client-prescribed procedure to notify Client of such a decision by the End User by providing a mechanism for Client to upload documents of their own choosing for each order.
- Provide a method to allow Client to specify which documents the Client has made available to the End User through the Web Signatures for Credit Unions Services that may be electronically signed by the End User through the use of Client-maintained eContract parameters.
- Provide a method for each Authorized User to determine on a document by document level which eContracts the End User will electronically sign and which eContracts will only be viewed online or print for ink signature on paper, as enabled to do so by the Client maintained eContract parameters.
- Provide a method for each End User to confirm the End User's decision to electronically sign an eContract. The sign button and the confirm signing button is the method for the End User to confirm again their intent to sign the eContract.
- Capture the electronic signature of each End User and bind it to the eContract.

The above description of the Web Signatures for Credit Unions Services is subject to change as Fiserv enhances the Fiserv System and/or the Services from time to time.  Fiserv shall provide Client with advance notice of any material change.

For purposes of this Schedule, the following terms have the following meanings:

(i)  "Authorized User" means the Client's employees, as identified by a unique email address and user name, authorized to use Web Signatures for Credit Unions.

(ii)  "eContract" means a contract, notice, disclosure, or other record or document deposited into the Fiserv System by an Authorized User for processing as part of the Web Signatures for Credit Unions Services.

(iii) "End-User" means Client's member or customer that is authorized by Client to access the Fiserv System to sign documents electronically, and who has agreed to and accepted the applicable Terms of Use of the Fiserv System.

(iv) "Envelope" means an electronic record containing one or more eContracts consisting of a single page or a group of pages of data uploaded to the Fiserv System.

(v) "Terms of Use" shall mean the terms and conditions to govern Client's, Authorized Users' and End Users' access to the Fiserv System.

(vi) "Web Service" means a method of communication between two electronic devices over the web (internet).

(b) Fiserv Responsibilities.

(i) As of the effective date of this Schedule, the Fiserv System only supports the following Topaz Signature Pad models during the embedded signing process:

- SignatureGem LCD 4x3 (*T-L755)/(T-LBK755BHSB-R)*
- Topaz LinkSign1X5 base unit *(T-RLB100-P6B-R)*
- Topaz 1X5 Sig Pad USB *(T-LBK462-HSB-R)*
- Topaz SigLite 4X3 *(T-LBK750SEBHSB-R)*

Fiserv will provide Client with notice (which may be via email) of any additional models supported by the Fiserv System.

(ii) Fiserv warrants that the formation of an eContract not involving any individual End User will be sufficient under the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §§ 7001 et seq. (the "ESIGN Act") to support the validity of such information, to the extent provided in the ESIGN Act; provided that the foregoing warranty shall only apply if there is proper use of the Fiserv System and Web Signatures for Credit Unions Services by Client, Authorized Users and End Users, and proper use of the Web Signatures for Credit Unions Services in accordance with the applicable Terms of Use.

(iii) Fiserv warrants that the formation of the eContract involving an individual End User will be sufficient under the ESIGN Act to support the validity of such formation, to the extent provided in the ESIGN Act; provided that the foregoing warranty shall only apply if there is proper use of the Fiserv System and the Web Signatures for Credit Unions Services by Client, Authorized Users and End Users, proper use of the Web Signatures for Credit Unions Services in accordance with the applicable Terms of Use, and Client, its Authorized Users and End Users comply with all special requirements for End User eContracts, including those described in this Schedule.

(c) Client Responsibilities.

(i) Client shall designate Authorized Users. Client shall ensure that only Authorized Users access and use the Web Signatures for Credit Unions Services. Each Authorized User shall be one natural person.

(ii) Client acknowledges and agrees that Fiserv will not maintain control or access to the contents of any eContract, and the content, quality, and format of any eContract is completely within the exclusive control of the Authorized User that deposits an eContract into the Fiserv System ("Depositing Party") and is the responsibility of Client.

(iii) In the event Client elects to receive optional services that are designed to verify the identity of the intended recipient of an eContract deposited into the Fiserv System ("Authentication Measures"), Fiserv (A) will only apply those Authentication Measures (if any) selected by Depositing Party; (B) makes no representations or warranties regarding the appropriateness of the Authentication Measures; and (C) assumes no liability or responsibility for a party's inability or failure to satisfy any particular Authentication Measure or for any circumvention of such Authentication Measures effected by any third party.

(iv) Client acknowledges and agrees that use of the Web Signature for Credit Unions Services is only a tool to be used within Client's overall processes and procedures for providing documents to End Users in accordance with the regulatory and compliance considerations applicable to the business

transaction between Client and End User. Fiserv strongly encourages Client to review their processes in detail, in order to assure that its processes address the legal requirements of using electronic records and electronic signatures with End Users.

(v)     Client acknowledges and agrees that Fiserv assumes no responsibility for determining whether any particular eContract is an exception to any applicable electronic signature law, subject to an agency promulgation, or whether it can be legally formed by electronic signatures.

(vi)    Client agrees that it is solely responsible for making available to third parties (including parties to its eContracts), all contracts, documents and other records required by applicable law, including without limitation, electronic signature laws and other laws that may require records relating to a transaction to be retained or made accessible for a certain period of time.

(vii)   Client acknowledges and agrees that certain laws or regulations may impose special requirements with respect to electronic transactions involving End Users, which may include without limitation, obtaining appropriate consents.  Client further acknowledges and agrees that Fiserv shall not have any responsibility to (A) determine whether any particular transaction involves an  End User; (B) to furnish or obtain any consents or determine if any consents have been withdrawn; (C) to provide information or disclosures in connection with any attempt to obtain any consents; (D) to provide legal review of, or to update or correct any information or disclosures currently or previously provided; (E) to provide any copies or access for transactions; or (F) otherwise to comply with any such requirements.

(viii)  Client acknowledges and agrees that Fiserv shall not be held liable for Client's business processes and procedures, including without limitation (A) obtaining the End User's initial agreement to receive eContracts electronically; (B) obtaining the End User's valid email address and entering that email address correctly without typographical errors into the Client's system of record to be transmitted as part of the Web Signatures for Credit Unions Services; (C) reviewing undeliverable emails sent using the Fiserv System; (D) providing the End User with detailed requirements on what the End User needs to do to notify the Client that they wish to opt-out of receiving eContracts electronically from Client; (E) reviewing the various queues on a regular basis to see the End User's activity on the Fiserv System; (F) uploading Client's eContracts intended for the End User, and monitoring the transmission of eContracts and other information from the Client's origination system, for any errors during transmission or upload of eContracts; (G) providing End Users with paper copies of disclosures and other documents, and/or switching End Users to the paper delivery of documents, upon the End User's request; or (H) terminating End User access to the Web Signatures for Credit Unions Services.

(ix)    Client agrees that Fiserv shall not be liable for and Client shall pay Fiserv fees for every Create Envelope action performed by the Authorized User.

(x)     Client agrees to comply with all applicable laws, rules, and regulations in connection with the receipt of Web Signatures for Credit Unions Services, including without limitation, with respect to the formation of eContracts and receipt of any End User consents that may be required.

(xi)    Client agrees that it will not use the Web Signatures for Credit Unions Services to send unsolicited mass mailings, including without limitation, all statutory and other common definitions for "unsolicited mass mailings" including all Commercial Electronic Marketing Messaged as defined in the U.S. CAN SPAM Act.

(xii)   Client acknowledges and agrees that it is solely responsible for the nature and content of all materials, works, data, statements, and other visual, graphical, video, written or audible communications of any nature submitted by any user or otherwise processed by the Fiserv System.

(xiii)  Client acknowledges and agrees that it will not use the Web Signatures for Credit Unions Services (A) to communicate any message or material that is defamatory, harassing, libelous, threatening, or obscene; (B) in a way that violates or infringes upon the intellectual property rights or the privacy or publicity rights of any person or entity or that may otherwise be unlawful or give rise to civil or criminal liability (other than contractual liability of the parties under eContracts processed through the Web Signatures for Credit Unions Services); (C) in any manner that is likely to damage, disable, overburden, or impair the Fiserv System or interfere in any way with the use or enjoyment of the

Web Signatures for Credit Unions Services by others; or (D) in any way that constitutes or encourages conduct that could constitute a criminal offense. Although Fiserv does not actively monitor the content processed through the Fiserv System, Fiserv may at any time, suspend any use of the Web Signatures for Credit Unions Services and/or remove or disable any content as to which Fiserv reasonably suspects or confirms is a violation of this subsection.

(xiv) Client will facilitate timely cooperation between any necessary third parties in order for Fiserv to provide access to Web Signatures for Credit Unions Services.

(xv) Client will access, and will instruct its Authorized Users and End Users to access, Web Signatures for Credit Unions Services in accordance with the Terms of Use.

(xvi) Client assumes exclusive responsibility for the consequences of any instructions it may give to Fiserv, for Client's or its Authorized User's and End User's failures to access Web Signatures for Credit Unions Services properly in a manner prescribed by Fiserv, and for Client's failure to supply accurate input information, including, without limitation, any information contained in a consent.

(xvii) Client is expressly prohibited from extending any warranty or warranties on Fiserv's behalf to any person.

(xviii) Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

(xix) Client will assign a Project Manager to be the primary liaison with Fiserv throughout the implementation process and work closely with the Fiserv project team to plan, monitor and control the entire project. This person must know Client's internal organization, have an excellent understanding of procedures and workflows, and be empowered to make decisions that are important to the overall project. Client will commit adequate resources to meet the implementation project schedule and ensure timely completion of tasks assigned to Client.

2. **Fees:**

(a) <u>Transaction Fees</u>. The Web Signatures for Credit Unions Fees are charged as follows:

| Member Size | Web Signature Per Envelope | Web Signature Monthly Minimum | In-Branch Monthly Fee |
|---|---|---|---|
| 10,001 – 25,000 | $4.00 | $75.00 | $0.00 |

Phone Authentication …………………..……$0.95 per End User
Knowledge Base Authentication ...…………. $2.50 per End User

For purposes of calculating transaction fees hereunder, the following terms have the following meanings:

(i) "Knowledge Base Authentication" means the additional authentication used, per End User, by using Fiserv's or its subcontractor's public database for such purposes. Knowledge Base Authentication is an optional Service.

(ii) "Monthly Fee" means the flat fee for signing eContracts in the branch; this Fee will begin after Fiserv has made the Web Signatures for Credit Unions Services available to Client for use.

(iii) "Phone Authentication" means the additional authentication used, per End User, by using a phone number for such purposes. Phone Authentication is an optional Service.

(iv) "Web Signature Per Envelope" means each Envelope containing one or more eContract consisting of a single page or a group of pages of data uploaded to the Fiserv System for the End User. A click charge will occur when eContracts are sent through the Web Service.

(v) "Web Signature Monthly Minimum" means the minimum monthly fee the Client will pay for the use of the Web Signatures for Credit Unions Services, once Fiserv has made the Web Signatures for Credit Unions Services available to Client for use.

(b) <u>Web Signatures for Credit Unions Setup Fees.</u>

100% of the Setup Fees are due on the effective date of this Schedule. These fees include implementation and training.

| Member Size | Setup Fee |
|---|---|
| 10,001 – 25,000 | $7,500.00 |

Fiserv will provide the following services to Client to setup the Web Signatures for Credit Unions Services (20 hours):

- Setup account in Web Services and give the Client access.

- Map existing forms, as identified by the Client, currently in the Client's document library. Additional forms mapping will be provided upon request subject to payment by Client of additional fees at Fiserv's then current rates.

- Development of a detailed implementation project schedule with Client's project representative.

*Estimated Hours and Fees. The hours and fees set forth herein are estimates based upon the scope of the services described in this Section 2(b). All services-related hours worked in excess of the hours quoted in this Section 2(b) shall be billed at Fiserv's then-current professional services rate, and are due and payable in accordance with the payment terms set forth herein.*

*Travel-Related Expenses. In addition to the fees identified in this Schedule, additional charges may include reasonable out of-pocket travel-related expenses incurred in connection with the services provided herein. All travel-related expenses shall be billed on a monthly basis as incurred, and are due and payable upon receipt of invoice.*

**3.    Additional Terms:**

(a)   As of the effective date of this Schedule, the Web Signatures for Credit Unions Services are provided through Fiserv's subcontractor, DocuSign, Inc. ("DocuSign").  In the event Fiserv's agreement with DocuSign terminates for any reason, Fiserv may terminate the portions of this Schedule applicable to DocuSign and the services provided by DocuSign.  During the term of this Schedule, Fiserv may provide written notice to Client that it is offering a product and/or service of substantially similar functionality and use as all or any portion of the Services described herein.  Following such notice, either party may elect to transition Client to such product or service, subject to (i) providing the other party with written notice at least 90 days prior to such transition, and (ii) if applicable Fiserv and Client entering into a separate Schedule to the Agreement for such product and/or service.

(b)  As long as DocuSign is providing all or any portion of the Web Signatures for Credit Unions Services described under this Schedule, the following terms and conditions apply:

(i)  Client agrees to comply with DocuSign's Terms of Use located at the following URL or any successor URL provided to Client in writing or via email: http://www.docusign.com/company/terms-of-use.  Thereafter, Client agrees to comply with Fiserv's Terms of Use.

(ii)  Client has the right to store, reproduce, display, perform, transmit, print out or otherwise make printed copies of the reports, results, or other information or materials generated from Client's use of the Web Signatures for Credit Unions Services and to provide copies of such reports to its End Users, prospective End Users, partner financial institutions and applicable regulatory authorities.

(iii) Fiserv or DocuSign will store all eContracts until the earlier of expiration or termination of Fiserv's agreement with DocuSign or expiration or termination of this Schedule.  Stored eContracts may be retrieved by Fiserv or Client at any time during the term of Fiserv's agreement with DocuSign.

Client may at its option and solely at Client's risk, direct that any eContract be deleted or purged, through the API, when the status of the eContract is either "Sent or Delivered".

(iv) Fiserv or DocuSign may delete an uncompleted eContract from the Fiserv System immediately and without notice upon the earliest to occur of (A) expiration of the Envelope where an expiration date has been set forth such Envelope, not to exceed 365 days, or (B) expiration or termination of this Schedule, or (C) expiration or termination of Fiserv's agreement with DocuSign.

(c) <u>Third Parties</u>.  In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

(d) <u>Term</u>. The initial term of this Schedule shall end eight (8) years following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of three (3) years.

(e) <u>Conflict</u>.  In the event of a conflict between the terms of the Agreement and this Schedule, this Schedule shall control.

**Wisdom Services Schedule to ASP Services Exhibit**

1. SERVICES.

(a) Fiserv agrees to provide to Client the services set forth in Attachment 1 to the Wisdom Software Schedule to the Software Products Exhibit ("**Wisdom Services**"):

(b) Implementation and Related Services:

   (i) Provide Client access to Wisdom database servers via the Windows based Wisdom application software solution. Client may access and conduct certain business transactions pertaining to General Ledger, Fixed Assets, Prepaid Expenses, Accounts Payable, Check Recon, Investment Portfolio Management, and 5300 Call Report Assistant, in each case to the extent Client has elected to receive access to and paid fees for access to such modules, to its enabled accounts from these access solution(s).

(c) Client Obligations and Responsibilities:

   (i) In order to access the Wisdom database servers, Client will be responsible, at Client's expense, to acquire its own personal computers each of which will be equipped with industry standard software and the capability to access the Internet.

   (ii) Client will be required to license and pay for Maintenance Services for the Wisdom Software described in Attachment 1 of the Wisdom Software Schedule to Software Products Exhibit.

   (iii) Client will be responsible for all communications costs associated with Client accessing the Wisdom database servers.

   (iv) Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or Affiliate access.

   (v) Client acknowledges that access to the Wisdom Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

   (vi) Client acknowledges that Fiserv may rely on any information provided by Client.

   (vii) Client agrees to hold Fiserv harmless from any loss that occurs if Client's instructions are incomplete, ambiguous, or incorrect. Fiserv is not required to seek clarification from Client regarding ambiguous instructions.

   (viii) Client will facilitate timely cooperation between any necessary third parties in order for Fiserv to provide Wisdom Services.

   (ix) Client shall provide written notice of confirmation and/or verification of any instructions given by Client, its agents, employees, officers, or directors to Fiserv in connection with Fiserv's provision of Wisdom Services.

   (x) Client acknowledges and understands that access to the Wisdom database servers may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties.

2. FEES.

(a) In exchange for access to the Services, Client agrees to pay Fiserv the fees as set forth in Attachment 1 of the Wisdom Software Schedule to the Software Products Exhibit.

(b) All One-Time Fees shall be paid as set forth in Attachment 1 of the Wisdom Software Schedule to the Software Products Exhibit.

3. PERFORMANCE.

(a)  Hours of Operation.  Fiserv will use reasonable efforts to make the Wisdom Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime, and causes beyond the reasonable control of Fiserv.

4.  ADDITIONAL TERMS AND CONDITIONS.

(a)  Term.  The term for Services shall be as set forth in the Wisdom Software Schedule to the Software Products Exhibit.

(b)  Regulatory Compliance.  Client shall use Wisdom Services only in conjunction with lawful purposes.  Client agrees not to use Wisdom Services for any activities in violation of any laws or regulations, including, but not limited to, wrongful transmission of copyrighted material, sending of threatening or obscene materials, or misappropriation of exportation of trade or national secrets.

(c)  If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to the Wisdom Services and any other Deliverables provided under this Schedule.

**Zelle Payment Services Schedule**

**to ASP Services Exhibit**

1. <u>Term</u>. On the terms and subject to the conditions set forth below, Fiserv and Client hereby enter into this Zelle Payment Services Schedule (this "**Schedule**"), and agree that this Schedule shall be incorporated into and made subject to the provisions of the Agreement. The initial term of this Schedule shall end five (8) years following the date the Services are in production. Unless written notice of non-renewal is provided by either party at least one hundred eighty (180) days prior to the expiration of the initial term or any renewal term, this Schedule shall automatically renew for additional term(s) of three (3) years. In the event of any conflict, ambiguity or inconsistency between this Schedule and the Agreement, or any other document which may be annexed hereto, the terms of this Schedule shall govern.

2. <u>Services</u>. Fiserv, itself and through its Affiliates and service providers, will provide to Client the Services described below (collectively, the "**Services**" for purposes of this Schedule) for the Fees set forth in this Schedule. Client may make the Services available to its members or customers, as applicable, (collectively, "**End Users**") who have properly enrolled for an applicable Service, and who are authorized to use that Service by Client, in accordance with the terms of this Schedules and the Agreement. In order to receive the Services, participants in Early Warning's Zelle Network® ("**Zelle Network**") must be financial institutions that are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Administration. For purposes of this Schedule, "**Deposit Account**" means a checking, savings or money market account and "**Rules**" means the business requirements and a scoring thresholds provided by Client in accordance with Fiserv's Global Risk Administration model. For the avoidance of doubt, all services indicated as provided by Fiserv to End Users (including the collection of required account information of a Receiver or Recipient, whether from the End User, Receiver or Recipient) are provided by Fiserv solely in its capacity as a service provider for, and on behalf of, Client, and are "Services" for purposes of this Schedule.

(a) <u>Zelle Person to Person Services</u>. Fiserv and Early Warning will provide payment services that allow payments to accounts owned by individual persons other than the designated End User ("**Zelle**"). These may include: (a) payments to known third parties, where the End User ("**Sender**") provides the required account information of the third party ("**Recipient**") (hereinafter referred to as "**Known Third Parties**"); (b) payments to persons where the Sender provides the contact information of the Recipient or Receiver through which such Recipient or Receiver receives transaction notifications (e.g., an email address and/or mobile phone number) (a "**Token**"), as further described in the specifications made available by Fiserv (the preceding subsections (a) and (b) are referred to as "**Send Money**"); and (c) sending requests for payment ("**Request Money**") through the Service to the Token of other individual persons and the ability to view as well as pay requests for payment received through such Service from such persons. For the Request Money functionality, the End User may be a Receiver and/or a Requestor. For purposes of this Schedule, a "**Receiver**" means a person who receives a Request Money request through the Zelle Service and a "**Requestor**" means a person who sends a Request Money request to a Receiver through the Zelle Service; if such request is accepted, Requestors subsequently become Recipients. If Fiserv's agreement with its service provider, Early Warning Services, LLC or its successor ("**Early Warning**"), terminates and Fiserv thereafter no longer receives services from Early Warning in support of the Services under this Schedule, then the Zelle Services will automatically terminate. Fiserv will provide Client with nine months' prior written notice of cessation of service, except as follows: if Fiserv is in material breach of such agreement with Early Warning pertaining to data and Fiserv is not able to provide nine months' prior written notice of termination, then Fiserv will provide as much notice as is commercially reasonable. This Schedule is subject to Early Warning's approval of Client for purposes of receiving the Services under this Schedule.

(b) <u>Zelle Real-Time Payments</u>. Fiserv will enable the use of Fiserv's NOW Network to facilitate the transmission of Zelle Service transactions on behalf of End Users ("**Zelle Real-Time Payments**"). Zelle Real-Time Payments constitute a portion of the Zelle Services. Fiserv will specifically use the NOW Network via mutually-agreed upon connectivity to debit or credit funds to the Deposit Account of the End User, as applicable. In certain cases, such connectivity may require Client to license additional Fiserv software, subject to a separate Schedule or agreement with Fiserv; Fiserv will promptly inform Client of any such requirement upon request. Fiserv does not represent or warrant that Zelle Real-Time Payments are delivered instantaneously. Applicable payments may be subject to delays from third party networks, such as debit card

networks ("**Debit Card Networks**"), and other delays not within Fiserv's control, including without limitation delays resulting from funds availability policies of third party financial institutions.

(c)   Consulting Services. Fiserv will provide implementation, integration, training and support services for the Services described above in this Schedule. Client will reasonably cooperate with Fiserv in the implementation of the Services. The subsequent implementation of new or expanded functionalities for such Services, if any, is subject to the mutual, written agreement of the parties in a statement of work or similar document. That statement of work shall specify the terms for such services, including without limitation the Fees for such services and the location of performance for such services. At any time during the Term of this Schedule, if Client requests any additional services outside the scope of those agreed to in the applicable statement of work, such services will be provided based on the availability of Fiserv's resources and at Fiserv's then-current rates. Specifically for any training services provided in connection with the Customer Care System, Fiserv will provide such training services to Client's trainers (in a 'train the trainers' environment) as mutually agreed in writing. Client's trainers will be responsible for training Client's associates. Unless expressly stated in the applicable statement of work, all professional services will be performed during Fiserv's standard business operating hours at a site designated by Fiserv.

3.   Fees. Client will pay the fees set forth in the Fee Exhibit attached hereto as Attachment 2 in exchange for Fiserv's performance of the Services.

4.   Performance.

(a)   End User Technical Support.

(i)   As elected by Client in the CheckFree bill payment service Schedule between the parties, and subject to payment of any applicable fees set forth therein, Fiserv will provide first level technical support to Client's End Users (available only through CheckFree RXP). Such support will be available during Fiserv's standard business hours.

(ii)   Limitations. If Fiserv determines, in its reasonable discretion, that any support issues are caused by any action of Client or its End Users, including without limitation abuse or misuse of the Services, any modification or addition to the Services not authorized or performed by Fiserv or any failure of Client to maintain its technology or the Services, or any other circumstance outside of Fiserv's control, then Fiserv reserves the right to charge for any work performed by Fiserv in investigating such problem at Fiserv's then-current rates. Any troubleshooting or assistance requested by Client in connection with any such problems shall be provided at Fiserv's sole discretion and at Fiserv's then-current rates.

(b)   Customer Service Database. Fiserv may provide Client with one or more identification numbers, passwords and/or other means of identification and authentication (collectively "**Password**") to access Fiserv's customer service database. Client agrees to: (i) take reasonable steps to safeguard the confidentiality and security of the Password; (ii) limit access to its Password to persons who have a need to know such information; (iii) notify Fiserv promptly if Client has any reason to believe the security or confidentiality required by this provision has been or may be breached; and (iv) immediately change the Password if Client knows or suspects that the confidentiality of the Password has been compromised in any way. Fiserv may provide Client with access to an online database containing recipient information (e.g., name and bank name) in connection with the Services. Client agrees to access the database only: (a) to effect, administer, or enforce transactions that result from the Services; (b) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability related to the Services; (c) for internal audit and regulatory examination purposes; (d) to resolve consumer disputes or inquiries involving transactions that result from the Services, or (e) as permitted to access certain customer and transaction information in Fiserv's possession and shall only use the recipient information of non-Client users within such database to complete Service transactions and for regulatory purposes. Client shall limit access to such database to its trusted employees and shall closely and regularly monitor such employees' use of such database to ensure compliance with this provision. Client shall protect the database from security breaches at Client by establishing, maintaining and updating policies, procedures, equipment and software that are designed to safeguard the security and integrity of Client's computer systems used to access the database.

(c) <u>Current Release</u>. Client will perform duties reasonably necessary to be on the then-current commercially-available release of each Service.

5. <u>Risk Management</u>.

(a) <u>Risk Processes</u>. Fiserv will abide by its standard risk and fraud detection procedures and processes related to End Users' use of the Services as may be updated or modified from time to time ("**Risk Procedures**"). Fiserv will make available a summary of its then-current procedures and processes to Client upon request, including without limitation prior to commencement of the Services. For purposes of this Schedule, a "**Transaction Loss**" is a loss that occurs because the associated transaction was rescinded as unauthorized or has been returned and is un-collectable. As part of the Services under this Schedule, Fiserv is in no way responsible for authenticating End User credentials for access to the Services. Client acknowledges that with respect to Service transactions, Client is the Originator (as defined in the ACH Rules) of Service transactions under the Operating Rules of the National Automated Clearing House Association (the "**ACH Rules**"). Fiserv shall not be liable for any Transaction Losses incurred by Client for the Zelle Services, including but not limited to fraud losses or risk of loss, arising out of Client's use of the Zelle Services; liability for Transaction Losses is addressed in Early Warning's Zelle Network Participation Rules (the "**Network Rules**"). Fiserv's Risk Procedures and Section 5(d) only apply to Zelle transactions that are initiated via End User interfaces hosted by Fiserv (e.g., not transactions that are processed by Early Warning via ZellePay.com).

(b) <u>Risk Procedures</u>. Client shall reasonably cooperate with Fiserv's Risk Procedures, including (i) promptly responding to Fiserv's reasonable requests to verify account ownership or any Fiserv fraud investigation with respect to a Deposit Account held at Client, regardless of the transaction origin; (ii) promptly sending returns information to Fiserv via an ACH returns file, chargeback process, or daily batch feeds, as mutually agreed; (iii) requesting and obtaining a Written Statement of Unauthorized Debit signed and completed by its claimant or End User prior to initiating a debit return pursuant to the ACH Rules; and (iv) in the event that Fiserv has to provide a Letter of Indemnity, hold harmless letter or related documentation (each an "**LOI**") to another financial institution to recover Transaction Losses and there is a claim made under the LOI, then Client shall be responsible for all amounts relating to such claim, including without limitation, the settlement amount and attorney fees.

(c) <u>Access by Client Employees</u>. If Client employees or associates access the Services on behalf of End Users, then Client shall be responsible for the authentication and authorization of such employees and associates, as well as all resulting access and use of the Services and the User Data (defined below) and other End User, Recipient, Receiver and Requestor information, if applicable.

(d) <u>Recovery of Transaction Losses</u>.

(i) Regardless of who bears the Transaction Loss on a particular transaction, Fiserv will, in its capacity as a service provider for, and on behalf of, Client, attempt to recover the Transaction Loss from the End User and Client shall provide Fiserv with reasonable assistance in recovering such loss.

(ii) <u>Resubmission and Offsets</u>. If pursuant to the Services a credit is released and the corresponding debit or a portion of any such debit has failed, Fiserv reserves the right to resubmit or issue a new debit transaction for the uncollected portion of such debit. If Fiserv is unable to recover the uncollected portion of the debit, then Fiserv may additionally debit any of the End User's other accounts that are accessible via the Services to offset the uncollected portion.

(iii) <u>Compensation and Assignment</u>. If Fiserv is unable to recover the Transaction Loss from the End User, then Client shall compensate Fiserv for such loss within three (3) business days of receiving notice from Fiserv.

(iv) <u>Suspensions</u>. Fiserv may suspend or deny access to End Users, Requestors (if applicable), Receivers (if applicable) and/or accounts associated with such End Users, Requestors, Receivers and/or any counterparties if it receives any returns from an account associated with them whether with Client or another financial institution, or if Fiserv anticipates any potential losses arising from any such account(s), including without limitation due to concerns regarding fraud.

(e) <u>Threatening Conditions</u>. If Fiserv reasonably believes that the Services, or Client's or any End User's conduct in using the Services (including without limitation an End User intentionally initiating fraudulent or unauthorized transfers, account access or violating any agreement under which it has been provided access to the Services) violates any applicable laws, rules, regulations or industry standards, or otherwise poses a threat to Fiserv or any Fiserv client's system (including without limitation any Fiserv System), security, equipment, processes, intellectual property or reputation ("**Threatening Condition**") and if, in the reasonable and good faith determination of Fiserv, the Threatening Condition poses an imminent or actual threat (including without limitation regulatory investigation, inquiry or penalty), Client agrees that Fiserv may suspend any and all use of the applicable Service until such Threatening Condition is cured. Fiserv will promptly notify Client of such suspension, including the identity of the affected End User(s) as needed, and both parties will use reasonable efforts to cure or cause the correction of the Threatening Condition following such notice. Fiserv may terminate Client's and/or End User's use of the Services without further requirement of notice if the Threatening Condition remains uncured more than thirty (30) calendar days after Fiserv notifies Client of the Threatening Condition.

(f) <u>Obligations to End Users, Recipients and Receivers</u>.

(i) As between Client and the End Users, Client will be solely liable to End Users for completion of the Zelle transfers described in Section 2 hereof by payment of good funds in the correct amount and in a timely manner to the Recipient's bank account (regardless of whether the bank account information was provided by End User or collected from the Recipient) and is the "financial institution" for purposes of Zelle transfer transactions and their compliance with applicable laws. Without limiting the preceding sentence, Client will at all times remain responsible for making any consumer whole in connection with any failure to transmit money through the Services.

(ii) Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings by an End User relating to the Services or arising out of or relating to Client's breach of its obligation to make any consumer whole as set forth in the preceding sentence in Section 5(f)(i). The foregoing indemnification obligation shall not be subject to any limitations on Client's liability otherwise set forth in the Agreement. Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions, suits or proceedings, and satisfy all judgments, orders or decrees with respect to the foregoing, and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim, and grant Client control over the defense or settlement of such claim.

(g) <u>Receipts</u>. Receipts for applicable Services provided to End Users by Client will be provided by Client and contain contact information for Client and no details regarding Fiserv.

(h) <u>Client-Level and End User-Level Limits</u>. If Fiserv (a) identifies a sudden unanticipated increase in Transaction Losses and believes it prudent to take immediate action to reduce Limits; or (b) identifies an unanticipated risk increase as to an individual End User, based on Fiserv's risk assessment tools, then as to each of the preceding cases, Fiserv shall have the right at any time but not the obligation to (x) as applicable to the Service, reduce Limits in an amount and for a duration determined by Fiserv in its sole discretion, (y) process transactions using a "good funds only" model, and/or (z) suspend the Service. Client will promptly work with Fiserv to analyze the cause of such losses and to take appropriate measures to remedy their cause.

6. <u>Additional Terms and Conditions</u>.

(a) <u>NOW Network Services</u>. "**NOW Network Services**" means the Services identified in Section 2 in this Schedule that utilize the NOW Network, which include without limitation Zelle Real-Time Payments. Use of the NOW Network Services is subject to Client's participation in the NOW Network. Client agrees to comply with the terms of the Real-Time Network Participation Agreement, attached hereto as <u>Attachment 1</u> and incorporated herein, in connection with its use of the NOW Network Services. In all cases, Client will comply with the bylaws and operating rules of the applicable payment networks that Client utilizes with the NOW Network, which may include without limitation the NOW Network and Debit Card Networks. Fiserv is not responsible for the performance, speed, or other acts or omissions of third parties that use the NOW Network or interoperate with the NOW Network, such as Debit Card Networks. Notwithstanding anything to the contrary in the Agreement, NOW Network and Debit Card Network settlements are final except as set forth in the

applicable NOW Network and Debit Card Network rules and recovery may not be possible; however, if such applicable rules allow for reversal of funds, Fiserv will attempt to recover such funds from the destination account. Fiserv shall not be obligated to comply with the Automated Clearinghouse (ACH) Rules in such recovery efforts or otherwise in connection with NOW Network Services. Fiserv will choose the method of delivery of NOW Network Service payment via the NOW Network in its sole discretion based on available end points for delivery of such payment. Other than Early Warning, third party operators of networks that connect to the NOW Network, such as Debit Card Networks, shall not be considered to be subcontractors for purposes of the Agreement. Fiserv will choose the Debit Card Networks in which Fiserv will participate in its sole discretion.

(b) <u>NOW Network Brands</u>. Client shall treat the trademarks, servicemarks, and similar intellectual property rights of the NOW Network (including without limitation any Debit Card Networks accessible through the NOW Network) as if they are Network Marks (as defined in the Network Rules, including any successor term) for purposes of the rights and obligations of Client set forth in this Schedule and the Agreement; except that Client is only obligated to display such Network Marks as indicated by Fiserv in writing.

(c) <u>User Data</u>.

    (i) Clients and End Users ( and Recipients, Receivers, and Requestors) may be required to share with Fiserv certain data, including without limitation: (a) the End User's, Recipient's, Receiver's or Requestor's name, e-mail address, zip or postal code; and (b) Account or Deposit Account information (e.g., financial data, user identification, login and password and personal information (including without limitation birth date, IP address and Social Security number), as well as the ABA Routing and Transit Number that are specific to an End User's, Recipient's or Requestor's Account or Deposit Account) (collectively, "**User Data**"). Fiserv and its service providers may use the User Data solely for the performance of the Services on behalf of Client, in accordance with the Gramm-Leach-Bliley Act, its implementing regulations and other applicable laws, including (without limitation) any use to effect, administer or enforce a transaction or to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability.. Provided that the source of the information is not disclosed and the information is used in conjunction with other independent information, Fiserv may use, store and disclose User Data and other such information acquired in connection with the Services in statistical form for pattern recognition, modeling, enhancement and improvement, system analysis and to analyze the performance of the Services.

    (ii) Fiserv may supply User Data to any law enforcement agency if Fiserv or any Fiserv client has suffered or may reasonably be expected to suffer a loss as a result of fraudulent or suspicious activity performed by the End User. Client shall identify a representative as a point of contact or a subject matter expert if such law enforcement agency requires supplementary information on such End User.

    (iii) Fiserv may retain all User Data during and after the Term of this Schedule or the Agreement for audit, regulatory compliance, risk management purposes and as permitted by applicable law and regulations and/or to the extent it is required to do so in connection with payment network or organization rules and regulations or similar applicable industry requirements.

    (iv) Without limiting anything herein or any provisions of the Agreement, for the avoidance of doubt, the parties hereby agree that the User Data of End Users is customer information of Client for purposes of the Gramm-Leach-Bliley Act and its implementing regulations.

(d) <u>Credentials</u>. For certain Services, Fiserv will provide one or more identification numbers, passwords and/or other means of identification and authentication (collectively "**Credentials**") to access certain functionalities of the Services. All Credentials shall at all times be considered Fiserv Information.

(e) <u>Compliance</u>.

    (i) <u>Warranties</u>. Client represents and warrants to Fiserv that it has taken and will continue to take whatever action may be necessary to comply with all applicable laws, rules, statutes and regulations (and any interpretations thereof and rules promulgated thereunder), including, but not limited to, the USA Patriot Act, the federal Bank Secrecy Act, federal and state laws and

regulations relating to money transmission, currency reporting and the prevention of money laundering, any rule or regulation issued by a regulatory body, including the U.S. Office of Foreign Assets Control, the Electronic Fund Transfer Act and its implementing Regulation E, and the bylaws and operating regulations of any payment network or organization through which transactions are being processed, to enable it to offer and provide the Services to its End Users, and to otherwise register and activate End Users to make use of the Services and other Fiserv services that may be provided under this Schedule, including, but not limited to, any necessary pre-registrations, consents and authorizations from and notices to its End Users. The parties acknowledge and agree that Fiserv is relying on Client's performance as described in this Section in Fiserv's performance of the Services.

(ii) <u>Indemnification</u>. Notwithstanding anything to the contrary in the Agreement, Client will indemnify, defend, and hold harmless and release Fiserv and its Affiliates and their officers, directors, and employees from and against any claims, actions and other proceedings, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) arising from or related to any breach of the preceding representation and warranty or this clause. The foregoing indemnification obligation shall not be subject to any limitations on Client's liability otherwise set forth in the Agreement. Client shall, at its own cost and expense, not subject to reimbursement, defend all such actions, suits or proceedings, and satisfy all judgments, orders or decrees with respect to the foregoing, and Fiserv shall provide Client with prompt notice of any claim for indemnification, cooperation in the defense and settlement of such claim, and grant Client control over the defense or settlement of such claim.

(iii) <u>Records</u>. Client shall maintain all records and prepare and file any necessary forms, reports or other documentation, including without limitation, suspicious activity reports or currency transaction reports required to be filed in accordance with laws applicable to Client. Client shall immediately notify Fiserv of instances of suspected fraud, money laundering, terrorist financing, or other illegal activities determined within Client's reasonable discretion and involving the Services. Client will not use Customer Social Security numbers or Federal Employer Identification Numbers in the account numbers that Client designates within the Services; Fiserv will not be responsible for any resulting liability if Client violates this sentence.

(f) <u>U.S. Only Services</u>. Client will only make the Services available to End Users who hold U.S. accounts with Client. Service payments via Debit Card Networks are only available in the 50 states of the United States and the District of Columbia.

(g) In the event of termination or non-renewal of this Schedule or the Agreement, Client shall: (a) comply with all applicable laws, including laws governing notification of End Users prior to discontinuation of the use of the Services; and (b) be financially responsible for any transactions returned on any of its End Users' Deposit Accounts after the termination date, whether or not the returns are proper and timely. Following receipt of Client's written certification of Client's compliance with the foregoing, Fiserv will, for a period not to exceed sixty (60) days, continue to process transactions that were initiated prior to the effective date of termination (e.g., returns).

(h) <u>Terms of Service and Enforcement</u>.

Client will enter into a written agreement regarding the Services with End Users ("**Terms of Service**"). Client acknowledges that the Terms of Service are between Client and its End Users, not Fiserv.

As part of Fiserv's standard product documentation it generally provides to its financial institution clients, Fiserv may make available to Client sample general terms and conditions that Client may consider in establishing the Terms of Service. Any terms that are required by Fiserv to be present in such terms and conditions without substantial modification will be marked as such; Client will not substantially modify such marked terms and conditions without the prior, written approval of Fiserv. Furthermore, if Fiserv provides sample terms and conditions and Client elects to modify such terms and conditions, then Fiserv will not be obligated to host such modified terms and conditions, unless the parties agree otherwise in writing.

In its Terms of Service or other governing agreement between Client and the End Users for the Services, Client will include (i) disclaimers of incidental, indirect, consequential, special, punitive, and exemplary damages; and (ii) quantified limitations on direct damages that, with respect to both (i) and (ii), may be claimed or alleged by such End Users arising out of or relating to the Services. Such disclaimers and limitations must extend to Client's third party suppliers or providers (but do not need to specifically reference Fiserv). Client will enforce such disclaimers and limitations in claims, lawsuits and proceedings brought by Client's End Users. In addition, Client shall disclose in the Terms of Service that (i) Client is the sole party liable to End Users for transfers conducted using the Services; and (ii) as between Client and the End Users, Client is solely liable to Recipients and Receivers to the extent any liability attaches in connection with transfers via the Services.

(i) <u>Required Modifications</u>. If any modification to any Services is required by law or governmental regulation, or is necessary based on any payment processing requirements, Fiserv and Client shall use commercially reasonable efforts to comply in a timely manner. Fiserv may make any modifications, changes, adjustments or enhancements to the Services that Fiserv deems to be suitable.

(j) <u>Press Release</u>. Fiserv may include Client's name and logo in Fiserv-issued marketing materials (including a press release) that identifies Client as a Fiserv customer of the Zelle Services provided under this Schedule.

(k) <u>ETES</u>. Client will utilize the event triggered email service ("**ETES**"), a Fiserv messaging program service operated by Fiserv at no additional charge that is designed to increase usage and continued adoption of the Zelle Services among Customers, so long as Fiserv offers ETES.

(l) <u>Post-Launch Marketing</u>. Upon implementation of the Zelle Services, Client will execute a post-launch marketing program, leveraging the pre-approved marketing resources available at no additional cost on the Fiserv Impact Marketing Portal (or any successor site), for the promotion of the Zelle Services to its End Users. As part of such program, Client will leverage Fiserv offered marketing resources that Fiserv makes available to drive the adoption of the Zelle Services.

7. <u>Third Party Terms (cannot be modified by Client)</u>.

(a) <u>Rules</u>. In regard to the Rules, Fiserv is acting as an agent of Client and shall not be held responsible for any outcome or decision that is rendered in accordance with the Rules. Fiserv is authorized to rely on data provided by third parties and is not responsible for the accuracy of such data in connection with its performance of the Services, including without limitation application of the Rules. Client further acknowledges and agrees that: (a) third party data is obtained from databases whose accuracy, timelines and coverage are not guaranteed; (b) the data used to verify an End User is obtained from third parties; (c) Fiserv does not warrant or guarantee the identity of the End User, but merely receives a result from a third party provider ("**Result**") which is derived, in part, from information entered by the End User; (d) Fiserv will use the Result together with the applicable Client's Rules to attempt to verify the identity of the End User; and (e) the Result and related verification and authentication services will be only used for the purpose of verifying the identity of the End User and will not be used, in whole or in part, as a basis for determining the eligibility of an End User for credit, insurance or employment or to take 'adverse action,' as defined in the Fair Credit Reporting Act or similar laws. Client will not copy or retain any authentication questions or the End Users' answers to such questions or use such questions for purposes other than identity verification and End User authentication, except (i) as required by law and (ii) that Client shall be permitted to use and retain the pass/fail indication returned by the Services along with any related explanatory information/codes for risk management or other internal purposes permitted by law. Client will not reverse engineer or create derivative works based on the identity verification and authentication elements of the Services (or the technology used to provide such Services).

(b) <u>End User License and Consent</u>. Client hereby consents to Fiserv's disclosure of the User Data to certain Fiserv supplier(s) solely in connection with the verification and authentication of the End Users and subject to the terms and conditions of this Schedule and the Agreement. Client acknowledges that such verification and authentication services are proprietary and confidential and shall be treated as Fiserv Information under the Agreement. Client grants to Fiserv and Fiserv's applicable supplier(s) a non-exclusive, non-transferable, except as provided herein, right to use, copy, store, modify and display the User Data solely to the extent necessary to provide the Services pursuant to this Schedule and the Agreement. Client represents

that it has obtained all necessary End User agreements or consents as may be reasonably required to grant such license rights to Fiserv and its supplier(s).

(c)  Early Warning. Use of the Zelle Services is subject to Client's compliance with Attachment 1; provided, however, that if Client holds more than $8 Billion in assets in its depository accounts, or exceeds such $8 Billion threshold at any point during the term of this Schedule, Client must execute a Zelle Network Participant Agreement ("**Early Warning Participant Agreement**"), a copy of which will be provided to Client upon request, prior to utilizing the Zelle Services. In the event Client's asset size exceeds the $8 Billion threshold during the term of this Schedule, Fiserv's continued provision of the Zelle Services to Client is contingent on Client's payment of Fiserv's then-current rates for the Zelle Services for financial institutions that hold over $8 Billion in assets. Each affiliate of Client that will offer the Zelle Services to its End Users must sign an Early Warning Participant Agreement if such affiliate holds over $8 Billion in assets in its depository accounts, and must also be a financial institution that is insured by either the Federal Deposit Insurance Corporation or the National Credit Union Administration. For purposes of the Network Rules, Client agrees that Fiserv is Client's Processor as to the Services under this Schedule. Client agrees that Early Warning, LLC, and any of its affiliates involved in providing the Zelle Services are intended third-party beneficiaries of the terms set forth in this Schedule, including Attachment 1, and any Early Warning Participant Agreement.

(d)  Boku Identity (f/k/a Danal) – Phone Ownership Verification. Client must ensure that the affected End Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with End Users), except as Fiserv and Client otherwise agree in writing:

End User authorizes End User's wireless carrier to disclose information about End User's account, such as name, billing address, email, phone number, location information, subscriber status, payment method and device details, if available, to Client and Client's third party providers to support identity verification, fraud avoidance and other uses in support of transactions for the duration of End User's business relationship with Client. This information may also be shared with other companies to support End User's transactions with Client and for identity verification and fraud avoidance purposes.

In the event Boku Identity's (or its successors') mobile carriers determine subsequent changes to the above requirements are required, Fiserv will provide written notice detailing such changes to Client, and Client agrees to implement such changes to the above requirements within a commercially reasonably time frame.

(e)  Iovation – Device Intelligence Data. Client must ensure that the affected End Users agree to the following (or substantively the same clause using corresponding definitions from Client's terms with End Users), except as Fiserv and Client otherwise agree in writing:

Client may share certain personal information and device-identifying technical data about End User and End User's devices with third party service providers, who will compare and add device data and fraud data from and about End User and End User's devices to a database of similar device and fraud information in order to provide fraud management and prevention services, and identify and block access to the applicable service or Web site by devices associated with fraudulent or abusive activity. Such information may be used by Client and its third party service providers to provide similar fraud management and prevention services for services or Web sites not provided by Client. Client will not share with service providers any information that personally identifies the user of the applicable device.

**Attachment 1**

**REAL-TIME NETWORK PARTICIPATION AGREEMENT**

1.  <u>Authorized Use of the Service</u>.

    (a)  Upon the Effective Date of the Agreement to which the Zelle Schedule is attached, or the Effective Date of the Amendment by which such Schedule is added to the Agreement, as applicable, Client shall comply with and be subject to all provisions of: (a) the Zelle Network® Participation Rules ("**Zelle Network Rules**") and the other Network Documents (as defined in the Zelle Network Rules), and (b) the NOW$^{SM}$ Network Real-Time Participation Rules ("**NOW Network Rules**"), each of (a) and (b) as amended from time to time in accordance with the provisions thereof, (c) Applicable Law, and (d) any Network Technical Specifications promulgated by Fiserv, each of (c) and (d) as defined in the NOW Network Rules. Client acknowledges receipt of the Network Documents from Fiserv. Capitalized terms used but not otherwise defined in this <u>Attachment 1</u> shall have the meaning set forth in the Zelle Network Rules or the NOW Network Rules, as applicable.

    (b)  Client acknowledges that, by executing this Attachment it makes all representations, warranties and covenants given under the Network Documents, and that such representations, warranties and covenants shall be enforceable against it.

    (c)  Client agrees to use the Zelle Service solely for the purposes, and subject to the terms and conditions, set forth in the applicable Zelle Network Rules and NOW Network Rules.

    (d)  Client acknowledges and agrees that Fiserv is acting as Client's Processor, as defined in the Zelle Network Rules.

    (e)  Client acknowledges and agrees that Fiserv is acting as the Network Operator, as defined in the NOW Network Rules.

    (f)  Client acknowledges and agrees to the data contribution requirements with respect to the contribution of Account Owner Elements Data set forth in the Zelle Network Rules. Contribution may be direct to Early Warning, through Fiserv, or through a third party technical integrator that has been approved by Early Warning and has entered into an agreement with Fiserv.

2.  <u>Fees</u>. With the exception of Noncompliance Fees assessed under the Zelle Network Rules, notwithstanding anything in the Zelle Network Rules or NOW Network Rules, all fees for Client's use of the Zelle Service will be established by and billed to Client by Fiserv.

**CLIENT: Winston-Salem Federal Credit Union**

Signature: _John Jameson_
_4183C90048F44C4..._

Print Name: John Jameson

Title: President/CEO

Date: December 14, 2020 | 08:23 MST

**Attachment 2**

**Fee Exhibit**
**to Zelle Payment Services Schedule**

For the avoidance of doubt, Client is free to set and charge any fees to End Users in its sole discretion.

1.   Implementation Fee (place an "x" in the box next to Client's current level of DDAs). The Implementation Fee is payable on the date this Schedule is incorporated into the Agreement.

| | DDAs | Fee | | | DDAs | Fee |
|---|---|---|---|---|---|---|
| ☐ | Up to 2,500 | $1,000 | | ☐ | 112,001 – 136,000 | $18,000 |
| ☐ | 2,501 - 5,000 | $1,500 | | ☐ | 136,001 – 160,000 | $20,000 |
| ☒ | 5,001 - 10,000 | $~~2,500~~ (Waived) | | ☐ | 160,001 – 208,000 | $25,000 |
| ☐ | 10,001 - 15,000 | $3,500 | | ☐ | 208,001 – 272,000 | $30,000 |
| ☐ | 15,001 - 25,000 | $5,000 | | ☐ | 272,001 – 336,000 | $35,000 |
| ☐ | 25,001 - 40,000 | $6,000 | | ☐ | 336,001 – 400,000 | $40,000 |
| ☐ | 40,001 - 75,000 | $8,000 | | ☐ | 400,001 – 464,000 | $45,000 |
| ☐ | 75,001 – 88,000 | $12,000 | | ☐ | 464,001 – 554,000 | $50,000 |
| ☐ | 88,001 – 112,000 | $14,000 | | ☐ | > 554,000 | By Quote |

2.   Monthly Fee.

   (a)   Subscription Fee (place an "x" in the box next to Client's current level of DDAs). If a box is not checked, Fiserv will invoice Client based on information reasonably available to Fiserv regarding the total number of such accounts of Client. Fiserv reserves the right to change such Fee based on changes to the total number of such accounts, in accordance with the table below. The Monthly Subscription Fee goes into effect when the Service is in production.

| | DDAs | Monthly Fee | Transactions Included per Month* | | DDAs | Monthly Fee | Transactions Included per Month |
|---|---|---|---|---|---|---|---|
| ☐ | Up to 1,000 | $150 | Unlimited | ☐ | 15,001 - 25,000 | $850 | 400 |
| ☐ | 1,001 - 2,500 | $220 | Unlimited | ☐ | 25,001 - 40,000 | $1,100 | 600 |
| ☐ | 2,501 - 5,000 | $340 | Unlimited | ☐ | 40,001 - 75,000 | $1,900 | 1,000 |
| ☒ | 5,001 - 10,000 | $480 | Unlimited | ☐ | >75,000 | By Quote | |
| ☐ | 10,001 - 15,000 | $560 | 200 | | | | |

*The Monthly Fee includes the $0.75 transaction fee set forth in Section 3 below; all other fees associated with such "Included" transactions are specifically excluded from the Monthly Fee and will be charged in accordance with this Fee Exhibit.

3.   Early Warning Miscellaneous Fees (subject to Early Warning's Zelle Network Fee Schedule).

| Fee Type | Fee |
|---|---|
| Early Warning Zelle Partner Marketing Toolkit with P2P Marketing Materials Fee (This fee will be assessed upon Zelle implementation/kickoff date and assessed monthly thereafter.) | $35.00 per month per Client Participant in Early Warning Network |
| Early Warning Unknown Recipient/Respondent Notification Fee (Email or SMS/Text) | $0.04 per notification |

4.   Zelle Usage Fees:

| Usage Type | Fee |
|---|---|

| New User Enrollment Fee [applied to all End Users upon acceptance of the Zelle Terms of Service, including without limitation previous Popmoney users and net new End Users] | $1.00 per End User |
|---|---|
| In Network Send Money or Request Money transaction, regardless of speed; Out of Network send or receive money transaction, regardless of speed | $0.75 per transaction, subject to Section 6(b) below, plus any applicable Debit Card Network Transaction Fees. This fee applies only to the transactions in excess of the number of transactions included in the Monthly Subscription Fee in Section 2(a) above. |
| Debit Card Network Transaction Fees | Additional $0.07 per applicable debit or credit transaction, subject to Section 6(a) below. |

5. <u>Additional Fees</u>:

| Transaction Type | Fee |
|---|---|
| Stop Payment – In-Process Transaction Cancellation Fee | $10.00 each |
| ACH Return, Chargeback or NOC Fees: | $25.00 each |
| NACHA – Unauthorized Entry Fee | $4.50 each |
| Payment Investigation/Claims Fee | $35.00 each |

6. <u>Additional Fee Terms</u>.

(a) <u>Debit Card Services Networks</u>. Notwithstanding any fee increase restrictions in the Agreement, Fiserv shall have the right to pass through all Debit Card Network-associated fees (including without limitation from the Debit Card Network and the sponsoring institution) to Client for payment, without any mark-up, should such Debit Card Network-associated fees exceed the Debit Card Network Transaction Fees set forth above.

(b) <u>Early Warning</u>. If Early Warning increases its fees or otherwise requires the payment of additional fees for the use of its Zelle Service, then Fiserv will have the right to pass through such fee increases or additional fees to Client for payment, without any mark-up.

(c) <u>NACHA</u>. If NACHA increases its fee or otherwise requires the payment of additional fees for the use of the Automated Clearing House, then Fiserv will have the right to pass through such fee increases or additional fees to Client for payment, without any mark-up.

(d) <u>Real-Time Payments</u>. All other fees set forth in the Agreement that apply to Zelle shall otherwise apply to Zelle Real-Time Payments.

(e) <u>Transaction Fees</u>. For all transaction fees listed above, Fiserv will directly debit the End User account for the applicable End User Transaction Fee. In each monthly invoice for the Services, Fiserv will show the number and types of Service transactions processed during the previous month under this Schedule and the resulting fees. Fiserv will net against such fees any fees, charges or other amounts debited or collected by Fiserv on behalf of Client from any End Users during such previous month, such as the difference between the End User Transaction Fee and the wholesale Transaction Fee listed above. The applicable End User Transaction Fees will be those as set by Client and established in Fiserv's systems.

(f) <u>Pricing Calculation</u>. Any tiered pricing presented is based on thresholds, and such tiered fees only apply to the transactions or other fee measurements over that threshold.

(g) <u>Conversion of Materials</u>. If Client provides any content or materials in a format other than the format(s) approved by Fiserv, Fiserv reserves the right to charge for any conversion necessary for such content or materials at Fiserv's then-current rates; provided, however, Fiserv is not obligated to make any such conversion.

(h) <u>Invoicing</u>. Fiserv shall invoice Client monthly for fees and expenses incurred during the previous month for the Services.

**Consulting Services Exhibit to Master Agreement**

1. <u>Services</u>. Fiserv will provide Client with consulting and analysis services related to Services provided under the ASP Services Exhibit, Software provided under the Software Products Exhibit, and/or Client's business practices and/or financial services industry business practices ("**Consulting Services**") as described in individual Schedule(s) and Statement(s) of Work ("**SOW**") executed by the parties and attached hereto. Consulting Services shall be performed in accordance with the procedures set forth below and are subject to the terms of the Agreement and this Exhibit.

(i) <u>Fiserv Responsibilities</u>: Fiserv will provide the Consulting Services for the project(s) ("**Project**") specified in the Schedule(s) and/or SOW(s) attached hereto.

(j) <u>Client Responsibilities</u>:

(i) Provide a Client program manager with authority to act for Client in all aspects of the Project to serve as the primary point of contact between Fiserv's team and Client's team.

(ii) Identify the market, financial and strategic objectives to be utilized by Fiserv to complete the Consulting Services.

(iii) Grant Fiserv access to Client and third party systems and documentation, as needed to conduct the Project.

(iv) Identify and provide Fiserv with timely access to the appropriate Client subject matter experts.

(v) Obtain and provide information, data and decisions within a reasonable time period from the date of the request, not to exceed five (5) business days.

(vi) Provide approval of Project deliverables within a reasonable time period following receipt by Client, not to exceed five (5) business days.

(vii) Provide office space and equipment (phone, PC, etc.) and access to Client facilities as reasonably required for the Project.

7. <u>Fees</u>. Client shall pay Fiserv fees and other charges for each Project as set forth in each Schedule. Any estimates of fees and completion dates are referenced solely for the purpose of allowing Client to plan its budgets and schedules based upon information available at the time the Schedule is executed. Daily or hourly rates quoted in a Schedule, if any, will be valid for 3 months from the effective date of such Schedule. Thereafter, they will be subject to change by Fiserv on 30 days' prior written notice to Client.

8. <u>Performance</u>.

(a) The term of the Consulting Services will be set forth in the applicable Schedule and/or SOW. If not stated in the applicable Schedule or SOW, the term of Consulting Services shall end upon completion of the Project.

(b) All work performed by Fiserv hereunder shall be conducted in a professional manner and performed with reasonable care and diligence.

(c) If Client is unable to provide access to required facilities or personnel or is unable to meet its tasks assigned on a Project in a timely manner, Fiserv will endeavor to reschedule tasks to minimize non-productive time. All such non-productive time is chargeable to Client; provided that if such non-productive time is expected to be significant, Fiserv will endeavor to reassign its personnel to other suitable work. If Fiserv is successful in such reassignment efforts, Client will not be charged for the time personnel were reassigned.

9. <u>Additional Terms</u>. NOTWITHSTANDING ANYTHING IN THE AGREEMENT TO THE CONTRARY, FISERV SHALL NOT BE LIABLE FOR ANY DAMAGES INCURRED AS A RESULT OF ACCURACY OR INACCURACY OF DATA OR THE PROVISION OF DATA FILES PROVIDED TO FISERV BY CLIENT OR THIRD PARTIES AT CLIENT'S REQUEST FOR PROCESSING UNDER THIS EXHIBIT.

**Custom Development Services Exhibit to Master Agreement**

1. <u>Development Services</u>.  Fiserv will provide Client with custom modifications, enhancements and programming services related to Fiserv's proprietary Products ("**Custom Services**") as described in a statement of work ("**SOW**") attached hereto.  Custom Services shall be performed in accordance with the following:

(a) <u>Requirements</u>.  Client shall provide Fiserv with all necessary information concerning its requirements for Custom Services ("**Requirements**").

(b) <u>Functional Specifications</u>.  Based on the Requirements, Fiserv shall create functional specifications ("**Functional Specifications**"). Fiserv shall not be obligated to perform any further development work until such Functional Specifications are approved in writing by Client, which approval shall not be unreasonably withheld or unduly delayed.  Modifications, changes, enhancements, conversions, upgrades, or additions to the agreed upon services beyond those stated in Functional Specifications (collectively, "**Modifications**") shall be added only upon mutual written agreement.  If the parties agree to add any Modifications, the Functional Specifications and applicable Project Plan (as defined below) shall automatically be modified to the extent necessary to allow for the implementation or provision of the Modifications.

(c) <u>Project Plan</u>.  Fiserv shall develop a project plan in connection with the performance of Custom Services ("**Project Plan**").  Each Project Plan may contain a listing of the nature and estimated timing of tasks for the project to be performed by each party, including the development of an acceptance test if applicable.  Any dates for performance are non-binding and dependent upon the timely performance by each party of the tasks assigned under the Project Plan.

2. <u>Fees</u>.

(a) Client shall pay Fiserv fees and other charges for each project as set forth in each applicable SOW.  Any estimates of fees and completion dates are referenced solely for the purpose of allowing Client to plan its budgets and schedules based upon information available at the time the SOW is executed.

(b) Fees for any installation, conversion, or training services to be provided by Fiserv for a project or in connection with the Custom Services shall be specified in each SOW.

(c) Unless otherwise set forth in a SOW, fees shall be paid 50% upon execution of such SOW and 50% upon project completion.

(d) Fiserv may increase the applicable maintenance fees for the deliverable to which a Custom Services project relates and/or otherwise charge special maintenance fees to support and maintain any Deliverables resulting from the performance of Custom Services.

(e) Fiserv may charge Client at Fiserv's then current professional services rates for any retrofitting and integration services that are required or requested when releases of the Fiserv System(s) to which a Custom Services project relates are made generally available.

3. <u>Rescheduling</u>.  If Client is unable to provide access to required facilities or personnel or is unable to meet its tasks assigned on a Project Plan in a timely manner, Fiserv will endeavor to reschedule tasks to minimize non-productive time.  All such non-productive time is chargeable to Client, provided that if such non-productive time is expected to be significant, Fiserv will endeavor to reassign its personnel to other suitable work.  If Fiserv is successful in such reassignment efforts, Client will not be charged for the time personnel were reassigned.

**Equipment Exhibit to Master Agreement**

1.  Equipment.  Components of hardware being purchased by Client through Fiserv are described in the Schedule(s) and/or Attachment(s) attached hereto or the in the Fees Exhibit ("**Equipment**").  Client understands that Fiserv is acting as an independent sales organization representing each manufacturer or supplier, as applicable (each, a "**Supplier**").  Supplier may substitute equipment of equivalent or superior functionality and performance in the event any of the Equipment ordered is not available at the time of shipment.

2.  Payment.  Unless otherwise set forth in in the Schedule(s) and/or Attachment(s) attached hereto or in the Fees Exhibit, Client shall pay Fiserv 50% of the total price for Equipment specified in the Schedule(s) Attachment(s), and/or Fees Exhibit upon their execution, and 50% upon delivery of Equipment to the site or sites designated on each such document (collectively, "**Installation Site**").  Client shall be responsible for all freight charges associated with shipment of Equipment from Supplier or Fiserv, as the case may be, to the Installation Site.  In the event of any price increase by a Supplier, Fiserv shall accordingly increase the prices for Equipment.

3.  Fiserv Obligations.  The ability of Fiserv to obtain Equipment may be subject to availability and delays due to causes beyond Fiserv's control.  Fiserv shall promptly place any orders submitted under this Exhibit with each Supplier and shall, at Client's direction, request expedited delivery whenever available.

4.  Insurance.  Client shall be responsible for appropriate property insurance for all Equipment, whether Client-owned or Fiserv-owned, within Client's premises.

5.  Delivery and Installation.

    (a)  Delivery.  On Client's behalf, Fiserv shall arrange for delivery of Equipment to the Installation Site on or about the date requested by Client ("**Delivery Date**").  In the absence of shipping instructions, Fiserv shall select a common carrier on Client's behalf.

    (b)  Installation.  Fiserv shall arrange for the installation of the items of Equipment for the installation fees listed on each Schedule, Attachment and/or the Fees Exhibit.  Client shall not perform any installation activities without Fiserv's written consent.  Fiserv or its designee shall have full and free access to Equipment and the Installation Site until installation is completed.  If a suitable installation environment is not provided by Client, then Fiserv shall be required to perform only as many normal installation procedures as it deems to be practicable within the available facilities.  Installation of Equipment will take place during normal Fiserv business hours, Monday through Friday, exclusive of Fiserv holidays, unless otherwise agreed by Fiserv.

    (c)  Installation Environment.  Client shall provide a suitable installation environment for Equipment as specified by Fiserv or its agents and any and all other specifications provided to Client by Supplier or Fiserv.  Unless Fiserv agrees to so provide, Client shall also be responsible for (i) furnishing all labor required for unpacking and placing Equipment in the desired location for installation; and (ii) physical planning including, but not limited to, floor planning, cable requirements, and safety requirements in accordance with the installation manual and any and all applicable building, electrical, or other codes, regulations, and requirements.  All such physical planning shall be completed on or before the Delivery Date.

6.  Shipment and Risk of Loss.  All prices shown on each Schedule, Attachment and/or the Fees Exhibit are F.O.B. Supplier's plant.  All transportation, rigging, drayage, insurance, and other costs of delivery of Equipment to the Installation Site shall be paid by Client.  Risk of loss shall pass to Client upon shipment.

7.  Title to Equipment.  Title to all Equipment shall remain with Supplier or Fiserv, as the case may be, until all payments are made by Client and, until such time, Client agrees that it shall not sell, transfer, pledge, or otherwise dispose of such items without Fiserv's prior written consent.

8.  Security Interest.  Client grants Fiserv a security interest in each component Equipment and the proceeds thereof until the purchase price due Fiserv is paid in full.  Client shall execute any instruments or documents Fiserv deems appropriate to protect the security interest and, in any event, this Exhibit shall constitute a financing agreement within the meaning of Article 9 of the Uniform Commercial Code and a copy of this Exhibit may be filed at any time after signature by Fiserv as a financing statement for that purpose.  In the event of

default in payment or other breach by Client, Fiserv shall have all rights and remedies of a secured creditor upon default as provided by applicable law.  Fiserv shall, at its sole expense, file releases for any financing statements recorded pursuant to this Exhibit promptly upon receipt of final payment.

9.  Acceptance.  Equipment shall be deemed to have been accepted when it has passed either Fiserv's or Supplier's standard post-installation test procedures at the Installation Site.

10. Warranties.  Fiserv warrants that Client will acquire good and clear title to all hardware items comprising Equipment free and clear of all liens and encumbrances.  Fiserv assigns to Client all warranties Supplier has granted to Fiserv with respect to Equipment as set forth in each Schedule.  Client agrees to all of the terms and conditions applicable to those warranties and acknowledges that:

(a)  Neither Supplier nor Fiserv warrants that use of Equipment will be uninterrupted or error free; and

(b)  Supplier's warranties, and the assignment of such warranties by Fiserv to Client, shall not impose any liability on Fiserv due to the services or assistance provided to Client by Fiserv with respect thereto.

11. Liability.  Notwithstanding the limitation of liability provisions set forth in the Agreement, Fiserv's aggregate liability for a default relating to Equipment shall be limited to the amount paid by Client to Fiserv for the applicable Equipment.

**Portico Equipment Schedule to the Equipment Exhibit**

**Equipment, Supplier, and Fees:**

1.   Components of Equipment being purchased by Client are below ("Equipment").

2.   Client understands that Fiserv is acting as an independent sales organization representing each manufacturer or supplier (each, a "Supplier") identified below.

3.   The estimated total for the Equipment Client agrees to procure from Fiserv prior to conversion is set forth below.  This estimate is subject to change pending a final site visit by Fiserv; therefore the parties agree that a separate and final quotation for Equipment will be provided to Client by Fiserv and agreed upon prior to conversion. Such quotation will be deemed to be incorporated into this Schedule and be subject to the terms and conditions of the Agreement.

| Description | Part Number | Qty | Per Unit | Total |
|---|---|---|---|---|
| Portico Print Appliance* | | 1 | $2,000.00 | $2,000.00 |
| SSL Connectivity | | 1 | $500.00 | $500.00 |
| | | | | |
| **Total:** | | | | **$2,500.00** |

*Client acknowledges that Fiserv will have remote access to this Equipment for the purpose of maintenance or repair and may or may not notify Client in advance of such remote access.*

**Payment Terms:**

100% upon delivery

**Warranty and Maintenance**:

1.   Fiserv agrees to pass through the manufacturer warranty for the Equipment that is set forth in this Schedule.

2.   Maintenance services are not provided with respect to the Equipment purchased under this Schedule.

In the event of a conflict between the terms of this Schedule and the Agreement, this Schedule shall control.

**Software Products Exhibit to Master Agreement**

1.  <u>Software Products</u>.  The parties shall add individual Schedules to this Exhibit for Fiserv's license of software Products and provision of related software maintenance services to Client.  The terms of this Exhibit shall apply to any such Products and related services covered by Schedules to this Exhibit.

2.  <u>Defined Terms</u>.

   (a)  "**Computer System**" means the computer equipment and specified operating environment required for operation of the Software when installed, as identified in each Schedule and/or in the Documentation.

   (b)  "**Documentation**" means the technical end-user documentation for the Software, as delivered by Fiserv to Client with the Software, as may be updated by Fiserv from time to time as part of Maintenance Services.

   (c)  "**Enhancements**" means modifications made to Software that add program features or functions not originally within the Software and that are provided upon payment of additional license fees.

   (d)  "**Location**" means only the Client premises identified as such on each Schedule.

   (e)  "**Maintenance Fee**" means the annual (unless otherwise specified) fee set forth in each Schedule for Maintenance Services.

   (f)  "**Maintenance Services**" means maintenance services described in Section 4 below.  Maintenance Services are provided for only the current release of Software.

   (g)  "**Non-conformity**" means a failure of Software to perform in substantial accordance with the functions described in the Documentation, for which Client has provided sufficient information for Fiserv to replicate on a computer configuration that is comparable to the Computer System and under Fiserv's control.

   (h)  "**Open Source Component**" means software which Fiserv or its Affiliates includes in Software or other Deliverables that is subject to an Open Source License.

   (i)  "**Open Source License**" means a license identified as an open source license by the Open Source Initiative (www.opensource.org) or any substantially similar license.

   (j)  "**Professional Service Rates**" means Fiserv's then current hourly or daily rates for Fiserv's provision of implementation, conversion, and/or training services to Client in connection with the Software.

   (k)  "**Software**" means the standard, unmodified computer programs in object code (unless otherwise specified on the applicable Schedule), as specified in each Schedule, and any Open Source Components or Third Party code embedded in the Software.

   (l)  "**Software System**" means the Software and Third Party Software.

   (m)  "**Third Party**" means any party other than Fiserv and its agents and subcontractors, and Client.

   (n)  "**Third Party Software**" means the object code version of software that is owned or licensed by Third Parties and provided to Client by Fiserv.  Third Party Software shall be identified as such on the applicable Schedule hereto.  Third Party Software does not include Open Source Components, or Third Party code (if any) that Fiserv embeds in the Software.

   (o)  "**Updates**" means, when and if made available through Maintenance Services to Fiserv's other clients at no additional charge, changes to the Software made to correct Non-conformities, to maintain compatibility with new system software releases, or to improve existing features and functions, but does not include Enhancements or other new modules or products for which Fiserv charges a license fee.  Updates provided hereunder are subject to all license rights and related restrictions set forth in this Exhibit with respect to the Software, but provision of Updates does not commence new warranty periods for the Software.

   (p)  "**Use**" means copying, installing or operating any portion of the Software.  Use is limited to operations described in the Documentation solely to process Client's own work, and is subject to any other restrictions or

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 130 of 138

limitations set forth in each Schedule. Use specifically excludes any service bureau, time-share, training, or facilities management services to Third Parties without Fiserv's prior written consent and Client's payment of additional fees in accordance with mutually agreed terms. Use further excludes any right to enhance, modify, improve or create derivative works of the Software unless any such right is expressly granted in the applicable Schedule.

(q) "**Warranty Period**" means the period of time ending 90 days after the effective date of the applicable Schedule.

3. <u>License</u>.

(a) In exchange for Client's payment of the license fees set forth in the applicable Schedule, Fiserv agrees to furnish Software to Client and hereby grants to Client a non-exclusive, nontransferable, non-sublicensable, perpetual (subject to termination provisions set forth in this Exhibit and in the Agreement) license to Use the Software at the Location on the designated Computer System, subject to any additional limitations as to number of accounts, number of users, asset size, and other matters as specified in each Schedule ("**License Metrics**"). Any rights not expressly granted in this Exhibit are expressly reserved. Any transfer or assignment of this Exhibit (or any individual Schedule) by Client pursuant to Section 12(b) of the Agreement may result in additional license fees for such transfer, if applicable, at Fiserv's then current rates.

(b) Upon 60 days advance notice to Fiserv, Client may change the Location if Client transfers its operations to a new location within the same country. Client shall contemporaneously uninstall/delete the Software from the prior Computer System following such transfer to the alternative Client location. Assistance by Fiserv related to the transfer shall be chargeable at the Professional Service Rates plus any out-of-pocket expenses.

(c) Client shall not copy any portions of the Software System, other than Open Source Components provided under an Open Source License that permits copying, except that Client may copy reasonable quantities of any Documentation, and may utilize non-production copies of the Software at the Location for archive, back-up, or emergency restart purposes or to replace copy made on defective media. The original, and all copies of Software and Documentation, and all parts thereof, are Fiserv's property and shall include Fiserv's copyright and other proprietary notices.

(d) Client shall maintain any such copies and the original at the Location and one Client archive site in the same country ("**Archive Site**"). Client may transport or transmit a copy of Software from the Location or the Archive Site to another location in the same country as the Location for back-up use when required by Computer System malfunction in an emergency or disaster situation, provided that (i) Client must promptly inform Fiserv of the emergency or disaster (but in no event later than 5 days following the commencement of such use), (ii) Client must stop using such copy promptly after the Computer System and facility affected by the emergency or disaster is restored, and (iii) the copy or original is destroyed or returned to the Location or Archive Site when the malfunction is corrected.

(e) Client shall not decompile, disassemble, or otherwise reverse engineer the Software System. This restriction shall not apply to an Open Source Component whose Open Source License terms prohibit this restriction.

(f) In order to Use the Software, Client shall obtain and maintain at its own expense the Computer System, as well as any necessary data processing communications equipment and interfaces, that are both compatible with and required to access and Use the Software System, in accordance with specifications provided by Fiserv or otherwise approved by Fiserv. Client is responsible for the supervision, control, expense and management of its use of the Software, including: (i) assuring a proper Computer System configuration, and (ii) following industry standard procedures for the security of data, accuracy of input and output, and back-up plans, including restart and recovery in the event of hardware or software error or malfunction.

(g) Third Party Software is provided to Client under the following supplemental terms:

(i) Use of Third Party Software shall be restricted to use as part of the Software System.

Case 1:25-cv-01112-TDS-LPA    Document 58-2    Filed 03/02/26    Page 131 of 138

(ii) Third Party Software is provided "as is", and Third Party Software owners shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of Third Party Software. Fiserv's aggregate liability for a default relating to any Third Party Software shall be limited to the amount paid by Client to Fiserv for the applicable Third Party Software and Fiserv shall not be liable for any indirect, incidental or consequential damages associated with use of Third Party Software.

(iii) Publication of benchmark tests of Third Party Software is permitted only in a writing signed by an authorized officer of Fiserv and the Third Party Software owner.

(iv) Third Party Software owners are hereby designated as third party beneficiaries of this Exhibit as it relates to their software.

(v) Fiserv will not provide maintenance or support for Third Party Software, but agrees to pass through to Client any Third Party Software warranties provided by the applicable Third Party Software owner, to the extent Fiserv is able to do so without negatively impacting or diminishing its contractual rights with such Third Party Software owner.

4. Maintenance and Technical Support.

(a) During each annual period for which Client has paid the Maintenance Fee, Fiserv will provide the following Maintenance Services to Client:

(i) Telephone support during normal business hours for reasonable operator support to Client's employees duly trained in the Use of the Software. If telephone support requests are excessive or made outside of Fiserv's normal business hours, Client will be charged the Professional Service Rates.

(ii) Software program fixes or workarounds with respect to Non-conformities will be provided within a reasonable period of time following receipt of notice from Client. Client agrees to provide Fiserv with reasonable assistance and information in connection therewith.

(iii) Updates will be provided to Client and shall be installed by Client within the time frame specified by Fiserv. Training for Updates may be offered to Client at the Professional Service Rates.

(b) The initial term for Maintenance Services shall begin upon the effective date of the applicable Schedule and shall continue for the period of time set forth in the Schedule. Thereafter, Maintenance Services shall automatically renew for successive 1-year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 90 days prior to expiration of the then current term.

(c) Fiserv may utilize remote diagnostic software and Internet or other data connectivity in providing Maintenance Services.

(d) Should Fiserv's review of the Non-conformity indicate, in Fiserv's reasonable opinion, that the reported problem is not a Software defect but is due to other problems, including without limitation input not in accordance with the Documentation, Client's abuse or misuse of the Software System, a modification or addition to the Software System not performed by Fiserv, Client's failure to properly maintain the Computer System, or Client's failure to install the required current system software release, Update, fix or workaround as instructed by Fiserv, then:

(i) Client agrees to reimburse Fiserv for the related costs of work performed by Fiserv in investigating the problem at the Professional Service Rates, and

(ii) At Client's request, Fiserv shall advise Client whether Fiserv can correct or assist in resolving such problem, and the terms under which Fiserv shall undertake the same. Upon acceptance by Client, Fiserv shall correct or assist in resolving the problem in accordance with such terms.

(e) Maintenance Fees shall be payable annually in advance. Maintenance Fees shall be subject to annual increases commencing in the second year of the maintenance term upon 30 days' notice to Client, provided

Case 1:25-cv-01112-TDS-LPA     Document 58-2     Filed 03/02/26     Page 132 of 138

that any such annual increase shall not exceed 10%. Maintenance Fees may also be increased: (i) upon changes in accounts processed, user seats, or other license limitations set forth in the applicable Schedule, (ii) upon delivery of new Software releases, Enhancements, or custom Software modifications or additions provided by Fiserv as a result of Client-requested development services, and (iii) to implement the charge under Section 2(d) of the Agreement.

(f) Maintenance Services do not cover network-related problems, errors in non-production environments, or maintenance of or repairs to the Computer System. If Fiserv provides such services, or any other maintenance services beyond those specified in this Section, Client shall pay for such services at the Professional Service Rates.

5. <u>Performance</u>.

(a) Client agrees to train current and future support staff employees on Software technical and user operations, and shall require employees to complete ongoing training to maintain minimal proficiency.

(b) Work in determining the nature of any problem or in making Software corrections, amendments, or additions may be carried out at Fiserv premises or the Location, at Fiserv's option.

(c) Upon Fiserv's request, Client shall provide Fiserv with written certification of the following relating to Client's Software Use: (i) total number of Software copies and Documentation related thereto; (ii) total number and location of workstations and servers on which the Software is installed, operated, or accessed; and (iii) total number of accounts, users, or other measurement of Software use for the licensing restrictions set forth in the applicable Schedule. Fiserv reserves the right to audit such certification pursuant to paragraph (d) below.

(d) Client shall permit Fiserv's authorized representatives at all reasonable times during Client's normal hours of operation to audit Client's Use of the Software (such audit may occur at Client's premises) to confirm compliance with the provisions of this Exhibit and the Agreement. Any such audit shall be conducted in such a manner as to minimize the disruption to Client's business and/or the Use of the Software. If such audit reveals any misuse by Client, Client shall immediately terminate such use unless Fiserv otherwise agrees in writing to allow correction of the misuse by payment of appropriate additional fees. If such noncompliance by Client is material, Client shall also pay Fiserv its costs of conducting the audit.

6. <u>Warranties</u>.

(a) Fiserv warrants that, during the Warranty Period, the Software will perform without the occurrence of a Non-conformity when operated on the Computer System and in compliance with the Documentation, this Exhibit, and the Agreement. Fiserv will provide replacements or corrections to Software that does not so perform where such failure is material, provided Fiserv is notified in writing of such failure during the Warranty Period. This warranty shall not apply if the Non-conformity results from modification or addition to the Software by Client or any Third Party, use of the Software in combination with non-Fiserv provided software, Client's failure to properly maintain the Computer System, Client's failure to install a current software system release, Update, fix or workaround as instructed by Fiserv, incorrect Use of the Software or Use of the Software not in accordance with the Documentation. Client acknowledges that the Software System is designed to operate on the Computer System and that the warranties given by Fiserv are conditioned upon the procurement and maintenance by Client of the Computer System in accordance with the then current specified configuration.

(b) Fiserv warrants that Fiserv personnel will exercise due care in provision of the Maintenance Services. If Client notifies Fiserv in writing of any alleged warranty defect hereunder within 30 days after the date the services were performed, then Fiserv shall reperform the services at no additional charge to Client.

(c) FISERV DOES NOT WARRANT THAT ALL NON-CONFORMITIES CAN BE CORRECTED. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF OR DAMAGE TO CLIENT'S DATA RESULTING FROM CLIENT'S USE OF THE SOFTWARE. Client acknowledges that it is responsible for the results obtained from use of the Software, including without limitation the completeness, accuracy and content of such results. Client acknowledges further that it is responsible for independent verification and testing of any such results prior to using them in its business.

(d) OPEN SOURCE COMPONENTS USED SEPARATELY FROM THE SOFTWARE OR OTHER DELIVERABLES ("**STAND ALONE USAGE**") ARE PROVIDED ON AN "AS IS" BASIS AND ARE LICENSED PURSUANT TO THE APPLICABLE OPEN SOURCE LICENSE. FISERV DISCLAIMS, AND CLIENT EXPRESSLY WAIVES, ALL REPRESENTATIONS, CONDITIONS AND WARRANTIES, EXPRESS AND IMPLIED, WITH RESPECT TO THE STAND ALONE USAGE, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT AND ANY ARISING BY STATUTE OR FROM A COURSE OF DEALING OR USAGE OR TRADE. IN NO EVENT SHALL FISERV BE LIABLE FOR ANY DAMAGES HOWEVER ARISING WITH RESPECT TO THE STAND ALONE USAGE OF OPEN SOURCE COMPONENTS.

7. Termination.

(a) If Client violates Section 3 of this Exhibit, or Sections 3 or 12(b) of the Agreement in relation to the Software, and fails to remedy any such breach within 5 days of notice thereof from Fiserv, Fiserv may terminate this Exhibit or the applicable Schedule without further notice.

(b) If Client fails to pay the Maintenance Fee under any applicable Schedule, Fiserv may terminate Maintenance Services for the Software licensed under such Schedule upon notice to Client. Notwithstanding Section 8(b) of the Agreement, Client's failure to pay Maintenance Fees alone (in the absence of any other material breach by Client with respect to the Software or other Deliverables) shall not result in termination of the applicable Schedule for such Software, this Exhibit or the Agreement.

(c) Upon termination of the Agreement or this Exhibit or any individual Schedule for any reason other than by Client under Section 8(b)(i) of the Agreement, all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Fiserv pursuant to the payment terms set forth in the Agreement. The parties agree that Fiserv losses incurred as a result of early termination of any Schedule hereunder would be difficult or impossible to calculate as of the effective date of the applicable Schedule. Accordingly, the amounts set forth in this Section 7(c) represent a reasonable pre-estimate of losses and are not a penalty.

(d) The termination of the Agreement or this Exhibit or any individual Schedule hereto shall automatically, and without further action by Fiserv, terminate and extinguish the license(s) granted under the applicable Schedule and Fiserv's obligation to provide Maintenance Services with respect to such Software. Unless Client destroys all copies of the Software and provides written certification to Fiserv of said destruction within 10 days after receipt of written notice from Fiserv following termination of the applicable Schedule, Fiserv shall have the right to take immediate possession of the Software and all copies thereof wherever located without further notice or demand.

8. Export. Client shall not export, or re-export, directly or indirectly, any Software or any technical data derived therefrom to any country if such export or re-export is prohibited or where the United States Government or any agency thereof may require an export license or other government approval without first acquiring that license or approval, and Client will comply with all export regulations regarding the Software and technical data.

**Laser Checks Software Schedule**

**to the Software Products Exhibit**

**License Section:**

1.  <u>Software and License Fees</u>.  The following Software modules are hereby licensed to Client in exchange for Client's payment of the corresponding license fees, subject to the additional limitations set forth below.

|  | Laser Checks |
| --- | --- |
| Total License Fee | $4,495.00 |
| User Seat (Workstation) Limitations | 1 |

2. <u>License Fee Payment Schedule</u>.  All license fees set forth above shall be paid by Client in accordance with the following schedule:

    100% due upon delivery of Software

3. <u>Location</u>.  The Location for this Schedule is as follows:

    ***711 E Salem Ave, Winston Salem, NC 27101***; all branch locations included

4. <u>Computer System</u>.  The Computer System for this Schedule is as follows:

    Client is responsible for providing a Computer System that meets the minimum configuration requirements recommended by Fiserv or as separately published and updated from time to time.

**Maintenance Services Section:**

1.  <u>Term</u>.  The initial term of Maintenance Services shall begin on the later of the date the Fiserv System used to provide Account Processing Services under the Account Processing Services Schedule are first used in live production or the date the Software licensed under this Schedule is installed and shall continue for eight (8) years.  Thereafter, Maintenance Services shall automatically renew for successive three (3) year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 180 days prior to expiration of the then current term.

2.  <u>Maintenance Fees</u>.  The Maintenance Fee for the Software licensed under this Schedule is as follows:

| | |
| --- | --- |
| Laser Checks | $0.00 per month |
| Laser Notices (Printed at Client Location) | $0.00 per month |

**Wisdom Software Schedule**

**to Software Products Exhibit**

1. LICENSE AND MAINTENANCE.

(a) ☒ Hosted Database   ☐ In-House Client-managed Database. If Client chooses a hosted database, Fiserv will host Client's Wisdom database in a Fiserv data center. Fiserv will provide database capacity management, operating system maintenance, and disaster recovery services for the hosted database. If Client chooses an in-house Client managed-database, Fiserv shall have no obligations with respect to the Client-managed database.

(b) Software and License Fees. The Software modules listed in Attachment 1 are licensed to Client in exchange for Client's payment of the corresponding license fees set forth therein.

(c) Location. The Location for the Production System installation site will be:

**711 E Salem Ave, Winston Salem, NC 27101**

(d) Computer System. If Client chooses an in-house Client managed-database, the Computer System for this Schedule shall be supplied by Client and shall conform to the minimum specifications provided by Fiserv.

(e) Maintenance Term: Initial Term. The initial term of Maintenance Services shall be eight (8) years and shall begin on the effective date of this Schedule. Thereafter, notwithstanding Section 5(b) of the Software Products Exhibit and subject to maintenance for the Third Party Software being offered by the third party provider(s) and so long as Fiserv is offering Maintenance Services for the Software to its general customer base, Maintenance Services shall automatically renew for additional three (3) year periods unless either party provides written notice of non-renewal to the other party at least 180 days prior to expiration of the then current term. Fiserv may terminate Maintenance Services at any time upon at least 180 days prior notice to Client if the Software licensed under this Schedule is superseded or replaced by a new release thereof and either: (i) Client elects not to install such new release, or (ii) Fiserv, in its sole discretion, elects not to support the old release.

(f) Maintenance Fees. The Maintenance Fee for the Software licensed under this Schedule is set forth in Attachment 1. Maintenance Fees shall be payable monthly in advance, beginning on the effective date of this Schedule.

(i) Client's asset size will be reviewed annually during the term of this Schedule. If Client's asset size increases during the term of this Schedule and such increase places Client in a different Tier, Client will be required to pay the Maintenance Fees listed in the appropriate tier. In no event shall Client be entitled to a refund of Fees paid, even if Client's asset size decreases. Client's asset size as of September 2020 was $66,060,896 (Source: National Credit Union Administration, a U.S. Government Agency).

2. PROFESSIONAL SERVICES.

(a) Implementation and Related Services. If Client chooses an in-house Client managed-database, Fiserv may provide technical consulting, business consulting, project management, and training services in connection with the implementation of the Software licensed under this Schedule.

(b) Statement of Work and Fees. The parties will agree in writing upon the scope and duration of these services, including without limitation a mutually acceptable date for commencement of these professional services that is no later than 9 months from the effective date of this Schedule ("Project Start Date"). These services will be provided on a time and materials basis at Fiserv's then-current rates.

(c) Payment. Fiserv will invoice Client monthly for these services, as accrued, unless otherwise agreed to by the parties.

3. ADDITIONAL TERMS AND CONDITIONS.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

(a)  Upon execution of this Schedule, Client acknowledges and agrees the license to use the Software and Maintenance Services for such Software is not governed by the terms of any click-through license agreement agreed upon by Client when the Software is or was installed but is governed by the terms of this Schedule and the Agreement.  In the event of a conflict between the terms set forth in this Schedule and the Agreement, on the one hand, and the terms set forth in the click-through license agreement, on the other hand, the terms of this Schedule and the Agreement shall prevail.

(b)  In the event of a conflict between the terms set forth in the Agreement and the terms set forth in this Schedule, the terms set forth in this Schedule shall prevail.

DocuSign Envelope ID: 6F451FA5-DA80-41A8-BE60-8696D0AABAA2

**Attachment 1**

**Fees**

| DESCRIPTION | FREQUENCY | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Wisdom ASP Modules | | | | |
| 5300 Call Report Assistant | | | | |
| License | One Time | | | 6,380.00 |
| Maintenance | Monthly | | | 140.00 |
| | | | | |
| Wisdom General Ledger | | | | |
| License | One Time | | | 5,500.00 |
| Maintenance | Monthly | | | 260.00 |
| | | | | |
| Wisdom Accounts Payable | | | | |
| License | One Time | | | 3,025.00 |
| Maintenance | Monthly | | | 155.00 |
| | | | | |
| Check Reconciliation | | | | |
| License | One Time | | | 1,980.00 |
| Maintenance | Monthly | | | 75.00 |
| | | | | |
| Fixed Assets | | | | |
| License | One Time | | | 1,980.00 |
| Maintenance | Monthly | | | 75.00 |
| | | | | |
| Prepaid Expenses | | | | |
| License | One Time | | | 1,980.00 |
| Maintenance | Monthly | | | 75.00 |
| | | | | |
| Wisdom Add-Ons | | | | |
| AP Laser Check Form Design | One Time | | | 660.00 |
| User Seats | | | | |
| First 3 Seats | Monthly | | | Included |
| Additional Seats, each | Monthly | | | 5.50 |
| | | | | |
| Wisdom Data Conversion Fees | | | | |
| G/L Chart of Accts, Fixed Assets, Prepaid Exp., Vend. | One Time | | | 1,650.00 |
| Wisdom ASP Data Storage and Management Fees (Per Year) | | | | |
| Data Storage: General Ledger | Monthly | 1 Year | 3.00 | 3.00 |
| Data Storage: Accounts Payable | Monthly | 1 Year | 2.00 | 2.00 |
| Data Storage: Check Reconciliation | Monthly | 1 Year | 1.00 | 1.00 |
| Data Storage: Fixed Assets | Monthly | 1 Year | 1.00 | 1.00 |
| Data Storage: Prepaid Expenses | Monthly | 1 Year | 1.00 | 1.00 |